## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GIANNASCA, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>PEPSICO, INC., PEPSICO BEVERAGE SALES, LLC and WALMART, INC.<br><br>     Defendants. | Case No.  7:25-cv-06440-CS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Michael Giannasca ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants PepsiCo, Inc. and Pepsico Beverage Sales, LLC (collectively "Pepsi"), and Walmart, Inc. ("Walmart," collectively, "Defendants") for anticompetitive and unfair and deceptive business practices associated with the manufacture, marketing, and sale of Pepsi soft drinks (the "Products").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon his information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## <u>NATURE OF ACTION</u>

1. This is a class action against Defendants for anticompetitive and unfair and deceptive business practices associated with the marketing, manufacture and/or sale of Pepsi soft drinks (the "Products"), which includes providing Defendant Walmart, Inc. ("Walmart") with unfair price advantages to the disadvantage of other retailers of Pepsi's Products.  Defendants entered into an agreement under which Pepsi raised the effective price to other retailers to ensure that Walmart would always have anticompetitive price advantages that others did not have, and therefore that Walmart alone could offer.  These advantages would never impair Walmart's own margin and would allow Walmart to sell at prices that other retailers of the Products could not

match.  The advantages provided under the agreement between Pepsi and Walmart include promotional payments, allowances, and services to Walmart that are not available to other retailers on proportionally equal terms.  Because of Defendants' agreement and the resulting unfair promotions and price discrimination Plaintiff and class members could not compete with Walmart on price for retail customers, causing them to lose significant business.  Defendants' agreement violates the Sherman Act.  Further, the agreement created an artificial competitive advantage for Walmart exclusively, as done in this manner, which violates the Robinson-Patman Act as well as Massachusetts state law.

2.      Plaintiff brings his claims against Defendants individually and on behalf of a class of all other similarly situated purchasers of the Products for violations of the Sherman and Clayton Acts, the Robinson-Patman Act, 15 U.S.C. § 13 and the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A, *et. seq*.

## PARTIES

3.      Plaintiff Michael Giannasca is, and at all times relevant to this action has been, a resident of Chelsea, Massachusetts and a citizen of Massachusetts.  On May 6, 2025, May 13, 2025, and May 27, 2025, Mr. Giannasca made large purchases for multiple cases of the Products to his store, Michael G's Handcrafted Italian, located at 1066 Revere Beach Pkwy, Revere, MA 02151.  Plaintiff purchased the Products directly from Defendant Pepsico Beverages Sales, LLC in interstate commerce.  However, Mr. Giannasca did not have access to the promotional payments, allowances, and services that Pepsi made available to Walmart in contemporaneous sales.  Defendants' unfair and anti-competitive practices created an uneven playing field that forced Mr. Giannasca to charge higher prices for the Products than Walmart.  If not for Defendants'

practices, Mr. Giannasca would have been able to sell more of the Products than he in fact did. Mr. Giannasca's business therefore would have earned higher profits.

4.     Defendant PepsiCo, Inc. is a North Carolina corporation with its principal place of business at 700 Anderson Hill Road, Purchase, New York 10577.  Pepsi markets and distributes the Products throughout the United States.  Pepsi sells its products to consumers on websites and through retail stores nationwide.  Pepsi owns or controls multiple iconic beverage and food brands worth over $1 billion, including Pepsi-Cola, Frito Law, Mountain Dew, Starbucks (bottled products, under license), Gatorade, and Aquafina.  In 2023, Pepsi reported global net revenues of over $91 billion.

5.     Defendant Pepsico Beverage Sales, Inc. is a wholly-owned subsidiary of Defendant PepsiCo, Inc.  It is a Delaware company with its principal place of business at 700 Anderson Hill Road, Purchase, New York, 10577.  On information and belief, it is the successor to the Pepsi Beverages Company, which was formed in 2010 as a wholly-owned subsidiary of PepsiCo, Inc. following PepsiCo's acquisition of The Pepsi Bottling Group, Inc. and PepsiAmericas, Inc., which had previously been independent Pepsi bottlers.

6.     Defendant Walmart is the largest company in the world by revenue and operates more retail stores in the United States than any other retailer. Walmart is headquartered in Bentonville, Arkansas.

