**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION**

| | |
|---|---|
| IN RE: BRANDED BEVERAGE ANTITRUST LITIGATION<br><br>This Document Relates To:<br>Indirect Purchaser Plaintiffs | Case No. 25-CV-6440 (CS)<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     THE PARTIES ................................................................................................... 5

III.    JURISDICTION AND VENUE ......................................................................... 8

IV.     FACTUAL BACKGROUND .............................................................................. 8
        A.      Pepsi is a dominant player in the soft drink market ................................. 8
        B.      Walmart's dominance in retail markets makes it a critical relationship for
                soft drink suppliers, leading Pepsi to guarantee Walmart's retail "price
                leadership" ............................................................................................... 10
        C.      Pepsi and Walmart agree to ensure Walmart's price leadership by *raising*
                competing retail prices ............................................................................ 13
        D.      When Pepsi fails to successfully raise competitors' retail prices, Walmart
                imposes wholesale and retail price cuts through forced "rollbacks" ...... 15
        E.      The Scheme inflates wholesale and retail prices for soft drinks ............ 18
        F.      Pepsi's price increases cannot be explained by market forces .............. 23

V.      THE SCHEME CAUSED AND CONTINUES TO CAUSE ANTITRUST
        INJURY TO CONSUMERS ............................................................................. 24

VI.     MARKET POWER AND MARKET DEFINITION ........................................ 25

VII.    ANTICOMPETITIVE EFFECTS ..................................................................... 35

VIII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .... 35

IX.     EFFECT ON INTRASTATE AND INTERSTATE COMMERCE ................... 39

X.      CLASS ACTION ALLEGATIONS ................................................................. 39

XI.     COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS ......... 41

XII.    CAUSES OF ACTION ..................................................................................... 42
                COUNT I .................................................................................................. 42
                VIOLATIONS OF STATE ANTITRUST LAWS ............................... 43
                COUNT II .................................................................................................. 44
                COUNT III ................................................................................................ 45
                COUNT IV ................................................................................................ 46
                COUNT V .................................................................................................. 47
                COUNT VI ................................................................................................ 48
                COUNT VII ............................................................................................... 48
                COUNT VIII .............................................................................................. 49

COUNT IX ..................................................................................................... 50

COUNT X ....................................................................................................... 51

COUNT XI ..................................................................................................... 51

COUNT XII ................................................................................................... 52

COUNT XIII .................................................................................................. 53

COUNT XIV .................................................................................................. 53

COUNT XV ................................................................................................... 54

COUNT XVI .................................................................................................. 55

COUNT XVII ................................................................................................ 56

COUNT XVIII ............................................................................................... 57

COUNT XIX .................................................................................................. 58

COUNT XX ................................................................................................... 59

COUNT XXI .................................................................................................. 59

COUNT XXII ................................................................................................ 60

COUNT XXIII ............................................................................................... 61

COUNT XXIV ............................................................................................... 61

COUNT XXV ................................................................................................ 62

COUNT XXVI ............................................................................................... 63

COUNT XXVII ............................................................................................. 64

COUNT XXVIII ............................................................................................ 64

COUNT XXIX ............................................................................................... 65

COUNT XXX ................................................................................................ 66

COUNT XXXI ............................................................................................... 67

COUNT XXXII ............................................................................................. 68

VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ..................... 69

COUNT XXXIII ............................................................................................ 70

COUNT XXXIV ............................................................................................ 71

COUNT XXXV ............................................................................................. 72

COUNT XXXVI ............................................................................................ 73

COUNT XXXVII ........................................................................................... 74

COUNT XXXVIII ......................................................................................... 75

COUNT XXXIX ............................................................................................ 76

COUNT XL ................................................................................................... 77

COUNT XLI .................................................................................................. 78

COUNT XLII ................................................................................................. 79

COUNT XLIII ............................................................................................... 79

COUNT XLIV ........................................................................................................ 80

COUNT XLV......................................................................................................... 81

COUNT XLVI ....................................................................................................... 82

COUNT XLVII....................................................................................................... 83

COUNT XLVIII...................................................................................................... 84

COUNT XLIX ....................................................................................................... 85

COUNT L .............................................................................................................. 86

COUNT LI ............................................................................................................. 87

COUNT LII............................................................................................................ 87

COUNT LIII .......................................................................................................... 88

XIII.    PETITION FOR RELIEF ................................................................................. 89

1.      Plaintiffs Michael Donovan, Joe Crowley, Nick Greene, Melanie Barber, Martin Gelbspan, Aaron Hinds, Alexander Govea, Cassidy Lee, Carla Lown, Frederick Rozo, Galina Wind, and Cynthia Reese ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against PepsiCo, Inc. ("Pepsi") and Walmart Inc. ("Walmart") (collectively, "Defendants") for violating antitrust and consumer protection laws.

2.      Plaintiffs' claims concern agreements between Pepsi, the second largest beverage and processed food manufacturer in the world, and Walmart, the largest retailer in the world, to inflate both wholesale and retail prices for Pepsi's ready-to-drink soft drinks ("Pepsi soft drinks") above competitive levels.

## I.      INTRODUCTION

3.      Since at least 2018, Pepsi and Walmart have engaged in a joint scheme (the "Scheme") to prevent wholesale and retail competition for Pepsi soft drinks and ensure that both companies can charge higher-than-competitive prices for Pepsi soft drinks.

4.      The Scheme has two components. First, Pepsi agreed to police retail prices at Walmart's competitors, and to require retailers of Pepsi soft drinks to charge their retail customers no less than the retail price Walmart charged for Pepsi soft drinks. Competing retailers that did *not* raise their retail prices voluntarily risked a series of escalating, targeted wholesale price increases until undercutting Walmart became infeasible. By preventing retail price competition for Pepsi soft drinks through these mechanisms, Pepsi enabled Walmart to charge supracompetitive retail prices while still claiming the lowest retail prices in the market.

5.      Second, in exchange for Pepsi's actions to shut down retail price competition – to guarantee what Walmart called its "price leadership" – Walmart agreed to accept Pepsi's inflated *wholesale* prices. Absent Pepsi's actions to shut down retail price competition, Walmart would have required Pepsi to lower its wholesale prices so that Walmart could compete with lower market retail prices while maintaining the same or similar profit margins. Indeed, when Pepsi *failed* to adequately police competing retail prices, this is exactly what Walmart did. In exchange for Pepsi's

1

efforts to inflate retail prices, however, Walmart agreed to accept Pepsi's higher wholesale prices.

6.      These two components – Pepsi and Walmart's agreement (1) to inflate retail prices for Pepsi soft drinks at non-Walmart retailers, and (2) to inflate the wholesale prices Pepsi charged for its soft drinks – formed the Scheme.

7.      The Scheme was facilitated by Pepsi's market power in the market for soft drinks and the oligopolistic control of the soft-drink market by only three firms: Pepsi, the Coca-Cola Company ("Coca-Cola"), and Keurig Dr Pepper Inc. ("Dr Pepper") together sell a whopping *93 percent* of carbonated soft drinks in the United States. In a heavily concentrated market like this, a price increase by one of the dominant firms – here, Pepsi – will often be met by a comparable price increase by the other dominant firms. Agreements to fix retail prices such as the one alleged here can facilitate such coordination.[1]

8.      The Scheme was anticompetitive. First, it harmed intra-brand competition at the retail level by eliminating retail price competition between Walmart and other retailers for the sale of Pepsi soft drinks. The Scheme focused on impairing competition from lower-cost, lower-margin retailers – who drive prices down marketwide by forcing competitors to match those lower prices or risk losing market share – by preventing those retailers from undercutting Walmart's preferred retail price. This directly harmed consumers by inflating retail prices for Pepsi soft drinks, both those charged by Walmart as well as those charged by other retailers.

9.       Second, the Scheme also reduced inter-brand competition on the wholesale level by preventing Walmart and other large retailers from insisting that Pepsi cut its wholesale prices to subsidize the lower retail prices that would have prevailed absent the Scheme. It further reduced wholesale competition by reducing competition between Pepsi and its primary rivals – Coca-Cola and Dr Pepper – increasing Pepsi's market power and thus the prices it charged to retailers. This

---

[1] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 892 (2007) ("Resale price maintenance may, for example, facilitate a manufacturer cartel. An unlawful cartel will seek to discover if some manufacturers are undercutting the cartel's fixed prices. Resale price maintenance could assist the cartel in identifying price-cutting manufacturers who benefit from the lower prices they offer." (citation omitted)).

2

resulted in further inflated wholesale prices for Pepsi soft drinks (and Coca-Cola and Dr Pepper soft drinks) which were then passed on to consumers as higher retail prices.

10.     The Scheme was facilitated by the close connections between Walmart and Pepsi. Pepsi's CFO, Steven Schmitt, joined Pepsi in late 2025 after spending more than ten years at Walmart. Pepsi's Chief People Officer, Becky Schmitt, "served in various executive human resources roles at Walmart, Inc., including as senior vice president, chief people officer of Sam's Club, a division of Walmart, from 2018 to 2020, senior vice president, chief people officer of U.S. eCommerce and corporate functions from late 2016 to 2018, and vice president, human resources – technology from early 2016 to late 2016." Pepsi's CEO, North America, Steven Williams, "served as General Manager and Senior Vice President, Customer Management for PepsiCo's global Walmart business from 2013 to 2016." Pepsi has recognized in its internal reports that "we must maintain mutually beneficial relationships with our key customers, including Walmart, to compete effectively."

11.     This is not the first time Walmart has entered a similar scheme with one of its large suppliers. To the contrary, Walmart routinely uses its power as the world's largest retailer – and its suppliers' largest and most important customer – to require its large suppliers to police and inflate competing retail prices. For instance, at the same time that Pepsi agreed to ensure Walmart's "price leadership" by inflating competitors' prices, Energizer Holdings, Inc. ("Energizer")—another oligopolistic supplier in a highly concentrated industry—made a nearly identical commitment at Walmart's behest.[2] There, as here, Energizer agreed to impose targeted wholesale price increases on customers selling below Walmart's retail price in order to get the customers to "revise . . . [retail] pricing and get . . . off [Walmart's] radar."[3]

---

[2] *See* Compl., *Copeland v. Energizer Holdings, Inc.*, No. 5:23-cv-02087 (N.D. Cal. Apr. 28, 2023), ECF No. 1. The undersigned counsel seek to represent a class of indirect purchasers of Energizer batteries in the *Copeland* action, where their motion for class certification was filed on November 21, 2025. Plaintiffs incorporate the *Copeland* complaint, and all the allegations therein, by reference.

[3] *Id.* ¶ 80.

12.     As the District Court observed in denying defendants' motion to dismiss a similar indirect purchaser complaint challenging Walmart's scheme with Energizer, absent an agreement with Walmart, these efforts to *raise* competing retail prices would make little sense: "If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to *minimize* the ultimate retail prices—thereby maximizing sales and ultimately its profits."[4] The fact that Pepsi sacrificed its own sales by *raising* retail prices, conversely, reflected "that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create."[5]

13.     Indeed, in internal documents, Pepsi left no doubt that its efforts to inflate competing retail prices were pursuant to an agreement with Walmart. As Pepsi wrote of its targeted wholesale price increases on customers with sub-Walmart retail prices, it needed to "begin to CLOSE the gap" at the retail price level because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term." Energizer, in furtherance of its own agreement, put the Scheme in similar terms: "This is 1000% about Walmart and wanting the best price."[6]

14.     Pepsi's and Energizer's agreements to nearly identical arrangements with Walmart demonstrate that Pepsi's efforts to inflate competing retail prices were not isolated or unilateral; rather, they reflected Walmart's repeated practice of colluding with its suppliers to artificially claim "price leadership" without actually competing on price.

15.     As a result of the Scheme, Plaintiffs and other consumers paid inflated prices for Pepsi soft drinks.

16.     The Scheme began at least as early as January 1, 2018, and continues to the present day (the "Relevant Time Period").

17.     Plaintiffs bring this action on behalf of themselves individually and on behalf of an Indirect Purchaser Plaintiff ("IPP") class ("the Class" or the "Indirect Purchaser Plaintiff Class")

---

[4] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024).

[5] *Id.*

[6] *Compl.* ¶ 83, *Copeland*, No. 5:23-cv-02087.

consisting of all persons and entities in Repealer Jurisdictions who indirectly purchased Pepsi soft drinks, other than for resale, at any time during the period from January 1, 2018 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period"). A Repealer Jurisdiction is a state, district, or territory that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes: Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs bring this action against Defendants for injunctive relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and for treble damages under the antitrust laws and consumer protection laws of the several states.

## II.    THE PARTIES

18.    Plaintiff Michael Donovan is a resident of Ozone Park, New York and a citizen of the United States. Throughout the Class Period, Mr. Donovan has purchased Pepsi soft drinks in New York from Key Foods and Walgreens for his own use and not for resale. Mr. Donovan has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

19.    Plaintiff Joe Crowley is a resident of Osterville, Massachusetts and a citizen of the United States. Throughout the Class Period, Mr. Crowley has purchased Pepsi soft drinks in Massachusetts from Dollar General and Shaw's for his own use and not for resale. Mr. Crowley has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

20.    Plaintiff Nick Greene is a resident of Chicago, Illinois and a citizen of the United States. Throughout the Class Period, Mr. Greene has purchased Pepsi soft drinks in Illinois, California, and Nevada from 7-Eleven for his own use and not for resale. Mr. Greene has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in

5

this Complaint and has therefore suffered antitrust injury.

