**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Branded Beverage Antitrust Litigation | Case No. 7:25-cv-06440-CS |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates To: Consumer Direct Purchasers | **JURY TRIAL DEMANDED** |

Plaintiffs William Davis and Rick Petretti ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants PepsiCo, Inc. and Pepsico Beverage Sales, LLC (collectively "Pepsi"), and Walmart, Inc. ("Walmart," collectively, "Defendants") for anticompetitive and unfair and deceptive business practices associated with the manufacture, marketing, and sale of Pepsi ready-to-drink ("RTD") soft drinks. Plaintiffs make the following allegations based upon information and belief and pursuant to the investigation of counsel.

## NATURE OF ACTION

1. Pepsi is one of the largest producers of RTD soft drinks in the world. Pepsi's RTD soft drinks include well-known brands like Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Tropicana, Pure Leaf, Gatorade, Rockstar, and Starbucks.

2. Walmart is Pepsi's most important customer. In its 2024 Annual Report, Pepsi advised that sales to Walmart and its corporate affiliates were responsible for 14% of Pepsi's consolidated net revenue, or approximately $12.86 billion. Accordingly, Pepsi told investors that losing Walmart as a customer "would have a material adverse effect" on all of Pepsi's business. Walmart was the *only* such customer identified in Pepsi's 2024 Annual Report.

3. Beginning as early as 2018, Pepsi and Walmart entered into a scheme (the "Scheme")

1

to prevent wholesale and retail competition for Pepsi RTD soft drinks, thereby ensuring that both companies can charge supracompetitive prices.

4. Defendants' Scheme has two components. First, Pepsi agreed to inflate its wholesale prices above competitive levels for Pepsi RTD soft drinks to its wholesale customers other than Walmart. Pepsi's wholesale customers purchase Pepsi RTD soft drinks directly from Pepsi and compete with Walmart in selling those products at retail. The resulting wholesale price inflation enabled Walmart to elevate its retail prices for Pepsi RTD soft drinks above competitive levels and forced Walmart's competitors to charge higher prices at retail than they otherwise would have.

5. Second, Pepsi required its wholesale customers to charge retail prices that were higher than Walmart's price for Pepsi RTD soft drinks—even if Walmart's retail prices were well above Pepsi's wholesale prices. In furtherance of this second part of the Scheme, Pepsi monitored and policed its wholesale customers' retail prices, and punished those that undercut Walmart with further wholesale price increases, among other actions.

6. In exchange for Pepsi's actions to raise retail prices, Walmart agreed to accept higher wholesale prices than it otherwise would have. Thus, the agreement allowed Pepsi to impose numerous wholesale price increases on Pepsi RTD soft drinks. These price increases cannot be explained by market conditions, such as supply, demand, or costs.

7. The Scheme reduced price competition at the wholesale level and disadvantaged Pepsi retailers other than Walmart, including grocery stores, local convenience stores, mid-tier grocers, and independent retailers. The Scheme also reduced price competition at the retail level, forcing Walmart customers like Plaintiffs to pay inflated prices for Pepsi RTD soft drinks.

8. The Scheme benefitted both Pepsi and Walmart. It allowed Pepsi to reap supracompetitive profits from its sales of Pepsi RTD soft drinks to wholesale purchasers. Walmart

benefitted because it was able to sell Pepsi RTD soft drinks at inflated prices without being undercut by other sellers.

9.      The Scheme was facilitated by Pepsi's power in the market for soft drinks and its oligopolistic power with the Coca-Cola Company ("Coca-Cola"), and Keurig Dr. Pepper Inc. ("Dr. Pepper"). Together, these three companies sell over 90 percent of carbonated soft drinks in the United States. In an oligopolistic market like this, a price increase by one dominant market actor—here, Pepsi—will often be met by comparable price increases by the other dominant market actors—particularly if a dominant retailer—Walmart—limits their ability to gain market share by competing on price. Coca-Cola would closely monitor Pepsi's price increases, and would raise prices to around Pepsi's level.

10.      On information and belief, the Scheme arose and was facilitated, in part, due to the close connections between Walmart and Pepsi. Pepsi's current CFO, Steven Schmitt, joined Pepsi in late 2025 after spending more than ten years at Walmart.[1] Pepsi's Chief People Officer, Becky Schmitt, "served in various executive human resources roles at Walmart, Inc., including as senior vice president, chief people officer of Sam's Club, a division of Walmart, from 2018 to 2020, senior vice president, chief people officer of U.S. eCommerce and corporate functions from late 2016 to 2018, and vice president, human resources – technology from early 2016 to late 2016." Pepsi's CEO, North America, Steven Williams, "served as General Manager and Senior Vice President, Customer Management for PepsiCo's global Walmart business from 2013 to 2016." Pepsi has admitted that it has taken measures against smaller purchasers to impair their ability to compete with Walmart on price, as in its 2023 Annual Report: "The increasing power of retailers and consolidation also adversely impacts our smaller customers' ability to compete effectively,

_____

[1] https://www.pepsico.com/leadership/steven-schmitt.

resulting in an inability on their part to pay for our products or reduced or canceled orders of our products. Further, we must maintain mutually beneficial relationships with our key customers, including Walmart, to compete effectively."

11.      The percentage of Pepsi products sold through Walmart also reflects an agreement. Starting in 2022, Pepsi has sold 14% of its products through Walmart.  This is an increase over the historic trend. Walmart has engaged in a Scheme like this one before. Around the same time Walmart required Pepsi to agree to protect Walmart from retail competition by raising its rivals' wholesale prices for Pepsi RTD soft drinks, Walmart secured a similar agreement from Energizer Holdings, Inc., in another highly concentrated market, disposable batteries.[2] There, as here, Energizer agreed to raise wholesale prices on customers selling below Walmart's retail prices to protect Walmart from competition.

12.      There, as here, the defendants' conduct made little sense absent an agreement. As the District Court observed in denying Walmart and Energizer's motion to dismiss the direct purchaser complaint challenging Walmart's scheme with Energizer: "If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to *minimize* the ultimate retail prices—thereby maximizing sales and ultimately its profits."[3] The same is true for Pepsi. The fact that Pepsi sacrificed its own sales by *raising* retail prices reflects "that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create."[4]

13.      The Scheme has also garnered the attention of U.S. Congress and prompted

---

[2] *See* Complaint, *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 5:23-cv-02087 (N.D. Cal. Apr. 28, 2023), ECF No. 1.

[3] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024) (emphasis added).

[4] *Id.*

multiple inquiries into Pepsi's pricing tactics. Most recently, in a January 28, 2026 letter to Pepsi, Members of Congress wrote, "[A] newly unsealed Federal Trade Commission (FTC) complaint . . . raises fresh questions about whether PepsiCo (Pepsi) is engaging in discriminatory pricing strategies in favor of large chain stores that force smaller, independent retailers – and American consumers that shop at these retailers – to pay higher prices.[5] The congressmen further found that "[t]his newly disclosed information reveals new details about Pepsi's troubling pricing practices, and also appears to indicate that Pepsi's responses to our previous inquiry into this matter were evasive and inaccurate."[6]

14. Congress has also taken issue with the FTC's handling of the Scheme. In tandem with its January 28 letter to Pepsi, Congress sent a letter to the FTC stating, "Based on our review of recently unredacted materials, we are concerned that the Federal Trade Commission (FTC) lacked substantive grounds for dismissing its Robinson-Patman Act (RPA) lawsuit against PepsiCo (Pepsi)." The letter continued, "We are seeking answers regarding whether the FTC's decision to dismiss the lawsuit was politically motivated, and we urge the FTC to reconsider its decision to abandon the lawsuit."[7]

15. The Scheme caused those who purchased Pepsi RTD soft drinks directly from Walmart, like Plaintiffs, to pay higher prices than they otherwise would have.

16. Plaintiffs bring suit on behalf of themselves, and on behalf of nationwide and

---

[5] Letter from Senator Warren et al. to Pepsi CEO Ramon Laguarta 1 (Jan. 28, 2026), https://www.warren.senate.gov/imo/media/doc/20260128pepsifollowupletter.pdf.

[6] *Id. See generally* Letter from Senator Warren et al. to Pepsi CEO Ramon Laguarta (May 11, 2025), https://www.warren.senate.gov/imo/media/doc/letter_from_senators_warren_booker_repnadlertopepsirerobinsonpatmanact.pdf; Letter from Pepsi to Senator Warren et al. (May 25, 2025), https://www.warren.senate.gov/imo/media/doc/response_to_letter_to_pepsi_re_robinson-patman_act.pdf.

[7] Letter from Senator Warren et al. to FTC Chairman Andrew N. Ferguson 1 (Jan. 28, 2026), https://www.warren.senate.gov/imo/media/doc/letter_to_ftc_re_pepsi_rpa_lawsuit.pdf.

California classes of direct purchasers, to recover treble the overcharges they paid and to enjoin Defendants' unlawful conduct.

17. Plaintiffs bring claims individually against Defendants and on behalf of classes of all other similarly-situated purchasers for violations of the Sherman Act and California's Cartwright Act.