7.     Defendants acted to perpetrate the acts described herein. At all times relevant to the allegations in this matter, Defendants acted with the knowledge regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the conduct alleged violates the Sherman Act, 15 U.S.C. §1, and the Robinson-Patman Act, 15 U.S.C. § 13.

9.    This Court also has supplemental jurisdiction under 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from a Defendant.

10.    This Court has personal jurisdiction over Defendants because each Defendant conducts substantial business within this District and a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District.  Further, Defendant Pepsi resides in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District and because Defendant Pepsi resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Defendants' Business Activities

12.    The manufacture and sale of non-alcoholic soft drinks in the United States is a $150 billion industry.  There are two major categories of non-alcoholic soft drinks: carbonated soft drinks and non-carbonated soft drinks, which includes beverages such as energy drinks, juice, sports drinks or "isotonics," dairy or dairy substitute drinks, tea, coffee, and bottled still water.

13.    Defendant Pepsi is one of the largest manufacturers and marketers of soft drinks in the United States.  Pepsi is organized into seven divisions, including PepsiCo Beverages North America ("PBNA").  PBNA operates Pepsi's soft drink business in the United States and Canada.

In 2023, PBNA generated $27.6 billion in revenue. Pepsi distributes its soft drinks to retailers through its bottler network, which comprises Defendant PepsiCo, Inc.'s wholly owned bottling subsidiary, Defendant Pepsico Beverage Sales, Inc., and several dozen franchise bottlers. Pepsi directly controls the wholesale pricing provided to its retailer customers by its wholly owned bottler subsidiaries.

14.    The carbonated soft drink market is highly concentrated. Just three producers (The Coca-Cola Company, Pepsi and Keurig Dr. Pepper Inc.) account for approximately 93% of U.S. carbonated soft drinks.

15.    Defendant Pepsi's customers include retailers in several channels, such as grocery stores, drug stores, convenience stores, discount/dollar stores, mass merchandisers, and membership stores. Retailers purchase Pepsi products from Pepsi and its bottlers and then re-sell those products to consumers. Retailers within each channel compete with one another. Retailers in one channel also often compete with retailers in other channels in the sale of soft drinks.

16.    Pepsi's brand recognition is universal. Many food and beverage retailers consider Pepsi's soft drinks important to carry. Failing to carry Pepsi's soft drinks can put them at a competitive disadvantage to retailers that do carry Pepsi products. Pepsi distributes consumer products to retailers throughout the United States, who then sell the products to consumers.

17.    Pepsi's products and brands include Pepsi-Cola, Mountain Dew, Gatorade, and Aquafina, among others.

18.    While Pepsi's brand still remains a household name, sales have decreased 32% between 2010 and 2023, and it has fallen behind Dr. Pepper, the flagship soft drink of Keurig Dr. Pepper.

19.    Defendant Walmart is Pepsi's largest customer.  Walmart (including Sam's Club) represents approximately 11% of Pepsi's total net revenue.  In North America, Walmart represents approximately 17% of Pepsi's total net revenue.

20.    As Pepsi's largest customer and as the leading retail company, Walmart uses its leverage to enter into supply agreements directly with manufacturers, including Pepsi.  To keep Walmart happy, Pepsi provides Walmart with a slew of promotional payments, allowances, and services, benefits not provided to Walmart's competitors on proportionately equal terms.

21.    Nor was Walmart's agreement with Pepsi unique in Walmart's history.  In 2021, Walmart agreed with Energizer, the leading producer of consumer batteries, to impose a targeted retail price increase to prevent another direct customer from selling Energizer batteries below Walmart's retail price.  Because of its towering market power in retail, even consumer brands that may be at or near monopoly power (as Energizer is) cannot forgo distribution through Walmart.  Consequently, Walmart can and does demand that its suppliers price their branded wares ***to others*** such that Walmart can have the lowest price in the marketplace, without having to sacrifice its own margin to achieve this price advantage. That is, Walmart uses its market power to ensure that some branded products cost more everywhere else.

**II.    Pepsi Provides an Unfair and Competitive Advantage to Walmart**

22.    As Pepsi's largest source of sales and revenue, Walmart regularly transacts with Pepsi for the sale of Pepsi products.  These transactions include the sale of Pepsi products as well as promotional deals.

23.    Pepsi provides Walmart with promotional payments and allowances intended to promote the resale of Pepsi's soft drinks.  These payments and allowances from Pepsi are not available to competing retailers and are exclusive to Walmart.