21.    Plaintiff Melanie Barber is a resident of Upland, California and a citizen of the United States. Throughout the Class Period, Ms. Barber has purchased Pepsi soft drinks in California from Walmart, Target, Vons, and CVS for her own use and not for resale. Ms. Barber has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

22.    Plaintiff Martin Gelbspan is a resident of Los Angeles, California and a citizen of the United States. Throughout the Class Period, Mr. Gelbspan has purchased Pepsi soft drinks in California from CVS for his own use and not for resale. Mr. Gelbspan has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

23.    Plaintiff Aaron Hinds is a citizen of the United States and was a Florida, Massachusetts, and New York resident before moving to the State of New Jersey. Throughout the Class Period, Mr. Hinds has purchased Pepsi soft drinks in Florida, Massachusetts, New York, and New Jersey from CVS for his own use and not for resale. Mr. Hinds has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

24.    Plaintiff Alexander Govea is a citizen of the United States and was a California and New York resident before moving to the Commonwealth of Virginia. Throughout the Class Period, Mr. Govea has purchased Pepsi soft drinks in California, New York, and Virginia from CVS for his own use and not for resale. Mr. Govea has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

25.    Plaintiff Cassidy Lee is a resident of Topock, Arizona and a citizen of the United States. Throughout the Class Period, Ms. Lee has purchased Pepsi soft drinks in Arizona from Dollar General and Smith's for her own use and not for resale. Ms. Lee has paid supracompetitive

prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

26.     Plaintiff Carla Lown is a resident of Waterloo, Iowa and a citizen of the United States. Throughout the Class Period, Ms. Lown has purchased Pepsi soft drinks in Iowa from Fareway for her own use and not for resale. Ms. Lown has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

27.     Plaintiff Frederick Rozo is a resident of Rancho Santa Margarita, California and a citizen of the United States. Throughout the Class Period, Mr. Rozo has purchased Pepsi soft drinks in California from Pavilions and Target for his own use and not for resale. Mr. Rozo has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

28.     Plaintiff Galina Wind is a resident of McHenry, Maryland and a citizen of the United States. Throughout the Class Period, Ms. Wind has purchased Pepsi soft drinks in Maryland from Shop 'n Save and Martin's, and in West Virginia from Kroger, for her own use and not for resale. Ms. Wind has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

29.     Plaintiff Cynthia Reese is a resident of Boston, Massachusetts and a citizen of the United States. Throughout the Class Period, Ms. Reese has purchased Pepsi soft drinks in Massachusetts, Florida, and New Hampshire from B & Fourth Street Variety, CVS, Star Market, Stop & Shop, Shaw's, and Market Basket for her own use and not for resale. Ms. Reese has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

30.     Defendant PepsiCo, Inc. ("Pepsi") is a leading manufacturer of beverages and processed foods based in Harrison, New York.

31.     Defendant Walmart Inc. ("Walmart") is the largest company in the world by revenue and operates thousands of retail stores in the United States. Walmart is headquartered in

7

Bentonville, Arkansas.

### III.    JURISDICTION AND VENUE

32.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the Class; and at least one member of the Class is a citizen of a state different from that of one of the Defendants.

33.    Alternatively, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337, because this action alleges violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeks declaratory and equitable relief for these violations.

34.    The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

35.    Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside and/or regularly transact business within this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District. Defendant Pepsi is headquartered in this District, and it has sold its soft drinks to both Walmart and many other retailers within this District. Defendant Walmart operates retail stores within this District, and it has purchased and sold Pepsi soft drinks at stores within this District. In addition, Defendants have directed their unlawful conduct towards retailers located in this District.

36.    This Court has personal jurisdiction over Defendants because during the Class Period Defendants marketed and sold Pepsi soft drinks in this district and have had substantial contacts within this District in furtherance of the anticompetitive activity alleged herein.

### IV.    FACTUAL BACKGROUND

**A.    Pepsi is a dominant player in the soft drink market**

8

37. The manufacture and sale of soft drinks is a $150 billion industry in the United States. Pepsi is the second largest manufacturer of soft drinks in the United States, after the Coca-Cola Company ("Coca-Cola"). PepsiCo is structured into seven divisions, one of which is PepsiCo Beverages North America ("PBNA"). PBNA oversees Pepsi's soft drink operations in the United States and Canada and generated $27.6 billion in revenue in 2023. Pepsi's major brands include Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks. Pepsi supplies retailers through a bottling network that includes both wholly owned bottling subsidiaries and numerous franchise bottlers. For its wholly owned bottlers, Pepsi directly sets the wholesale prices offered to retail customers.

38. Pepsi serves customers across multiple retail channels, including grocery, drug, convenience, discount/dollar, mass merchandise, and membership clubs. Retailers obtain Pepsi products from Pepsi's bottlers and then resell them to consumers. Retailers compete both within the same channel and, frequently, across different channels in the sale of soft drinks.

39. Pepsi has significant market power in the retail market for soft drinks, controlling more than a third of all soft drink sales in the United States. Its only notable competitors are Coca-Cola and, to a lesser extent, Dr Pepper: Together, the three sell over 90 percent of all carbonated soft drinks in the United States.

40. The soft drink industry is characterized by high barriers to entry, which further increase Pepsi's market power. Perhaps the most visible barrier to entry in the soft drink market is advertising. For more than 50 years, Pepsi and its main rival, Coca-Cola, have engaged in the well-documented "Cola Wars" to compete for consumer loyalty through mutually targeted advertising campaigns. Today, Pepsi spends upwards of $3 *billion* dollars on advertising annually, leading to near-universal brand recognition. Many food and beverage retailers view carrying Pepsi soft drinks as critical, and retailers that do not carry Pepsi soft drinks can find themselves at a competitive disadvantage compared to those that do.

41. Another barrier to entry is access to the complex, nationwide manufacturing, bottling, and distribution network that Coke, Pepsi, and Dr Pepper use to access retailers across the

9

United States. Each soft drink manufacturer uses a combination of wholly owned and independent "bottlers" to manufacture, bottle, and sell their soft drinks to retailers. These networks have been developed over more than 100 years, since Coca-Cola first pioneered the bottler-distributor model in the late 1800s. Independent bottlers operate in distinct geographic regions and contract with Coca-Cola, Pepsi, and Dr Pepper to manufacture and bottle their products in exchange for the exclusive right to distribute the company's soft drinks in that region. Pepsi then employs what it calls its "Direct-Store-Delivery" logistics system to facilitate direct delivery from its wholly owned and independent bottlers to retailers across the country.

42.     Without access to these bottler networks, a competitor cannot use the vast economies of scale and broad distribution networks that these bottlers have built over more than a century of development and consolidation. And access to bottlers, in turn, requires the multi-billion-dollar annual investments in advertising and brand reputation that Pepsi and its rivals make to ensure ultimate customer demand for the soft drink products their bottlers manufacture and distribute. The pivotal role bottlers play in the distribution chain – and the preexisting scale necessary to access their networks – creates a significant barrier to entry for smaller would-be competitors.

**B.     Walmart's dominance in retail markets makes it a critical relationship for soft drink suppliers, leading Pepsi to guarantee Walmart's retail "price leadership"**

43.     At the retail level for soft drinks, there is a single dominant firm, Walmart. Walmart, the world's largest company by revenue, operates over 4,700 stores in every U.S. state and nearly every U.S. Metropolitan Statistical Area. Indeed, the vast majority of the U.S. population – 90%, in Walmart's estimation – lives within ten miles of a Walmart.

44.     Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it significant buyer power in negotiations. This market power is heightened by the significant number of captive customers who shop at Walmart for a complete basket of household goods – only some of which are consumable food and beverage items like soft drinks. In other words, few retail shoppers who go to Walmart to purchase a large number of goods for their home

are likely to leave to buy soft drinks elsewhere. This means that suppliers have significant incentives to keep Walmart happy – as losing Walmart as a customer means losing a substantial number of customers entirely. Indeed, Walmart is the only retailer that is important enough for Pepsi to reference in its annual SEC filings. In its most recent Form 10-K, Pepsi identified Walmart as its most important customer: "In 2024, sales to Walmart Inc. (Walmart) and its affiliates, including Sam's Club (Sam's), represented approximately 14% of our consolidated net revenue . . . the loss of this customer would have a *material adverse effect* on our [North America] divisions."

45.     To mitigate against the risk that "the loss of this customer" would pose, Pepsi makes significant concessions to Walmart, which Pepsi would not have made absent the Scheme. Among these are Pepsi and Walmart's joint efforts to maintain a retail "price gap" or "price hedge" between Walmart and its competitors – in other words, to ensure that Walmart has lower retail prices than its competitors. This "price gap" functions to give Walmart an advantage over its competitors in the retail market for Pepsi soft drinks.

46.     Pepsi's business documents reflect that maintaining Walmart's "price gap" – what Walmart referred to as ensuring retail "price leadership" – is a "foundational commitment," and that "[d]elivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi. As an internal Pepsi email put it, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

47.      Pepsi keeps close track of Walmart's "price leadership" through regular retail price monitoring. In particular, Pepsi tracks two metrics related to the Walmart retail price gap arrangement: (1) price gap and (2) value hedge. Price gap is the "[c]omparison of average price at Walmart [versus] comparisons within a time frame weighted on Walmart volume for items." By contrast, the "value hedge" metric does not weight by Walmart's volume of items, and instead represents a percentage difference in average retail price between Walmart and other retailers. Each metric compares retail prices for Pepsi soft drinks at Walmart with retail prices for the "rest of market" or "ROM." "[R]est of market" includes "multi outlet" or "multi-channel" stores, and stores in the grocery, club, drug, and dollar channels, but excludes Walmart.

11

48.     Pepsi similarly tracks and tries to correct for "leakage" of Walmart retail sales to competing retailers due to lower retail pricing at those stores. Pepsi's Vice President of Sales defined "leakage" as the "percentage of consumers that are shifting outside of Walmart to another retailer." A Pepsi evaluation from January 2023 observed that leakage increased when Pepsi failed to maintain Walmart's price gap, writing that the erosion of the "[p]rice [g]ap [was] [c]ontributing [t]o [a] [h]igh [d]egree [o]f [c]onversion [and] [l]eakage" from Walmart to other retailers, and that the "[m]ajority of the leakage and conversion losses [went] to Grocery, Club, [and] Dollar Channels." In the words of Pepsi's VP of Sales, where Walmart is "the least competitive there's the greatest share of market loss."

49.     Walmart likewise monitors its "price gap" on Pepsi soft drinks, and the two communicate frequently about whether Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis. Pepsi endeavors to "manage [retail] price gap expectations to longer timeframes," namely, annual and semi-annual timeframes, but it also views monthly and quarterly retail price gaps as "leading indicators" of potential issues with Walmart. Walmart's buyers (employees responsible for negotiating purchases from manufacturers such as Pepsi) would receive "Price Gap" reports before regular meetings with Pepsi executives, where they would discuss how to address gaps to reinforce and renew their agreement.

50.     When Pepsi fails to successfully protect Walmart's retail "price leadership," as evidenced on these "Price Gap" reports, Walmart expresses in no uncertain terms its dissatisfaction and its expectation that Pepsi will take swift action against specific undercutting retailers. For instance, in 2019, Pepsi became aware that a competing retailer was aggressively cutting retail prices on 12-pack Pepsi soft drinks. Pepsi executives recognized that Walmart would react poorly to these lower prices on the Price Gap report, and that Walmart would demand action. As a Pepsi executive wrote: "[The competitor has] now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]." Likewise, in October 2020, Walmart's senior beverage buyer emailed Pepsi's Senior Director of

12

Sales to complain about a Target promotion featuring discounts on eight packs of Bubly 12-ounce cans. Walmart's buyer expressed frustration that Pepsi "continue[d] to undermine [Walmart's] price leadership with our competition." The Pepsi Senior Director responded: "[W]e understand the importance of finishing strong and that price leadership is key. With that context, the data we have indicates [Walmart's] price leadership with [B]ubly is advantaged versus the market and prior year" and that "[Walmart] has an advantaged price gap on [B]ubly v[ersus] [rest of market] and Target."

### C.    Pepsi and Walmart agree to ensure Walmart's price leadership by *raising* competing retail prices

51.    Walmart did not respond to Pepsi's failure to prevent competitive retail pricing—what it referred to as "undermin[ing] [its] price leadership with our competition"—solely with complaints. Instead, it demanded that Pepsi take specific, concrete actions to restore Walmart's price leadership. As one Pepsi executive noted in an email, if Pepsi's monthly or quarterly retail price gaps are "out of balance" with Walmart's expectation, Walmart "will pressure [Pepsi] for actions."

52.    In a competitive market, if Walmart hoped to restore "price leadership" against lower-priced competitors, it would have to cut its retail prices for soft drinks to match those competitors. And if it wanted to do so while maintaining its profit margins, it would have to demand a corresponding wholesale price cut from Pepsi to subsidize its retail price cut.

53.    Instead, Walmart and Pepsi entered into the Scheme: Rather than simply reducing the wholesale and retail prices of soft drinks at Walmart, they agreed to use their combined market power to *raise* wholesale and retail prices at Walmart's competitors. In particular, Walmart agreed *not* to cut retail prices (and force Pepsi to cut wholesale prices to compensate) if Pepsi targeted competing retailers selling below Walmart's price and took actions to raise their retail prices above Walmart's preferred level. When Pepsi or Walmart saw sustained retail price competition by these retailers – which Pepsi refers to as "offenders" – they agreed that Pepsi would take action to punish these retailers for their price cuts in order to restore Walmart's retail price advantage.

54.     In internal communications, Pepsi explicitly stated that it raised competing retail prices to avoid lowering wholesale and retail prices at Walmart. In 2021, Pepsi's Pricing Council – an internal Pepsi organization composed of senior executives and responsible for aligning pricing strategy – reviewed a "price gap risk" involving grocery chains "battling" for market share by competing on retail price for Pepsi soft drinks. As the Pricing Council's talking points emphasized, there was a "decision tree" with two options for addressing the price gap, which Pepsi also called Walmart's "hedge": "1. Raise non-[Walmart] customers through Q1 to prevent price risk," or "2. Manage hedge" by cutting Walmart's wholesale and retail prices.

55.     Where it was "feasible" to do so, Pepsi chose the first option: "moving [the of-fender's retail pricing] up to correct hedge." One example of Pepsi's efforts to raise competing retails pursuant to its agreement with Walmart involved Food Lion, a large regional supermarket chain that operates over 1,000 stores in 10 states. In 2022, Pepsi became aware that Food Lion had "heavily indexe[d]" its retail prices "against retails at [Walmart] and Kroger" and "set[] retails relative to these competitors." For this competitive conduct, Pepsi characterized Food Lion as the "worst offender" violating its price leadership commitment by "beating [Walmart] in price." In response to these lower retail prices, Pepsi designed a multi-year plan to raise Food Lion's retail prices – emphasizing that Pepsi "must commit to raising rate [on Food Lion] faster than market." This plan included a combination of targeted wholesale price increases – "[r]ais[ing] rate across core [soft drink] packages" – and reductions in promotional payments and allowances – "[r]educ[ing] holiday [promotion]" lengths, "[r]ais[ing] promo[tion]" price, and "scal[ing] back on promoting multiple core packages in the same week" – until Food Lion had no choice but to raise its retail prices to make its sales of Pepsi soft drinks profitable.