## PARTIES

18. Plaintiff William Davis is a California resident who has purchased and continues to purchase Pepsi RTD soft drinks from Walmart. He has purchased Pepsi RTD soft drinks from Walmart since at least June 2022. He purchased Pepsi RTD soft drinks at artificially inflated prices during the Class Period defined below. Plaintiff Davis suffered antitrust injury as a direct result of the antitrust violations alleged in this complaint.

19. Plaintiff Rick Petretti is a California resident who has purchased and continues to purchase Pepsi RTD soft drinks from Walmart. He purchased Pepsi RTD soft drinks at artificially inflated prices during the Class Period defined below. Plaintiff Petretti suffered antitrust injury as a direct result of the antitrust violations alleged in this complaint.

20. Defendant PepsiCo, Inc. is a North Carolina corporation with its principal place of business at 700 Anderson Hill Road, Purchase, New York 10577. PepsiCo, Inc. markets and distributes the Products throughout the United States. PepsiCo, Inc. sells its products to consumers on websites and through retail stores nationwide. PepsiCo, Inc. owns or controls multiple iconic beverage and food brands worth over $1 billion, including Pepsi-Cola, Frito Law, Mountain Dew, Starbucks (bottled products, under license), Gatorade, and Aquafina. In 2023, PepsiCo, Inc. reported global net revenues of over $91 billion.

6

21.     Defendant Pepsico Beverage Sales, Inc. is a wholly-owned subsidiary of Defendant PepsiCo, Inc.  It is a Delaware company with its principal place of business at 700 Anderson Hill Road, Purchase, New York, 10577.  On information and belief, it is the successor to the Pepsi Beverages Company, which was formed in 2010 as a wholly-owned subsidiary of PepsiCo, Inc. following PepsiCo's acquisition of The Pepsi Bottling Group, Inc. and PepsiAmericas, Inc., which had previously been independent Pepsi bottlers.

22.     Defendant Walmart is the largest company in the world by revenue and operates more retail stores in the United States than any other retailer. Walmart is headquartered in Bentonville, Arkansas.

23.     Defendants acted to perpetrate the acts described herein. At all times relevant to the allegations in this matter, Defendants acted with knowledge regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

24.     This case arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, and California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq*.  Plaintiffs seek treble damages for their injuries, and those suffered by members of the proposed classes, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), as well as 15 U.S.C. § 15 (antitrust), because the conduct alleged violates the Sherman Act, 15 U.S.C. § 1.

26. This Court also has supplemental jurisdiction under 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from a Defendant.

27. This Court has personal jurisdiction over Defendants because each Defendant conducts substantial business within this District and a substantial portion of the events that gave rise to Plaintiffs' claims occurred in this District. Further, Pepsi resides in this District.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District and because Pepsi resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I. Defendants' Business Activities

29. Pepsi is engaged in the manufacture and sale of non-alcoholic ready-to-drink ("RTD") soft drinks. RTD soft drinks include carbonated soft drinks, non-carbonated soft drinks, sports drinks, energy drinks, juices, and bottled and canned coffees and teas, but not bottled water.

30. Pepsi is one of the largest manufacturers and marketers of RTD soft drinks in the United States. Pepsi is organized into seven divisions, including PepsiCo Beverages North America ("PBNA"). PBNA operates Pepsi's soft drink business in the United States and Canada. In 2023, PBNA generated $27.6 billion in revenue. Pepsi distributes its RTD soft drinks to retailers through its bottler network, which comprises Defendant PepsiCo, Inc.'s wholly owned bottling subsidiary, Defendant Pepsico Beverage Sales, Inc., and several dozen franchise bottlers. Pepsi directly controls the wholesale pricing provided to its retailer customers by its wholly owned bottler subsidiaries.

31. The RTD soft drink market is highly concentrated. Just three producers (The Coca-Cola Company, Pepsi and Keurig Dr. Pepper Inc.) account for approximately 93% of U.S. carbonated soft drinks. In the sports drink segment, Pepsi owns Gatorade, which has approximately 60% share, while the other significant brands are owned by Coca-Cola. Other segments demonstrate concentration, and on the whole, three companies dominate the market.

32. Pepsi's customers include retailers in several channels, such as grocery stores, drug stores, convenience stores, discount/dollar stores, mass merchandisers, and membership stores. Retailers purchase Pepsi products from Pepsi and its bottlers and then re-sell those products to consumers. Retailers within each channel compete with one another. Retailers in one channel also often compete with retailers in other channels in the sale of soft drinks.

33. Pepsi's brand recognition is universal. Many food and beverage retailers consider Pepsi's soft drinks important to carry. Failing to carry Pepsi's soft drinks can put them at a competitive disadvantage to retailers that do carry Pepsi products. Pepsi distributes consumer products to retailers throughout the United States, who then sell the products to consumers.

34. Further, as discussed below, Pepsi's portfolio of products and brands includes several that exercise market power. Pepsi-Cola, Mountain Dew, Gatorade, and RTD Starbuck's, among others are owned or sold by Pepsi.

35. While Pepsi's brand still remains a household name, sales have decreased 32% between 2010 and 2023, and within carbonated soft drinks, Pepsi has fallen behind Keurig Dr. Pepper (though Pepsi's distribution agreements, discussed below, give it the ability to effectively control over pricing far beyond Pepsi's own brands).

36. Further, Pepsi owns Lay's, which has a monopoly share of the U.S. salty snack market, and which it uses for cross-promotions with its RTD soft drinks.

37. Walmart is Pepsi's most important customer. In its 2024 Annual Report, Pepsi advised that sales to Walmart and its corporate affiliates were responsible for 14% of Pepsi's consolidated net revenue, or approximately $12.86 billion. Accordingly, Pepsi told investors that losing Walmart as a customer "would have a material adverse effect" on all of Pepsi's business. Walmart was the *only* such customer identified in Pepsi's 2024 Annual Report.

38. As Pepsi's largest customer and as the leading retail company, Walmart uses its leverage to enter into supply agreements directly with manufacturers, including Pepsi. At Walmart's insistence, Pepsi has agreed to an arrangement that affects its prices across the entire universe of wholesale customers. Under this agreement, not only does Pepsi provide Walmart with a slew of promotional payments, allowances, and services—benefits not provided to Walmart's competitors on proportionately equal terms—it also guarantees Walmart a "gap" in retail price such that Pepsi does not sell to other customers on terms equal to Walmart. Rather than a relatively common "most favored nation" clause that requires Pepsi to treat Walmart no worse than any other buyer, Walmart requires Pepsi to price higher to every other buyer, so that Walmart can be the lowest retail seller of Pepsi's RTD soft drinks, but without Walmart having to reduce its own profit margin to ensure that result. Acting in its own unilateral self-interest, Pepsi would have no incentive to prevent retailers from competing with each other on price or to cut off supply to retailers that undercut Walmart's prices, as it did pursuant to the Scheme.

39. The agreement with Pepsi was not unique in Walmart's history. Around the time that Walmart and Pepsi entered into the Scheme, Walmart entered a similar arrangement with Energizer, the leading producer of consumer batteries. There, like here, Energizer agreed to protect Walmart from retail price competition by raising the wholesale prices it charged Walmart's competitors so they could not sell Energizer batteries below Walmart's retail price. Because of its

towering power in retail, even consumer brands with significant market share, like Energizer, cannot forgo distribution through Walmart. Consequently, Walmart can and does demand that its suppliers price their branded wares *to others* such that Walmart can have the lowest price in the marketplace, without having to sacrifice its own margin to achieve this price advantage. That is, Walmart uses its market power to ensure that some branded products cost more everywhere else.

## II.    The Agreement Provides an Unfair and Competitive Advantage to Walmart

40.    As early as January 2018, Pepsi and Walmart agreed to the Scheme.

41.    The Scheme has two components. First, Pepsi agreed with Walmart to artificially inflate the wholesale prices it charged to Walmart's competitors for Pepsi RTD soft drinks. Second, Pepsi agreed to monitor Walmart's competitors to ensure that they did not charge lower retail prices for Pepsi Soft Drinks than Walmart and to discipline those that did, including by raising their wholesale prices.

42.    To ensure that other retailers charge higher prices than Walmart for Pepsi RTD soft drinks, Pepsi works with Walmart to create what Defendants refer to as a retail "price gap." This gives Walmart an advantage over its brick-and-mortar competitors in the resale of Pepsi RTD soft drinks to consumers.

43.    According to an investigation conducted by the U.S. Federal Trade Commission ("FTC"), Pepsi's internal business documents reflect a "foundational commitment" to provide Walmart with this price gap: "Delivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi. The FTC cited one internal Pepsi email explaining, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

44. The FTC further learned that Pepsi keeps close track of Walmart's "price leadership" through regular retail price monitoring. In particular, Pepsi tracks two metrics related to the Walmart retail price gap arrangement: (1) price gap and (2) value hedge. Price gap is the "[c]omparison of average price at Walmart [versus] comparisons within a time frame weighted on Walmart volume for items." By contrast, the "value hedge" metric does not weight by Walmart's volume of items, and instead represents a percentage difference in average retail price between Walmart and other retailers. Each metric compares retail prices for Pepsi RTD soft drinks at Walmart with retail prices for the "rest of market" or "ROM." "[R]est of market" includes "multi outlet" or "multi-channel" stores, and stores in the grocery, club, drug, and dollar channels, but excludes Walmart.