24.     Pepsi provides special deals to favored retailers.  Discounts like those Pepsi provides to Walmart are one of the reasons why independent grocers struggle to survive and food prices are high.[1]

25.     These payments and allowances to Walmart are made in connection with various promotions.  Such promotions include eye-catching advertising displays, multimedia advertising, and advantaged in-store placement relative to other brands and items in the store.  Such displays may include dump bins (freestanding container where customers can easily grab loose items), inline displays (displays integrated directly onto the regular store shelves, highlighting specific products within the aisle), endcap displays (located at the end of aisles, these are highly visible and often used for showcasing new products or special promotions), gondola displays (shelving units that allow for displaying a variety of products across multiple levels), point-of-purchase displays (positioned to capture the attention of customers near a point of purchase), casestacker displays (designed to stack multiple cases of a product on top of each other, ideal for bulk items), shelf talkers (small signage attached to shelves to highlight promotions or product details), floor displays (free-standing displays that sit directly on the floor), and pallet displays (a large platform built on a pallet, used to showcase large quantities of a single product).  An example of one such display can be seen below:

---

[1] *See* Zephyr Teachout, New York City Has the Power to Bring Down Grocery Prices. All Cities Do., New York Times (July 21, 2025), https://www.nytimes.com/2025/07/21/opinion/nyc-grocery-prices.html?smid=nytcore-ios-share&referringSource=articleShare.



**Figure 1**

26.     In exchange for these payments and allowances and to support the resale of Pepsi's soft drinks, Walmart will typically feature Pepsi's soft drinks in its stores with flashy displays and advertisements, and better placement. These promotional services and facilities have a measurable effect of driving the resale of Pepsi's soft drinks to consumers at Walmart stores.

27.     However, the payments and allowances by Pepsi to Walmart go beyond display, advertisement, and placement benefits. To ensure that Walmart remains their leading retailer, Pepsi provides Walmart with promotional payments and allowances beyond the advertisements and other displays in Walmart stores. These payments and allowances are exclusive to Walmart

and are not available to other retailers, even major grocery chains and other big box retailers. As such, Pepsi cannot make the same promotional payments and allowances available to all other retailers on proportionately equal terms.

28.    Notwithstanding the above, Pepsi still goes beyond providing benefits to Walmart disproportionately. Pepsi sells its products to Walmart at a discounted price in order to give them a competitive advantage against other retailers. This advantage becomes evident when viewing Walmart's prices of Pepsi's Product relative to other competitors and vendors.

29.    On July 1, 2025, the price of a Two-Liter Pepsi Soda was $2.59 at a Lynn, MA Walmart location.



**Figure 2**

30.    The price of a Two-Liter Pepsi Wild Cherry Soda was $2.20 at a Lynn, MA Walmart location.



**Figure 3**

31.     The price of a Two-Liter Diet Pepsi Soda was $2.50 at a Lynn, MA Walmart location



**Figure 4**

32.     The prices listed on the Lynn, MA Walmart website are in stark contrast to the prices of Two-Liter Pepsi Sodas at other surrounding stores, including Michael G's Handcrafted Italian and other large retailers.

33.    At a nearby Walgreens located at 1010 Broadway, Chelsea, MA 02150, the prices of a Two-Liter Pepsi Soda, Two-Liter Pepsi Wild Cherry Soda, and Two-Liter Diet Pepsi Soda are each $3.59.



**Figure 5**

34.    One of Pepsi's biggest retailers, 7-Eleven, has a nearby location at 188 Chelsea St, Everett, MA 02149.  Here, the prices of a Two-Liter Pepsi Soda, Two-Liter Pepsi Wild Cherry Soda, and Two-Liter Diet Pepsi Soda are each $3.69.



**Figure 6**

11

35.    Two-Liter Pepsi Sodas and Two-Liter Diet Pepsi Sodas are also sold at CVS, which has a nearby location at 1010 Revere Beach Pkwy, Chelsea, MA 02150.  Here, the price of a Two-Liter Pepsi Soda and Two-Liter Diet Pepsi Soda is $3.69.



**Figure 7**



**Figure 8**

36.     Compared to the price of a Two-Liter Pepsi Soda at Walgreens, the price of the same product at Walmart is up to 39% less.  When compared to 7-Eleven and CVS, the difference only becomes more evident.  A Two-Liter Pepsi Soda at Walmart becomes 40% cheaper when compared to 7-Eleven and CVS.