56.     Pepsi left no doubt that it undertook this effort pursuant to its agreement with Walmart to raise retail prices: Pepsi leadership urged the Food Lion sales team to "CLOSE the gap" on retail pricing because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term." Absent its agreement with Walmart, Pepsi would have had little unilateral in-centive to raise retail prices and sacrifice potential sales.

57.     Indeed, for Walmart, there was nothing unusual about its agreement with Pepsi to monitor and inflate competing retail prices, as Walmart uses its dominant market position to induce many of its suppliers to enter similar arrangements. For instance, at the same time that Pepsi agreed to ensure Walmart's "price leadership" by raising Food Lion's retail prices, Energizer Holdings, Inc. ("Energizer") – another large supplier in a highly concentrated industry – made a nearly identical commitment at Walmart's behest.[7] In 2021, Energizer imposed a targeted retail price increase on one of its direct customers selling below Walmart's retail price in order to get the customer to "revise his [retail] pricing and get him off [Walmart's] radar."[8] There, as here, Energizer made crystal clear that its retail-price-maintenance efforts were undertaken pursuant to an agreement with Walmart, writing: "This is 1000% about Walmart and wanting the best price."[9] Energizer's agreement to a nearly identical arrangement with Walmart demonstrates that Pepsi's efforts to raise prices at Food Lion and other discount retailers were not isolated but rather reflective of Walmart's pattern and practice of working with its suppliers to artificially claim "price leadership" without competing on price.

**D.      When Pepsi fails to successfully raise competitors' retail prices, Walmart imposes wholesale and retail price cuts through forced "rollbacks"**

58.     By raising competitors' retail prices to Walmart's preferred level, Pepsi aimed to restore Walmart's price leadership *without* requiring Walmart to compete on price. This agreement allowed Walmart to maintain inflated retail prices (because it did not need to match lower-priced competitors) and allowed Pepsi to maintain inflated wholesale prices (because it did not need to lower its wholesale prices to subsidize those lower retail prices in whole or in part).

59.     Indeed, when Pepsi was *unable* to successfully "demonstrate progress" on its efforts to raise competing retails above Walmart's level, this wholesale and retail price competition

---

[7] *See* Compl., *Copeland*, No. 5:23-cv-02087.

[8] *Id.* ¶ 80.

[9] *Id.* ¶ 83.

is exactly what occurred, as Walmart forced Pepsi to lower its wholesale prices to fund lower retail prices.

60.    Walmart carried out these wholesale and retail price cuts in part through forced "Rollback" promotions at Walmart stores. Rollback promotions are advertised price reductions at Walmart for specific items, funded in whole or in part by the manufacturer of that item. Sometimes, manufacturers determine it is in their unilateral self-interest to fund Rollback promotions, as heavily advertised price discounts at key times of year (e.g., holidays) can drive sales, increase market share, and improve a manufacturer's profits in the long run.

61.    However, when Pepsi failed to successfully raise Walmart's rivals' retail prices, Walmart weaponized its Rollbacks as a punishment: Rather than proposing Rollbacks to Pepsi as a mutually profitable venture to drive sales, Walmart *required* Pepsi to fund "Rollbacks" on the affected products so that Walmart could match competing retail prices without sacrificing its profit margin. Walmart's forced Rollbacks thus amounted, in essence, to a wholesale price cut to subsidize lower retail prices. Pepsi agreed to these Rollbacks not because they were in Pepsi's unilateral self-interest but because it had no choice: As Pepsi wrote in its SEC filings, "the loss of this customer [Walmart] would have a *material adverse effect*" on Pepsi's profitability, and Pepsi could not afford to reject Walmart's demands and risk losing its business. Acting in its own unilateral self-interest, Pepsi would have no incentive to prevent retailers from competing with each other on price or to cut off supply to retailers that undercut Walmart's prices, as it did pursuant to the Scheme.

62.    In internal communications around these Rollbacks, Pepsi executives emphasized that it undertook these price cuts only begrudgingly: For example, in 2019, immediately before meeting with Walmart's senior buyer regarding a "very aggressive" sub-Walmart retailer on the Price Gap report, a Pepsi executive lamented: "I see no way that we do not start a planned [Walmart] Rollback ASAP to help with combatting the price gap challenge that this [price report] will most definitely create."

16

63.     Moreover, Pepsi made clear that it agreed to these forced wholesale price cuts to match competing retail prices *only* when it could not raise competing retail prices sufficiently quickly to placate Walmart. For instance, in December 2021, Pepsi identified a highly competitive region—the Richmond-Raleigh-Charlotte corridor—in which grocery chains were "battling each other" for market share and driving a "price gap risk" by lowering retail prices. Before agreeing to fund a Rollback, Pepsi's Pricing Council sought internal "feedback" on whether it was "feasible" to raise retail prices in that region in the short-term. Only after concluding that "moving Grocery up to correct Hedge is not feasible because of competitive dynamics or previous commitments on price increase timing" did Pepsi agree to a limited, short-term Rollback.

64.     Similarly, Pepsi sought to restrict these Rollbacks to only the minimum scope necessary to placate Walmart and prevent it from taking drastic, nationwide action to reduce retail prices. As a Pepsi employee wrote after agreeing to a regional Rollback on limited products, Pepsi's hope was that these concessions would "[g]et ahead of price gap challenges by showing [Walmart] we are addressing in key spots and *avoid [Walmart] forcing national move*." And even in agreeing to these temporary Rollbacks, Pepsi emphasized that, in the long run, "sustained progress" was feasible on price gaps only by raising competing retail prices: "the above actions are intended to improve [Walmart's] gap performance [on our products]; however, to see sustained progress, in some cases, additional [rest of market] actions" – namely, retail price increases – "will be needed."

65.     Forced Rollbacks thus hung as a looming threat over Pepsi and Walmart's relationship: If Pepsi *did* take action to inflate competing retail prices to Walmart's preferred price, Walmart agreed to accept Pepsi's preferred wholesale prices, which would have otherwise been against Walmart's self-interest; and if Pepsi failed to do so, Walmart would force a wholesale price cut leading to lower wholesale and retail prices for Pepsi soft drinks. It was to avoid such widespread wholesale and retail price cuts that Pepsi's leadership urged its Food Lion sales team to raise Food Lion's retail prices: "We absolutely have to demonstrate progress [to Walmart] in the

17

immediate term"—or else sacrifice wholesale prices, and profits, to allow Walmart to match the market.

### E.    The Scheme inflates wholesale and retail prices for soft drinks

66.    Absent the Scheme, Walmart would have had no choice but to match lower retail prices for soft drinks and demand wholesale price concessions from Pepsi across the board—as it did in limited fashion when it imposed forced Rollbacks—in order to remain competitive in the soft drink market.

67.    These price cuts would have spread across the market, as competing retailers would have had little choice but to match Walmart's lower prices and demand lower wholesale prices from Pepsi themselves to remain profitable. Pepsi's only significant competitors—Coca-Cola and Dr Pepper—would then have been forced to match these lower prices to remain competitive, leading to lower, more competitive pricing on soft drinks across the entire market.

68.    Instead, by eliminating retail price competition, Walmart was able to maintain its preferred retail prices, and Pepsi was likewise able to maintain its preferred wholesale prices, staving off this price war that would have resulted in lower pricing across soft drinks. With their wholesale and retail positioning secure, Pepsi and Walmart then reaped further benefits of their Scheme by imposing highly profitable wholesale and retail price *increases* on Pepsi soft drinks.

69.    At the wholesale level, Pepsi launched a prolonged series of significant price increases that were made possible by the parties' agreement. In 2019, for instance, Pepsi imposed a market-wide wholesale price increase on all its customers—but exempted Walmart, thus fortifying Walmart's "price leadership" position while providing Pepsi further inflated wholesale profits on its remaining sales. As an internal Pepsi email acknowledged: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs/retails in order to drive growth on our mutual businesses."

70.    Pepsi followed this up with a series of substantial, successive wholesale price increases on all customers that would not have been possible absent the Scheme. Between 2022 and

18

2023, Pepsi raised wholesale prices by double-digit percentages each quarter for *seven consecutive quarters*.[10] In October 2022, commentators observed that these "[p]rice hikes" had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on . . . costs to consumers."[11]

71.    On a 2022 earnings call, Pepsi's Chief Financial Officer, Hugh Johnston, admitted that Pepsi's price increases were protected from competition, stating "We increased prices at the beginning of the fourth quarter . . . I actually think we're capable of taking *whatever pricing [increases] we need*."[12] Pepsi's Chief Executive Officer, Ramon Laguarta, echoed this sentiment on a 2023 earnings call, stating: "[O]bviously, we've been able to raise prices and consumers stay within our brand."

72.    At the retail level, Walmart was able to use its prevention of retail price competition and softening of wholesale price competition on soft drinks to not only pass on Pepsi's wholesale price increases to consumers but also independently impose further retail price increases—all of which were protected from competition thanks to the Scheme. This combination resulted in a dramatic retail price increase during the Relevant Time Period, with real prices on soft drinks increasing by *over 70 percent* between 2019 and 2023:

---

[10] Dee-Ann Durbin, *PepsiCo hikes prices by double digits for the 7th consecutive quarter and profits jump 14%*, Detroit News (Oct. 10, 2023) https://www.detroitnews.com/story/business/retail/2023/10/10/pepsico-hikes-prices-7th-consecutive-quarter-profits-jump/71127783007/.

[11] Maria Monteros, *Price hikes pump up PepsiCo's annual outlook*, ModernRetail (Oct. 12, 2022), https://www.modernretail.co/operations/price-hikes-pump-up-pepsicos-annual-outlook/.

[12] *Id* (emphasis added).

FIGURE 1: AVERAGE U.S. PRICE FOR TWO LITER SOFT DRINK



73.     The greatest potential threats to the Scheme were Coca-Cola and, to a lesser extent, Dr Pepper. They could have attempted to steal market share from Pepsi through lower pricing. But the Scheme reduced their already-limited incentives to do so by facilitating tacit collusion at the wholesale level between these oligopolistic firms.

74.     Together, Coca-Cola, Pepsi, and Dr Pepper control 93 percent of the carbonated soft drink market. In highly concentrated markets like this, when two dominant firms – here, Coca-Cola and Dr Pepper – see price increases by another dominant firm – here, Pepsi – they do a cost-benefit analysis. On one hand, Coca-Cola and Dr Pepper could compete with Pepsi by charging lower wholesale prices – which would presumably be passed on to consumers as lower retail prices – in order to gain market share at the wholesale and retail level. On the other hand, by doing so, Coca-Cola and Dr Pepper would risk triggering intense price competition that would decrease all three companies' profits (and benefit consumers). This cost-benefit analysis, particularly when a small number of firms have a history of interacting in the marketplace, can lead firms to engage in what is known as "conscious parallelism" or "tacit coordination" – independently setting their

20

wholesale prices closer to the hypothetical monopoly level, rather than competing, without expressly communicating or colluding.

75. In fact, Coca-Cola has long emphasized its use of conscious parallelism to set prices, referring to its pricing strategy as "meet-the-competition pricing," pursuant to which Coca-Cola expressly sets its prices "on par with those of other soda brands." By broadcasting its intent *not* to compete on price with Pepsi, Coca-Cola ensures Pepsi that it can profitably impose supracompetitive price increases without worrying that Coca-Cola will undercut it to compete for market share.

76. These tendencies toward coordinated pricing are further heightened by Pepsi, Coca-Cola, and Dr Pepper's use of the nationwide network of independent bottlers described above. By using standardized regional facilities to manufacture, bottle, and resell their products, Pepsi and its competitors increase the homogeneity of their supply chains and consolidate pricing decisions in shared actors. Indeed, Pepsi and its competitors often use the *same* bottlers, at the *same* time, to reach regional markets, creating myriad opportunities to monitor and coordinate pricing.

77. Sometimes, moreover, Pepsi will use its own wholly owned bottling subsidiaries to manufacture and distribute its *competitors'* products, leading to even more direct opportunities for price coordination. For instance, in 2009, after Pepsi purchased two of the largest independent bottlers for almost $8 billion, it agreed to continue to manufacture and distribute *Dr Pepper's* soft drinks, which the bottlers had previously done pursuant to independent supply agreements. This agreement gave Pepsi significant control over the distribution of Dr Pepper's soft drinks in the United States, including—critically—the ability to set wholesale pricing for its rival's products. Pepsi's control over the distribution, pricing, and sale of its next largest competitor's soft drinks—particularly when combined with Coca-Cola's "meet-the-competition pricing" policy—only further softens the incentives for price competition in the soft drink market and increases the opportunities for price coordination.

78. Through multiple mechanisms, the Scheme facilitated and enhanced tacit collusion at the wholesale level by increasing Pepsi, Coca-Cola, and Dr Pepper's incentive and ability to

21

engage in conscious parallelism. For one, by setting Pepsi's retail prices marketwide at Walmart's preferred price, the Scheme made it easier for Coca-Cola and Dr Pepper to track Pepsi's pricing and react accordingly. Commentators observe that, because retail prices are easier to observe than wholesale prices, oligopolistic manufacturers may use retail-price maintenance agreements to "collude directly on retail prices," and use retail prices to indirectly monitor and facilitate collusion on wholesale prices.[13]

79.    For another, the Scheme allowed Pepsi, Coca-Cola, and Dr Pepper to avoid competing on price by opening another avenue of competition: preserving Walmart's margins. By thwarting retail price competition, Pepsi competed for Walmart's business on a non-price dimension – guaranteeing Walmart higher retail margins free from lower competitive pricing – that did not risk a price war among oligopolistic rivals.

80.    Third, by standardizing retail prices on favorable terms to Pepsi's largest buyers, the Scheme prevented these large buyers from leveraging their buyer power to disrupt Pepsi, Coca-Cola and Dr Pepper's tacit collusion. As Walmart's forced Rollbacks described above demonstrate, a large purchaser can require its suppliers – even oligopolistic suppliers – to offer discounts and wholesale price cuts to avoid losing the critical customer's business. These forced price cuts have the power to spark a price war by disrupting the pricing equilibrium between oligopolists and spurring competitors to respond in kind. By agreeing to shut down retail price competition, Pepsi averted Walmart's threatened Rollbacks and protected Pepsi, Coca-Cola, and Dr Pepper's abilities to price oligopolistically.