45. Walmart also monitors its "price gap" on Pepsi RTD soft drinks. Pepsi and Walmart regularly communicate about whether Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis. Internal documents indicate that Pepsi endeavors to "manage [retail] price gap expectations to longer timeframes," namely, annual and semi-annual timeframes, but it also views monthly and quarterly retail price gaps as "leading indicators" of potential issues with Walmart. Walmart's buyers (employees responsible for negotiating purchases from manufacturers such as Pepsi) would receive "Price Gap" reports before regular meetings with Pepsi executives where they would discuss how to address gaps to reinforce and renew their agreement.

46. This continual monitoring of Walmart's retail price gap on Pepsi RTD soft drinks as compared with the rest of the market and sharing of information allowed Walmart to police Pepsi's compliance with the Scheme.

47. When Walmart's price gap narrowed due to competitive prices from other retailers, Pepsi executives feared Walmart's negative reaction. For example, according to the FTC, in 2019,

Pepsi executives became aware of aggressive price cutting by another retailer relating to 12 packs of Pepsi soft drinks. The Pepsi executives became concerned that the price cutting would threaten Walmart's retail price gap. The FTC identified a document in which a Pepsi executive expressed concern about Walmart's reaction to a price gap report: "They have now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]."

48.     Per the FTC, to achieve and sustain the Walmart price gap, advantage Walmart in the resale of Pepsi RTD soft drinks, and adhere to the agreed-upon Scheme, Pepsi disadvantaged other direct purchasers of Pepsi RTD soft drinks by selectively reducing promotional payments and allowances and raising wholesale prices.

49.     When Pepsi or Walmart learn that other retailers are threatening Walmart's agreed upon retail price gap under the Scheme, these retailers are labeled "offenders." Pepsi takes action to punish the "offenders' by eliminating promotional support and increasing wholesale prices. Pepsi takes these actions against discounting retailers with the expectation that, to meet margin goals, those retailers will pass on the wholesale price increase to consumers by raising retail prices on Pepsi RTD soft drinks, thereby restoring Walmart's price gap. In other words, to enforce Walmart's price gap, Pepsi seeks to drive up retail prices for Pepsi RTD soft drinks sold by Walmart's rivals.

50.     The FTC identified an internal Pepsi email from 2019 that acknowledges an effort to advantage Walmart in the resale of Pepsi RTD soft drinks by increasing competitors' costs to buy Pepsi Soft Drinks: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs /

retails in order to drive growth on our mutual businesses." Pepsi describes a cost increase it imposed on other retailers, but not Walmart: "[REDACTED]cost increase in the rest of market. The cost increase, which is already in effect in rest of market, has not been passed on to Walmart."

51. An example of Pepsi strategizing to raise prices of another retailer to facilitate the Scheme and protect Walmart's price gap involves the supermarket retailer Food Lion. Food Lion is a regional supermarket chain that operates over 1,000 stores across 10 states. According to the FTC, in 2022, Pepsi believed that Food Lion was the "worst offender" on the price gap for "beating [Walmart] in price."

52. As a result of Food Lion threatening Walmart's price gap, Pepsi created a plan to force Food Lion to increase retail prices on Pepsi RTD soft drinks by raising Food Lion's costs to acquire Pepsi RTD soft drinks, including by reducing promotional payments and allowances to Food Lion. The plan advised that Pepsi "must commit to raising rate [on Food Lion] faster than market by minimum [REDACTED] annually." Pepsi's plan included a multi-year initiative that recommended a combination of (1) reductions in promotional payments and allowances and (2) wholesale price hikes to raise Food Lion's dead net price, or price including all discounts, allowances, and other charges. Pepsi was clear about its purpose in targeting Food Lion. Pepsi was raising Food Lion's costs to buy Pepsi RTD soft drinks to "begin to CLOSE the gap" because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term." Absent its agreement with Walmart, Pepsi would have had little incentive to raise retail prices and sacrifice potential sales against its own self-interest.

53. These acts are contrary to Pepsi's independent self-interest, and Pepsi would not have engaged in this conduct absent the Scheme. Indeed, if Pepsi was independently pursuing its own economic interests, it would be motivated to minimize retail prices, including at Food Lion,

which would drive sales volume and profit. Likewise, in a competitive market, if Walmart was concerned about discounted Pepsi RTD soft drinks at Food Lion or any other retailer, it would have demanded lower prices from Pepsi to subsidize its own lower retail prices.

54. At the wholesale level, Pepsi imposed series of significant price increases that were made possible by its Scheme with Walmart, which otherwise would have been against Walmart's self-interest. In 2019, for instance, Pepsi imposed a market-wide wholesale price increase on all its customers except Walmart, thus fortifying Walmart's "price leadership" position while providing Pepsi further inflated wholesale profits on its remaining sales. As an internal Pepsi email acknowledged: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs/retails in order to drive growth on our mutual businesses."

55. Pepsi followed this up with a series of substantial, successive wholesale price increases on all customers that would not have been possible absent the Scheme. Between 2022 and 2023, Pepsi raised wholesale prices by double-digit percentages each quarter for seven consecutive quarters. In October 2022, commentators observed that these "[p]rice hikes" had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on . . . costs to consumers."

56. On a 2022 earnings call, Pepsi's Chief Financial Officer, Hugh Johnston, told investors that Pepsi's price increases were protected from competition, advising "We increased prices at the beginning of the fourth quarter . . . I actually think we're capable of taking whatever pricing [increases] we need." Pepsi's Chief Executive Officer, Ramon Laguarta, echoed this sentiment on a 2023 earnings call, stating: "[O]bviously, we've been able to raise prices and consumers stay within our brand."

57. The wholesale price increases Pepsi imposed during the Class Period are large and unexplained. They include the following:

**Wholesale Price Increases**

| Date | Soda 12-Pack | Soda 2 Liter | Gatorade 20 oz. |
|---|---|---|---|
| Sept. 2018 | 3% | 18% | - |
| Mar. 2019 | 0% | 0% | - |
| Jan. 2020 | 5% | 0% | 0% |
| Sept. 2021 | 11% | 0% | 0% |
| Oct. 2022 | 4% | 4% | 0% |
| Jan. 2023 | 6% | 7% | 70% |
| Sept. 2023 | 6% | 23% | 0% |
| Oct. 2024 | 12% | 17% | 0% |
| Sept. 2025 | 4% | 0% | - |
| **Total:** | **64%** | **104%** | **70%** |

58. Prior to 2018, Pepsi typically increased prices just once a year and typically did so modestly. Starting in 2018, however, Pepsi's price increases became larger and more frequent.

59. In July 2024, after receiving yet another price increase notice from Pepsi, a Redner's employee remarked: "Hard to fathom that Pepsi feels another price increase is warranted. Retails are chasing folks away from CSD." Indeed, consumption of CSD fell in 2024 and 2025 relative to historic trends due to the aggressive pricing that Pepsi, followed by Coca-Cola, pursued.

60. The Scheme has also allowed Walmart to charge its customers, like Plaintiffs, inflated prices for Pepsi RTD soft drinks over time, while retaining high profit margins.





61. In sum, pursuant to their agreement, Pepsi prices its products so that all other buyers have a higher wholesale cost (net of all discounts and promotions) than Walmart, and Walmart receives promotional payments and allowances intended to promote the resale of Pepsi's RTD soft

drinks that put its net wholesale cost below any other of Pepsi's customers. The payments and allowances to Walmart from Pepsi that create this disparity are by design not available to competing retailers and exclusive to Walmart.

62. Disparate pricing that advantages Walmart and disadvantages other retailers are one of the reasons why independent grocers struggle to survive and food prices are high.[8]

63. The prices, payments and allowances to Walmart that create the disparity include various promotions. Pricing in grocery retail items generally includes promotions both in the form of promotional prices to consumers (supported by the manufacturer's pricing to the retailer), and advertisement paid for as part of the wholesale arrangement intended to draw consumers to the promotion. Such promotions include eye-catching advertising displays, multimedia advertising, and advantaged in-store placement relative to other brands and items in the store. Such displays may include dump bins (freestanding containers where customers can easily grab loose items), inline displays (displays integrated directly onto the regular store shelves, highlighting specific products within the aisle), endcap displays (located at the end of aisles, these are highly visible and often used for showcasing new products or special promotions), gondola displays (shelving units that allow for displaying a variety of products across multiple levels), point-of-purchase displays (positioned to capture the attention of customers near a point of purchase), casestacker displays (designed to stack multiple cases of a product on top of each other, ideal for bulk items), shelf talkers (small signage attached to shelves to highlight promotions or product details), floor displays (free-standing displays that sit directly on the floor), and pallet displays (a large platform

---

[8] *See* Zephyr Teachout, *New York City Has the Power to Bring Down Grocery Prices. All Cities Do.*, New York Times (July 21, 2025), https://www.nytimes.com/2025/07/21/opinion/nyc-grocery-prices.html?smid=nytcore-ios-share&referringSource=articleShare.

built on a pallet, used to showcase large quantities of a single product).  An example of one such display can be seen below:



**Figure 1**

64.	In exchange for these payments and allowances and to support the resale of Pepsi RTD soft drinks, Walmart will typically feature Pepsi RTD soft drinks in its stores with flashy displays and advertisements, and better placement.  These promotional services and facilities have a measurable effect of driving the resale of Pepsi RTD soft drinks to consumers at Walmart stores.