37.     A May 6, 2025 purchase order for the Products at Plaintiff's store shows that Plaintiff purchased a variety of Two-Liter Pepsi Sodas from Pepsi.  Plaintiff paid $43.90 for 16 bottles of Two-Liter Pepsi Sodas and $43.90 for 16 bottles of Two-Liter Diet Pepsi Sodas.  This comes to a per-unit cost of $2.74 per bottle.

38.     The per-unit cost of $2.74 per bottle for Pepsi's Products paid by Plaintiff to supply his store is higher than the resale price at Walmart.  Pepsi is clearly supplying Walmart with Two-Liter Pepsi Sodas for less than $2.59, Two-Liter Diet Pepsi Sodas for less than $2.50, and Two-Liter Pepsi Wild Cherry Sodas for less than $2.20, inclusive of exclusive payments and allowances that are made only to Walmart.

39.     Pepsi is therefore affording Walmart lower prices than other surrounding stores and large retailers.  As such, this raises the prices to each other retailer and creates a competitive advantage for Walmart at the cost of other stores and retailers.

40.     These payments and allowances thus allow Walmart to offer prices at levels that other retailers, including Plaintiff, can never hope to match or beat.

41.     By creating a competitive advantage for one retailer over others, Pepsi places an unfair and oppressive burden on other stores and retailers who are not provided the same advantages as Walmart.  Plaintiff and Class Members must then either charge an artificially inflated price, which reduces their sales, or not purchase any of Pepsi's Products.  Either decision

places Plaintiff and Class Members at a significant competitive disadvantage. These lost profits represent a direct monetary injury to each individual retailer.

42.    Plaintiff and Class Members thus suffer tangible harm through the artificially inflated prices of the Product created by Pepsi's practices.

43.    The Products are a thing in interstate commerce.

44.    By engaging in such a practice with Walmart, Pepsi has violated various state unfair and deceptive practices laws including, but not limited to, Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A, *et. seq.* ("93A") and the Robinson-Patman Act, 15 U.S.C. § 13(d), (e).

**A.    Higher Pepsi Prices Impacted The Entire Market**

45.    In raising wholesale prices for everyone but Walmart, Pepsi initiated a series of price hikes that impacted the entire market.

46.    As shown in Figure 9, soda prices increased more than a half dozen times from 2020 to 2025. Had Walmart had to discount to maintain its price advantage over rivals for Pepsi, the discounts would have disciplined the closely related prices for the two competing producers. Because Walmart could maintain its preferred pricing while Pepsi increased the effective wholesale prices to all others, instead the entire market increased.

//

//

//

//

//

//



**Figure 9**

### III.    Agreement In Restraint of Trade

47.    The Sherman Act makes unlawful any agreement in restraint of trade.  15 U.S.C. §1.  Agreements in restraint of trade are either *per se* unlawful, or subject to the "rule of reason." Defendants' conduct herein is vertical price fixing, or "resale price maintenance," which is subject to a rule of reason analysis.

48.    Defendant Pepsi and Defendant Walmart agreed that Pepsi would increase effective prices (net of discounts and promotional considerations) to other retailers such that Walmart would have a cost advantage and could then price below all its retail competitors without reducing its own margin.  Walmart was able to secure this agreement by the exercise of market power.

### A.    Relevant Product Markets

49.    The products at issue here compete in the product market for carbonated soft drinks. Carbonated soft drinks constitute a separate market recognized by both producers and retailers. Customers do not view other beverages as close substitutes for carbonated soft drinks and will

only substitute other products for carbonated soft drinks under circumstances that will not allow a substitute to discipline the price of carbonated soft drinks.

50.     The carbonates soft drink market is characterized by high barriers to entry because distribution at scale is highly constrained by store shelf space and further constrained by market realities whereby the three existing large producers have exclusive rights to shelf space and discount calendars.  New entry is foreclosed by the difficulty and massive cost of generating name recognition, and the problems of securing widespread distribution.

51.     Defendants' successful implementation of its agreement shows that the market for carbonated soft drinks is one in which it is possible to exercise market power.  If consumers substituted away from Pepsi products upon a small but significant, non-transitory increase in price (what antitrust economists call a "SSNIP"), then the increase would have reduced the Defendants' sales so much that the increase would be unprofitable.  That this did not happen shows that consumers did not, and will not, substitute away from Pepsi in response to an increase with enough frequency to make the increase unprofitable, allowing one or more dominant firms to exercise market power.