---

[13] *See, e.g.,* Bruno Jullien & Patrick Rey, *Resale Price Maintenance and Collusion*, 38(4) RAND J. of Econ. 983 (2007) (reviewing the "conventional wisdom according to which vertical restrictions on retail prices help upstream firms to collude" and concluding that "[o]verall, RPM can facilitate collusion and reduce total welfare when firms adopt it"); *see also* David Gilo & Yaron Yehezkel, *Vertical Collusion*, 51(1) RAND J. of Econ. 133 (2020) ("We characterize collusion involving secret vertical contracts between retailers and their supplies . . . ('vertical collusion'). We show such collusion is easier to sustain than collusion among retailers. Furthermore, vertical collusion can solve the supplier's inability to commit to charging the monopoly wholesale price when retailers are differentiated."); Emanuel Holler & Dennis Rickert, *How Resale Price Maintenance and Loss Leading affect Upstream Cartel Stability: Anatomy of a Coffee Cartel*, 85(3) Int'l J. of Indus. Org. (2022) ("[R]esale price maintenance facilitated better organization of the cartel, as evidenced by the higher overcharges and longer cartel duration.").

81.     The Scheme's effectiveness in softening inter-brand competition is demonstrated by Figure 1 above, which demonstrates the real prices on *all* soft drinks increasing by over 70 percent during the Relevant Time Period. If Coca-Cola and Dr Pepper had responded to Pepsi's inflated prices by competing on price at the wholesale level, one would have expected that price competition to prevent marketwide price inflation, while leading to a decline in Pepsi's market share. Instead, the opposite occurred: Prices increased on soft drinks *across the board*, whether sold by Pepsi, Coca-Cola, or Dr Pepper. As discussed next, these increases can be explained only by success of the Scheme.

### F.     Pepsi's price increases cannot be explained by market forces

82.     Pepsi's price increases cannot be explained by competitive market forces, such as demand increases, cost increases, or general inflation.

83.     Pepsi's wholesale price increases cannot be explained by increased demand for soft drinks. On the contrary, per-capita soft drink consumption has exhibited what market analysts describe as a "long-term trend of gradual decline," decreasing by over 15 percent since its early-2000s peak and by more than a gallon per consumer annually during the Relevant Time Period. Despite this decreasing demand, Pepsi was able to raise its prices by double-digits each quarter – and see its "profits jump" by double-digits in doing so.

84.     Nor can Pepsi's wholesale price increases be explained by increased costs or general inflation. Commentators noted that Pepsi had "continually beaten analysts' expectations" by successfully increasing prices by more than costs during the pandemic. And inflation was only 3.2% in July 2023 and October 2023, but Pepsi increased prices by 15% and 11% in each month.

85.     A December 2025 industry report from FinanceBuzz titled "Soda Inflation: Prices Have Bubbled Up Faster Than Inflation Since 2020" used Consumer Price Index data to demonstrate that these prices increases are at odds with competitive market forces: "[P]rices for 2-liter soda bottles have risen at more than double the rate of inflation since 2020, going up by 62% at a time when the national inflation rate was 25%. The cost increases are even more drastic for 12-pack boxes of soda cans. From 2020 to 2025, the average price for 12-packs nearly doubled, rising

23

by 89% overall, which is more than triple the rate of inflation during that time." The report included the following graph demonstrating the pricing differential above inflation:

FIGURE 2: SODA COST INCREASES, 2020-2025



## V.    THE SCHEME CAUSED AND CONTINUES TO CAUSE ANTITRUST INJURY TO CONSUMERS

86.    Through Pepsi's actions to punish and inflate wholesale prices for retailers like Food Lion that tried to compete with Walmart's retail prices, Pepsi set Walmart's preferred retail price as a price "floor" below which competing retailers could not sell Pepsi soft drinks, even if sub-Walmart retail prices would have been profitable absent the Scheme. This retail price floor inflated retail prices at both retailers like Food Lion that Pepsi targeted directly with its punitive actions, as well as at all other retailers that would have competed with these lower retail prices by lowering their own prices. As a result, the Scheme directly caused inflated retail prices to consumers, including Members of the Class.

87.    In exchange for Pepsi's actions to inflate competing retail prices, Walmart agreed

to accept Pepsi's inflated wholesale prices, which otherwise would have been against Walmart's self-interest, and did not follow through on its threats to impose wholesale price cuts through forced Rollbacks. This agreement then allowed Pepsi to impose numerous additional, double-digit wholesale price *increases* in the following years. These inflated wholesale prices were passed on as still-higher retail prices to consumers, including Members of the Class.

88.    As a consequence of Defendants' anticompetitive conduct as alleged herein, during the Class Period defined below, Plaintiffs and other members of the Class indirectly purchased Pepsi soft drinks at artificially inflated prices, which were substantially higher than the prices they would have paid absent Defendants' unlawful conduct. Plaintiffs and members of the Class have sustained losses and damages to their business and property in the form of paying artificially inflated prices ("overcharges"), which are the type of injuries that the antitrust laws were designed to prevent and are a direct and proximate result of Defendants' unlawful conduct. Therefore, Defendants have caused antitrust injury to Plaintiffs and all members of the Class.

## VI.    MARKET POWER AND MARKET DEFINITION

89.    The ready-to-drink ("RTD") soft drink market is a relevant market. There are no reasonable substitutes for RTD soft drinks. Given their convenience and flavor, customers do not view other beverages, including bottled water, as reasonably interchangeable or close substitutes for their soft drink counterparts and will only substitute other products under circumstances that will not allow a substitute to discipline the price of RTD soft drinks. Alcoholic drinks have obvious mood-altering effects that render them non-substitutable, while bottled water does not provide the same flavor and functional benefits. Nor are non-beverage products substitutes for RTD soft drinks for virtually any purpose.

90.    Because there are no reasonable substitutes for RTD soft drinks, the demand for soft drink products is relatively inelastic—that is, consumers do not refrain from buying soft drink products when prices rise (even substantially).

91.    The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "hypothetical monopolist" test. The test asks whether a

25

hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%) and non-transitory increase in price ("SSNIP"), without causing so many customers to switch to other products such that the SSNIP would be unprofitable. If a market satisfies the hypothetical monopolist test, it is a relevant antitrust market.

92.     Here, cross-elasticity of demand is sufficiently low to satisfy the hypothetical monopolist test. A hypothetical monopolist in the market for RTD soft drinks could profitably impose a SSNIP.

93.     The fact that Pepsi and Walmart were able to successfully inflate the price of Pepsi products above competitive levels provides additional evidence that the RTD soft drink market is a relevant antitrust market because if it were not, customers would have switched to other products at sufficient volumes to make a SSNIP unprofitable.

94.     The relevant geographic market consists of the United States, and its territories, possessions, and the Commonwealth of Puerto Rico (in conjunction with the relevant product market below, the "Relevant Market").

95.     Pepsi owns and distributes a suite of products that together provide it approximately 34% market share within the RTD soft drink market. Pepsi's distribution agreements, discussed below, give it the ability to effectively control pricing beyond Pepsi's own brands.

96.     The RTD soft drink market is characterized by high barriers to entry, which further increase Pepsi's market power, as distribution at scale is highly constrained by access to national bottling networks, as well as by limited store shelf space and market realities whereby the three existing large producers have exclusive rights to shelf space and discount calendars. New entry is further foreclosed by the difficulty and massive cost of generating name recognition, and the challenges of securing widespread distribution.

97.     Pepsi has substantial market power in the RTD soft drink market due to its high market share, the existence of barriers to entry, as well as its dominant position in several subcategories of RTD soft drinks, as discussed below.

98.    Pepsi's market power in the RTD soft drink market is also demonstrated directly by its power, in conjunction with Walmart, to inflate prices above the competitive levels. Pepsi and Walmart's successful implementation of their agreement shows that the market for RTD soft drinks is one in which it is possible for Pepsi to exercise market power.

99.    The RTD soft drink market includes both carbonated soft drinks ("CSD") and non-carbonated soft drinks ("NCSD"). Its market size in the United States is forecasted to reach $247.26 billion by 2032.

100.    ***Carbonated Soft Drinks.*** Pepsi has an approximately 40% share of the carbonated soft drinks category as a distributor of both in-house brands, including Pepsi and Mountain Dew, and Dr Pepper brands, including Dr Pepper, Schweppes, and Crush. Together, these brands give Pepsi significant presence in the CSD subcategories discussed below.

101.    ***Cola.*** The cola flavor subcategory is the largest segment within carbonated soft drinks, accounting for half of total CSD volume.

102.    Pepsi and Coca-Cola have a longstanding duopoly in the cola category. Pepsi and Coca-Cola are the largest and most recognizable members, dominating shelf space and consumer spending, with smaller brands holding only marginal market share.

103.    Pepsi has a roughly 30% share in the cola flavor subcategory through its sales of Pepsi, Diet Pepsi, Pepsi Zero Sugar (formerly Pepsi Max), Wild Cherry Pepsi, Diet Pepsi Wild Cherry, Pepsi Zero Sugar Wild Cherry, Diet Pepsi Vanilla, Caffeine Free Pepsi, Caffeine Free Diet Pepsi, and Pepsi Real Sugar (formerly Pepsi Throwback).

104.    ***Citrus.*** Pepsi also has a leading share in the citrus flavor subcategory, with Mountain Dew representing roughly 80% of the category in the U.S.

105.    ***Pepper.*** In 2009, Pepsi entered into a 20-year bottling and distribution agreement with Keurig Dr Pepper (then Dr Pepper Snapple Group, Inc.). The FTC challenged the deal, pointing out that "PepsiCo and Dr Pepper Snapple are direct competitors in the highly concentrated and difficult-to-enter markets for branded soft drink concentrate and branded and direct-store-delivered carbonated soft drinks."

27

106. Today, Pepsi manufactures and distributes brands licensed from Keurig Dr Pepper Inc., including Dr Pepper, Schweppes, and Crush.

107. Because Pepsi bottles and distributes Dr Pepper in certain regions, Pepsi is able to exert control over the prices of Dr Pepper-owned brands. For example, Pepsi offers package deals to wholesalers and retailers who agree to carry its entire line of products, which includes Dr Pepper. These package deals affect wholesalers' and retailers' overall costs, which thereby have a direct effect on Dr Pepper pricing. In a similar way, Pepsi has a direct effect on Dr Pepper pricing through the promotions and rebates that Pepsi offers to its wholesalers and retailers.

108. This partnership effectively increases Pepsi's share in the CSD category beyond its owned brands. Dr Pepper accounts for over 12% of the carbonated soft drink category and over 90% of the pepper flavor subcategory.

109. ***Non-Carbonated Soft Drinks.*** Pepsi has a roughly 30% share in the non-carbonated soft drinks category, due to its brands in the sports drinks, RTD coffee, RTD tea, energy drinks, and juice subcategories discussed below.

110. ***Sports Drinks.*** Pepsi is by far the category leader in sports drinks in the United States, holding approximately 61.6% of the category, which is worth roughly $15 billion overall.

111. Pepsi sells multiple brands of RTD sports drinks: Gatorade, Gatorade Zero, GatorLyte, G2, and Propel (which is sometimes categorized as a "functional hydration" beverage).

112. The Gatorade trademark dwarfs each of its nearest competitors, Powerade and BODYARMOR, threefold. Both are owned by Coca-Cola and make up a respective 14.5% and 11.8% of the sports drinks category.

113. As Pepsi's Chairman and CEO remarked recently, "[w]e see ourselves, obviously, very statistically leading the functional hydration category and that category is accelerating. . . . We see Gatorade and Propel gaining share there."

114. ***RTD Coffee.*** For over a decade, Pepsi has had roughly a 45-60% share in the RTD coffee category in the United States, which is worth approximately $8 billion.

28

115.    More than twenty years ago, Pepsi and Starbucks formed a joint venture, the North American Coffee Partnership (NACP), in response to the growing demand for on-the-go coffee products.

116.    Through the NACP, Pepsi develops and distributes popular RTD coffee drinks, including bottled Frappuccino beverages, Starbucks iced coffee, Starbucks DoubleShot espresso drinks, Starbucks cold brew, Starbucks iced espresso, and Seattle's Best Coffee beverages.

117.    Pepsi is by far the leader in the RTD coffee category, outselling Coca-Cola's Georgia and Dunkin' trademarks and Nestlé's Nescafé trademark. Starbucks's overall RTD coffee sales nearly quadruple the next closest brand, Danone (Stok Coffee). Starbucks's Frappuccino trademark alone is the largest RTD coffee brand in the United States by a wide margin, larger than the next ten non-Starbucks trademarks combined (Stok Coffee, Dunkin' Iced Coffee, La Colombe Draft Latte, Califia Farms, Black Rifle Coffee, Super Coffee, High Brew Coffee, Peet's, Stumptown Coffee, and Costa Coffee).

118.    ***RTD Tea.*** Pepsi also has the largest share of any company in the RTD tea category, representing more than 25% in the United States.

119.    Since 1991, Pepsi and Unilever have operated joint ventures in the RTD tea category. In 2014, they unified under a single leadership team, the global Pepsi-Lipton Joint Venture. This 50-50 joint venture sells RTD tea concentrate to franchise bottlers, leveraging Pepsi's bottling and distribution network to market and distribute Lipton RTD tea products.

120.    Pepsi has three brands in the RTD tea category: Lipton, Pure Leaf, and Brisk, which is under the Lipton trademark.

121.    Including Brisk, Lipton is the single largest trademark in the RTD Tea category, beating out Arizona and Coca-Cola's Gold Peak. The Lipton brand alone ranks second after Arizona, followed by Pure Leaf and Brisk, which are five and six, respectively.

122.    ***Energy Drinks.*** In 2022, Pepsi invested $550 million in Celsius Holdings and entered a long-term, exclusive distribution deal with them. In August 2025, Pepsi increased its ownership stake in Celsius to 11% with another $585 million investment, as well as selling its U.S.

29

Rockstar brand—representing around 10% of spending in the energy drink category—to Celsius. Today, Celsius represents upwards of 20% of the energy drink category with its three brands: Celsius, Alani Nu, and Rockstar Energy.

123.    The Celsius investment came a few years after Pepsi's distribution deal with Bang Energy came to an abrupt end, with Bang filing a lawsuit accusing Pepsi of "intimidation tactics with independent distributors and major retailers like Walmart threatening lawsuits against anyone who fails to purchase Bang Energy exclusively from Pepsi."