65.	However, the payments and allowances between Pepsi and Walmart go beyond display, advertisement, and placement benefits.  To ensure that Walmart remains their leading

retailer, Pepsi provides Walmart with promotional payments and allowances. These payments and allowances result in net prices to Walmart that are exclusive to Walmart, with all other retailers buying at higher effective prices net of all promotions and allowances. Accordingly, and by design, even major grocery chains and other big box retailers cannot achieve Walmart's exclusive low cost and cannot profitably match Walmart's retail prices on Pepsi RTD soft drinks. As such, Pepsi by design does not and cannot make the same promotional payments and allowances available to all other retailers on proportionately equal terms. The purpose of the agreement is a structural cost advantage to Walmart so that, without sacrificing any of its own margin, Walmart can remain the cheapest retailer of Pepsi RTD soft drinks.

66. The net effect is that Pepsi sells its products to every other retailer for a higher price, in order to give Walmart a competitive advantage against other retailers. It works. The advantage becomes evident when viewing Walmart's prices of Pepsi RTD soft drinks relative to other competitors and vendors.

67. On July 1, 2025, the price of a Two-Liter Pepsi Soda was $2.59 at a Lynn, MA Walmart location.



**Figure 2**

68.    The price of a Two-Liter Pepsi Wild Cherry Soda was $2.20 at a Lynn, MA Walmart location.



**Figure 3**

69.    The price of a Two-Liter Diet Pepsi Soda was $2.50 at a Lynn, MA Walmart location.



**Figure 4**

70. The prices listed on the Lynn, MA Walmart website are in stark contrast to the prices of Two-Liter Pepsi Sodas at other surrounding stores, including Michael G's Handcrafted Italian and other large retailers.

71. That same day, at a nearby Walgreens located at 1010 Broadway, Chelsea, MA 02150, the prices of a Two-Liter Pepsi Soda, Two-Liter Pepsi Wild Cherry Soda, and Two-Liter Diet Pepsi Soda were each $3.59.



**Figure 5**

72. One of Pepsi's biggest retailers, 7-Eleven, has a nearby location at 188 Chelsea St, Everett, MA 02149. Here, the prices of a Two-Liter Pepsi Soda, Two-Liter Pepsi Wild Cherry Soda, and Two-Liter Diet Pepsi Soda were each $3.69.



**Figure 6**

73.    Two-Liter Pepsi Sodas and Two-Liter Diet Pepsi Sodas are also sold at CVS, which has a nearby location at 1010 Revere Beach Pkwy, Chelsea, MA 02150.  Here, the price of a Two-Liter Pepsi Soda and Two-Liter Diet Pepsi Soda were also $3.69.



**Figure 7**



**Figure 8**

74. Compared to the price of a Two-Liter Pepsi Soda at Walgreens, the price of the same product at Walmart is up to 39% less. When compared to 7-Eleven and CVS, the difference only becomes more evident. A Two-Liter Pepsi Soda at Walmart becomes 40% cheaper when compared to 7-Eleven and CVS.

75. Pepsi RTD soft drinks are sold in interstate commerce.

### III. Agreement In Restraint of Trade

76. The Sherman Act makes unlawful any agreement in restraint of trade. 15 U.S.C. § 1. Agreements in restraint of trade are either *per se* unlawful, or subject to the "rule of reason." Defendants' conduct herein is vertical price fixing, or "resale price maintenance," which is subject to a rule of reason analysis.

77. Defendant Pepsi and Defendant Walmart agreed that Pepsi would increase effective prices (net of discounts and promotional considerations) to other retailers such that Walmart would have a cost advantage and could then price below all its retail competitors without reducing its own margin. Walmart was able to secure this agreement by the exercise of market power.

### A. Relevant Product Markets

78. Pepsi owns and distributes a suite of products that together provide it approximately 40% market share within the overall non-alcoholic ready-to-drink ("RTD") soft drink market.

79. The RTD soft drink market includes both carbonated soft drinks ("CSD") and several types of non-carbonated soft drinks. Its 2026 market size in the United States is forecasted to reach $247.26 billion by 2032.[9] The RTD soft drink market is a relevant market. There are no reasonable substitutes for RTD soft drinks. Given their convenience, customers do not view other beverages, including bottled water, as reasonably interchangeable or close substitutes for their soft drink counterparts and will only substitute other products under circumstances that will not allow a substitute to discipline the price of RTD soft drinks. Alcoholic drinks have obvious mood-altering effects that render them non-substitutable, while bottled water does not provide the same flavor and functional benefits. Nor are non-beverage products substitutes for RTD soft drinks for virtually any purpose.

80. Because there are no reasonable substitutes for RTD soft drinks, the demand for soft drink products is relatively inelastic—that is, consumers do not refrain from buying soft drink products when prices rise (even substantially).

81. The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "hypothetical monopolist" test. The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%) non-transitory increase in price ("SSNIP"), without causing so many customers to switch to other products such that the SSNIP would be unprofitable. If a market satisfies the hypothetical monopolist test, it is a relevant antitrust market.

---

[9] https://www.fortunebusinessinsights.com/ready-to-drink-rtd-beverages-market-102124

82. Here, cross-elasticity of demand is sufficiently low to satisfy the hypothetical monopolist test. A hypothetical monopolist in the market for RTD soft drinks could profitably impose a SSNIP.

83. The fact that Pepsi and Walmart were able to successfully inflate the price of Pepsi products above competitive levels provides additional evidence that the RTD soft drink market is a relevant antitrust market because if it were not, customers would have switched to other products at sufficient volumes to make a SSNIP unprofitable.

84. The RTD soft drink market is characterized by high barriers to entry because distribution at scale is highly constrained by store shelf space and further constrained by market realities whereby the three existing large producers have exclusive rights to shelf space and discount calendars. New entry is foreclosed by the difficulty and massive cost of generating name recognition, and the problems of securing widespread distribution.

85. Pepsi's market power in the RTD soft drink market is also demonstrated directly by its power, in conjunction with Walmart, to inflate prices above the competitive levels. Pepsi and Walmart's successful implementation of their agreement shows that the market for RTD soft drinks is one in which it is possible for Pepsi to exercise market power.

86. Pepsi has substantial market power in the RTD soft drink market due to its high market share in the RTD soft drink market, as well as its dominant position in several subcategories of RFD soft drinks as discussed below.

87. ***Carbonated Soft Drinks.*** Pepsi has approximately 40% share of the Carbonated Soft Drinks category as a distributor of both in-house brands, including Pepsi and Mountain Dew, and Dr. Pepper brands, including Dr. Pepper, Schweppes, and Crush. Together, these brands give Pepsi significant presence in the CSD subcategories discussed below**.**

88. ***Cola.*** The cola flavor subcategory is the largest segment within Carbonated Soft Drinks, accounting for half of total CSD volume.[10]

89. Pepsi and Coca-Cola have a longstanding duopoly in the cola segment. Pepsi and Coca-Cola are the largest and most recognizable members, dominating shelf space and consumer spending, with smaller brands holding only marginal market share.

90. Pepsi has a roughly 30% share in the Cola segment through its sales of Pepsi, Diet Pepsi, Pepsi Zero Sugar (formerly Pepsi Max), Wild Cherry Pepsi, Diet Pepsi Wild Cherry, Pepsi Zero Sugar Wild Cherry, Diet Pepsi Vanilla, Caffeine Free Pepsi, Caffeine Free Diet Pepsi, and Pepsi Real Sugar (formerly Pepsi Throwback).[11]

91. ***Citrus.*** Pepsi also has a leading share in the Citrus flavor subcategory, with Mountain Dew representing roughly 80% of the category in the U.S.[12]

92. ***Pepper.*** In 2009, Pepsi entered into a 20-year bottling and distribution agreement with Keurig Dr. Pepper (then Dr Pepper Snapple Group, Inc.).[13] The FTC challenged the deal, pointing out that "PepsiCo and Dr Pepper Snapple are direct competitors in the highly concentrated and difficult-to-enter markets for branded soft drink concentrate and branded and direct-store-delivered carbonated soft drinks."[14]

---

[10] Beverage Digest.

[11] Beverage Digest.

[12] https://bevi.co/blog/history-of-starry-soda/; https://web.archive.org/web/20100825095145/http:/seekingalpha.com/article/211464-branded-entertainment-could-boost-pepsico; Beverage Digest

[13] Press Releases, *PepsiCo Reaches Agreement to Distribute Certain Dr Pepper Snapple Group Brands*, PepsiCo, Inc. (Dec. 8, 2009), https://www.pepsico.com/newsroom/press-releases/2009/pepsico-reaches-agreement-to-distribute-certain-dr-pepper-snapple-group-brands.

[14] Press Release, FTC Puts Conditions on PepsiCo's $7.8 Billion Acquisition of Two Largest Bottlers and Distributors, FTC (Feb. 26, 2010), https://www.ftc.gov/news-events/news/press-releases/2010/02/ftc-puts-conditions-pepsicos-78-billion-acquisition-two-largest-bottlers-distributors.