52.     Walmart competes in the grocery market.  It is a brand name maintaining a location within ten miles of more than ninety percent of American consumers.  Walmart's brand is widely recognized, and Walmart has positioned the brand as the lowest cost place to get many grocery items, including carbonated soft drinks.

**B.     Relevant Geographic Market**

53.     The relevant geographic market is the United States.  Carbonated soft drinks are shelf-stable and can be shipped in a way that will tend to arbitrage significant wholesale price differences.

54.    Walmart also competes in a national market against nationwide grocery chains. Around 30% of the grocery store market in the United States belongs to Walmart.[2]   In 43 metropolitan areas in the United States, Walmart has 50-69% of the grocery market share.   In a further five metropolitan areas in the United States, Walmart has more than 70% of the grocery market share.[3]

## C.    Market Power

55.    Defendant Pepsi has market power in the relevant market.  The soft drink industry is highly concentrated; three makers have over 90% market share.  The Herfindahl-Hirschman Index ("HHI")[4]  is no less than 2700 and possibly exceeds 3000, indicating high concentration. Pepsi is a recognizable brand, and carbonated soft drinks are often a staple item that brings customers in the door for multiple purchases.  Retailers, therefore, cannot afford to forgo access to Pepsi products.

56.    Walmart has market power as a retailer.  With approximately 4700 locations, and a presence within ten miles of about 90% of the U.S. population, Walmart is massive in comparison to every other retailer, including national grocery chains.  Walmart has a staggering share of some staple food items, accounting for *e.g.* more than 28% of all canned tuna sold in the U.S.  Because of this outsized presence, Walmart is a critical distribution mechanism for most consumer food and beverage categories.

---

[2] *See* https://www.forbes.com/sites/errolschweizer/2025/12/18/how-walmart-and-pepsico-rigged-prices-and-supercharged-food-inflation/, last accessed December 22, 2025.
[3] *See* https://ilsr.org/article/independent-business/walmarts-monopolization-of-local-grocery-markets/, last accessed December 22, 2025.
[4] A common measure of concentration in antitrust economics, used by regulators including the Department of Justice and Federal Trade Commission.  Under the current Department of Justice merger guidelines, an industry is highly concentrated if the HHI, calculated by the sum of the squares of the percentage market share of the three largest firms, exceeds 1800.

57.     In particular, Walmart is Pepsi's largest customer and distributor, without which Pepsi revenues and market share in the already highly concentrated carbonated soft drink market would collapse.  Walmart's market power is demonstrated by its ability to secure even from Energizer (with a market share in its market that far exceeded Pepsi) an agreement to raise other customers' prices.

58.     Walmart operates in intra-brand competition to sell Pepsi at retail, *i.e.* Walmart sells the same Pepsi products that other retailers sell, and Walmart competes on price to secure the consumers' business.  However, Walmart is in inter-brand competition against other retailers, including grocers and small markets.  Walmart competes to provide all or substantially all of the consumer's grocery needs, against national chain and local grocery providers.  Walmart also competes with small markets to offer ready-to-drink beverages and ready-to-eat snacks.  Walmart can and does use agreements with producers to raise the cost of name-brand products, secured through its market power, to avoid competing on price, not only intra-brand for each product, but inter-brand against retailers such as grocers and small markets.  Because Walmart agrees with producers to raise other retailers' costs, Walmart avoids either having to (a) lower its own margin to compete on prices against other retailers; or (b) innovate and offer better or different wares and shopping experiences than competing stores.  Plaintiff and the Class are injured by Walmart's exercise of market power.

## IV.     The Robinson-Patman Act ("RPA")

59.     In 1936, Congress passed the Robinson-Patman Act ("RPA") to help level a playing field that favored chain stores and other large enterprises over small businesses.  The law prohibits price discrimination and other ways that large businesses may gain an unfair advantage.  Section 2(d) of the RPA generally prohibits sellers of products or commodities from granting advertising

and promotional allowances to their customers unless the same allowances are available to all competing customers on proportionally equal terms.  Section 2(e) of the RPA generally prohibits sellers from furnishing services or facilities connected with the processing, handling, sale, or offering for sale of commodities upon terms not accorded to all purchasers on proportionally equal terms.  Together, Sections 2(d) and 2(e) are intended to prevent sellers from evading prohibitions on price discrimination by using other methods, like promotional allowances or services, to favor large customers over smaller businesses.