124.    Pepsi's structural relationship with Celsius—including (a) its equity stake of 11% through two series of convertible preferred stock totaling approximately $1.135 billion, (b) the right to designate directors to the Celsius Board of Directors, and (c) its exclusive distribution agreement covering substantially all U.S. retail and foodservice channels—gives Pepsi the ability to influence the pricing and competitive conduct of Celsius products.

125.    As Celsius's exclusive U.S. distributor, Pepsi controls the wholesale price at which Celsius products reach retailers, determines promotional and trade spending, and manages channel-specific pricing across grocery, drug, convenience, discount/dollar, mass merchandise, and membership clubs. Having terminated its relationships with more than 250 independent distributors upon entering the Pepsi distribution system, Celsius has no credible alternative U.S. distribution channel, effectively eliminating its ability to resist Pepsi's pricing preferences.

126.    Pepsi also distributes Starbucks-branded energy drinks (Starbucks Doubleshot Energy and Starbucks Tripleshot Energy) and Mountain Dew energy drinks (Mountain Dew Kickstart and Mountain Dew Amp).

127.    Pepsi's distribution of the full Celsius portfolio (Celsius, Alani Nu, and Rockstar) alongside its own energy brands (Mountain Dew and Starbucks) enables it to coordinate pricing across competing energy drink products, allocate promotional resources in a manner that reflects Pepsi's portfolio-wide strategic priorities rather than any single brand's independent preferences, and manage retailer negotiations holistically by offering packages of energy brands at coordinated price points.

128.    ***Juice and Juice Drinks.*** Tropicana is the U.S. leader in orange juice (its flagship product) at 30% share. It also makes several other flavors of fruit drinks, including fruit punch and lemonade.

129.    Pepsi sold the Tropicana and Naked juice businesses in 2021 to PAI Partners, but Pepsi still retains a 39% ownership stake in their joint venture, called Tropicana Brands Group ("TBG"). Pepsi remains "the exclusive distributor for small-format and foodservice customers with chilled direct-store-delivery (DSD) for the portfolio of brands owned by" TBG.

130.    The effect of the Tropicana Brands Group partnership is that Pepsi is able to exert market power in a larger swath of the juice category.

131.    To the extent any of these subcategories of RTD soft drinks are themselves relevant antitrust submarkets, the RTD soft drink market is a cluster market because the various subcategories of RTD soft drinks complement one another at the wholesale level. Retailers typically need to stock all or almost all of the various subcategories of RTD soft drinks. Consumers expect and value the convenience of accessing and purchasing all categories of RTD soft drinks in the same retail stores and even the same sections within those stores. Retailers do not find it competitively feasible to offer only a subset of the subcategories of RTD soft drinks and rarely stock certain subcategories of RTD soft drinks without stocking others.

132.    Pepsi further increases retailers' incentives to carry all subcategories of RTD soft drinks by offering reimbursements and discounts contingent on retailers allotting certain percentages of their shelf space to Pepsi products.

133.    Pepsi also uses its market power in the salty snack market (e.g., Fritos and Lay's potato chips), where Pepsi's holdings approach or exceed 60% market share, to bolster its RTD soft drink market power, often using its market power in the salty snack market to cross-promote its RTD soft drinks.

134.    Pepsi is a leader in many segments of its Pepsi Beverages North America ("PBNA") portfolio; indeed, in the company's earnings call on April 16, 2026, Pepsi's Chairman and CEO Ramon Laguarta remarked:

PBNA is growing 9% total business, right? So we're growing at an accelerated way, including energy. So we see ourselves participating in the energy portfolio through our CELSIUS investment and our distribution of CELSIUS, that's gaining share. ***We see ourselves, obviously, very statistically leading the functional hydration category and that category is accelerating.*** For the first time in several years, we see functional hydration, including sports and the rest of functional hydration growing ahead of LRB. That's a key objective for us as well... We see Gatorade and Propel gaining share there.

We still have some work to do on accelerating the coffee business and accelerating the tea business***, where we're also leaders. Some of the innovation that we have in the Starbucks portfolio is intended to do that. And then in CSDs, we continue to have good growth in modern soda, which is a segment that keeps accelerating.*** Our poppi business is starting to accelerate now, and then obviously, we have opportunities with Mountain Dew that we have highlighted for quite some time.

(emphasis added).

135.    Bottled water is not a reasonable substitute for RTD soft drinks because it is functionally, commercially, and economically distinct from RTD soft drinks.

136.    RTD soft drinks have functional and flavor-based attributes that bottled water lacks. Carbonated soft drinks have carbonation, sweeteners, and proprietary flavor compounds. Sports drinks have sweeteners, proprietary flavor compounds, and electrolytes for rehydration. Energy drinks contain caffeine, taurine, and other stimulant ingredients. RTD tea and coffee are derived from tea leaves and coffee beans and consumed for their distinctive flavor profiles and caffeine content. Juice is derived from fruit and consumed for its distinctive flavor, nutrients, and vitamins. Bottled water does not have these functional attributes. A consumer seeking the caffeine stimulation of an energy drink or coffee, the electrolyte rehydration of a sports drink, or the flavor of a carbonated soft drink or juice would not consider bottled water an adequate substitute.

137.    The companies that lead in the bottled water market, including Primo Water Corporation (which owns Poland Spring, Pure Life, Deer Park, Essentia, and many other water trademarks), Niagara Bottling, and Crystal Geyser, also have little or no presence in the RTD soft drink market. And the dominant players in the RTD soft drink market, including PepsiCo, Coca-

Cola, Keurig Dr Pepper, Monster Beverage Corporation, and Red Bull GmbH, derive only a small portion of their total sales volume from bottled water.

138. There is also a substantial price disparity between bottled water and RTD soft drinks. Bottled water is typically less than half of the price of sports drinks; one-third of the price of carbonated soft drinks, juice, and RTD tea; and one-sixth of the price of energy drinks and RTD coffee. This price differential provides further evidence that the products are not close substitutes.

139. Beverage Digest, a leading industry data source, tracks bottled water as a standalone market separate from non-carbonated soft drinks, which includes sports drinks, RTD tea, RTD coffee, and juice.

140. At the retail level for RTD soft drinks, there is a single dominant firm, Walmart. Walmart has significant market power within the Relevant Market. The world's largest company by revenue, Walmart operates over 4,700 stores in every U.S. state and nearly every U.S. Metropolitan Statistical Area. Roughly 90% of the U.S. population lives within ten miles of a Walmart.

141. Walmart also competes in a national market against nationwide grocery chains. Around 30% of the grocery store market in the United States belongs to Walmart. In 43 metropolitan areas in the United States, Walmart has 50-69% of the grocery market share. In a further five metropolitan areas in the United States, Walmart has more than 70% of the grocery market share.

142. Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it significant buyer power in negotiations. This market power is heightened by the significant number of captive customers who shop at Walmart for a complete basket of household goods—only some of which are consumable food and beverage items like soft drinks. In other words, few retail shoppers who go to Walmart to purchase a large number of goods for their home are likely to leave to buy soft drinks elsewhere. This means that suppliers have significant incentives to keep Walmart happy—as losing Walmart as a customer means losing a substantial number of customers entirely. Indeed, Walmart is the only retailer that is important enough for Pepsi to reference in its annual SEC filings. In its most recent Form 10-K, Pepsi identified

Walmart as its most important customer: "In 2024, sales to Walmart Inc. (Walmart) and its affiliates, including Sam's Club (Sam's), represented approximately 14% of our consolidated net revenue . . . the loss of this customer would have a material adverse effect on our [North America] divisions."

143.    Walmart is also able to control its competitors' retail prices for RTD soft drinks through its combined market power with Pepsi. Pepsi effectively delegates its market power to Walmart, enabling Walmart to set retail prices and increase wholesale prices for RTD soft drinks.

144.    Because RTD soft drinks are identical products whether sold at the wholesale or retail level (i.e. they are not used as inputs to create any different products), Pepsi's market share is functionally identical at the wholesale and retail level. Indeed, Pepsi measures its market share in the RTD soft drink market by surveying the relevant volumes of retail sales. Likewise, because the Scheme enabled Pepsi to effectively fix retail prices, it was able to exercise market power at both the wholesale and retail level.

145.    Direct evidence establishes that Defendants exercise the combined market power possessed by both Walmart and Pepsi within the Relevant Market. That direct evidence includes Defendants' ability to profitably and sustainably inflate prices above competitive levels. It also includes Pepsi's numerous large price increases since January 2019, which were enabled by its agreement with Walmart and cannot be explained based on competitive forces or unilateral self-interest.

146.    As shown by Pepsi's significant price inflation alleged herein, inter-brand competition did not restrain Pepsi from inflating its prices. On the contrary, Pepsi's agreement with Walmart reduced price competition between Pepsi, Coca-Cola, and Dr Pepper by encouraging Coca-Cola and Dr Pepper to follow Pepsi's price increases and reducing Coca-Cola's and Dr Pepper's incentives to attempt to compete with Pepsi on wholesale pricing. Walmart's agreement with Pepsi made it easier for Coca-Cola and Dr Pepper to observe and follow Pepsi's price changes and prevented Walmart from instigating a price war by forcing Pepsi to compete aggressively with Coca-Cola and Dr Pepper on price.

## VII.   ANTICOMPETITIVE EFFECTS

147.   The Scheme caused Walmart's retail competitors to pay inflated wholesale prices for Pepsi soft drinks, impairing their ability to compete effectively in the retail market.

148.   The Scheme increased Pepsi's market power by reducing competition between Pepsi, Coca-Cola, and Dr Pepper, increasing their incentive to match Pepsi's price increases, and reducing the risk that Pepsi would lose market share if it inflated its prices above competitive levels.

149.   The Scheme enabled Pepsi to implement a series of anticompetitive wholesale price increases. These price increases started in 2019 and accelerated in 2022 and 2023, when Pepsi raised wholesale prices by double-digit percentages each quarter for seven consecutive quarters.

150.   The price increases identified above cannot be adequately explained by general inflation in the economy or other competitive market forces.

151.   All of these wholesale price increases were passed on by retailers to consumers, including Plaintiffs and Class Members.

152.   Defendants' Scheme also reduced competition on the retail level by reducing price competition among retailers who sell Pepsi soft drinks. In particular, the Scheme forced competing retailers that attempted to gain market share by offering retail prices lower than Walmart's to increase their retail prices. As a result, innovative or more efficient retailers could not profitably compete with Walmart on retail price, other retailers were not pressed to match the lower retail prices that these retailers would have charged, and retail prices were inflated across the soft drink market.

## VIII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

153.   *Continuing Violation.* During the Relevant Time Period, Defendants' Scheme was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by taking overt acts in furtherance of the Scheme.

154.   Throughout the Relevant Time Period, Defendants met frequently to discuss and renew the Scheme, adjusted it to match new Walmart prices, agreed to new wholesale price

increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi soft drinks.

155. Throughout the Relevant Time Period, Defendants took repeated actions to enforce the agreement against retailers who undercut Walmart's prices. Defendants' Scheme repeatedly injured Plaintiffs and members of the Class by causing them to pay overcharges each time they purchased Pepsi soft drinks.

156. **_Fraudulent Concealment._** The statute of limitations is tolled because Defendants fraudulently concealed their Scheme.

157. Plaintiffs and members of the proposed Class did not have actual or constructive knowledge of the facts constituting their claim for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy until the complaint in _FTC v. PepsiCo, Inc.,_ No. 1:25-cv-00664-JMF, was unsealed on December 11, 2025. Indeed, as discussed below, Pepsi took intentional steps to prevent these facts from becoming public by moving to seal the record in the FTC action. Without access to Pepsi's confidential negotiations, customer-specific pricing information, and internal strategy documents, Plaintiffs would have had no reasonable way to discover the alleged conduct.

158. Defendants intentionally concealed their Scheme from consumers, reassuring them that they were working to lower retail prices for Pepsi soft drinks at Walmart and its competitors, when in reality they were achieving price leadership by working together to _increase_ prices at Walmart's competitors. In 2023, CNBC reported that Walmart CEO Doug McMillon "was confident that Walmart's lower-priced products could push other brands to bring down their own prices, even as Walmart and its peers face rising costs." "Over time, the market works," McMillon said. "We believe branded manufacturers and all of our suppliers of all types will have to respond to that market in time."

159. Similarly, on a May 17, 2022 earnings call, McMillon said that "we do want customers to have lower prices on food, and we want to sell more general merchandise. And so we'll partner with the suppliers on the food and consumable side to try and bring those costs down."

36

160.    Likewise, in earnings calls and press reports, Walmart has attributed cost and price increases to inflation and stated that it is working with suppliers to lower grocery prices as quickly as possible. In response to a question about inflation in a 2019 *Fortune* interview, McMillon said Walmart had "a lot of different levers to pull within the company and [was] trying to find ways to save customers money, and I think that'll be the constant theme that you'll see from us and hear from us is we do everything we can to help the customers get a value on quality merchandise…. We will do all we can to try and keep prices from going up."

161.    Similarly, in November 2021, McMillon told CNBC that Walmart "save[s] people money and help[s] them live a better life. Those are the words that came out of [Walmart founder] Sam Walton's mouth. He loved to fight inflation. So do we…. We're proud to try and hold prices down, and our conversations with suppliers today, tomorrow will be 'How can you help us roll back prices and swim upstream and be different than everybody else?'… We start out trying to figure out how to help people save money…. Sometimes you hear us say that our scale helps us navigate these things. I think our experience and the creativity of the team is every bit as important as the size of the company." Walmart's Chief Financial Officer, Brett Biggs, similarly told CNBC that Walmart has "always been an inflation fighter for customers…. Our scale and the product breadth that we have allows us to do things in a way that is beneficial to customers and beneficial to shareholders."

162.    Walmart has also issued publicly available codes of conduct and related guidelines that have further concealed the Defendants' Scheme. For example, Walmart's website lists "Supplier Expectations Compliance Areas," which include the following:

163.    "As a supplier, you are prohibited from….

    a.    Providing or offering to share with Walmart another third party's non-public, commercially sensitive or proprietary information. This includes a competitor's future pricing or product strategies…

    b.    Discussing with Walmart your sales plans or strategies that you have with your other customers."