93. Although the FTC ultimately allowed the transaction to go through, it noted at the time concerns that Pepsi's access to commercially sensitive information about Dr Pepper Snapple's marketing plans "could hurt Dr Pepper Snapple's ability to compete, and ultimately could harm consumers by eliminating competition between PepsiCo and Dr Pepper Snapple and/or facilitating coordinated interaction in the industry" and entered a consent order requiring a "firewall" between the two companies.

94. Today, Pepsi manufactures and distributes certain brands licensed from Keurig Dr Pepper Inc., including Crush, Dr Pepper and Schweppes.[15]

95. As a result of the Pepsi-Dr Pepper relationship Pepsi is able to exert control over the prices of Dr. Pepper-owned brands. This effectively increases Pepsi's share in the CSD category beyond its owned brands. Dr. Pepper accounts for over 12% of the carbonated soft drink category and over 90% of the Pepper flavor subcategory.[16]

96. Indeed, typical price increases would include both Pepsi and Dr. Depper products. For example, a September 2023 price increase notice Pepsi sent its retailer customers noted that prices for all RTD soft drinks in specified packaging Pepsi carried would increase: "This pricing includes all the brands that [Pepsi Bottling Company] of Havre de Grace, distributes in that package including Dr Pepper."

97. ***Non-Carbonated RTD soft drinks.*** Taking the non-carbonated categories of RTD soft drinks as a whole, Pepsi has a roughly 40% share, due to its brands in the Sports Drinks, RTD Coffee, RTD Tea, and Energy Drinks subcategories discussed below.

---

[15] PepsiCo, Inc. 2025 Form 10-K at 3.

[16] Beverage Digest.

98. ***Sports Drinks.*** Pepsi is by far the category leader in sports drinks in the United States, holding approximately 61.6% of the category, which is worth roughly $15 billion overall.[17]

99. Pepsi sells multiple brands of RTD Sports Drinks: Gatorade, Gatorade Zero, GatorLyte, G2, and Propel (which is sometimes categorized as a "functional hydration" beverage).[18]

100. The Gatorade trademark dwarfs each of its nearest competitors, Powerade and BODYARMOR, threefold. Both are owned by Coca-Cola and make up a respective 14.5% and 11.8% of the sports drinks category.[19]

101. As Pepsi's Chairman and CEO remarked recently, "[w]e see ourselves, obviously, very statistically leading the functional hydration category and that category is accelerating. . . . We see Gatorade and Propel gaining share there."[20]

102. ***RTD Coffee.*** For over a decade, Pepsi has had roughly a 45-60% share in the RTD coffee category in the United States, which is worth roughly $8 billion.[21]

103. More than twenty years ago, Pepsi and Starbucks formed a joint venture, the North American Coffee Partnership (NACP) in response to the growing demand for on-the-go coffee products.[22]

---

[17] https://www.beveragedaily.com/Article/2025/02/26/gatorade-powerade-bodyarmor-how-coca-cola-pepsico-shape-sports-drinks/; Beverage Digest.

[18] Beverage Digest.

[19] https://www.beveragedaily.com/Article/2025/02/26/gatorade-powerade-bodyarmor-how-coca-cola-pepsico-shape-sports-drinks/

[20] PepsiCo Q1 2026 Earnings Call

[21] https://www.mordorintelligence.com/industry-reports/united-states-of-america-ready-to-drink-rtd-coffee-market.

[22] https://www.linkedin.com/pulse/brewing-success-starbucks-pepsico-partnership-bikramjit-laskar-

104. Through the NACP, Pepsi develops and distributes popular RTD coffee drinks, including bottled Frappuccino beverages, Starbucks iced coffee, Starbucks DoubleShot espresso drinks, Starbucks cold brew, Starbucks iced espresso, and Seattle's Best Coffee beverages.[23]

105. Pepsi is by far the leader in the RTD coffee category, outselling Coca-Cola's Georgia and Dunkin trademarks and Nestlé's Nescafé trademark. Starbucks' overall RTD coffee sales nearly quadruple the next closest brand, Danone (Stok Coffee). Starbucks' Frappuccino trademark alone is the largest RTD coffee brand in the United States by a wide margin, larger than the next ten non-Starbucks trademarks combined (Stok Coffee, Dunkin Iced Coffee, La Colombe Draft Latte, Califia Farms, Black Rifle Coffee, Super Coffee, High Brew Coffee, Peet's, Stumptown Coffee, and Costa Coffee).[24]

106. **RTD Tea.** Pepsi also has the largest share of any company in the RTD Tea category, representing more than 25% in the United States.[25]

107. Since 1991, Pepsi and Unilever have operated joint ventures in the RTD Tea category. In 2014, they unified under a single leadership team, the global Pepsi-Lipton Joint Venture. This 50-50 joint venture sells RTD tea concentrate to franchise bottlers, using PepsiCo's bottling and distribution network to market and distribute Lipton RTD tea products.[26]

108. Pepsi has three brands in the RTD Tea category: Lipton, Pure Leaf, and Brisk, which is under the Lipton trademark.

---

[23] https://www.sec.gov/Archives/edgar/vprr/1300/13000217.pdf.

[24] Beverage Digest.

[25] Beverage Digest.

[26] https://www.sec.gov/Archives/edgar/data/77476/000130817926000172/pep015012-ars.pdf

109.     Including Brisk, Lipton is the single largest trademark in the RTD Tea category, beating out Arizona and Coca-Cola's Gold Peak. The Lipton Brand alone ranks second after Arizona, followed by Pure Leaf and Brisk, which are five and six, respectively.[27]

110.     ***Energy Drinks.*** In 2022, Pepsi invested $550 million in Celsius Holdings and entered a long-term, exclusive distribution deal with Celsius.[28] In August 2025, Pepsi increased its ownership stake in Celsius to 11% with another $585 million investment, as well as selling its U.S. Rockstar brand—representing around 10% spend of the energy drink category—to Celsius. Today, Celsius represents upwards of 20% of the energy drink category with its three brands: Celsius, Alani Nu, and Rockstar Energy.[29]

111.     The Celsius investment came a few years after Pepsi's distribution deal with Bang Energy came to abrupt end, with Bang filing a lawsuit accusing Pepsi of "intimidation tactics with independent distributors and major retailers like Walmart threatening lawsuits against anyone who fails to purchase Bang Energy exclusively from Pepsi."[30]

112.     PepsiCo also distributes Starbucks-branded energy drinks (Starbucks Doubleshot Energy and Starbucks Tripleshot Energy) and Mountain Dew energy drinks (Mountain Dew Kickstart and Mountain Dew Amp).[31]

---

[27] Beverage Digest.

[28] https://www.fooddive.com/news/pepsico-celsius-550m-investment-distribution/628549/

[29] https://www.fooddive.com/news/pepsico-ups-stake-in-energy-drink-company-celsius-with-585m-deal/758933/

[30] https://www.fooddive.com/news/bang-energy-sues-pepsico-citing-gross-misconduct-and-intimidation/589847/.

[31] Beverage Digest.

113. ***Juice and Juice Drinks.*** Tropicana is the U.S. market leader in orange juice (its flagship product) at 30% market share. It also makes several other flavors of fruit drinks including fruit punch and lemonade.

114. PepsiCo sold the Tropicana and Naked juice businesses in 2021 to PAI Partners, but it still retains a 39% ownership stake in their joint venture, called Tropicana Brands Group ("TBG"). PepsiCo remains "the exclusive distributor for small-format and foodservice customers with chilled direct-store-delivery (DSD) for the portfolio of brands owned by" TBG.[32]

115. The effect of the Tropicana Brands Group partnership is that Pepsi is able to exert market power in a larger swath of the juice category. Pepsi's market power in the juice segment is also bolstered by its brand licensing agreements with Dole Food Company, Inc. and Ocean Spray Cranberries, Inc.[33]

116. To the extent any of these subcategories of RTD soft drinks are themselves relevant antitrust submarkets, the RTD soft drink market is a cluster market because the various subcategories of RTD soft drinks complement one another at the wholesale level. Retailers typically need to stock all or almost all of the various subcategories of RTD soft drinks. Consumers expect and value the convenience of accessing and purchasing all categories of RTD soft drinks in the same retail stores and even the same sections within those stores. Retailers do not find it competitively feasible to offer only a subset of the subcategories of RTD soft drinks and rarely stock certain subcategories of RTD soft drinks without stocking others.

---

[32] PepsiCo, Inc. 2025 Form 10-K at 3.

[33] *Id.*

117. Pepsi itself measures competitive performance and market share within the broader "Liquid Refreshment Beverage" category—a category encompassing carbonated soft drinks, sports drinks, juice beverages, RTD tea, RTD coffee, and other packaged non-alcoholic beverages.

118. Pepsi further increases retailers' incentives to carry all subcategories of RTD soft drinks by offering reimbursements and discounts contingent on retailers allotting certain percentages of their shelf space to Pepsi products.

119. Pepsi also uses its market power in the salty snack market (e.g. Fritos and Lay's potato chips), where Pepsi's holdings approach or exceed 60% market share, and other food offerings, to bolster its RTD soft drink market power when making agreements with retailers.