## V.    Section 5 Of The Federal Trade Commission Act

60.    Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive actors or practices, as well as unfair methods of competition, in or affecting commerce.  Section 5 also encompasses violations of the Sherman Act, which prohibits certain exclusionary and other anti-competitive conduct.  *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992); *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001).

61.    Since Section 5 of the FTC Act was passed, the FTC has explained that "the text, structure, and history of Section 5 reaches more broadly than the antitrust laws."[5]

62.    93A gives deference to Section 5 of the FTC Act as interpreted by the Federal Trade Commission ("FTC").  Section 2 of the Massachusetts Unfair and Deceptive Business Practices Act states that "[i]t is the intent of the legislature that in construing paragraph (a)…, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."

---

[5] https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf, pg 2.

63.     Additionally, the Massachusetts Attorney General has promulgated rules stating that "an act or practice is a violation of M.G.L. c.93A, § 2 if … [i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection.  940 Mass. Code Regs. 3.16; *see also Searle v. Nationstar Mortg., LLC*, 2022 WL 3045807, at *8 (D. Mass. Aug. 2, 2022) ("However, an act is a per se violation of Section 93A if it 'fails to comply with existing statutes, rules, regulations or laws ... intended to provide the consumers of this Commonwealth protection.'  Taking the facts alleged as true, the Searles have sufficiently pleaded that Nationstar violated Section 93A by not complying with RESPA.") (citing 940 C.M.R. 3.16).

64.     The FTC has found "price discrimination claims such as knowingly inducing and receiving disproportionate promotional allowances" to be violations of Section 5 of the FTC Act.[6]

65.     Pepsi's practices favoring Walmart over smaller retailers constitute unfair methods of competition under the Federal Trade Commission Act.

## VI.  FTC's January 2025 Action Against Pepsi

66.     On January 23, 2025, the FTC took action against Pepsi for allegations that are substantially similar to this complaint.  *Federal Trade Commission v. PepsiCo, Inc.*, 1:25-cv-00664-JMF (S.D.N.Y. 2025) ("FTC Compl.").

67.     In this action, the FTC found that the aforementioned conduct constitutes "unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45."  FTC Compl. ¶ 81.   The FTC also found that this conduct "harms consumers who shop at [non-Walmart] retailers by forcing them to pay higher prices for Pepsi products."  *Id.* ¶ 17.

---

[6] *Id.* at 14.

68.    Similarly, the FTC found that Pepsi's conduct also violated the RPA.  *Id.* ¶¶ 2, 72-76.

## CLASS REPRESENTATION ALLEGATIONS

69.    Plaintiff seeks to represent a Class of all retailers other than Walmart who purchased Products from directly from Pepsi (the "Class").

70.    Plaintiff also seeks to represent a Subclass of all retailers other than Walmart who purchased Products directly from Pepsi in the Commonwealth of Massachusetts (the "Massachusetts Subclass").

71.    The Class and the Massachusetts Subclass may be referred to collectively as "the Class."

72.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

73.    At this time, Plaintiff does not know the exact number of members of the aforementioned Class ("Class Members") but believes it numbers in the thousands.  Given the size of the Pepsi's operations and the number of retail stores in the United States selling Pepsi's Products, Plaintiff believes that Class Members are so numerous that joinder of all members is impracticable.

74.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

    (a)    Whether Defendants misrepresented and/or failed to disclose
           material facts concerning the Product;

    (b)    whether Defendants' conduct was unfair and/or deceptive;

(c)   whether Plaintiff and the Class sustained damages with respect to

the claims asserted, and if so, the proper measure of their

damages; and

(d)   whether Defendants' conduct violates the Massachusetts Unfair

and Deceptive Business Practices Act.

75.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Pepsi's Product, and Plaintiff sustained damages on account of Pepsi's wrongful conduct.

76.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class.

77.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, especially given the potentially low individual damages suffered by individual class members.

78.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not.  In addition, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
15 U.S.C. § 1, §3

79.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

22

80.    Defendants violated 15 U.S.C. Sections 1 and 3 by entering into and/or enforcing an unreasonable agreement in restraint of trade.  More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi's carbonated soft drinks.