164.    Similarly, Walmart's code of conduct, which is available on Walmart's website, states that: "We believe success comes from offering quality products and services at low prices. Effective competition leads to stronger innovation, lower prices, and better quality, while anticompetitive practices harm our customers and members. Build trust by: Protecting and not sharing competitively sensitive information – such as pricing, costs, bid submissions, or strategic plans – with competitors, either directly or through a third party, such as a supplier."

165.    Pepsi has also made public statements that have concealed the Defendants' Scheme from consumers. First, Pepsi repeatedly raised its prices during the period from 2018 to 2024 and justified those price increases as related to "higher costs associated with commodities, transportation, and labor" rather than its Scheme with Walmart.

166.    Second, Pepsi also has a public-facing code of conduct that states: "Integrity in the marketplace requires each of us to treat our customers ethically, fairly, and in compliance with all applicable laws. When dealing with our customers, you should always:

- Earn their business on the basis of our superior products, customer service and competitive prices
- Present our services and products in an honest and forthright manner
- Avoid unfair or deceptive trade practices…"

167.    Third, Pepsi took active steps to conceal the information that was revealed in *FTC v. PepsiCo, Inc.*, No. 1:25-cv-00664-JMF, by moving to seal filings in that case. Pepsi sought to maintain confidentiality of "three categories of particularly sensitive information: (1) confidential negotiations between Pepsi and its retail customers; (2) confidential, customer-specific business strategies and forward-looking plans; and (3) confidential pricing and go-to-market plans." Def.'s Mem. of Law in Opp'n to Mot. to Unseal at 9, *FTC v. PepsiCo, Inc.*, No. 1:25-cv-00664-JMF (S.D.N.Y. Aug. 15, 2025), ECF No. 55. These "confidential" and "private" negotiations, business strategies, and pricing all pertained to Pepsi's dealings with Walmart and related conduct at issue in this case. *See* Decl. of Daniel Murray in Supp. of Def.'s Mem. of Law in Opp'n to Mot. to

Unseal, *FTC v. PepsiCo, Inc.*, No. 1:25-cv-00664-JMF (S.D.N.Y. Dec. 11, 2025), ECF No. 69 ¶¶ 9, 13, 16, 18-21, 23, 26 (citing FTC Complaint ¶¶ 10, 39-43, 51-55, 57-59, 63-64, 66).

## IX.    EFFECT ON INTRASTATE AND INTERSTATE COMMERCE

168.    The Pepsi soft drinks at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce in the United States.

169.    Defendants' anticompetitive conduct occurred in part in trade and commerce within the Repealer Jurisdictions set forth herein. During the Relevant Time Period, Pepsi soft drinks, manufactured by Pepsi, were shipped into each Repealer Jurisdiction and were sold to and paid for by Class Members. Defendants conspired in restraint of trade within the intrastate commerce of each Repealer Jurisdiction because Defendants agreed to fix the price for Pepsi soft drinks sold within each of the Repealer Jurisdictions.

## X.    CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this Action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of a class (the "Class") defined as follows:

> All persons and entities in Repealer Jurisdictions who indirectly[14] purchased Pepsi soft drinks for their own use and not for resale, at any time during the period from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period" or "Relevant Time Period").

171.    A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

---

[14] For clarity, purchases of Pepsi soft drinks directly from a defendant, including Walmart, do not count as indirect purchases for the purpose of this definition.

172.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

173.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Class Members number in the millions.

174.    **Typicality.** Plaintiffs' claims are typical of the claims of members of the Class, who are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs and all members of the Class were injured in the form of overcharges caused by Defendants' conduct.

175.    Plaintiffs' interests do not conflict with those of members of the Class.

176.    **Commonality.** Questions of law and fact common to the Members of the proposed Class include:

1.    Whether Defendants agreed to increase, fix, or stabilize the prices of Pepsi soft drinks;

2.    The nature, scope, and extent of Defendants' agreement;

3.    Whether that agreement violates the Sherman Act and relevant state laws;

4.    Whether retail competition for sales of Pepsi soft drinks was impaired by Defendants' agreement;

5.    Whether Plaintiffs and Class Members were injured by Defendants' agreement;

6.    The appropriate measure of classwide damages for members of the Class; and

7.    Whether injunctive relief to prevent Defendants' agreement from recurring is appropriate and, if so, what injunctive relief is appropriate.

40

177.    **Predominance.** The common issues above predominate over any issues affecting only individual Class Members.

178.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by some of the individual Class Members may be relatively small, the expense and burden of individual litigation makes it impractical for individual members of the Class to redress the wrongs done to them. Furthermore, litigating millions of individual cases would inevitably lead to inconsistent rulings and results, burden the judicial and legal system, and magnify the delay and expense to all the parties and the court system through repeated litigation and trial of the same factual and legal issues.

## XI.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS

179.    In accordance with the requirements of Arizona Rev. Stat. Ann. § 44-1415; Colorado Rev. Stat. § 6-4-116; Connecticut Gen. Stat. § 35-37; Hawaii Rev. Stat. § 480-13.3(a); Minnesota Stat. § 325D.63; Nevada Rev. Stat. § 598A.210(3); New York Gen. Bus. Law § 340(5); Oregon Rev. Stat. § 646.780(5)(b); Rhode Island Gen. Laws § 6-36-21; and Utah Code Ann. § 76-16-511(9), Plaintiffs' counsel sent letters regarding this class-action complaint to the Attorneys General of Arizona, Colorado, Connecticut, Hawaii, Minnesota, Nevada, New York, Oregon, Rhode Island, and Utah. The letters informed the Attorneys General of the existence of this complaint, identified the relevant state antitrust provisions at issue, and enclosed a copy of this complaint.

180.    Counsel sent demand letters to Defendants regarding this class-action complaint, which satisfy the demand-letter requirements of certain consumer-protection statutes mentioned below (e.g., Massachusetts). The demand letters identified the claimant as Plaintiffs, in their individual and representative capacity; described the allegedly unfair or deceptive acts or practices committed by Defendants (i.e., entering into an agreement to fix the prices of Pepsi soft drinks); described Plaintiffs' and the Class's injury (inflated prices for Pepsi soft drinks); set forth a demand for relief (treble damages, attorneys' fees, litigation costs, and other available sanctions); and

41

requested an offer to cure within the statutorily prescribed time.

## XII.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3) (ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR DECLARATORY AND EQUITABLE RELIEF)

181.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

182.   Defendants violated 15 U.S.C. Sections 1 and 3 by entering into, furthering, and/or enforcing an unreasonable restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi soft drinks.

183.   The agreements reached by Defendants stifle intra-brand competition by eliminating price competition from discount retailers and other retailers that compete with Walmart in the retail market.

184.   The agreements reached by Defendants also reduce inter-brand competition between Pepsi, Coca-Cola, and Dr Pepper.

185.   **Defendants Violated the "Rule of Reason"**: The market for RTD soft drinks is a relevant antitrust market. There are no reasonable substitutes for RTD soft drinks. Customers purchasing RTD soft drinks at retail do not view RTD soft drinks as reasonably interchangeable with other types of beverages, such as alcoholic drinks or bottled water.

186.   Pepsi has market power in the market for RTD soft drinks in the United States, controlling approximately one third of the market. This market power is enhanced by the concentrated nature of the soft-drink industry, with just three manufacturers accounting for the vast bulk of sales. There are significant barriers to entry in the RTD soft drink market, due to the existing firms' multibillion dollar investments into durable advantages in brand recognition and relationships with bottlers, without which competitors cannot reach the mass retail market.

187.   Pepsi's market power was enhanced by Pepsi having reached an agreement with the largest retailer in the United States, Walmart.

188. Walmart has market power in many local "brick and mortar" retail markets, as it is the largest retailer in the United States, and the dominant retailer in many relevant geographic markets.

189. Walmart used its market power to cause Pepsi to agree to limit price competition from other retailers.

190. Defendants' Scheme had substantial price effects in the market for soft drinks and therefore on Pepsi soft drinks. Defendants' agreement increased the wholesale price of Pepsi soft drinks substantially, which were then passed on to retail customers including Class Members. The agreement also stifled the competition that should exist between retailers, leading directly to higher retail prices for Pepsi soft drinks.

191. There is no procompetitive justification for Defendants' Scheme. For example, Pepsi soft drinks are not specialized products that require the retailer to expend resources to explain their use to consumers or to maintain a skilled sales staff that is familiar with their products. Therefore, there are no free-rider justifications for the challenged agreements.

192. Defendants' Scheme violates the rule of reason under a "quick look" analysis because the anticompetitive effect of their agreements is plain and obvious.

193. Defendants' Scheme violates the full-blown rule of reason because the agreements harm competition without providing any benefit to any relevant market.

194. As a result of Defendants' Scheme, prices for Pepsi soft drinks were inflated above competitive levels in the United States.

195. As a result of Defendants' Scheme, Plaintiffs and Class Members have been injured in their businesses and property in that they have paid more for Pepsi soft drinks than they otherwise would have paid in the absence of that conduct.

196. With respect to their claim under the Sherman Act, Plaintiffs and Class Members seek injunctive relief and attorneys' fees and costs.

## VIOLATIONS OF STATE ANTITRUST LAWS

197. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

43

allegation set forth in the preceding paragraphs of this Complaint.

198.    The following Second through Thirty-Second Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

199.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

**COUNT II**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. ANN. §§ 44-1401 et seq.**

200.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

201.    By reason of the conduct alleged herein, Defendants have violated Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

202.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington, PLC*, 75 P.3d 99, 101-10 (Ariz. 2003).

203.    Under Arizona law, "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." ARIZ. REV. STAT. ANN. § 44-1402.

204.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arizona.

205.    Defendants' violations of Arizona law were flagrant.

206.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Arizona by fixing the prices charged by retailers for Pepsi soft drinks in Arizona.

207.    As a direct and proximate cause of Defendants' unlawful conduct, members of the

44

Class have been injured in their business or property and are threatened with further injury.

208.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq.*

**COUNT III**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE §§ 16700, et seq.**

209.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

210.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700, *et seq.*, governs antitrust violations in California.

211.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. CAL. BUS. & PROF. CODE § 301.

212.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

213.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. CAL. BUS. & PROF. CODE § 16726.

214.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within California.

215.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code Sections 16700, et seq.

45

216. Defendants' unlawful conduct substantially affected California's trade and commerce and Defendants' unlawful conduct occurred in substantial part in California by fixing the prices charged by retailers for Pepsi soft drinks in California.

217. Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

218. Plaintiffs and members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**COUNT IV**
**VIOLATION OF COLORADO'S ANTITRUST ACT**
**COLO. REV. STAT. §§ 6-4-104 et seq.**

219. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

220. The Colorado Antitrust Act states that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal." COLO. REV. STAT. § 6-4-104.

221. Members of the Class indirectly purchased Pepsi soft drinks within Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

222. Under Colorado Law, indirect purchasers have standing to maintain an action under the Colorado Antitrust Act based on the facts alleged in this Complaint. COLO. REV. STAT. § 6-4-112.

223. Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Colorado in violation of COLO. REV. STAT. § 6-4-104.

224.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Colorado, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT V**
**VIOLATION OF CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. ANN. §§ 35-24, et seq.**

225.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

226.    The Connecticut Antitrust Act states that "[e]very contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful." CONN. GEN. STAT. ANN. § 35-27.

227.    Members of the Class indirectly purchased Pepsi soft drinks within Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

228.    Under Connecticut law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Connecticut General Statutes based on the facts alleged in this Complaint, because, in response to an action brought under subsection (c) of Conn. Gen. Stat. Ann. section 35-32 or seeking treble damages under section 35-35, a defendant "[m]ay not assert as a defense that the defendant did not deal directly with the person on whose behalf the action is brought." CONN. GEN. STAT. ANN. § 35-46a.

229.    Defendants contracted, combined or conspired to act in restraint of trade within Connecticut in violation of Conn. Gen. Stat. Ann. Sections 35-27, *et seq*.

230.    Defendants' unlawful conduct substantially affected Connecticut's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Connecticut by fixing the prices charged by retailers for Pepsi soft drinks in Connecticut.

231.    Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Connecticut and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## COUNT VI
## VIOLATION OF DELAWARE ANTITRUST ACT,
### DEL. CODE ANN. TIT. 6, §§ 2101, et seq.

232. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

233. Delaware Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce of [Delaware]." Del. Code Ann. tit. 6, § 2103.

234. Members of the Class indirectly purchased Pepsi soft drinks within Delaware during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

235. Under Delaware law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint under Del. Code Ann. tit. 6, § 2108.

236. Defendants contracted, combined or conspired to act in restraint of trade within Delaware in violation of Del. Code Ann. tit. 6, § 2103.

237. Defendants' unlawful conduct substantially affected Delaware's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Delaware by fixing the prices charged by retailers for Pepsi soft drinks in Delaware.

238. Defendants' violations are willful.

239. Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Delaware and are entitled to all forms of relief, including recovery of treble damages.

## COUNT VII
## VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,
### D.C. CODE ANN. §§ 28-4501, et seq.

240. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

241. The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District

48

of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. CODE ANN. § 28-4501.

242.    Members of the Class purchased Pepsi soft drinks within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

243.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE ANN. § 28-4509(a).

244.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, in violation of D.C. Code Ann. Sections 28-4501, *et seq*.

245.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**HAW. REV. STAT. §§ 480-4, *et seq*.**

246.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.    Hawaii Antitrust Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal." HAW. REV. STAT. §480-4(a).

248.    Members of the Class indirectly purchased Pepsi soft drinks within Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

249.    Under Hawaii law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint under Haw. Rev. Stat. §480-3.

49

250.    Defendants contracted, combined or conspired to act in restraint of trade within Hawaii in violation of Haw. Rev. Stat. §480-4(a).

251.    Defendants' unlawful conduct substantially affected Hawaii's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Hawaii by fixing the prices charged by retailers for Pepsi soft drinks in Hawaii.

252.    Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Hawaii and are entitled to all forms of relief, including recovery of treble damages.

**COUNT IX**
**VIOLATION OF ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), et seq.**

253.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254.    The Illinois Antitrust Act, 740 ILL. COMP. STAT. ANN. 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILL. COMP. STAT. ANN. 10/2.

255.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

256.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN. 10/7(2).

257.    Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices in the Relevant Market within the State of Illinois.

258.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Illinois and are entitled to all forms of relief, including actual damages, treble

50

damages, and reasonable attorneys' fees and costs.