120. For its retailer customers, Pepsi provides discounts and incentives tied to purchasing both Frito Lay and Pepsi's RTD soft drinks. These promotions also have a disproportionate impact on RTD soft drink sales. As an example, at one grocery chain, a combined Pepsi and Lay's promotion boosted the Lay's product sales just 17%, but the Pepsi RTD soft drinks 70%, showing that Lay's cross-promotion has an outsized impact on RTD soft drink sales. These promotions allow Pepsi to exercise market power in RTD soft drinks beyond the market share that it controls though its owned brands and distribution agreements.

121. Pepsi is a long-time sponsor of the NFL and the Super Bowl, and Pepsi and Frito Lay have repeatedly run cross-promotions with displays and incentives bringing together snacks and Pepsi's RTD soft drinks with displays in stores tied to the Super Bowl and the beginning of the NFL season.



122. A common promotion tied to the NFL was the one Pepsi ran in the Fall of 2023, where consumers who purchased an 8-pack of certain Pepsi RTD soft drinks and also a bag of Frito Lay chips would get a $2 manufacturer's coupon.

123. These promotions were very popular with consumers and brought revenue and customer traffic to Pepsi retailers. Indeed, according to Neilsen data beverages drive traffic to supermarkets more than any other product. Coca-Cola created a presentation for its clients in 2023 called "Beverages are the largest trip driver across store categories," showing that non-alcoholic beverages had a growth of $41.4 billion from 2019 to 2023, more than double the next category, prepared foods, which saw $18.5 million in growth.

124. A merchant simply cannot afford to forgo Pepsi altogether because of the sheer size of its portfolio of products, as well as incontestable consumer demand for individual branded products, and because Pepsi's products have dominant positions within multiple subcategories. Retailer purchasers cannot effectively extricate separate products from Pepsi's portfolio of offerings.



125.     Pepsi is a leader in many segments of its Pepsi Beverages North America ("PBNA")

portfolio; indeed, in the company's earnings call on April 16, 2026, Pepsi's Chairman and CEO

Ramon LaGuarta remarked:

> PBNA is growing 9% total business, right? So we're growing at an accelerated way, including energy. So we see ourselves participating in the energy portfolio through our CELSIUS investment and our distribution of CELSIUS, that's gaining share. ***We see ourselves, obviously, very statistically leading the functional hydration category and that category is accelerating.*** For the first time in several years, we see functional hydration, including sports and the rest of functional hydration growing ahead of LRB. That's a key objective for us as well... We see Gatorade and Propel gaining share there.
>
> We still have some work to do on accelerating the coffee business and accelerating the tea business***, where we're also leaders. Some of the innovation that we have in the Starbucks portfolio is intended to do that. And then in CSDs, we continue to have good growth in modern soda, which is a segment that keeps accelerating.*** Our poppi business is starting to accelerate now, and then obviously, we have opportunities with Mountain Dew that we have highlighted for quite some time.
>
> (emphasis added).[34]

126.     Pepsi and Walmart's successful implementation of their agreement shows that the

market for RTD soft drinks is one in which it is possible for Pepsi to exercise market power. The

fact that Pepsi and Walmart were able to successfully inflate the price of Pepsi products above

---

[34] PepsiCo Q1 2026 Earnings Call,

competitive levels provides additional evidence that the RTD soft drink market satisfies the SSNIP test because if it did not, customers would have switched to other products at sufficient volumes to make a SSNIP unprofitable.

127. Walmart competes in the grocery market. It is a brand name maintaining a location within ten miles of more than ninety percent of American consumers. Walmart's brand is widely recognized, and Walmart has positioned the brand as the lowest cost place to get many grocery items, including carbonated soft drinks.

128. Walmart is also able to control its competitors' retail prices for RTD soft drinks through its combined market power with Pepsi. Pepsi effectively delegates its market power to Walmart, enabling Walmart to set retail prices and increase wholesale prices for RTD soft drinks.

129. Because RTD soft drinks are identical products whether sold at the wholesale or retail level (i.e. they are not used as inputs to create any different products), Pepsi's market share is functionally identical at the wholesale and retail level. Indeed, Pepsi measures its market share in the RTD soft drink market by surveying the relevant volumes of retail sales. Likewise, because the scheme enabled Pepsi to effectively fix retail prices, it was able to exercise market power at both the wholesale and retail level.

130. Direct evidence establishes that Defendants exercise the combined market power possessed by both Walmart and Energizer within the Relevant Market. That direct evidence includes Defendants' ability to profitably and sustainably inflate prices above competitive levels. It also includes Pepsi's numerous large price increases since January 2019 that were enabled by its agreement with Walmart that cannot be explained based on competitive forces or unilateral self-interest.

131. To the extent any of these subcategories of RTD soft drinks are themselves relevant antitrust submarkets, the RTD soft drink market is a cluster market. Retailers typically need to stock all or almost all of the various subcategories of RTD soft drinks. Consumers expect and value the convenience of accessing and purchasing all categories of RTD soft drinks in the same retail locations, and retailers do not view it as competitively feasible to offer only a subset of the subcategories of RTD soft drinks. Pepsi further increases retailers' incentives to carry all subcategories of RTD soft drinks by offering reimbursements and discounts contingent on retailers allotting certain percentages of their shelf space to Pepsi products.[35]

132. Bottled water is not a functional substitute for RTD soft drinks for several reasons. First, unlike every RTD soft drink, nearly all American consumers have effectively free access to water. Therefore, while other RTD soft drinks must be purchased whether the consumer wishes to consume them immediately or at home, a consumer who wishes to drink water at home already has a supply, as a utility. Bottled water therefore serves a different purpose, allowing consumers to conveniently carry the water bottle away from home. Water is different in other ways: it is not flavored, there are few if any recognized brands, and companies do not make major investments to attempt to build brand loyalty in bottled water. In addition, production is different. Water bottles can be very thin because of the contents, and nothing is added to the water drawn from the source, so the bottling process varies materially from those for all other RTD soft drinks.

133. Pepsi's ability to exercise market power is demonstrated by its ability to command scarce retail shelf space. Pepsi negotiates shelf space with grocers according, with chiefly terminological differences, to the market and segments described herein. Its proposal for shelf

---

[35] *See* T. Burt Redner's Screenshot.

space in this regard generally varies from 30% to 70% depending on the segment, as illustrated in detail by Pepsi's own graphic:



134.    In the large CSD segment, for example, Pepsi is in a position to bargain for half the shelf space, as a result of not only its branded sodas but its power as a bottler and distributor. Likewise, largely due to its agreement with Starbuck's, it could bargain for 70% of the RTD coffee space.

135.    The ready inference is that the shelf space Pepsi demanded of its grocery retail customers is an effective measure of its market share, at something approaching fifty percent across the entire RTD soft drink market.  In the alternative, Pepsi's shelf space document shows that its position in the industry allowed it to command square footage of precious space in excess of its market share, which itself demonstrates market power.  Either inference supports the conclusion that Pepsi was able to exercise market power in RTD soft drinks.Pepsi's conduct

harmed Interbrand competition in the RTD Beverages market because it led to a series of parallel price increases by Coca-Cola.

136. During the Class Period, Coca-Cola personnel would closely monitor pricing from Pepsi and would reach out to Pepsi customers directly to confirm there had been price increases. For example, in July 2021 Annie Casserly of Coca-Cola asked Redner's whether Pepsi had recently raised its wholesale prices so it "can keep track of the market." Redner's confirmed that Pepsi had indeed raised prices.

137. In March 2019, after noticing that Pepsi and Coca-Cola prices appeared to increase at around the same time, a Redner's employee remarked "It seems that Coke and Pepsi are aligning the 2 liters and 12packs again."

138. During the Class Period, Pepsi pursued a pricing strategy of aggressive price increases relative to Coca-Cola.

139. Pepsi pursued this strategy, at least in part, because it had committed to Walmart to increase prices on its competitors in order to maintain a "price gap."

140. The result of this strategy is that Pepsi's prices rose relative to its competitors, including Coca-Cola, and Coca-Cola took advantage of this strategy by raising its own prices: "Coca-Cola's average selling price rose 11% for the full year ended Dec. 31, [2022,] while PepsiCo's increased 14%." Ananya Mariam Rajesh, *Coca-Cola to push ahead with price hikes as PepsiCo hits pause*, Reuters (Feb. 14, 2023); https://www.reuters.com/business/retail-consumer/coca-cola-sees-annual-profit-above-estimates-resilient-demand-price-hikes-2023-02-14/.

141. Coca-Cola's strategy in the first quarter of 2024 was to follow Pepsi's lead, leading to increased profits on flats sales due to Coca-Cola's 13% price increases. See

https://fortune.com/2024/04/30/coca-cola-earnings-james-quincey-pepsi-price-hike/ ("Coca-Cola's bid to cash in on increased prices and international sales mirrors rival PepsiCo, which reported similar trends in its April 23 earnings report.")

142. Pepsi socialized its high pricing relative to Coca-Cola by telling its retailer customers that it would seek to price *at or above* Coca-Cola's level, using pretexts for increased prices. It informed one customer that "[g]iven the sensitivity around aluminum supply in the current environment, the expectation from my bosses are that we are level or higher on pricing relative to the red guys." The ability of a firm to command a price in excess of a direct rival's competing product, alone, is a demonstration of market power.

###### B. Relevant Geographic Market

143. The relevant geographic market is the United States. RTD soft drinks are shelf-stable and can be shipped in a way that will tend to arbitrage significant wholesale price differences.