81.    The agreement reached by Defendants eliminated intra-brand price competition by artificially raising to supracompetitive levels the price of Pepsi carbonated soft drinks through every retail outlet except Walmart.

82.    The agreement reached by Defendants also reduces inter-brand competition between Walmart and other retail outlets for carbonated soft drinks, including grocers and small markets.

83.    Defendants' agreements violated the "Rule of Reason."

84.    Each Defendant's market power was enhanced by the unlawful agreement.  Pepsi was able to raise wholesale prices for its products, while Walmart was able to ensure that it would be the lowest priced retailer of Pepsi products without sacrificing its own margin.  Defendants' Scheme had substantial price effects in the market for soft drinks and therefore on Pepsi soft drinks. Defendants' agreement increased the wholesale price of Pepsi soft drinks substantially, which wholesale increases were paid by Plaintiff and the members of the Class.

85.    There is no procompetitive justification for Defendants' Scheme. Resale price maintenance is nearly always unlawful when, as here, it is used by a dominant distributor or retailed to reduce intra-brand competition for a brand, thereby preventing other retailers from competing against the dominant retailer or distributor on price.  Here, Walmart has a history of reaching agreement to have the lowest wholesale effective cost, and therefore without sacrificing its own margins the lowest retail price, for certain goods.  As a dominant retailer, Walmart has used this agreement to thwart price competition among retailers and keep prices at

supracompetitive levels, which is not justified by the Rule of Reason as applied to resale price maintenance.

86.    Pro-competitive justifications for resale price maintenance begin with the manufacturer and travel through the need to ensure an enhanced margin to maintain a luxury product, for example for specialty products whose brands benefit from knowledgeable sales staff and value-added retail environments (such as performance cars that benefit from capable test drivers to demonstrate the product's capabilities, or equipment requiring installation). In such circumstances, a low-price intrabrand seller could benefit as a free rider from the more sophisticated seller's cost. No such circumstances are present in the market for carbonated soft drinks.

87.    Therefore, there are no free-rider justifications for the challenged agreements.

88.    As a result of Defendants' Scheme, prices for Pepsi soft drinks to every retailer in the country except Walmart were inflated above competitive levels in the United States.

89.    As a result of Defendants' Scheme, Plaintiffs and members of the Class have been injured in their businesses and property in that they have paid more for Pepsi soft drinks than they otherwise would have paid in the absence of that conduct.

90.    Walmart has done this before and appears likely to do it again. Plaintiffs and Class Members seek injunctive relief preventing Walmart from reaching agreement with any retailer that increases wholesale effective prices to other retailers in a way not applicable to Walmart. Plaintiffs and the Class also seek attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 2(d) of the Robinson-Patman Act**
**15 U.S.C. § 13(d)**

91.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth herein.

92.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

93.     In consideration for promotional services and facilities furnished by Walmart in connection with the sale and offering for sale of Pepsi soft drinks, Pepsi has provided Walmart with the promotional payments and allowances alleged herein.  These payments and allowances, intended to provide Walmart with an advantage in the resale of Pepsi soft drinks, were not and are not made available on proportionally equal terms to all of the disfavored retailers, like Class members, who compete and have competed contemporaneously with Walmart in the sale and distribution of Pepsi soft drinks of like grade and quality at all relevant times.  This discriminatory provision of promotional payments and allowances violates Section 2(d) of the RPA, 15 U.S.C. § 13(d).

94.     Defendants' violation of Section 2(d) of the RPA will continue in the absence of the relief herein requested.

95.     Plaintiff and the Class Members were injured as a direct and proximate result of Defendants' violation of Section 2(d) of the Robinson-Patman Act because they would not have been forced to charge more for their Products than Walmart if they had been given access to the same advantages that Walmart has.  Thus, Class members lost substantial revenue.

## THIRD CLAIM FOR RELIEF
### Section 2(e) of the Robinson-Patman Act
### 15 U.S.C. § 13(e)

96.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth herein.