## COUNT X
## VIOLATION OF IOWA COMPETITION LAW,
### IOWA CODE ANN. §§ 553.1, et seq.

259. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

260. The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." IOWA CODE ANN. § 553.2.

261. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

262. Members of the Class purchased Pepsi soft drinks within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

263. Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Iowa in violation of Iowa Code Ann. Sections 553.1, *et seq*.

264. Members of the Class were injured with respect to purchases of Pepsi soft drinks in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT XI
## VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,
### KAN. STAT. ANN. §§ 50-101, et seq.

265. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266. The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

267. Members of the Class purchased Pepsi soft drinks within the State of Kansas during the Class Period.

268.    But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

269.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

270.    Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce in the Relevant Market, increasing the price of Pepsi soft drinks, or preventing competition in the sale of Pepsi soft drinks, in a manner that established the price of Pepsi soft drinks and precluded free and unrestricted competition among themselves in the sale of Pepsi soft drinks, in violation of Kan. Stat. Ann. Sections 50-101, *et seq.*

271.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT XII
## VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW, ME. STAT. TIT. 10, §§ 1101, et seq.

272.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

273.    Part 3 of Title 10 of the Maine Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. STAT. tit. 10, §§ 1101-1102.

274.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

275.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. STAT. tit. 10, § 1104(1).

276.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maine in violation of Me. Stat. tit. 10, Sections 1101, *et seq.*

277.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

## COUNT XIII
## VIOLATION OF MARYLAND'S ANTITRUST STATUTE,
## MD. CODE ANN. COM. LAW §§ 11-201, et seq.

278.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279.    Maryland's antitrust statute makes it unlawful to, *inter alia*, "[b]y contract, combination, or conspiracy with one or more persons, unreasonably restrain trade or commerce." MD. CODE ANN. COM. LAW § 11-204(a)(1).

280.    The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. COM. LAW § 11-202(a)(1).

281.    Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE. ANN. COM. LAW § 11-209(b)(2)(i).

282.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maryland in violation of Md. Code Ann. Com. Law § 11-204(a)(2)-(6).

283.    Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. MD. CODE ANN. COM. LAW § 11-209(b)(4).

284.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

## COUNT XIV
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,
## MICH. COMP. LAWS ANN. §§ 445.771, et seq.

285.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

53

allegation set forth in the preceding paragraphs of this Complaint.

286. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." 1984 Mich. Pub. Acts 274 (MICH. COMP. LAWS ANN. §§ 445.771, *et seq.*).

287. Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

288. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS ANN. § 445.778(2).

289. Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the Relevant Market in violation of Mich. Comp. Laws Ann. § 445.772.

290. Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**COUNT XV**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. ANN. §§ 325D.49, et seq.**

291. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

292. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power; whenever any of the foregoing affects the trade or commerce of [Minnesota]." MINN. STAT. ANN. § 325D.54.

54

293.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

294.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. ANN. § 325D.57.

295.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the Relevant Market, within the intrastate commerce in and outside of Minnesota in violation of Minn. Stat. Ann. Sections 325D.49, *et seq*.

296.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**COUNT XVI**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**MISS. CODE ANN. §§ 75-21-1, et seq.**

297.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

298.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

299.    "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

300.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Mississippi.

301. Defendants sold Pepsi soft drinks within Mississippi.

302. Members of the Class purchased Pepsi soft drinks within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

303. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

304. Defendants combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Pepsi soft drinks and hindering competition in the sale of Pepsi soft drinks, in violation of Miss. Code Ann. Sections 75-21-1, *et seq*.

305. Pepsi soft drinks are sold indirectly via retailers throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

306. Defendants' unlawful conduct substantially affected Mississippi's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Mississippi by fixing the prices charged by retailers for Pepsi soft drinks in Mississippi.

307. Members of the Class were injured with respect to purchases of Pepsi soft drinks in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## COUNT XVII
## VIOLATION OF THE NEBRASKA JUNKIN ACT,
## NEB. REV. STAT. ANN. §§ 59-801, et seq.

308. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

309. Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

310. Members of the Class purchased Pepsi soft drinks within the State of Nebraska

56

during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

311.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. ANN. § 59-821.

312.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. Ann. Sections 59-801, *et seq*.

313.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**COUNT XVIII**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. ANN. §§ 598A.010, et seq.**

314.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

315.    The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1)(a).

316.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060(1)(a)-(c), (e).

317.    Members of the Class purchased Pepsi soft drinks within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

318.    Under Nevada law, indirect purchasers have standing to maintain an action under

NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

319.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nevada in violation of Nev. Rev. Stat. Ann. Sections 598A.010, *et seq*.

320.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Nevada in that at least thousands of sales of Pepsi soft drinks took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct.

321.    Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT XIX**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. §§ 356:1, et seq.**

322.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

323.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

324.    Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. §§ 356:2-356:3.

325.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

326.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II).

327.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Hampshire in violation of N.H. Rev. Stat. Ann. Sections 356:1, *et seq*.

328.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and

58

injunctive relief.

## COUNT XX
### VIOLATION OF THE NEW JERSEY ANTITRUST ACT,
### N.J. STAT. ANN. §§ 56:9-1, et seq.

329.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

330.    New Jersey Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce [in the State]" or monopolies in the relevant market within the State. N.J. STAT. ANN. §§ 56:9-3 and 56:9-4.

331.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New Jersey during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

332.    Under New Jersey law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.J. STAT. ANN. § 56:9-12.

333.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Jersey in violation of N.J. Stat. Ann. § 56:9-1, *et seq*.

334.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in New Jersey and are entitled to all forms of relief under the New Jersey Antitrust Act.

## COUNT XXI
### VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
### N.M. STAT. ANN. §§ 57-1-1, et seq.

335.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

336.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

337.    Members of the Class purchased Pepsi soft drinks within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

338. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

339. Defendants contracted, agreed, combined or conspired in restraint of trade in the Relevant Market within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. Sections 57-1-1, *et seq*.

340. Members of the Class were injured with respect to purchases of Pepsi soft drinks in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XXII
### VIOLATION OF THE NEW YORK DONNELLY ACT,
### N.Y. GEN. BUS. LAW §§ 340, et seq.

341. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

342. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

343. Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

344. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

345. Defendants restrained competition in the free exercise of the conduct of the business in the Relevant Market within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law Sections 340, *et seq*. Defendants' unlawful conduct substantially affected New York's trade and commerce and Defendants' unlawful conduct occurred in substantial part in New York by fixing the prices charged by retailers for Pepsi soft drinks in New York.

346. Plaintiffs and members of the Class were injured with respect to purchases of Pepsi

soft drinks in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. Gen. Bus. Law Section 340(5).

## COUNT XXIII
## VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. ANN. §§ 75-1, et seq.

347.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

348.    Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

349.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Lab'ys, Inc.*, 473 S.E.2d 680, 687-88 (N.C. Ct. App. 1996).

350.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina because Defendants' agreement fixed the retail prices of Pepsi soft drinks in North Carolina, both before and after they were imported into North Carolina.

351.    Defendants' unlawful conduct substantially affected North Carolina's intrastate trade and commerce.

352.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

353.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. Ann. Sections 75-1, *et seq*.

## COUNT XXIV
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE ANN. §§ 51-08.1-01, et seq.

354.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

61

355.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE ANN. §§ 51-08.1-01, *et seq.*

356.    Members of the Class purchased Pepsi soft drinks within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

357.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE ANN. § 51-08.1-08(4).

358.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Dakota.

359.    Defendants' violations of North Dakota law were flagrant.

360.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

361.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. Cent. Code Ann. Sections 51-08.1-01, *et seq.*

**COUNT XXV**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. ANN. §§ 646.705, et seq.**

362.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

363.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. ANN. § 646.715(1).

62

364.    Members of the Class purchased Pepsi soft drinks within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

365.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. ANN. § 646.780(1)(a).

366.    Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market in violation of Or. Rev. Stat. Ann. Sections 646.705, *et seq*. *See* OR. REV. STAT. ANN. §§ 646.725-646.730.

367.    Members of the Class were injured with respect to purchases of Pepsi soft drinks within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**COUNT XXVI**
**VIOLATION OF THE PUERTO RICAN ANTI-MONOPOLY ACT,**
**P.R. LAWS ANN. TIT. 10, §§ 257, et seq.**

368.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

369.    The provisions of the Puerto Rican Anti-Monopoly Act of 1964 (the AMA) parallel Sections 1 and 2 of the Sherman Act, and other federal statutes. Those provisions are supplemented by The Regulation on Fair Competition Number VII, which proscribes certain conduct including the type engaged in by Defendants more fully described above.

370.    Under the AMA, it is unlawful to monopolize, or attempt to monopolize any part of the trade or commerce in the Commonwealth of Puerto Rico. P.R. LAWS ANN. tit. 10, § 260.

371.    Members of the Class purchased Pepsi soft drinks within Puerto Rico during the Class Period. But for Defendants' conduct set forth herein, the price of those Pepsi soft drinks would have been lower, in an amount to be determined at trial.

372.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, attorneys' fees, and costs of suit. P.R. LAWS ANN. tit. 10, § 268.

**COUNT XXVII**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**6 R.I. GEN. LAWS ANN. §§ 6-36-1, et seq.**

373.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

374.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS ANN. § 6-36-2(a)(2).

375.    Members of the Class purchased Pepsi soft drinks within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

376.    Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. 6 R.I. GEN. LAWS ANN. § 6-36-11(a).

377.    Defendants contracted, combined and conspired in restraint of trade in the Relevant Market within the intrastate commerce of Rhode Island in violation of 6 R.I. Gen. Laws Ann. Sections 6-36-1, *et seq*.

378.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**COUNT XXVIII**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,**
**S.D. CODIFIED LAWS §§ 37-1-3.1, et seq.**

379.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

380.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade,

monopolies and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1 to 37-1-3.2.

381.    Members of the Class purchased Pepsi soft drinks within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

382.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

383.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of South Dakota in violation to S.D. Codified Laws §§ 37-1-3.1, *et seq*.

384.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**COUNT XXIX**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE ANN. §§ 47-25-101, et seq.**

385.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

386.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

387.    Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

388.    Defendants competed unfairly and colluded by regularly meeting to fix prices and

65

otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

389.    Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Pepsi soft drinks were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Pepsi soft drinks.

390.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as Pepsi soft drinks were sold in Tennessee.

391.    A substantial part of Defendants' illegal conduct occurred within Tennessee because Defendants' agreement fixed the retail prices of Pepsi soft drinks in Tennessee, both before and after they were imported into Tennessee.

392.    Members of the Class purchased Pepsi soft drinks within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

393.    As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

394.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## COUNT XXX
## VIOLATION OF THE UTAH ANTITRUST ACT,
## UTAH CODE ANN. §§ 76-16-501, et seq.

395.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

396.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-16-502(1)(b).

397.    Members of the Class purchased Pepsi soft drinks within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

398.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-16-509(1)(a)(i).

399.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market in violation of Utah Code Ann. §§ 76-16-501, *et seq*.

400.    Members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of Pepsi soft drinks in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT XXXI
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE ANN. §§ 47-18-1, et seq.

401.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

402.    The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

403.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia in violation of W. Va. Code Sections 47-18-3 to 47-18-4.

404.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a

67

substantial part of which occurred within West Virginia.

405.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of West Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

406.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE R. 142-9-2(1) ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. VA. CODE §§ 47-18-1, et seq., may bring an action for damages under W. VA. CODE § 47-18-9.").

407.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

408.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for Pepsi soft drinks than they otherwise would have paid in the absence of Defendants' unlawful conduct.

409.    Plaintiffs and members of the Class have standing to pursue their claims under, *inter alia*, W. Va. Code Ann. Section 47-18-9.

410.    As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

## COUNT XXXII
## VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. ANN. §§ 133.01, et seq.

411.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

412.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or

68

hamper competition." WIS. STAT. ANN. § 133.01.

413.    Members of the Class purchased Pepsi soft drinks within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

414.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. ANN. § 133.18(1)(a).

415.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market, with the intention of injuring or destroying competition therein, in violation of WIS. STAT. ANN. §§ 133.01, *et seq*.

416.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Pepsi soft drinks in Wisconsin.

417.    Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

### VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

418.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

419.    Defendants' above-described Scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and the Class paid higher prices for Pepsi soft drinks than they should have.

420.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

69

421.    Plaintiffs and members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

422.    There was and is a gross disparity between the price that Plaintiffs and the Class members paid for Pepsi soft drinks and the value they received.

423.    The following Thirty-Third through Fifty-Third Counts are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Class.

### COUNT XXXIII
### VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, et seq.

424.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

425.    Arkansas Deceptive Trade Practices Act (the "ADTPA") forbids certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." ARK. CODE ANN. §§ 4-88-107(a).

426.    Indirect purchasers have standing to maintain an action under the ADTPA based on the facts alleged in this Complaint. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 178-79 (D. Me. 2004).

427.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Arkansas during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

428.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arkansas.

429.    The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

430.    Defendants' unlawful conduct substantially affected Arkansas's trade and

70

commerce.

431.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by being forced to pay more for Pepsi soft drinks than they otherwise would have paid in the absence of Defendants' unlawful conduct.

432.    Accordingly, Plaintiffs and members of the Arkansas Class seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

**COUNT XXXIV**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200, et seq. (THE "UCL")**

433.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

434.    The violations of federal antitrust law set forth above also constitute violations of Section 17200, et seq., of the California Business and Professions Code.

435.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

436.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

437.    Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq*., of the California Business and Professions Code, set forth above.

438.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, et seq., of the California Business

71

and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

439.    Plaintiffs and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

440.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

441.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause members of the Class to pay supracompetitive and artificially-inflated prices for Pepsi soft drinks sold in the State of California. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

442.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

## COUNT XXXV
## VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE ANN. §§ 28-3901, et seq.

443.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

444.    Members of the Class purchased Pepsi soft drinks for personal, family, or household purposes.

445.    By reason of the conduct alleged herein, Defendants have violated D.C. CODE ANN. §§ 28-3901, *et seq.*

446.    Defendants are "merchants" within the meaning of D.C. CODE ANN. § 28-

72

3901(a)(3).

447. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within the District of Columbia.

448. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

449. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

450. As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

451. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. CODE ANN. §§ 28-3901, *et seq.*

**COUNT XXXVI**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. ANN. §§ 501.201(2), et seq.**

452. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

453. The Florida Deceptive & Unfair Trade Practices Act, FLA. STAT. ANN. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. ANN. § 501.204(1).

454. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. ANN. § 501.202(2).

455. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. *See* FLA. STAT. ANN. § 501.211(1)

73

("anyone aggrieved by a violation of this [statute] may bring an action . . .").

456.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

457.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Florida.

458.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

459.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

460.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of being forced to pay overcharges on Pepsi soft drinks. Because Defendants' anticompetitive agreement to fix the price of Pepsi soft drinks is ongoing and because members of the Class buy Pepsi soft drinks on a regular basis, there is a high probability that members of the Class will suffer injury in the future as a result of Defendants' conduct.

461.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including injunctive relief pursuant to FLA. STAT. ANN. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. ANN. § 501.211.

### COUNT XXXVII
### VIOLATION OF THE HAWAII REVISED STATUTES ANNOTATED, HAW. REV. STAT. ANN. §§ 480-2, et seq.

462.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

463.    Hawaii's unfair competition statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." HAW. REV. STAT. ANN. § 480-2(a).

74

464. Defendants' anticompetitive Scheme, which is described above, constitutes an unfair method of competition, or unfair, unconscionable, or deceptive acts or practices, in violation of the HAW. REV. STAT. ANN. §§ 480-2, *et seq*.

465. Defendants' conduct was intentional, i.e., it entered into exclusionary agreements in order to suppress competition in the Relevant Market.

466. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

467. Defendants' unlawful conduct had the following effects: (1) Pepsi soft drink price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Pepsi soft drink prices were fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Class were deprived of free and open competition; (4) members of the Class paid supracompetitive, artificially inflated prices for Pepsi soft drinks; and (5) retailers in Hawaii were prevented from charging a competitive price for Pepsi soft drinks.

468. During the Class Period, members of the Class purchased, paid, and/or provided reimbursement for some or all of the purchase price of Pepsi soft drinks within Hawaii.

469. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured and there is a high probability that they will suffer injury in the future as a result of Defendants' conduct.

470. In light of the above, members of the Class are entitled to seek all available relief under Hawaii's consumer-protection laws, including actual damages, treble damages, punitive damages (to the extent available), injunctive relief, attorneys' fees, costs, etc.

## COUNT XXXVIII
## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT,
### IDAHO CODE ANN. §§ 48-601, et seq.

471. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

472. The Idaho Consumer Protection Act (the "ICPA") prohibits "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce," IDAHO

CODE § 48-601, which includes, among other things, "any unconscionable method, act or practice in the conduct of any trade or commerce." IDAHO CODE ANN. § 48-603C(1).

473.    Defendants' anticompetitive efforts, which are described above, constituted an unfair method of competition, or an unconscionable practice, under the ICPA.

474.    Defendants intentionally engaged in the above conduct in order to reduce competition in the Relevant Market.

475.    Defendants' alleged conduct would outrage or offend the public conscience.

476.    During the Class Period, members of the Class purchased, paid, and/or provided reimbursement for some or all of the purchase price of Pepsi soft drinks in Idaho.

477.    Defendants' conduct was the proximate cause of injuries to members of the Class, namely in the form of overcharges for Pepsi soft drinks.

478.    Because Pepsi soft drinks are purchased on an ongoing basis, there is a high probability that members of the Class will suffer injury in the future, as a result of Defendants' conduct.

479.    In light of the above, members of the Class are entitled to seek actual damages, along with any other form of relief that the Court deems proper under the ICPA, including actual damages, statutory damages, punitive damages, attorneys' fees, costs, injunctive relief, etc. *See* IDAHO CODE ANN. § 48-608.

### COUNT XXXIX
### VIOLATION OF THE KANSAS CONSUMER PROTECTION STATUTE, KAN. STAT. ANN., §§ 50-623, et seq.

480.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

481.    Members of the Class purchased Pepsi soft drinks for personal, family, or household purposes.

482.    By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. §§ 50-626-627.

483.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Kansas.

484.    Defendants' conduct constituted deceptive or unconscionable act or practice in connection with consumer transactions in Kansas.

485.    Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

486.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured by paying an overcharge for Pepsi soft drinks.

487.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Kan. Stat. Ann. §§ 50-623, *et seq*.

## COUNT XL
## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT, ME. REV. STAT. ANN. TIT. 5, §§ 205A-214.

488.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

489.    Members of the Class purchased Pepsi soft drinks for personal, family, or household purposes.

490.    By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. tit. 5, §207.

491.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Maine.

492.    Defendants' conduct constituted unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in Maine.

493.    Defendants' unlawful conduct substantially affected Maine's trade and commerce.

494.    As a direct and proximate cause of defendants' unlawful conduct, members of the Class have been injured by paying an overcharge for Pepsi soft drinks.

495.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Me. Rev. Stat. Ann. tit. 5, §§ 205A to 214.

## COUNT XLI
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS. ANN. CH. 93A, §§ 1, et seq.

496.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

497.     By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ANN. ch. 93A, §§ 1 *et seq*.

498.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

499.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Massachusetts.

500.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

501.     Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

502.     Plaintiffs and members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

503.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property by virtue of being forced to pay overcharges on Pepsi soft drinks. Because Defendants' anticompetitive agreement to fix the price of Pepsi soft drinks is ongoing and because Plaintiffs and members of the Class buy Pepsi soft drinks on a regular basis, there is a high probability that Plaintiffs and members of the Class will suffer injury in the future as a result of Defendants' conduct.

78

504.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under MASS. GEN. LAWS ANN. ch. 93A, § 9.

## COUNT XLII
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. §§ 407.010, et seq.

505.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

506.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

507.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Missouri for personal, family, or household purposes during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

508.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

509.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Missouri in violation of MO. ANN. STAT. §§ 407.010, *et seq*.

510.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XLIII
### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT, MISS. CODE ANN. §§ 75-24-1, et seq.

79

511. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

512. Chapter 24 of Title 75 of the Mississippi Code, known as the Mississippi Consumer Protection Act (the "MCPA"), prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1).

513. The MCPA defines 'trade" and "commerce" broadly to include "any trade or commerce directly or indirectly affecting the people of this state." MISS. CODE ANN. § 75-24-3(b).

514. Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Mississippi for personal, family, or household purposes during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

515. Under Mississippi law, a person who suffers an ascertainable loss of money or property as a result of a method, act, or practice prohibited by Section 75-24-5 may bring an action to recover damages. MISS. CODE ANN. § 75-24-15(1).

516. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Mississippi.

517. Defendants' conduct constituted unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in Mississippi in violation of MISS. CODE ANN. §§ 75-24-5, et seq.

518. Defendants' unlawful conduct substantially affected Mississippi's trade and commerce.

519. As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by being forced to pay more for Pepsi soft drinks than they otherwise would have paid in the absence of Defendants' unlawful conduct and are entitled to seek all forms of relief available under MISS. CODE ANN. § 75-24-15.

**COUNT XLIV**

80

**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1970,
MONT. CODE ANN. §§ 30-14-103, et seq., 30-14-201, et seq.**

520.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

521.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE ANN. §§ 30-14-103, et seq., 30-14-201, *et seq.*

522.     Defendants' unlawful conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated throughout Montana; (2) Pepsi soft drinks' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for Pepsi soft drinks; (5) retailers in Montana were prevented from charging a competitive price for Pepsi soft drinks.

523.     Plaintiffs and members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

524.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

525.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. §§ 30-14-103, *et seq.*, 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT XLV
VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,
NEB. REV. STAT. ANN. §§ 59-1602, et seq.**

526.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

81

527. By reason of the conduct alleged herein, Defendants have violated NEB. REV. STAT. ANN. §§ 59-1602, *et seq*.

528. Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. ANN. § 59-1609.

529. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nebraska.

530. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

531. Defendants' conduct had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

532. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

533. As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

534. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under NEB. REV. STAT. ANN. § 59-1614.

## COUNT XLVI
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. ANN. §§ 598.0903, et seq.

535. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

536. By reason of the conduct alleged herein, Defendants have violated NEV. REV. STAT. ANN. §§ 598.0903, *et seq*.

537. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

538. Defendants entered into a contract, combination, or conspiracy between two or

more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nevada.

539.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

540.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

541.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

542.    Defendants' conduct was willful.

543.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

544.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. ANN. § 598.0993.

## COUNT XLVII
## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. §§ 358-A:1, et seq.

545.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

546.    By reason of the conduct alleged herein, defendants have violated N.H. REV. STAT. ANN. §§ 358-A:1, *et seq*.

547.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 575-582 (N.H. 2007).

548.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Hampshire. Defendants' unlawful conduct occurred in substantial part in New Hampshire by fixing the prices charged by retailers for Pepsi soft drinks

in New Hampshire.

549.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

550.    Defendants' conduct was willful and knowing.

551.    Defendants' conduct had a direct or indirect impact upon members of the Class's ability to protect themselves.

552.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

553.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

554.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under N.H. REV. STAT. ANN. §§ 358-A:10, 358-A:10-a.

## COUNT XLVIII
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,
## N.M. STAT. ANN. §§ 57-12-1, et seq.

555.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

556.    By reason of the conduct alleged herein, Defendants have violated N.M. STAT. ANN. §§ 57-12-3, *et seq.*

557.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Mexico.

558.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

559.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

560.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class members and the

price paid by them for Pepsi soft drinks as set forth in N.M. STAT. ANN. § 57-12-2E.

561.    Defendants' conduct was willful.

562.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

563.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. ANN. § 57-12-10.

## COUNT XLIX
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. ANN. §§ 75-1.1, et seq.

564.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

565.    By reason of the conduct alleged herein, Defendants have violated N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Lab'ys, Inc.*, 473 S.E.2d 680, 687-88 (N.C. Ct. App. 1996).

566.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina.

567.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

568.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

569.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

570.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an

honest marketplace in which economic activity is conducted in a competitive manner.

571.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

572.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. ANN. § 75-16.

**COUNT L**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS ANN. §§ 6-13.1-1, et seq.**

573.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

574.    By reason of the conduct alleged herein, Defendants have violated R.I. GEN. LAWS ANN. §§ 6-13.1-1, *et seq*.

575.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supracompetitive profits.

576.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Rhode Island.

577.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

578.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

579.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

580.    Defendants' conduct was willful.

581.    Members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

582.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

86

583. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS ANN. § 6-13.1-5.2.

## COUNT LI
## VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, et seq.

584. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

585. By reason of the conduct alleged herein, Defendants have violated S.C. CODE ANN. §§ 39-5-10, *et seq*.

586. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within South Carolina.

587. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

588. Defendants' conduct had a direct or indirect impact upon members of the Class's ability to protect themselves.

589. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

590. Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of members of the public purchase Pepsi soft drinks.

## COUNT LII
## VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE ANN. §§ 13-11-1, et seq.

591. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

592. By reason of the conduct alleged herein, Defendants have violated UTAH CODE ANN. §§ 13-11-1, *et seq.*

593. Defendants are a supplier within the meaning of UTAH CODE ANN. § 13-11-3(5).

594.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Utah.

595.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

596.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of UTAH CODE ANN. § 13-11-3.

597.    Defendants knew or had reason to know that their conduct was unconscionable.

598.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

599.    Members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

600.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

601.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to UTAH CODE ANN. §§ 13-11-19(5), 13-11-20.

## COUNT LIII
## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT, VT. STAT. ANN. TIT. 9, §§ 2451, et seq.

602.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

603.    By reason of the conduct alleged herein, Defendants have violated VT. STAT. ANN. tit. 9, §§ 2451, *et seq*.

604.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, *inter alia*, unfair methods of competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT. ANN. tit. 9, § 2453(a).

605.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of

88

Vermont primarily for personal, family, or household purposes during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

606.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. tit. 9, § 2465(b); *see also Elkins v. Microsoft Corp.*, 817 A.2d 9, 20 (Vt. 2002).

607.    Defendants competed unfairly by restraining trade as set forth herein, in violation of VT. STAT. ANN. tit. 9, §§ 2453, *et seq*.

608.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Vermont.

609.    Defendants' violations of Vermont law were flagrant.

610.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

611.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

612.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

613.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

### XIII.    <u>PETITION FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

1.    Certifies the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and

declares Plaintiffs as representatives of the Class;

2.      Appoints Plaintiffs and their attorneys as Class representatives and Class counsel, respectively;

3.      Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

4.      Awards a declaratory judgment that Pepsi's challenged agreement with Walmart was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Market in violation of the Sherman Act, § 1.

5.      Grants permanent injunctive relief enjoining Pepsi from making sales of Pepsi soft drinks contingent on the price charged by any retailer; and requiring Pepsi and Walmart to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

6.      Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

7.      Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

8.      Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

9.      Directs such further relief as it may deem just and proper.

Dated: July 6, 2026                                        Respectfully submitted,

/s/ Daniel H. Silverman
Daniel H. Silverman (SBN 4917845)
**COHEN MILSTEIN SELLERS & TOLL LLP**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Daniel Gifford (SBN 5935382)
Emily Marcus (SBN 6065569)
**COHEN MILSTEIN SELLERS & TOLL LLP**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (202) 408-4699
dgifford@cohenmilstein.com
emarcus@cohenmilstein.com

*Interim Lead Class Counsel for Proposed
Indirect Purchaser Class*

Blake Hunter Yagman (SBN 5644166)
**YAGMAN PLLC**
RXR Plaza
626 RexCorp Plaza, Suite 605
Uniondale, New York 11556
Tel.: (929) 709-1493
blake.yagman@yagmanpllc.com

Alexander W. Cogbill
**ZELLE LLP**
45 Broadway, Suite 920
New York, NY 10006
Tel: (646) 876-4420
acogbill@zellelaw.com

Christopher T. Micheletti (admitted *pro hac
vice*)
Qianwei Fu (admitted *pro hac vice*)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
cmicheletti@zellelaw.com

91

qfu@zellelaw.com

Daryl Andrews
Glen DeValerio
**ANDREWS DEVALERIO LLP**
P.O. Box 67101
Chestnut Hill, MA 02467
Tel: (617) 999-6473
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

Robert J. Gralewski, Jr.
**KIRBY MCINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Tel: (858) 834-2044
Fax: (858) 255-7772
bgralewski@kmllp.com

James Isacks
**KIRBY MCINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel: (212) 371-6600
Fax: (212) 371-6600
jisacks@kmllp.com

*Counsel for Plaintiffs and the Proposed Class*

92