144. Walmart also competes in a national market against nationwide grocery chains. Around 30% of the grocery store market in the United States belongs to Walmart.[36] In 43 metropolitan areas in the United States, Walmart has 50-69% of the grocery market share. In a further five metropolitan areas in the United States, Walmart has more than 70% of the grocery market share.[37]

---

[36] *See* https://www.forbes.com/sites/errolschweizer/2025/12/18/how-walmart-and-pepsico-rigged-prices-and-supercharged-food-inflation/, last accessed December 22, 2025.

[37] *See* https://ilsr.org/article/independent-business/walmarts-monopolization-of-local-grocery-markets/, last accessed December 22, 2025.

### C. Antitrust Impact

145. Defendants' agreement caused prices for Pepsi RTD soft drinks at Walmart to be higher than they would have been in a competitive market.

146. The price increases cannot be explained by increases to Pepsi's costs; neither aluminum nor sugar exhibit an input cost pattern that would explain the increases. Aluminum PPI[38] was 168 in June 2020, and rose to 268 by April 2022, but then fell back to 208 by September 2023. The prices of Pepsi's RTD soft drinks do not demonstrate a downward movement as the costs decreased, and aluminum prices did not continue to rise as Pepsi took some of its largest increases. A cost shock in aluminum cannot explain the price increases.

147. Nor does the price of sugar explain the price increases. Sugar PPI rose from 170 in June 2021 to 237 in March 2024, but then fell back down to 197 in February 2026. Again, a major component fell before steep increases in Pepsi RTD soft drink prices. Sugar prices cannot explain the price increases.

148. Nor can the price increases be explained by increased demand. In fact, demand for soft drinks peaked in the early 2000s and has been in a prolonged slump, decreasing by more than 15% points from the peak.

149. These price increases also cannot be explained by general inflation. For instance, inflation was only 3.2% in July 2023 and October 2023, but Pepsi increased prices by 15% and 11% in each month.

## IV. FTC's January 2025 Action Against Pepsi

150. On January 23, 2025, the FTC took action against Pepsi for allegations that are substantially similar to this complaint. *See Federal Trade Commission v. PepsiCo, Inc.*, 1:25-cv-

---

[38] PPI is a nominal index used to track inflation and relative cost in components of the economy.

00664-JMF (S.D.N.Y. 2025) ("FTC Compl."). While redacted from the publicly-filed complaint, the retailer in question is widely understood to have been Walmart.[39]

151.    In this action, the FTC found that the aforementioned conduct constitutes "unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45." FTC Compl. ¶ 81.  The FTC also found that this conduct "harms consumers who shop at [non-Walmart] retailers by forcing them to pay higher prices for Pepsi products." *Id.* ¶ 17.

## V.  Statutes of Limitations Do Not Bar Plaintiffs' Claims

### A.    Continuing Violation

152.    From January 1, 2018 to present (the "Class Period"), Defendants' Scheme was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by taking overt acts in furtherance of the Scheme.

153.    Throughout the Class Period, Defendants discussed the Scheme, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi RTD Beverages.

154.    Throughout the Class Period, Defendants' Scheme repeatedly injured Plaintiffs and proposed Class Members by causing them to pay overcharges each time they purchased Pepsi RTD Beverages from Walmart.

### B.    Fraudulent Concealment

155.    The statute of limitations is tolled because Defendants fraudulently concealed their Scheme.

---

[39] *See* https://www.cnn.com/2025/01/17/business/pepsi-walmart-ftc-prices, last accessed August 4, 2025.

156. Plaintiffs and members of the proposed Classes did not have actual or constructive knowledge of the facts constituting their claims for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy any earlier.

157. Pepsi misled its retailer customers as to the reasons for its price increases, reassuring them that they were working to lower retail prices for Pepsi soft drinks at Walmart and its competitors while in reality they were achieving price leadership by working together to *increase* prices at Walmart's competitors. On July 8, 2024, Pepsi sent a price increase notice to its customers that stated: "We have a broad consideration set when evaluating pricing decisions—including macro trends, current economic conditions, category dynamics, commodity and processed commodity prices labor costs and strategic investments. No single factor determines pricing actions. This letter is to inform you that PepsiCo Beverages North America intends to take low- to mid-single digit pricing on our portfolio starting September 2nd, 2024." This communication is typical of the price increase notices Pepsi sent during the Class Period. Pepsi did not disclose that maintaining a "price gap" with Walmart stores was a key consideration in its wholesale pricing, and that price increases were intended to make Pepsi products relatively less expensive at Walmart stores.

158. In a January 2025 press statement, Pepsi stated, "PepsiCo's practices are in line with industry norms and we do not favor certain customers by offering discounts or promotional support to some customers and not others."

159. Pepsi has also affirmatively misled the public about the reasons for its price increases. Following the Federal Trade Commission action against Pepsi, members of the United States Senate, led by Senator Elizabeth Warren, wrote to Pepsi's Chair and CEO, Ramon Laguarta.

160.     In its May 25, 2025 response, Pepsi denied any wrongdoing and averred that "[r]etail pricing may reflect and include wholesale costs, but is also influenced by a range of other considerations such as category dynamics, competitor pricing, consumer shopping occasion, retailer margin requirements, retailer performance, and individual retailer revenue management strategies. PepsiCo does not control retail pricing."  Pepsi also stated that "PepsiCo's pricing architecture is designed to ensure that all retailers—regardless of size or channel—receive competitive, non-discriminatory pricing, discounts, and promotional support."

161.     After reviewing these assertions after the substantial unsealing of the FTC complaint, Senator Warren wrote a response undersigned by eleven federal legislators, which states in part: "the newly unsealed FTC complaint against Pepsi appears to indicate that these claims were false and misleading."

162.     According to Senator Warren, Pepsi's assertion that it did not control retail pricing is "belied by the new documents that appear to indicate that Pepsi actively tried to maintain a price gap between Walmart and other competitors."  Senator Warren also wrote that the allegations in the FTC complaint were inconsistent with Pepsi's other statement that it provided "competitive, non-discriminatory pricing" to every customer.

163.     Upon finding that Pepsi's statements in writing were manifestly inconsistent with the allegations and documents revealed in the FTC complaint, Senator Warren noted that "[p]roviding false or misleading information in response to a Congressional inquiry would represent a serious matter."

164.     In a December 2025 press statement, Pepsi stated: "PepsiCo continues to operate in compliance with applicable laws and remains committed to providing all customers with fair,

competitive, and non-discriminatory pricing, discounts and promotional value, regardless of size or channel."

165. For its part, Walmart consistently maintains publicly that "it is committed to negotiating on behalf of its customers so it can deliver value and everyday low prices."[40]

166. In earnings calls and press reports, Walmart has attributed cost and price increases to inflation and stated that it is working with suppliers to lower grocery prices as quickly as possible. In response to a question about inflation in a 2019 *Fortune* interview, McMillon said Walmart had "a lot of different levers to pull within the company and [was] trying to find ways to save customers money, and I think that'll be the constant theme that you'll see from us and hear from us is we do everything we can to help the customers get a value on quality merchandise…. We will do all we can to try and keep prices from going up."

167. Similarly, in November 2021, McMillon told CNBC that Walmart "save[s] people money and help[s] them live a better life. Those are the words that came out of [Walmart founder] Sam Walton's mouth. He loved to fight inflation. So do we…. We're proud to try and hold prices down, and our conversations with suppliers today, tomorrow will be 'How can you help us roll back prices and swim upstream and be different than everybody else?'… We start out trying to figure out how to help people save money…. Sometimes you hear us say that our scale helps us navigate these things. I think our experience and the creativity of the team is every bit as important as the size of the company." Walmart's Chief Financial Officer, Brett Biggs, similarly told CNBC that Walmart has "always been an inflation fighter for customers…. Our scale and the product

---

[40] Kate Perez, *Lawsuit against Walmart, PepsiCo alleges decade-long price fixing scheme*, USA TODAY (Jan. 8, 2026), https://www.usatoday.com/story/money/2026/01/08/walmart-pepsi-price-fixing-scheme-lawsuit/88083796007.

breadth that we have allows us to do things in a way that is beneficial to customers and beneficial to shareholders."

168. Walmart also issues publicly available codes of conduct and related guidelines which further concealed the Defendants' scheme. For example, Walmart's website lists "Supplier Expectations Compliance Areas" which include the following:

169. "As a supplier, you are prohibited from….

    a. Providing or offering to share with Walmart another third party's non-public, commercially sensitive or proprietary information. This includes a competitor's future pricing or product strategies…

    b. Discussing with Walmart your sales plans or strategies that you have with your other customers."[41]

170. Similarly, Walmart's code of conduct, which is available on Walmart's website, states that: "We believe success comes from offering quality products and services at low prices. Effective competition leads to stronger innovation, lower prices, and better quality, while anticompetitive practices harm our customers and members. Build trust by: Protecting and not sharing competitively sensitive information – such as pricing, costs, bid submissions, or strategic plans – with competitors, either directly or through a third party, such as a supplier."