97.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

98.     Pepsi has furnished Walmart with services in connection with the sale and offering for sale of Pepsi soft drinks.  Specifically, Pepsi has provided Walmart additional services as compared with Class members who are competitors in the resale of Pepsi soft drinks.  Pepsi does not make and has not made these services available on proportionally equal terms to all of the Disfavored Retailers like Class Members, who compete and have competed with Walmart in the sale and distribution of Pepsi soft drinks of like grade and quality at all relevant times.  This discriminatory provision of services violates Section 2(e) of the RPA, 15 U.S.C. § 13(e).

99.     Pepsi's violation of Section 2(e) of the RPA will continue in the absence of the relief herein requested.

100.    Plaintiff and the Class Members were injured as a direct and proximate result of Defendants' violation of Section 2(e) of the Robinson-Patman Act because they would not have been forced to charge more for their Products than Walmart if they had been given access to the same advantages that Walmart has.  Thus, Class members lost substantial revenue.

## FOURTH CLAIM FOR RELIEF
### Violation of the Massachusetts Unfair and Deceptive Business Practices Act,
### Mass. Gen. Laws Ch. 93A *et seq.*

101.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

102.    Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendants.

103.    Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("MUDBPA")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."  An act is "unfair" under Chapter 93A if it "(1) is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers or other businesses."  *Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 39 (1st Cir. 2024) (internal quotation marks and citation omitted).

104.    It is "the intent of the legislature that in construing" whether an act is unfair under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."  *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

105.    An act or practice is a violation of MUDBPA if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2."  940 CMR 3.16.

106.    Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he

adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons."

107.    Pursuant to the definitions codified at Chapter 93A § 1, each Defendant is a "person," and each Defendant is engaged in "trade" and "commerce" in Massachusetts by offering for sale Products that directly or indirectly affect the people of Massachusetts.

108.    By engaging in the acts and omissions alleged above and incorporated herein, Defendants have engaged and continue to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

109.    Defendants' practices are immoral, unethical, oppressive, and unscrupulous.

110.    Defendants have also committed a violation of MUDBPA predicated on its violations of FTC regulations – specifically, its violation of Section 5 of the FTC Act as interpreted by the Federal Trade commission.

111.    Defendant Pepsi knowingly sold its Products at lower prices to Defendant Walmart compared to other vendors in violation of federal and Massachusetts law.

112.    If not for Defendant's practices, Plaintiff and the Class Members would not have been forced to charge higher prices for the Products than Walmart.  Plaintiff and the Class Members therefore have lost profits that they otherwise would have earned.

113.    Plaintiff and the Class Members were injured as a direct and proximate result of Defendants' practices because they would not have been forced to charge more for their Products than Walmart if they had been given access to the same advantages that Walmart has.

114.    Plaintiff and members of the Class have been harmed by this injury, adverse consequence, and/or loss.

115.    The MUDBPA represents a fundamental public policy of the Commonwealth of

Massachusetts.

116.    For each loss, Plaintiff and each member of the Class may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

117.    Because Defendants acted willfully or knowingly, Plaintiff and each member of the Class may recover up to three but not less than two times this amount.  In addition, Plaintiff may recover attorneys' fees and costs.

118.    Plaintiff and the members of the Class may also seek the imposition of an injunction relief which limits and polices Defendants' practices within or reaching Massachusetts.  The balance of the equities favors the entry of permanent injunctive relief against Defendant.  Plaintiff, members of the Class, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendants.  Plaintiff, members of the Class, and the general public lack an adequate remedy at law.  A permanent injunction against Defendants is in the public interest. Defendants' unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

119.    In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), on August 7, 2025, Plaintiff's counsel served Defendant Pepsi with written notice of its violation of Ch. 93A and a demand for relief.  Defendant Pepsi did not make a written tender of settlement for the putative class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order certifying the nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as

representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and Class on all counts asserted herein;

(d)     For an injunction preventing Walmart from reaching agreement with any retailer that increases wholesale effective prices to other retailers in a way not applicable to Walmart;

(e)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(f)     An award of statutory penalties to the extent available;

(g)     For pre-judgment interest on all amounts awarded;

(h)     For an order of restitution and all other forms of monetary relief; and

(i)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated:  January 8, 2026                    Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**

                                           By: */s/ Julian C. Diamond*

                                           Joseph I. Marchese
                                           Julian C. Diamond

Spencer N. Migotsky
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jmarchese@bursor.com
        jdiamond@bursor.com
        smigotsky@bursor.com

Thomas H. Burt
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
burt@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
malmstrom@whafh.com

*Attorneys for Plaintiff*