171. Pepsi has also made public statements which concealed the Defendants' scheme from consumers.

172. First, Pepsi has repeatedly raised its prices during the period from 2018 to 2024 and justified those price increases as related to "higher costs associated with commodities, transportation, and labor" rather than its scheme with Walmart.[42]

---

[41] https://corporate.walmart.com/suppliers/requirements/compliance-areas
[42] Food Navigator, *PepsiCo plots additional price hikes, but remains optimistic about consumers' willingness to pay more,* October 5, 2021, https://www.foodnavigator-usa.com/Article/2021/10/05/PepsiCo-plots-additional-price-hikes-but-remains-optimistic-about-consumer-s-willingness-to-pay-more/

173. Second, Pepsi's also has a public-facing code of conduct which states: "Integrity in the marketplace requires each of us to treat our customers ethically, fairly, and in compliance with all applicable laws. When dealing with our customers, you should always:
- Earn their business on the basis of our superior products, customer service and competitive prices
- Present our services and products in an honest and forthright manner
- Avoid unfair or deceptive trade practices…"[43]

2. Third, Pepsi took active steps to conceal the information that was revealed in *FTC v. PepsiCo, Inc.,* No 1:25-cv-00664-JMF by moving to seal filings in that case. Pepsi sought to maintain confidentiality of "three categories of particularly sensitive information: (1) confidential negotiations between Pepsi and its retail customers; (2) confidential, customer-specific business strategies and forward-looking plans; and (3) confidential pricing and go-to-market plans." Memo. at 9. These "confidential" and "private" negotiations, business strategies and pricing all pertained to Pepsi dealings with Walmart and related conduct that are at issue in this case. *See* Decl. ¶¶ 9, 13, 16, 18-21, 23, 26 (citing FTC Complaint ¶¶ 10, 39-43, 51-54, 57-59, 63-64, 66).

1. Pepsi actively concealed the nature of its agreement with Walmart. Pepsi concealed the very facts which would lead a reasonable plaintiff to investigate and continued to conceal them even to Congress until the FTC complaint was substantially unsealed. Accordingly, until the unsealing of the FTC allegations, a reasonable customer would not and could not bring a claim through the exercise of reasonable diligence.

## VI. Class-Action Allegations

2. Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and seek certification of the following Classes:

---

[43]

3. National Class:

All persons who directly purchased Pepsi RTD Beverages from a Walmart brick-and-mortar store in the United States, and who did not use the Walmart Plus Program when making their purchases, from January 1, 2018 through the present and until the unlawful conduct alleged herein ceases. Excluded from the proposed Class are Defendants and all governmental entities.

4. California Class:

All persons who directly purchased Pepsi RTD Beverages from a Walmart brick-and-mortar store in California, and who did not use the Walmart Plus Program when making their purchases, from January 1, 2018 through the present and until the unlawful conduct alleged herein ceases. Excluded from the proposed Class are Defendants and all governmental entities.

5. Subject to additional information obtained through further investigation and discovery, the Classes may be modified or narrowed as appropriate.

6. At this time, Plaintiffs do not know the exact number of members of the Classes, but believe they number in the hundreds of thousands. Members are so numerous that joinder is impracticable.

7. Questions of law and fact common to the members of the proposed Classes predominate over questions, if any, that may affect only individual members.

8. Questions of law and fact common to the members of the Classes include:

a. Whether Defendants entered into the Scheme;

b. The nature, scope, and extent of the Scheme;

c. Whether the Scheme violates the Sherman Act or the Cartwright Act under the rule of reason;

d. Whether Plaintiff Davis, Plaintiff Petretti, and Class members were injured by the Scheme;

e. The proper measure of classwide damages for each Class; and

f. Whether the Court should grant injunctive relief to prevent the scheme from recurring, and, if so, what injunctive relief is appropriate.

9. Plaintiffs' claims are typical of those of the proposed Classes because they press the same legal theories and seek to redress the same injuries.

10. Plaintiffs will fairly and adequately protect the interests of the Classes. They have retained counsel that is experienced in litigating complex class actions, and they have no interests that conflict with those of the Classes.

11. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, especially given the relatively low damages suffered by individual Class members. Further, the prosecution of separate actions by members of the Classes would create a risk of inconsistent rulings or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. In addition, individual actions could be dispositive of the interests of the Classes even where certain members were not parties to those actions.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. §§ 1, 3**
**Against All Defendants on Behalf of the National Class**

12. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

49

13. Defendants violated 15 U.S.C. Sections 1 and 3 by entering into and/or enforcing an unreasonable agreement in restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi's RTD soft drinks.

14. The Scheme stifles intra-brand price competition by eliminating price competition from other retailers in the retail market.

15. The Scheme also reduced inter-brand competition between Pepsi and Coca-Cola.

16. The Scheme violated the "Rule of Reason."

17. Each Defendant's market power was enhanced by the unlawful agreement. Pepsi was able to raise wholesale prices for its RTD soft drink products, while Walmart was able to ensure that it would be the lowest priced retailer of Pepsi products without sacrificing its own margin. Defendants' Scheme had substantial price effects in the market for RTD soft drinks and therefore on Pepsi RTD soft drinks. Defendants' agreement increased the price of Pepsi RTD soft drinks at Walmart substantially, which were paid by Plaintiffs and the members of the Class.

18. There is no procompetitive justification for Defendants' Scheme. Resale price maintenance is nearly always unlawful when, as here, it is used by a dominant retailer or distributor to reduce intra-brand competition for a brand, thereby preventing other retailers from competing against the dominant retailer or distributor on price. Here, Walmart has a history of reaching agreements to have the lowest wholesale effective cost, and therefore without sacrificing its own margins the lowest retail price, for certain goods. As a dominant retailer, Walmart has used this agreement to thwart price competition among retailers and keep prices at supracompetitive levels, which is not justified by the Rule of Reason as applied to resale price maintenance.

19. Pro-competitive justifications for resale price maintenance begin with the manufacturer and travel through the need to ensure an enhanced margin to maintain a luxury

product, for example for specialty products whose brands benefit from knowledgeable sales staff and value-added retail environments (such as performance cars that benefit from capable test drivers to demonstrate the product's capabilities, or equipment requiring installation). In such circumstances, a low-price intrabrand seller could benefit as a free rider from the more sophisticated seller's cost. No such circumstances are present in the market for RTD soft drinks.

20. Therefore, there are no free-rider justifications for the challenged agreements.

21. As a result of Defendants' Scheme, prices for Pepsi RTD soft drinks were inflated above competitive levels in the United States.

22. As a result of Defendants' Scheme, Plaintiffs and members of the Class have been injured in their businesses and property in that they have paid more for Pepsi RTD soft drinks than they otherwise would have paid in the absence of that conduct.

23. Walmart has done this before and appears likely to do it again. Plaintiffs and Class Members seek injunctive relief preventing Walmart from reaching agreement with any retailer that increases wholesale effective prices to other retailers in a way not applicable to Walmart. Plaintiffs and the Sherman Act Class also seek attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**Violation of California's Cartwright Act**
**Cal. Bus. & Prof. Code §§ 16720 *et seq.***
**(Vertical Price Fixing)**
**Against All Defendants on Behalf of the California Class**

24. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

25. Plaintiffs Davis and Petretti bring this claim for violation of the Cartwright Act on behalf of members of the California Class.

26. Defendants violated and continue to violate the Cartwright Act by entering into, furthering, and enforcing an unreasonable agreement in restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi RTD soft drinks.

27. The Scheme caused Plaintiff Davis, Plaintiff Petretti, and California Class members to pay inflated prices for Pepsi RTD Beverages on purchases in California.

28. Defendants' conduct is per se unlawful under the Cartwright Act because it involves an agreement to restrain prices.

29. As a result of Defendants' violation of the Cartwright Act, Plaintiff Davis, Plaintiff Petretti, and California Class members seek treble damages and the costs of suit, including reasonable attorneys' fees. *See* Cal. Bus. & Prof. Code § 16750(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)   For an order certifying each Class defined herein under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes as indicated, and Plaintiff's attorneys as Class Counsel to represent each Class;

(b)   For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For an injunction preventing Walmart from reaching an agreement with any retailer that increases wholesale effective prices to other retailers in a way not applicable to Walmart;

(e)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory penalties to the extent available;

(g)    For pre-judgment interest on all amounts awarded;

(h)    For an order of restitution and all other forms of monetary relief; and

(i)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated:  July 6, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Julian C. Diamond*

Joseph I. Marchese
Julian C. Diamond
Spencer N. Migotsky
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jmarchese@bursor.com
       jdiamond@bursor.com
       smigotsky@bursor.com

*Liaison Counsel for Plaintiffs and the Putative Class*

Thomas H. Burt
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**

270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
burt@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
malmstrom@whafh.com

*/s/ Matthew S. Weiler*
David D. Burnett (NY Bar No. 4581641)
(SDNY Bar No. DB1024)
**SCHNEIDER WALLACE**
**COTTRELL KIM LLP**
1050 30th Street NW
Washington, D.C. 20007
Telephone: (415) 421-7100
dburnett@schneiderwallace.com

Todd M. Schneider*
Matthew S. Weiler*
Raymond S. Levine*
Braden R. Leach*
**SCHNEIDER WALLACE**
**COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com
rlevine@schneiderwallace.com
bleach@schneiderwallace.com


*Co-Lead Counsel for Plaintiffs and the Putative Classes*

54