**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: BRANDED BEVERAGE ANTITRUST LITIGATION

This Document Relates To:

(1) Indirect Purchaser Plaintiffs
(2) Consumer Direct Purchasers
(3) Direct Retailer Plaintiffs

Case No. 7:25-cv-06440-CS

**DEFENDANTS PEPSICO, INC., PEPSICO BEVERAGE SALES, LLC, AND WALMART INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINTS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

BACKGROUND ....... 4

A. The Parties ....... 4

B. The Alleged Conduct ....... 5

C. The Alleged Market Definition ....... 6

D. The Alleged Classes And Claims For Relief ....... 7

LEGAL STANDARD ....... 8

ARGUMENT ....... 8

I. PLAINTIFFS' ANTITRUST CLAIMS FAIL ....... 8

A. Plaintiffs Do Not Plausibly Allege An Unlawful Agreement ....... 8

B. Plaintiffs Do Not Plausibly Allege Substantial Harm To Competition In A Relevant Market ....... 18

II. PLAINTIFF GIANNASCA'S ROBINSON-PATMAN ACT CLAIMS FAIL ....... 29

III. PLAINTIFFS' OTHER STATE-LAW CLAIMS FAIL TOO ....... 33

A. Plaintiffs' Consumer-Protection Claims Fail As Derivative Of Their Antitrust Claims ....... 34

B. Plaintiff Giannasca Cannot Sue Under Massachusetts Chapter 93A ....... 35

C. Consumers' Per Se Cartwright Act Claim Fails ....... 35

D. Indirects Plead No State-Specific Facts ....... 36

E. Indirects' Consumer-Protection Claims Fail ....... 36

IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED ....... 37

V. DISMISSAL SHOULD BE WITH PREJUDICE ....... 47

CONCLUSION ....... 48

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Lab'ys v. Adelphia Supply USA*,
2018 WL 8967057 (E.D.N.Y. Aug. 7, 2018)....................32

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)....................20, 23

*Alqosh Enters. Inc. v. PepsiCo, Inc.*,
2026 WL 478119 (C.D. Cal. Feb. 18, 2026)....................29

*Anderson News, LLC v. Am. Media, Inc.*,
899 F.3d 87 (2d Cir. 2018)....................2, 11, 26

*Apprentice Info. Sys., Inc. v. DataScout, LLC*,
544 S.W.3d 536 (Ark. 2018)....................36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8, 47

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007).................... *passim*

*Bert G. Gianelli Distrib. Co. v. Beck & Co.*,
172 Cal. App. 3d 1020 (1985)....................35

*Boeing Co. v. Sierracin Corp.*,
738 P.2d 665 (Wash. 1987)....................39

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
769 F.2d 919 (2d Cir. 1985)....................2, 12, 14

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988)....................19

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
799 F.3d 202 (2d Cir. 2015)....................33

*Chalmers v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 3628416 (2d Cir. Dec. 15, 2025)....................43

*Chanel, Inc. v. RealReal, Inc.*,
2026 WL 843256 (S.D.N.Y. Mar. 26, 2026)....................41, 42, 43

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)....................20, 24

*City of N.Y. v. Grp. Health, Inc.*,
649 F.3d 151 (2d Cir. 2011)....................19, 20

*City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Secs. Corp.*,
92 F.4th 381 (2d Cir. 2024) ....................11, 16

*Coal. For A Level Playing Field, L.L.C. v. AutoZone, Inc.*,
737 F. Supp. 2d 194 (S.D.N.Y. 2010)....................29, 31, 32

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
817 F.3d 46 (2d Cir. 2016)....................19, 20

*Coniglio v. Highwood Servs., Inc.*,
495 F.2d 1286 (2d Cir. 1974)....................21

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) ....................39, 43

*Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.*,
123 F.3d 1107 (8th Cir. 1997) ....................15

*D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*,
873 F. Supp. 786 (E.D.N.Y. 1995) ....................32

*Dayton Superior Corp. v. Spa Steel Prods., Inc.*,
2010 WL 3825619 (N.D.N.Y. Sept. 24, 2010)....................30

*Dorrell v. Constellation Energy Corp.*,
2026 WL 2249275 (D. Md. Aug. 5, 2026) ....................40, 44

*Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*,
104 F. Supp. 2d 184 (W.D.N.Y. 2000)....................28

*Duffy v. Camp*,
882 S.E.2d 675 (N.C. Ct. App. 2022)....................36

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
100 F.3d 462 (6th Cir. 1996) ....................41

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006)....................10

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984)....................26

*Eastman Kodak Co. v. Image Technical Servs.*,
504 U.S. 451 (1992)....................27

*Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
129 F.3d 240 (2d Cir. 1997)....................12, 19, 25, 26

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
368 F. Supp. 3d 681 (S.D.N.Y. 2019)....................43, 46, 47

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
55 Cal. App. 5th 381 (2020)....................35

*Frullo v. Landenberger*,
61 Mass. App. Ct. 814 (2004)....................35

*Garg v. Macomb Cnty. Cmty. Mental Health Servs.*,
696 N.W.2d 646 (Mich. 2005)....................42

*Garippo v. Skokie Valley Air Control Inc.*,
2026 WL 296391 (N.D. Ill. Feb. 4, 2026)....................44

*GateGuard, Inc. v. Amazon.com Inc.*,
2023 WL 2051739 (S.D.N.Y. Feb. 16, 2023)....................22

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013)....................25

*Gemini Supply Corp. v. Zeitlin*,
590 F. Supp. 153 (E.D.N.Y. 1984)....................30

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004)....................23, 27

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998)....................30

*Giordano v. Saks Inc.*,
654 F. Supp. 3d 174 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co. LLC*, No. 23-600, 2025 WL 799270 (2d Cir. Mar. 13, 2025)....................38, 41

*Grand Union Co. v. FTC*,
300 F.2d 92 (2d Cir. 1962)....................3, 32

*Great Atl. & Pac. Tea Co. v. FTC*,
440 U.S. 69 (1979)....................32, 33

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989)....................14, 28

*Hack v. Pres. & Fellows of Yale College*,
237 F.3d 81 (2d Cir. 2000)....................20

*Higgins v. New York Stock Exchange, Inc.*,
942 F.2d 829 (2d Cir. 1991)....................37

*Hinds Cnty. Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009)....................46, 47

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors*,
2026 WL 2321409 (10th Cir. Aug. 11, 2026)....................39

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)....................34

*In re Aluminum Warehousing Antitrust Litig*.,
833 F.3d 151 (2d Cir. 2016)....................34

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. July 31, 2023)....................28

*In re Asacol Antitrust Litig*.,
2016 WL 4083333 (D. Mass. July 20, 2016)....................35

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)....................11

*In re Bystolic Antitrust Litig.*,
583 F. Supp. 3d 455 (S.D.N.Y. 2022)....................34, 37

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003)....................40, 41

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025)....................11, 34

*In re Concrete & Cement Additives Antitrust Litig.*,
2026 WL 2594002 (S.D.N.Y. Sept. 2, 2026)....................16

*In re Crude Oil Commodity Futures Litig*.,
913 F. Supp. 2d 41 (S.D.N.Y. 2012)....................44

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................16

*In re Interest Rate Swaps Antitrust Litig*.,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................46

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019)..........35

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016)..........42

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015)..........16

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004)..........37

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017)..........39, 43

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)..........36

*In re Set-Top Cable Television Box Antitrust Litig.*,
2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011)..........22

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003)..........34

*In re Tamoxifen Citrate Antitrust Litig.*,
466 F.3d 187 (2d Cir. 2006)..........34

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015)..........11

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021)..........36, 37

*In re Watson Labs., Inc.*,
101 F.4th 223 (2d Cir. 2024)..........34

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016)..........24

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995)..........25

*Kearse v. Kaplan, Inc.*,
692 F. Supp. 2d 398 (S.D.N.Y. 2010)..........40

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)..........39, 42

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012)....................................................................................43

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)......................................................................................8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)........................................................................................18, 19, 25

*Lewis v. Danos*,
83 F.4th 948 (5th Cir. 2023) .....................................................................................47

*Litovich v. Bank of Am. Corp.*,
2025 WL 2521039 (S.D.N.Y. 2025)................................................................... *passim*

*Louisiana Health Serv. & Indem. Co. v. Celgene Corp.*,
2025 WL 1056668 (S.D.N.Y. Apr. 8, 2025)...............................................................34

*Low v. Robb*,
2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ...............................................................16

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)............................................................................... *passim*

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
2008 WL 4547518 (S.D.N.Y. 2008)...................................................................39, 41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................................................16

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)............................................................................... *passim*

*Miller v. Gen. Motors, LLC*,
773 F. Supp. 3d 461 (E.D. Mich. 2025)......................................................................45

*Moll v. U.S. Life Title Ins. Co. of N.Y.*,
700 F. Supp. 1284 (S.D.N.Y. 1988)............................................................................44

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)..........................................................................................2, 12, 14

*Monsieur Touton Selection, Ltd. v. Future Brands, LLC*,
2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006)...........................................................30, 31

*New York v. Hendrickson Bros.*,
840 F.2d 1065 (2d Cir. 1988)......................................................................................43

*Ohio v. American Express Co.*,
585 U.S. 529 (2018) (*Amex*) ....................19, 22, 24

*Open Pantry Food Marts of Se. Wis., Inc. v. Falcone*,
286 N.W.2d 149 (Wis. Ct. App. 1979) ....................38

*Oreck Corp. v. Whirlpool Corp.*,
639 F.2d 75 (2d Cir. 1980)....................2, 12, 15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................10

*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co*.,
840 F.2d 985 (1st Cir. 1988)....................39

*PBTM LLC v. Football Nw., LLC*,
511 F. Supp. 3d 1158 (W.D. Wash. 2021)....................39

*Pearl v. Cty. of Long Beach*,
296 F.3d 76 (2d Cir. 2002)....................44, 47

*Phhhoto Inc. v. Meta Platforms, Inc*.,
123 F.4th 592 (2d Cir. 2024) ....................45

*Pocahontas Supreme Coal Co., v. Bethlehem Steel Corp*.,
828 F.2d 211 (4th Cir. 1987) ....................45

*Premier Concrete LLC v. Argos N. Am. Corp*.,
2021 WL 1209354 (N.D. Ga. Mar. 31, 2021)....................45

*Reborn Enters. v. Fine Child, Inc.*,
590 F. Supp. 1423 (S.D.N.Y. 1984), *aff'd*, 754 F.2d 1072 (2d Cir. 1985) ....................15

*Rock v. NCAA*,
928 F. Supp. 2d 1010 (S.D. Ind. 2013) ....................22

*Sensory, Inc. v. Google LLC*,
2026 WL 2017536 (D.D.C. July 13, 2026)....................22

*SL-x IP. S.à.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
2023 WL 2620041 (2d Cir. Mar. 24, 2023) ....................41

*SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co., L.P.*,
2026 WL 2137807 (S.D.N.Y. July 24, 2026) ....................41

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*,
266 So. 3d 207 (Fla. Dist. Ct. App. 2019) ....................36

*Tera Group, Inc. v. Citigroup, Inc.*,
2024 WL 4501967 (2d Cir. Oct. 16, 2024)....16

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)....4, 41, 42

*Watson v. United States*,
865 F.3d 123 (2d Cir. 2017)....43

*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011)....39

*Windesheim v. Larocca*,
116 A.3d 954 (Md. 2015)....39

*Wolff v. Ford Motor Co.*,
1977 WL 1396 (S.D.N.Y. Apr. 20, 1977)....29, 30, 31

*Wood v. Carpenter*,
101 U.S. 135 (1879)....44

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)....39

## STATUTES

12 V.S.A. § 511....38

740 ILCS
10/7(2)....38
10/7(4)....38
10/11....39

42 Pa. Cons. Stat. § 5527....38

15 U.S.C.
§ 13(d)–(e)....3, 32
§ 13(f)....32
§ 15b....37, 38

Ariz. Rev. Stat.
§ 44-1410....38
§ 44-1412....35, 39

Ark. Code Ann. § 16-56-115....38

Cal. Bus. & Prof. Code
§ 16720....35
§ 16750.1....38

Colo. Rev. Stat. § 6-4-119(1)....38

Conn. Gen. Stat. Ann. § 35-40....38

D.C. Code
§ 28-4511(b)....38
§ 28-4515....39

Del. Code Title 6
§ 2111....38
§ 2113....39

Fla. Stat. § 542.26(1)....38

Haw. Rev. Stat. § 480-24....38

Idaho Code Ann. § 48-115....38

Idaho Code
§ 48-102(3)....39
§ 48-115(3)....42

Ind. Code § 34-11-2-4....38

Iowa Code Ann. § 553.16....38, 42

Iowa Code § 553.2....39

Kan. Stat. Ann. § 60-512(2)....38

Ky. Rev. Stat. § 413.120(2)....38

Mass. Gen. Laws ch. 93 § 13....38

Mass. Gen. Laws ch. 260 § 5A....38

Md. Code Ann., Com. Law § 11-209....38

Mich. Comp. Laws
§ 445.772....36
§ 445.781....38
§ 600.5827....39
§ 600.5855....42

Minn. Stat. Ann. § 325D.64, subd. 1....38

Miss. Code Ann. § 15-1-49(1) ....38

Mo. Rev. Stat. § 416.131(2) ....38

Mont. Code Ann. § 27-2-211 ....38

N.C. Gen. Stat.
§ 75-1.1(b) ....36
§ 75-16.2 ....38

N.D. Cent. Code § 51-08.1-10 ....38

N.H. Rev. Stat. Ann. § 356:12(II) ....38

N.H. Rev. Stat. § 356:14 ....39

N.J. Stat. Ann. § 56:9-14 ....38

N.M. Stat. Ann. § 57-1-12 ....38, 39

N.Y. Gen. Bus. Law § 340(5) ....38

Neb. Rev. Stat. § 59-829 ....38, 39

Nev. Rev. Stat.
§ 598A.220 ....38
§ 598A.220(1) ....39

Or. Rev. Stat. § 646.800(2) ....38

R.I. Gen. Laws Ann. § 6-36-23 ....38

S.C. Code Ann. § 15-3-530(2) ....38

S.D. Codified Laws § 37-1-14.4 ....38

Tenn. Code Ann. § 28-3-105 ....38

Utah Code Ann. § 76-10-3117 ....38

Va. Code Ann. § 59.1-9.14(A) ....38

W. Va. Code Ann. § 47-18-11 ....38

Wash. Rev. Code § 19.86.120 ....38

Wis. Stat. Ann. § 133.18(2) ....38

## RULES

Fed. R. Civ. P. 12(b)(6)........................................................................................................8

## INTRODUCTION

Plaintiffs allege a vast and secret conspiracy between PepsiCo and Walmart to fix prices on all Pepsi "ready to drink" soft drinks nationwide. But the reality is that Walmart and PepsiCo negotiated vigorously over the wholesale prices that Walmart would pay for PepsiCo soft drinks. The Complaints make clear that Walmart, a retailer that seeks to deliver everyday low prices to its customers, bargained for the lowest available wholesale prices from PepsiCo. That simply is not price fixing. Stripped of bald assertions and nonsensical accusations, Plaintiffs' Complaints reflect only ordinary buyer-seller bargaining—nothing more.

To try to present a viable claim, the three Plaintiff groups—retailers that purchased beverages directly from PepsiCo ("Retailers"), consumers who purchased beverages directly from Walmart ("Consumers"), and consumers who purchased beverages indirectly from other retailers ("Indirects")—posit, without any support, that the vigorous negotiations between PepsiCo and Walmart were a sham. In their telling, those negotiations reflected a surreptitious "Scheme" to raise wholesale prices and retail prices on "ready-to-drink" soft drinks sold by Walmart and other retailers. CC ¶¶ 3–5; RC ¶¶ 3–5; IC ¶¶ 3–6.[1] That conspiracy theory is economically irrational and completely implausible. And Plaintiffs' Complaints even supply their own lawful explanations for PepsiCo's and Walmart's alleged conduct: Walmart's interest in delivering the lowest possible prices for its customers and PepsiCo's interest in maximizing its revenue while

[1] Defendants refer to Indirects' Amended Consolidated Class Action Complaint (ECF No. 78) as "IC"; Consumers' Consolidated Amended Class Action Complaint (ECF No. 79) as "CC"; and Retailers' Consolidated Amended Class Action Complaint (ECF No. 80) as "RC." Collectively, the IC, CC, and RC are the "Complaints." Each of the Complaints has been amended multiple times. Plaintiff Giannasca filed his original Complaint on August 5, 2025 (ECF No. 1), filed a First Amended Complaint on November 12, 2025 (ECF No. 20), filed a Second Amended Complaint on January 8, 2026 (ECF No. 28), filed a Consolidated Complaint on May 4, 2026 (ECF No. 65), and filed a Second Amended Consolidated Complaint on July 6, 2026 (ECF No. 80). The other Plaintiffs filed Complaints between December 2025 and January 2026 (*see* ECF No. 37), filed Consolidated Complaints on May 4, 2026 (ECF Nos. 62-63, 66), and filed Second Amended Consolidated Complaints on July 6, 2026 (ECF Nos. 78–80).

maintaining its Walmart sales. Plaintiffs' claims should be dismissed under the pleading standard set out in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 565–67 (2007).

Plaintiffs' antitrust claims fail for two fundamental reasons. *First*, Plaintiffs allege no facts plausibly suggesting an unlawful agreement between Defendants. *Infra* Section I.A. Not surprisingly, there is no direct evidence (*i.e.*, no contract term, meeting, identified participant, or communication) reflecting an agreement, nor are there circumstantial allegations to support an inference of agreement. PepsiCo's wholesale pricing, Walmart's monitoring of competitors' retail prices and its complaints about underpricing, and PepsiCo's own monitoring and responses are all clearly lawful, independent actions. It is well established that such conduct "'arise[s] in the normal course of business and do[es] not indicate illegal concerted action.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *id.* (a retailer's "complaints about price-cutters 'are natural—and from the manufacturer's perspective, unavoidable—reactions to the activities of their rivals"); *see also Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 103 (2d Cir. 2018); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 80 (2d Cir. 1980). Plaintiffs' own allegations describe arm's-length bargaining between PepsiCo and Walmart over their respective independent business interests, undermining their claims of an unlawful agreement.

*Second*, Plaintiffs do not allege substantial harm to competition in a plausible relevant market under the rule of reason. *Infra* Section I.B. Their proposed "RTD [ready-to-drink] soft drink" market is facially overbroad: It implausibly combines products with patently different functions, attributes, prices, and competitive conditions—including colas, sports drinks, energy drinks, juice, and ready-to-drink coffee and tea—while arbitrarily excluding water on distinctions that apply equally to products included in the market. CC ¶¶ 78–115; RC ¶¶ 88–127; IC ¶¶ 89–

130. Their alleged market restraint is also *intra*brand only—meaning, it concerns only PepsiCo products—and therefore does not establish market-wide *inter*brand harm. Consumers would switch to competing brands if prices were supracompetitive, and Plaintiffs' own allegations that PepsiCo's volume "decreased 32% between 2010 and 2023" and that PepsiCo "has fallen behind Keurig Dr Pepper" confirm that rivals remained more than capable of competing for share. CC ¶ 35; RC ¶ 39. Common sense dictates that Plaintiffs' market definition is gerrymandered and, as a result, neither PepsiCo's share nor Walmart's alleged 30% grocery-store share establishes market power in the pleaded ready-to-drink market, or any valid relevant market. CC ¶¶ 78–142, 144; RC ¶¶ 88–155, 157; IC ¶¶ 89–146.

Plaintiffs' other claims fare no better. Giannasca's Robinson-Patman claims (which he alone brings) fail several times over, because he pleads no contemporaneous interstate sales of commodities of like grade and quality, no identified promotional payment or service, and no proportional inequality. *Infra* Section II; *see* RC p. 53 ¶ 4, p. 57 ¶ 29, p. 58 ¶ 34).[2] Sections 2(d) and 2(e) also regulate sellers, not buyers, and therefore do not apply to Walmart at all. 15 U.S.C. § 13(d)–(e); *Grand Union Co. v. FTC*, 300 F.2d 92, 94 (2d Cir. 1962).

Plaintiffs' various state-law claims fail both because they depend on the same deficient conduct as the Sherman Act claims and for independent reasons. *Infra* Section III. Giannasca cannot sue under Chapter 93A § 9 of the Massachusetts Unfair and Deceptive Business Practices Act. Consumers plead only a *per se* theory under California's antitrust statute (the Cartwright Act) even though they acknowledge elsewhere that the alleged vertical restraint is subject to the rule of

[2] Due to what appears to be a typographical error, Consumers' and Retailers' Amended Complaints use duplicate paragraph numbers. *See* CC at p. 47 (jumping from paragraph 173 to 2 and then restarting from 1); RC at p. 52 (jumping from paragraph 193 to 2 and then restarting from 1). As a result, Defendants cite both page number and paragraph number when referring to allegations after that typographical error.

reason. CC ¶ 76, 184, p. 52 ¶ 28. And Indirects plead no state-specific facts and identify no deception or unconscionability. IC ¶¶ 18–29, 151, 204–206, 219–224, 256.

Plaintiffs' antitrust and consumer-protection claims are also facially time-barred. *Infra* Section IV. Each Complaint pleads that the purported Scheme began by at least January 2018 and that Plaintiffs suffered injury from January 1, 2018 onward. CC ¶¶ 3, 40, 152; RC ¶¶ 3, 44, 173; IC ¶¶ 16–17, 170. But the earliest antitrust claims were filed on December 15, 2025—more than seven years after the alleged initial injury. Plaintiffs cannot invoke the disfavored continuing-violation doctrine because the conduct they allege after January 2018 is, at most, mere performance of the same purported Scheme, not a new and independent overt act. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68–69 (2d Cir. 2019). Nor do Plaintiffs plead fraudulent concealment: They identify no affirmative acts of concealment, do not allege when they discovered their claims, and plead no facts showing diligence.

At bottom, Plaintiffs' allegations simply describe hard bargaining and ordinary supply-chain dynamics, not an antitrust conspiracy, price discrimination, or unfair competition. The Court should thus grant Defendants' motion and dismiss all three Complaints with prejudice.

## BACKGROUND

### A. The Parties

Retailer named plaintiffs are five companies with principal places of business in North Dakota and Pennsylvania and one individual (Giannasca) who operates a restaurant in Massachusetts. They allegedly purchased "Pepsi RTD soft drinks" from PepsiCo and then resold those products to retail customers. RC ¶¶ 19–23, 25. Consumer named plaintiffs are two California residents who allegedly purchased "Pepsi RTD soft drinks from Walmart." CC ¶¶ 18–19. Indirect named plaintiffs are twelve individuals who reside in nine different states who allegedly purchased "Pepsi soft drinks" from various retailers. IC ¶¶ 18–29.

PepsiCo is alleged to manufacture and sell ready-to-drink beverages through Defendant PepsiCo Beverage Sales, LLC and several dozen independent franchise bottlers. CC ¶¶ 20–21, 30; RC ¶¶ 24–26, 34. Walmart is alleged to operate thousands of U.S. stores and to purchase PepsiCo beverages wholesale for retail resale. CC ¶ 22; RC ¶ 27; IC ¶¶ 31, 43. Plaintiffs thus place PepsiCo and Walmart in a vertical relationship, with PepsiCo at the manufacturing and supply level and Walmart at the retail level of the distribution chain. CC ¶ 32; RC ¶ 36; IC ¶ 38. Plaintiffs also allege that Walmart is PepsiCo's largest customer, accounting for approximately 14% of PepsiCo's consolidated net revenue, and that losing Walmart as a customer could have a material adverse effect on PepsiCo's business. CC ¶¶ 2, 37–38; RC ¶¶ 2, 40–42; IC ¶¶ 44, 142.

### B. The Alleged Conduct

Plaintiffs' purported Scheme began in January 2018, when PepsiCo and Walmart allegedly made a "foundational commitment" under which PepsiCo would monitor and "police" retail prices and raise wholesale prices to retailers that undercut Walmart, while Walmart would accept higher wholesale prices than it otherwise would have. CC ¶¶ 3–5, 40–41, 43, 46; RC ¶¶ 3–5, 43–45, 47, 50; IC ¶¶ 3–6, 16, 46.

Plaintiffs allege that Walmart "has positioned [its] brand as the lowest cost place to get many grocery items," CC ¶ 127; RC ¶ 139, and that Walmart is "committed to negotiating on behalf of its customers so it can deliver value and everyday low prices." CC ¶¶ 165, 167; RC ¶¶ 185, 187; IC ¶ 161; *see also* CC ¶¶ 67-74; RC ¶¶ 71-78 (showing lower prices at Walmart). They allege that Walmart does not know the "future pricing or product strategies" of its competitors. CC ¶ 169; RC ¶ 189; IC ¶ 163. And they allege that Walmart monitors its competitors' prices on PepsiCo's products, CC ¶¶ 45-46; RC ¶¶ 49-50; IC ¶¶ 49-50, "express[ing] in no uncertain terms its dissatisfaction" when competitors are offering lower prices, IC ¶ 50. In one alleged instance, a Walmart employee "expressed frustration" about a Target promotion on

Bubly sparkling water. IC ¶ 50. Indirects also allege that when competitors were beating Walmart on price, "Walmart forced Pepsi to lower its wholesale prices to fund lower retail prices," IC ¶ 59, and that PepsiCo "undertook these price cuts only begrudgingly." IC ¶ 62.

Plaintiffs allege that PepsiCo acknowledges that it "must maintain mutually beneficial relationships with [its] key customers, including Walmart, to compete effectively." CC ¶ 10; RC ¶ 11; IC ¶ 10. They allege that PepsiCo anticipated that Walmart would have a "negative reaction" to being beaten on price and "expressed concern" about or "feared" that reaction. CC ¶ 47; RC ¶ 51. And they allege that PepsiCo monitored retail prices and responded to or anticipated Walmart's complaints. CC ¶¶ 45–52; RC ¶¶ 49–56; IC ¶¶ 49–56. Plaintiffs concoct an erroneous narrative around an alleged 2022 "Food Lion" episode in which PepsiCo supposedly determined that Food Lion was "beating [Walmart] in price" and planned to "eliminat[e] promotional support" or "increase[e] wholesale prices" to Food Lion. CC ¶¶ 49, 51–52; RC ¶¶ 53, 55–56; IC ¶¶ 55–56.

Plaintiffs allege that PepsiCo's wholesale prices increased from 2018 through 2025 and characterize those increases as continued performance of the purported Scheme. CC ¶¶ 54–57; RC ¶¶ 57–61; IC ¶¶ 69–72, 145, 149. Plaintiffs also allege that PepsiCo's "brand recognition is universal" and that "[m]any" retailers "consider Pepsi[Co]'s soft drinks important to carry." CC ¶ 33; RC ¶ 37; *see* IC ¶ 40.

### C. The Alleged Market Definition

Plaintiffs allege a single nationwide U.S. market for "RTD soft drinks," including carbonated and non-carbonated soft drinks, sports drinks, energy drinks, juice, and bottled or canned coffee and tea, while excluding bottled water. CC ¶¶ 29, 78–115, 143; RC ¶¶ 88–143, 156; IC ¶¶ 89–146. Indirects justify excluding water by invoking differences in "functional and flavor-based attributes": sports drinks have sweeteners and electrolytes; energy drinks have caffeine and stimulants; coffee and tea have distinctive flavor profiles and caffeine; and juice has distinctive

flavor, nutrients, and vitamins. IC ¶ 136. Indirects also rely on price differentials in alleging that water is not a close substitute for sports drinks, carbonated soft drinks, or energy drinks. IC ¶ 138.

Retailers and Consumers plead that PepsiCo has a 40% market share in their alleged market. RC ¶¶ 88, 98, 108; CC ¶¶ 78, 87, 97. Indirects instead allege that PepsiCo has "approximately 34%" of the "RTD market" and "roughly 30%" of non-carbonated soft drinks. IC ¶¶ 95, 100, 109. Plaintiffs include in PepsiCo's market share Dr. Pepper, which they describe as owned by a "direct competitor[]" to PepsiCo. CC ¶ 92; RC ¶ 103; IC ¶ 105.

### D. The Alleged Classes And Claims For Relief

Retailers assert four causes of action. Count I alleges violations of Sherman Act Sections 1 and 3. RC pp. 56–57 ¶¶ 16–27. Counts II and III allege violations of Robinson-Patman Act Sections 2(d) and 2(e). RC pp. 57–59 ¶¶ 28–37. And Count IV alleges a violation of Massachusetts General Laws Chapter 93A. RC pp. 59–62 ¶¶ 38–56. Only Giannasca asserts the Robinson-Patman and Chapter 93A counts. RC p. 53 ¶¶ 4–5, p. 57 ¶ 29, p. 58 ¶ 34, p. 59 ¶¶ 39.

Consumers assert two causes of action. Count I alleges violations of Sherman Act Sections 1 and 3 (CC pp. 49–51 ¶¶ 12–23), and Count II alleges a violation of California's Cartwright Act (CC pp. 51–52 ¶¶ 24–29). Although Consumers' Complaint concedes that the challenged conduct "is subject to a rule of reason analysis" (CC ¶ 76), it alleges that the same conduct is "*per se* unlawful under the Cartwright Act" (CC p. 52 ¶ 28).

Indirects assert fifty-three causes of action. IC Counts I–LIII. Count I seeks only "declaratory and equitable relief" under Sherman Act Sections 1 and 3 (IC ¶¶ 181–198); Counts II through XXXII allege violations of 31 state antitrust statutes; and Counts XXXIII through LIII allege violations of 21 state consumer-protection statutes.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible only when its factual content permits a reasonable inference that the defendant is liable, not merely a "sheer possibility" of unlawful conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility depends on "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). The Court accepts well-pleaded factual allegations, but need not credit mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678–79. "[N]aked assertion[s]" devoid of "further factual enhancement" do not suffice. *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I. PLAINTIFFS' ANTITRUST CLAIMS FAIL

Each group of Plaintiffs asserts claims under Sections 1 and 3 of the Sherman Act, while Consumers and Indirects also assert state antitrust claims based on essentially the same alleged conduct. All of those claims fail for two independent reasons: (1) Plaintiffs do not plausibly allege an unlawful agreement; and (2) Plaintiffs do not plausibly allege substantial harm to competition in a valid relevant market.

#### A. Plaintiffs Do Not Plausibly Allege An Unlawful Agreement

Plaintiffs' antitrust claims require a "contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553. The "crucial question" is whether the challenged conduct "stem[s] from independent decision or from an agreement." *Id.* Without direct evidence of an agreement, Plaintiffs must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City*

*Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Allegations that are "merely consistent with" conspiracy do not suffice. *Twombly*, 550 U.S. at 557. And if there is an "obvious alternative explanation," such that the alleged conduct is explained by the "best interests" of the companies at issue, that does not plausibly allege a conspiracy. *Id.* at 567-68; *see also Citigroup*, 709 F.3d at 138 (conduct resulting from companies' "own business priorities" fails to plausibly allege a conspiracy).

Plaintiffs do not challenge any written agreement between PepsiCo and Walmart. Instead, they claim a secret conspiracy outside the formal contract, alleging that PepsiCo "agreed to inflate its wholesale prices above competitive levels for Pepsi RTD [ready-to-drink] soft drinks to its wholesale customers other than Walmart" and "required its wholesale customers to charge retail prices that were higher than Walmart's price," while "Walmart agreed to accept higher wholesale prices than it otherwise would have." CC ¶¶ 4-6; RC ¶¶ 4-6; *see* IC ¶¶ 4-6. These "conclusory allegation[s] of agreement" are not entitled to any weight. *Twombly*, 550 U.S. at 557.

**1. Plaintiffs Allege No Direct Evidence Of Agreement**

The Complaints lack any direct evidence of the supposed unlawful agreement. *See Citigroup*, 709 F.3d at 136 (describing direct evidence as, for example, "a recorded phone call in which two competitors agreed to fix prices"). They identify no written agreement or contractual term requiring PepsiCo to raise rival retailers' prices or Walmart to accept higher wholesale prices; no meeting, call, or negotiation session where such an agreement began; no participant who accepted those alleged reciprocal commitments; and no communication in which Walmart requested, or PepsiCo promised, them. Plaintiffs instead quote PepsiCo's references to Walmart "hedge commitments," an "aligned commercial strategy," and "deliverables and commitments."

CC ¶ 43; RC ¶ 47; IC ¶ 46. But those vague phrases do not identify the object, participants, or terms of any agreement and therefore do not come close to constituting direct evidence.

### 2. Plaintiffs Allege No Indirect Or Circumstantial Evidence Of Agreement Either

Without direct evidence, Plaintiffs seek to "support the inference that a conspiracy actually existed," *Citigroup*, 709 F.3d at 136, with the following allegations: (1) PepsiCo raised its wholesale prices; (2) Walmart monitored its competitors' prices and complained when those competitors undersold it; and (3) PepsiCo monitored retail prices, was aware of Walmart's desire for the lowest price, and at points responded to Walmart's complaints. None of that plausibly alleges a conspiracy, and this conduct is explained by Defendants' independent business interests.[3]

***PepsiCo's Wholesale Prices.*** Plaintiffs allege that PepsiCo increased its wholesale prices to all customers due to its supposed agreement with Walmart. CC ¶¶ 54-58; RC ¶¶ 58-62; IC ¶¶ 69-72. But businesses are "free to choose the parties with whom they will deal, *as well as the prices* … of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (emphasis added). A seller's unilateral price increases do not, without more, imply an agreement with a buyer. A "price increase … is something [PepsiCo] can achieve without the aid of [Walmart]." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006). And if the "interdependence of basic price decisions [among horizontal competitors] is not conspiracy," *Twombly*, 550 U.S. at 554 (citation omitted), then the inference is weaker when the alleged pricing decision concerns a *single* seller's vertical pricing agreements with retailers. After all, those retailers have every incentive to minimize wholesale cost; a business's motive for "increased profit

[3] Plaintiffs' conclusory allegations that particular actions were against Defendants' self-interest, *e.g.*, CC ¶¶ 53-54; RC ¶¶ 57-58; IC ¶¶ 61, 87, ought not be credited—and, in fact, are belied by other allegations in their Complaints.

'always exists.'" *City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 409 (2d Cir. 2024).

Plaintiffs' "allegations about market-wide price increases do not show … an anticompetitive conspiracy." *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025). "[P]rice inflation can and does occur in competitive markets," *id.*, and Plaintiffs themselves supply an alternative explanation for increased prices: "Pepsi's brand recognition is universal" and "[m]any" retailers "consider Pepsi's soft drinks important to carry," such that "[f]ailing to carry Pepsi's soft drinks can put them at a competitive disadvantage." CC ¶ 33; RC ¶ 37; *see* IC ¶ 40 (referring to PepsiCo's "near-universal brand recognition" and the "critical" need to carry PepsiCo's products). That brand recognition—not any conspiracy—allowed PepsiCo to "raise prices and [have] consumers stay within [its] brand," CC ¶ 56; RC ¶ 60; IC ¶ 71.

***Walmart's Monitoring And Complaints.*** Plaintiffs next allege that Walmart monitors its competitors' prices on PepsiCo's products. CC ¶¶ 45-46; RC ¶¶ 49-50; IC ¶¶ 49-50. Indirects allege Walmart "expresses in no uncertain terms its dissatisfaction" when competitors are beating its prices and cite one instance in which a Walmart employee allegedly reached out to PepsiCo and "expressed frustration" about a "Target promotion" that led to lower prices on "eight packs of Bubly 12-ounce cans." IC ¶ 50.

That does not suggest a conspiracy. The Second Circuit has found that companies have "legitimate business reason[s]" to "monitor competitors' behavior." *Anderson News*, 899 F.3d at 103; *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("We can, … without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir.

1999) ("Gathering competitors' price information can be consistent with independent competitive behavior."). And, as the Supreme Court has held, a retailer's "complaints about price-cutters 'are natural—and from the manufacturer's perspective, unavoidable—reactions to the activities of their rivals.'" *Monsanto*, 465 U.S. at 763. Such complaints "'arise in the normal course of business and do not indicate illegal concerted action.'" *Id.* The Second Circuit has held the same, finding a complaint by one retailer "about the selling practices of another" does "not indicate illegal concerted action, since it is normal marketplace behavior for such complaints to be made." *Oreck*, 639 F.2d at 80; *see also Burlington Coat*, 769 F.2d at 923 ("Direct complaints from Federated to Esprit would be, by themselves, insufficient to show a conspiracy between Federated and Esprit, even if Esprit cancelled Burlington immediately thereafter."); *Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 245 (2d Cir. 1997) (similar).

Here too, Plaintiffs' Complaints establish an obvious alternative explanation. Walmart offers its customers everyday low prices. As Consumers and Retailers acknowledge, Walmart "has positioned [its] brand as the lowest cost place to get many grocery items." CC ¶ 127; RC ¶ 139. And their own price survey shows that Walmart's prices are significantly lower than those of its competitors. CC ¶¶ 67-74; RC ¶¶ 71-78. A retailer pursuing that strategy has an obvious reason to monitor competitors, seek favorable input prices (especially when it appears that competing retailers are receiving lower costs), and ask suppliers to fund rollbacks. Walmart is also alleged to be "committed to negotiating on behalf of its customers so it can deliver value and everyday low prices," to try to "hold prices down," and to ask suppliers "How can you help us roll back prices …?" CC ¶¶ 165, 167; RC ¶¶ 185, 187; IC ¶ 161; *see also* IC ¶ 158 (Walmart CEO noting that "Walmart's lower-priced products could push other brands to bring down their own

prices"). Those allegations describe hard bargaining over input costs—not an agreement for Walmart to pay more.

Under Walmart's alleged policies, it cannot and does not know the "future pricing or product strategies" of its competitors. CC ¶ 169; RC ¶ 189; IC ¶ 163 (Walmart's guidelines instructing suppliers against "offering to share with Walmart another third party's non-public, commercially sensitive or proprietary information" and "[d]iscussing with Walmart your sales plans or strategies that you have with your other customers"). Instead, Walmart tracks the present, public retail prices of its competitors to determine whether it is fulfilling its promise of everyday low prices for its customers. There is nothing illicit about that goal of "price leadership" (*i.e.*, lower prices). *Cf.* IC ¶ 52. Also, if retail prices are lower elsewhere, Walmart has reason to suspect that those other retailers may be receiving lower wholesale prices than Walmart is receiving, which prompts Walmart to negotiate with its suppliers to also obtain lower wholesale prices. Such actions reflect Walmart's own procompetitive "business priorities," not an anticompetitive conspiracy. *Citigroup*, 709 F.3d at 138. The Complaints' conclusory allegations that PepsiCo tracked "price gap" or "price hedge" metrics as part of its "commercial strategy" to "win with" its largest customer do not plausibly allege a conspiracy. IC ¶¶ 45–47.

Indirects' allegations regarding "Rollbacks," which they describe as "advertised price reductions at Walmart for specific items, funded in whole or in part by the manufacturer of that item," underscore the point. *See* IC ¶¶ 58-65. They allege that, when competitors were beating Walmart on price, "Walmart forced Pepsi to lower its wholesale prices to fund lower retail prices." IC ¶ 59. That amounts to arm's-length negotiation. As Indirects admit, PepsiCo "undertook these price cuts only begrudgingly," because it meant "sacrific[ing] … profits." IC ¶¶ 62, 65. Far from

a conspiracy, these allegations describe the ordinary transactional relationship of a buyer and seller continually negotiating over prices.

***PepsiCo's Monitoring And Responses.*** Plaintiffs also allege that PepsiCo monitored retail prices, was aware of Walmart's desire for the lowest retail price, and either responded to or anticipated Walmart's complaints. CC ¶¶ 43-44, 47, 49-52; RC ¶¶ 47-48, 51, 53-56; IC ¶¶ 46-48, 50-51, 54-56. That allegation does not come close to raising an inference of conspiracy. Even a manufacturer *terminating* a retailer "in response to" price-related complaints does not permit an inference of an unlawful agreement between the manufacturer and the complaining retailer. *Monsanto*, 465 U.S. at 763; *see also Burlington Coat*, 769 F.2d at 923. And Plaintiffs make no allegation that PepsiCo terminated any of its customers. At most, they claim that PepsiCo "eliminat[ed] promotional support" or "increas[ed] wholesale prices" as to at least one retailer (Food Lion is their only specific example). CC ¶¶ 49, 51-52; RC ¶¶ 53, 55-56; *see* IC ¶¶ 55-56. But the Food Lion narrative demonstrates the existence of retail price competition, not its absence. And in any event, "an effort by [a manufacturer] to persuade [a retailer] to raise its prices" is "as consistent with responses by [the manufacturer] to dealer complaints as they are with a conspiracy between [the manufacturer] and those dealers." *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1016 (2d Cir. 1989). Here, Plaintiffs do not allege that Walmart complained about Food Lion; instead, they allege that PepsiCo took these actions on its own to ward off *potential* complaints. CC ¶¶ 51-52; RC ¶¶ 55-56; IC ¶¶ 55-56.

Far from establishing a plausible conspiracy, Plaintiffs' Complaints suggest that PepsiCo was motivated by its independent interest in maintaining a good relationship with its largest customer. PepsiCo allegedly anticipated that Walmart would have a "negative reaction" to being beaten on price by its competitors, and "expressed concern" about Walmart's potential reaction.

CC ¶ 47; RC ¶ 51. That mattered because Walmart is PepsiCo's largest customer, and "losing Walmart as a customer 'would have a material adverse effect' on all of Pepsi's business." CC ¶¶ 2, 37-38; RC ¶¶ 2, 41-42; *see* IC ¶¶ 11, 44. And as PepsiCo acknowledged, it "must maintain mutually beneficial relationships with [its] key customers, including Walmart, to compete effectively." CC ¶ 10; RC ¶ 11; IC ¶ 10. Preserving a major customer relationship is a legitimate business strategy—not evidence of an agreement to restrain competition. *See, e.g.*, *Reborn Enters. v. Fine Child, Inc.*, 590 F. Supp. 1423, 1442 (S.D.N.Y. 1984) (noting "legitimate business reason of continuing a strong business relationship with a favored account"), *aff'd*, 754 F.2d 1072 (2d Cir. 1985); *Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.*, 123 F.3d 1107, 1111 (8th Cir. 1997) (company "understandably favor[ing] its best customers" did not show conspiracy). In fact, had Walmart and PepsiCo come to some sort of overarching agreement to fix prices as Plaintiffs assert, PepsiCo executives would not have "feared" Walmart's continuing wholesale price negotiations. CC ¶ 47; RC ¶ 51. That fear reflects the absence, not the presence, of an unlawful agreement.

***Plaintiffs' Other Allegations Do Not Supply A Plus Factor.*** None of Plaintiffs' other allegations suffices to suggest an unlawful agreement.

- *First*, Plaintiffs allege "close connections" between PepsiCo and Walmart, based primarily on a few employees. CC ¶ 10; RC ¶ 11; IC ¶ 10. But that does not plausibly allege a conspiracy because "a mere showing of close relations … will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement." *Oreck*, 639 F.2d at 79.
- *Second*, Plaintiffs put weight on an FTC investigation and lawsuit that the FTC since dismissed. CC ¶¶ 150-151; RC ¶¶ 170-172; *see also, e.g.* CC ¶ 48 ("Per the FTC …").

The FTC's case did not involve any conspiracy claims. Walmart was not a defendant in the FTC action. And there was no adjudication of liability. The mere existence of the FTC's investigation and withdrawn complaint does not plausibly support allegations of a conspiracy. *BNP Paribas*, 92 F.4th at 405 (government investigation "does not amount to direct evidence of a conspiracy"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (noting FTC complaint and consent decree did not "suggest … an agreement was made" where claim did not require conspiracy); *see also Low v. Robb*, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012) ("[A]llegations … that are either based on, or rely on, complaints in other actions that have been dismissed … are, as a matter of law, immaterial."); *In re Concrete & Cement Additives Antitrust Litig.*, 2026 WL 2594002, at *16 (S.D.N.Y. Sept. 2, 2026) (allegations predicated on government investigation "weaken[ed]" by government's closure of the investigation).

- *Third*, Plaintiffs proclaim that "Walmart has engaged in a Scheme like this one before" with respect to disposable batteries. CC ¶¶ 11-12; RC ¶¶ 12-13; *see* IC ¶¶ 11-12. But there has been no determination that any such conspiracy ever existed; there are only assertions by many of the same counsel representing Plaintiffs in this matter. The allegations here differ meaningfully from the allegations there. And "absent any evidence of linkage" with that alleged conduct, Plaintiffs' claim that "if it happened there, it could have happened here" is "an insufficient factual basis for their assertions." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also Tera Group, Inc. v. Citigroup, Inc.*, 2024 WL 4501967, at *5 (2d Cir. Oct. 16, 2024) ("The [defendants'] conduct in different markets, with respect to different products, is not circumstantial evidence of the conspiracy alleged here.").

- *Fourth*, Plaintiffs claim that "[t]he percentage of Pepsi products sold through Walmart also reflects an agreement." CC ¶ 11; RC ¶ 12. That is not and cannot be the law; it would render every substantial supply relationship the basis for a conspiracy claim.

### 3. Plaintiffs' Theory Makes No Economic Sense

Plaintiffs' theory of Defendants' "agreement" suffers from another fundamental flaw: It "simply makes no economic sense" for Walmart to join this alleged conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twombly*, 550 U.S. at 565-66 (relying on "common economic experience" and concluding "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway"). Plaintiffs allege that Walmart "is the largest company in the world by revenue." CC ¶ 22; RC ¶ 27; IC ¶ 2. They allege that Walmart has "leverage to enter into supply agreements directly with manufacturers." CC ¶ 38; RC ¶ 42; *see also* IC ¶ 80 (referencing a "large purchaser" "leveraging their buyer power"). They refer to Walmart's "market power" as a reason that PepsiCo agreed to the purported conspiracy. CC ¶¶ 39, 77; RC ¶¶ 43, 87; IC ¶¶ 188-189. And their Complaints include various references to Walmart's importance to PepsiCo, *supra* at 14-15, including the allegation that "Pepsi could not afford to reject Walmart's demands and risk losing its business," IC ¶ 61. Those allegations concern Walmart's bargaining leverage and its incentive to seek *favorable* wholesale prices, not an incentive to accept *higher* ones.

Plaintiffs nonetheless assert—without support—that Walmart agreed to "accept *higher* wholesale prices than it otherwise would have" from PepsiCo. CC ¶ 6; RC ¶ 6 (emphasis added); *see* IC ¶ 5. That allegation conflicts with Walmart's asserted leverage and its alleged everyday-low-price strategy. *First*, if Walmart had the bargaining power Plaintiffs describe, it would use that power to negotiate the lowest available wholesale prices while preserving retail price leadership and shareholder returns. The Complaints identify no offsetting benefit that would make

paying more rational. The theory therefore requires Walmart to sacrifice profits to raise rivals' costs without alleging how Walmart would recover that sacrifice. A theory that depends on a defendant knowingly injuring itself to injure others, without a pleaded path to recoupment, is precisely the sort of implausible inference rejected by *Twombly*.

*Second*, Plaintiffs' own allegations describe why Walmart would not enter such a conspiracy: its everyday low price strategy, its reputation for being the lowest-cost retailer, and its commitment to "negotiat[e] on behalf of its customers" and "hold prices down" with suppliers. CC ¶¶ 127, 165, 167; RC ¶¶ 139, 185, 187; IC ¶ 161; *see supra* at 12-13. The contrast is striking. Plaintiffs lack any specific allegations (no well-pleaded facts regarding who, what, when, where, or how) about Walmart's alleged agreement to the Scheme, while providing detailed allegations illustrating why such an agreement would make no sense.

Plaintiffs' antitrust claims should be dismissed because Plaintiffs themselves plead "obvious alternative explanation[s]" and because their allegations are belied by "common economic experience." *Twombly*, 550 U.S. at 565, 567. In short, Plaintiffs fail to allege "enough facts to support the inference that a conspiracy actually existed." *Citigroup*, 709 F.3d at 136.

### B. Plaintiffs Do Not Plausibly Allege Substantial Harm To Competition In A Relevant Market

Plaintiffs also fail to adequately allege that the challenged conduct caused substantial harm to competition in a relevant antitrust market. Under the governing rule-of-reason framework, Plaintiffs' failures are twofold: (1) their proposed product market is facially overbroad; and (2) they do not adequately plead substantial harm to competition in that alleged product market. Either failure is a sufficient basis to dismiss Plaintiffs' federal and state antitrust claims.

### 1. The Rule Of Reason Governs Plaintiffs' Claims

The alleged conspiracy between PepsiCo and Walmart should be analyzed under the rule of reason, which "is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). The Supreme Court has held that "vertical price restraints are to be judged by the rule of reason," *id.* at 882, noting that "the economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance." *Id.* at 889; *see also Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018) (*Amex*) ("nearly every … vertical restraint … should be assessed under the rule of reason"). A "vertical restraint[]" is one "imposed by agreement between firms at different levels of distribution" (while "horizontal restraints" are "imposed by agreement between competitors"). *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

Here, Plaintiffs allege a vertical agreement between PepsiCo (a manufacturer) and Walmart (a retailer), not a horizontal agreement between competitors. *E.g.*, CC ¶¶ 4-6; RC ¶¶ 4-6; IC ¶¶ 4-6. They also characterize the alleged conduct as "resale price maintenance." CC ¶ 76; RC ¶ 86; IC ¶ 7 n.1. Unsurprisingly, then, Consumers and Retailers expressly acknowledge that their Sherman Act claims are "subject to a rule of reason analysis." CC ¶ 76; RC ¶ 86. And while Indirects briefly attempt to suggest that a "'quick look' analysis" applies, IC ¶ 192, that is foreclosed by *Leegin* and *Amex*. *See Amex*, 585 U.S. at 541-42 (describing "three-step, burden-shifting framework" for the rule of reason). Under the rule of reason, a plaintiff must plausibly allege an "actual adverse effect on competition in the relevant market." *Toshiba*, 129 F.3d at 244.

### 2. Plaintiffs' Alleged Relevant Product Market Fails As A Matter Of Law

Under the rule of reason, Plaintiffs must first plausibly allege a relevant market. *E.g.*, *City of N.Y. v. Grp. Health, Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("[A] plaintiff must allege a plausible

relevant market in which competition will be impaired"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (noting "only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market"); *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) ("relevant market analysis … is essential for assessing the potential harm to competition"). The relevant market has two components: a product market and a geographic market.

A relevant product market "consists of 'products that have reasonable interchangeability for the purposes for which they are produced." *Concord*, 817 F.3d at 52. Products are "reasonably interchangeable where there is sufficient cross-elasticity of demand"—that is, where "consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). And where a "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," the "relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (citation omitted); *see also Grp. Health*, 649 F.3d at 155. Plaintiffs fail to plausibly allege a relevant product market here because: (1) their alleged "RTD soft drink" market is facially implausible and overbroad; and (2) they focus on the wrong analytical question. These failures mandate dismissal.

***Plaintiffs' Product Market Is Implausibly Broad***. Plaintiffs allege a single "non-alcoholic ready-to-drink . . . soft drink market," including both carbonated soft drinks (like Pepsi, Mountain Dew, and Dr. Pepper) and non-carbonated drinks such as sports drinks, ready-to-drink coffee, ready-to-drink tea, energy drinks, and juice. *See* CC ¶¶ 78-115; RC ¶¶ 88-127; IC ¶¶ 89-146. To find this market sufficiently pleaded, the Court would have to accept that if the price of Diet Pepsi were "slight[ly] increase[d]," *AD/SAT*, 181 F.3d at 227, consumers would switch to a Gatorade, a

Starbucks Frappuccino, or orange juice—and that if the price of orange juice were slightly increased, consumers would switch back to Diet Pepsi. That facial implausibility defeats their proposed relevant market. Moreover, the Complaints nowhere allege cross-elasticity of demand among the products they group together. Plaintiffs instead define the market by the identity of the seller, PepsiCo. *Cf. Hack v. Pres. & Fellows of Yale College*, 237 F.3d 81, 85-86 (2d Cir. 2000) (rejecting single-brand market defined).

Plaintiffs' own allegations again work against their claim on two different fronts. *First*, Indirects acknowledge different "functional and flavor-based attributes" among these different products while trying to exclude bottled water from their proposed market. IC ¶ 136. In their own words, sports drinks have "sweeteners" and "electrolytes"; energy drinks contain "caffeine" and "other stimulant[s]"; tea and coffee are "consumed for their distinctive flavor profiles and caffeine content"; and juice is "consumed for its distinctive flavor, nutrients, and vitamins." *Id.* Plaintiffs argue that these distinctive components mean that water is not "an adequate substitute" and should not be included in the relevant market. *Id.* Yet they fail to follow that logic where it leads: A "consumer seeking the caffeine stimulation of an energy drink" would not view "the electrolyte rehydration of a sports drink" to be an adequate substitute, either. *Id.* In other words, Plaintiffs' descriptions demonstrate distinct consumer demand for different drink types.

*Second*, Indirects contend that the "price differential" between bottled water and sports drinks, carbonated soft drinks, and energy drinks "provides further evidence that the products are not close substitutes." *Id.* ¶ 138. But if (as Indirects contend) price differentials show that products are not close substitutes, then their own allegations undermine their market definition: they allege that carbonated soft drinks, juice, and tea are about 50% more expensive than sports drinks, while energy drinks and coffee are double the price of carbonated soft drinks, juice, and tea, and triple

the price of sports drinks. *Id.* The same functional and price-based distinctions Plaintiffs invoke to exclude water apply with equal or greater force among the products they include, so their market definition cannot be reconciled with their own stated methodology.

Other courts have found such facially overbroad markets legally insufficient. *See Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974) (rejecting alleged entertainment market including movies, plays, and sports as "so broadly defined as to render that concept all but meaningless"); *cf. In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *8 (S.D.N.Y. Apr. 8, 2011) ("[A]n overly broad product [market] definition may render the alleged product market implausible."). For example, one court in this district held that an alleged "e-commerce delivery market" that included disparate entities like third-party logistics providers, package delivery companies, e-commerce retailers, and building access providers was an "amalgamation" that "fail[ed] to satisfy the rule of reasonable interchangeability." *GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739, at *18 (S.D.N.Y. Feb. 16, 2023). Another court dismissed "search access point" market allegations because "a market inclusive of all search access points would be too broad to be plausible, as a desktop browser search bar, for example, is clearly not reasonably interchangeable with a mobile widget." *Sensory, Inc. v. Google LLC*, 2026 WL 2017536, at *8 (D.D.C. July 13, 2026). And still another dismissed a market capturing all college sports, holding that "Plaintiffs' decision to lump all NCAA schools into the same market regardless of material distinctions in division, sport offered by gender, or athletic success proves that their proposed market is not legally cognizable." *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013). Plaintiffs' allegations are similarly overbroad, and their Sherman Act claims should be dismissed on this basis.

***Plaintiffs Ignore Consumer Substitution***. Plaintiffs' market allegations attempt to distract from this basic implausibility by shifting their focus to the wrong issue. Specifically, Plaintiffs' focus appears to be on whether PepsiCo sells a particular product, rather than on any "arena within which significant substitution in consumption or production occurs." *Amex*, 585 U.S. at 543. That leads them to include, in a single market, a variety of different competitive realities and commercial relationships.

Plaintiffs themselves allege differences in market concentration and competitors. For instance, Plaintiffs allege a "longstanding duopoly" in the "cola" category, CC ¶ 89; RC ¶ 100; IC ¶ 102, but that the "citrus" and "pepper" categories are marked by one dominant player. CC ¶¶ 91-95; RC ¶¶ 101-106; IC ¶¶ 104-107. And, while they lack similar details about ready-to-drink tea, energy drinks, and juice, they introduce new and different competitors there. *See* CC ¶¶ 106-115; RC ¶¶ 117-127; IC ¶¶ 118-130. But products that are genuine substitutes for one another tend to face the same competitive constraints. *See AD/SAT*, 181 F.3d at 228 (asking whether consumers switching to other producers "substantially constrain the price-increasing ability" of a "hypothetical cartel" (citation omitted)); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (asking what is "the competitive force that restrains" a company "from raising prices"). Plaintiffs' own allegations—including that PepsiCo sees itself "leading" in the sports drink category, while merely "participating" in energy drinks, and seeing "good growth" in certain areas of soft drinks, CC ¶ 125; RC ¶ 137; IC ¶ 134—show that these products do not share common competitive constraints. Grouping products together in these circumstances improperly assumes that otherwise dissimilar products belong in a single market just because the same company sells them.

Plaintiffs also group together different commercial relationships. Plaintiffs include Dr. Pepper in PepsiCo's market share because of "bottling and distribution agreement" between the two companies, even though they describe Dr. Pepper as owned by a "direct competitor[]" to PepsiCo. CC ¶¶ 87, 92-94; RC ¶¶ 103-105; IC ¶¶ 105-108. But such a licensing agreement says nothing about whether consumers view particular products as reasonable substitutes, and the Complaints do not allege facts showing that PepsiCo owns or controls the licensed products, or that their full sales may properly be attributed to PepsiCo. For example, the allegations do not foreclose that Dr. Pepper has other distribution agreements with other companies. Plaintiffs also sweep in PepsiCo's minority ownership stakes, joint ventures, and licensing agreements, without any regard for potential distinctions in how these different business relationships affect commercial realities. *See* CC ¶¶ 102-115; RC ¶¶ 114-127; IC ¶¶ 115-130 (including joint ventures, "11%" ownership stake, "39% ownership stake" in "joint venture," and "brand licensing agreements"). None of those supply-side relationships answers the relevant demand-side inquiry: reasonable interchangeability and cross-elasticity of demand. *Chapman*, 546 F.3d at 238. This Court need not "accept uncritically" Plaintiffs' market definition, for a party cannot "gerrymander its way to an antitrust victory without due regard for market realities." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

### 3. The Alleged Conduct Did Not Substantially Harm Competition

Under the rule of reason, plaintiffs bear the burden to show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 585 U.S. at 541. Plaintiffs can do that "directly," by showing "reduced output" or "increased prices" in the relevant market caused by the alleged conduct, or "indirectly" through "proof of market

power plus some evidence that the challenged restraint harms competition." *Id.* at 542; *see also MacDermid*, 833 F.3d at 184-87 (same). Here, Plaintiffs cannot make either showing.

***Plaintiffs' Allegations Of Direct Evidence Of Harm To Competition Fail.*** As for direct evidence, Plaintiffs' allegations primarily concern increased prices for *PepsiCo* products. *See, e.g.*, CC ¶ 145 ("Defendants' agreement caused prices for Pepsi RTD soft drinks at Walmart to be higher than they would have been in a competitive market."); RC ¶ 158 (same for "wholesale prices for Pepsi RTD soft drinks"); IC ¶ 147 (same); CC p. 51 ¶ 21 ("As a result of Defendants' Scheme, prices for Pepsi RTD soft drinks were inflated above competitive levels in the United States"); RC p. 57 ¶ 25 (same); IC ¶ 194 (same). Yet there is a fundamental mismatch between those allegations of harm and the alleged market that Plaintiffs plead. *See supra* at 6-7. Plaintiffs' market does not consist solely of *PepsiCo*'s products but instead includes *all* ready-to-drink soft drinks. CC ¶¶ 78-80; RC ¶¶ 88-90; IC ¶ 89. As a result, Plaintiffs must plausibly show "harm to competition in the market *as a whole*," not just increased prices for PepsiCo products. *MacDermid*, 833 F.3d at 187 (emphasis added). They do not come close to doing so.

The defect in Plaintiffs' theory is that their alleged restraint is intrabrand (relating *only* to PepsiCo products) and not interbrand (concerning the products of other manufacturers). At most, Plaintiffs describe a reallocation of margin among distributors of a single brand, Pepsi products. That does not establish market-wide harm—on the contrary, it could actually enhance interbrand competition by inducing PepsiCo's rivals to compete on price. *See Leegin*, 551 U.S. at 890 (defining intrabrand competition as "the competition among retailers selling the same brand" and interbrand competition as "the competition among manufacturers selling different brands of the same type of product"); *see also Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 77 (2d Cir. 2013) (intrabrand restraints "lie far from the core § 1 violations that are likely to give rise to

antitrust injury"). That is why a plaintiff must "show more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *see also Toshiba*, 129 F.3d at 244 (similar).

Because an intrabrand, wholesale-level restraint cannot establish market-wide harm, Plaintiffs attempt to backfill. They first allege that the relevant market is an oligopoly among PepsiCo, Coca-Cola, and Dr. Pepper. CC ¶ 9; RC ¶ 9; IC ¶ 7. But "that a market has few competitors does not transform every action by one of them into an antitrust violation." *MacDermid*, 833 F.3d at 186. Next, Plaintiffs allege a "series of parallel price increases by Coca-Cola." CC ¶ 135; RC ¶ 148; *see* IC ¶¶ 74-75. But these allegations are thin: they do not offer specifics about the timing of Coca-Cola's price increases, beyond the conclusory allegation that Coca-Cola "follow[ed] Pepsi's lead." CC ¶ 141; RC ¶ 154; *see* IC ¶ 146; *cf. E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, (2d Cir. 1984) ("Labelling one producer's price change as a 'signal,' parallel price changes as 'lock-step,' or prices as 'supracompetitive,' hardly converts its pricing into an 'unfair' method of competition.").

Notably, Plaintiffs do *not* allege any agreement between PepsiCo and Coca-Cola or any hub-and-spoke conspiracy. Instead, they allege that Coca-Cola *did not know* about PepsiCo's pricing and had to "reach out" to their customers to determine those prices and then decide what to do about pricing. CC ¶ 136; RC ¶ 149. That is, Plaintiffs' own allegations demonstrate that Coca-Cola acted independently. Indirects' allegation that "Coca-Cola has long emphasized its use of conscious parallelism to set prices," IC ¶ 75, does not suggest otherwise. *See Twombly*, 550 U.S. at 553-54 ("conscious parallelism … is not in itself unlawful"); *Anderson News*, 899 F.3d at 103 (noting "legitimate business reason[s]" to "monitor competitors' behavior"); *supra* at 10-12.

Plaintiffs cannot conscript a non-party's lawful pricing decisions to supply the market-wide effect that their intrabrand restraint lacks. Otherwise, vertical arrangements involving a single firm in a concentrated market would be transformed into an antitrust violation by operation of its rivals' lawful conduct. That is not the law. *See MacDermid*, 833 F.3d at 186; *Toshiba*, 129 F.3d at 245.

Plaintiffs' allegations regarding Dr. Pepper's pricing are even more sparse—the only price increase they plead comes more than five years after the alleged conspiracy began. CC ¶ 96; RC ¶ 107; IC ¶ 106. That, along with a conclusory allegation that Pepsi "is able to exert control over the prices of Dr. Pepper-owned brands," CC ¶ 95; RC ¶ 106; IC ¶ 107, is insufficient to plausibly allege market-wide harm.

***Plaintiffs' Allegations Of Indirect Evidence Of Harm To Competition Likewise Fail.*** Plaintiffs also cannot show indirect evidence of market-wide anticompetitive effects based on market power. *See MacDermid*, 833 F.3d at 182 (defining "market power" as "the ability of a single seller to raise prices and restrict output" without regard to competitive pressure). Plaintiffs' allegations describe two distinct levels of distribution: the wholesale market in which PepsiCo sells to retailers, and a downstream retail market in which retailers sell to consumers. The Complaints improperly conflate those two levels, with some claims relying on retail market shares and others focusing on the wholesale level. *See also supra* 22-24 (describing how Plaintiffs gerrymander PepsiCo's market share).

Plaintiffs try to combine the shares of PepsiCo and Walmart in two separate markets by alleging that PepsiCo "effectively delegates its market power to Walmart, enabling Walmart to set retail prices and increase wholesale prices" for *other retailers*. CC ¶¶ 128, 130; RC ¶¶ 140, 142; IC ¶¶ 143, 145. But PepsiCo and Walmart are sellers in two different markets, and alleging aggregated shares in an attempt to create market power is improper. Market power is both *market-*

specific and *firm*-specific. Analytically, the market-power inquiry comes after market definition; a court cannot determine whether a firm has *power* in a market until it knows what the market is. *Geneva Pharms.*, 386 F.3d at 496 ("Evaluating market power begins with defining the relevant market."); *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 455, 486 (1992) (assessing market power separately in "primary equipment market" and "derivative aftermarkets"). That means conflating markets does not work.

Similarly, market power is "the ability of a *single* seller to raise prices." *MacDermid*, 833 F.3d at 182 (emphasis added); *cf. H.L. Hayden*, 879 F.2d at 1018 (holding that market share of two defendants "could not be aggregated" for a Section 2 claim). Plaintiffs' "delegated market power" theory would collapse the firm-specific market-power inquiry by treating two separate firms operating in two separate markets as a single seller. Plaintiffs' attempt to play fast and loose with their market-power allegations once again highlights the shortcomings of their antitrust claims.

Plaintiffs' theory depends on *Walmart* possessing sufficient retail market power to force other retailers into matching Walmart's preferred pricing (since that is the mechanism by which the alleged conspiracy operates). Plaintiffs concede that Walmart accounts for just 14% of PepsiCo's net revenue, CC ¶ 2; RC ¶ 2; IC ¶ 44,[4] and allege that Walmart competes in the "grocery store market," where it allegedly has a 30% market share, CC ¶ 144; RC ¶ 157; IC ¶ 141. But Plaintiffs' alleged market for ready-to-drink soft drinks encompasses a wide variety of retail outlets beyond just "grocery stores," including convenience stores, pharmacies, coffee shops, and vending machines. Even if the asserted figure were accurate, Walmart's alleged market share in groceries cannot be used as a shorthand for its position in the market alleged by Plaintiffs. Market power

[4] The reference to "14%" of PepsiCo's revenue is misleading if Plaintiffs suggest that it relates *only* to beverage products. As Plaintiffs elsewhere allege, PepsiCo sells snacks like chips to Walmart as well. *See, e.g.*, CC ¶ 120; RC ¶ 132; IC ¶ 133.

must be assessed in the market Plaintiffs pleaded. A share in an un-pleaded "grocery store market" is legally irrelevant to whether Walmart has power in the alleged ready-to-drink soft-drink market.[5]

* * *

Plaintiffs' antitrust claims fail because they do not plausibly allege the essential elements either of an agreement or of substantial harm to competition in a relevant market.

## II. PLAINTIFF GIANNASCA'S ROBINSON-PATMAN ACT CLAIMS FAIL

Of the nearly two dozen plaintiffs across the three Complaints, only one (Giannasca) asserts claims under the Robinson-Patman Act (RPA). Those claims fail as to both PepsiCo and Walmart for four independent reasons: Giannasca pleads (1) no contemporaneous pair of sales of commodities of like grade and quality; (2) no facts making a sale in interstate commerce plausible; (3) no identified promotional payment or service; and (4) no proportional inequality. The claims also fail against Walmart because Sections 2(d) and 2(e) regulate sellers, not buyers, and Section 2(f), the only provision reaching buyers, is both un-pleaded and derivative of a seller-side violation, which Giannasca has not plausibly alleged.

The RPA is narrowly construed and requires transaction-specific pleading.[6] To state a claim under Section 2(d), a plaintiff must allege that the defendant made "contemporaneous sales of commodities of like grade and quality in [interstate] commerce" to a favored customer and a disfavored customer. *Wolff v. Ford Motor Co.*, 1977 WL 1396, at *6 (S.D.N.Y. Apr. 20, 1977)

---

[5] Even a 30% share is insufficient as a matter of law to support an inference of market power. *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 n.22 (S.D.N.Y. July 31, 2023) ("[A] market share of between 30 and 40% does not lead to an inference of market power, as is necessary to adequately plead a market-wide effect."); *Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*, 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) ("[C]ourts have rejected … market shares between 30 percent and 40 percent as inadequate to demonstrate market power.").

[6] This is why Retailers' class allegations as to this claim cannot be certified. *See Alqosh Enters. Inc. v. PepsiCo, Inc.*, 2026 WL 478119, at *5 (C.D. Cal. Feb. 18, 2026) (RPA claims "require individualized proof at every step"); *see id.* at *13 (granting motion to strike class allegations).

(cleaned up). The plaintiff also must allege that: (1) the defendant-seller made a payment to a customer in connection with promoting the resale of the defendant's products; (2) the defendant failed to offer the payment on proportionally equal terms to all other customers competing to resell the defendant's products; and (3) the plaintiff was injured because of the payment. *See Coal. For A Level Playing Field, L.L.C. v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 213 (S.D.N.Y. 2010). The elements of a Section 2(e) claim are identical except that, rather than the defendant *paying* the customer to promote the defendant's products, the defendant directly supplies the customer with promotional *services* to facilitate resales. *See George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 144 (2d Cir. 1998).

***No Contemporaneous Sales Of Commodities Of Like Grade And Quality.*** "It is not enough that two sales have occurred under the RPA. The sales to the favored customer and disfavored customer must be contemporaneous." *Dayton Superior Corp. v. Spa Steel Prods., Inc.*, 2010 WL 3825619, at *9 (N.D.N.Y. Sept. 24, 2010). Giannasca does not plead that PepsiCo sold any product, at or around the same time, to both Giannasca and a Walmart location that competes with Giannasca's restaurant. At most, Giannasca compares the *retail* price of a Two-Liter Pepsi Soda at Walmart on July 1, 2025, with the *wholesale* price Giannasca paid for the same product nearly two months earlier. *See* RC ¶¶ 71–73, 79–80. But this apples-to-oranges comparison says nothing about when, if ever, PepsiCo sold Two-Liter Pepsi Soda to Walmart, much less whether any such sale was contemporaneous with a sale to Giannasca. *See Gemini Supply Corp. v. Zeitlin*, 590 F. Supp. 153, 156 (E.D.N.Y. 1984) (requiring "contemporaneous sales of commodities of like grade and quality between two or more different customers" of the supplier); *Dayton*, 2010 WL 3825619, at *10 (dismissing where plaintiff did "not allege that [defendant's] sale of the offending products to [plaintiff's] unnamed competitors occurred at or around the time when [defendant]

sold [plaintiff] the offending products"). Giannasca's other allegations of contemporaneous sales are conclusory, *see* RC ¶ 22, p. 58 ¶ 30, and cannot be credited. *See Monsieur Touton Selection, Ltd. v. Future Brands, LLC*, 2006 WL 2192790, at *5 (S.D.N.Y. Aug. 1, 2006) (dismissing RPA claims "utterly devoid of any allegation of a specific transaction, contemporaneous or otherwise"); *Wolff*, 1977 WL 1396, at *6 ("Since no specific sales of [defendant's] products or dates are identified, neither the defendants nor the Court can determine whether commodities of like grade and quality are involved.").

***No Sales In Interstate Commerce.*** Giannasca also fails to allege facts showing that "at least one of the discrimination-generating transactions itself crossed a state line." *Wolff*, 1977 WL 1396, at *2. He offers only a vague assertion that he purchased unspecified "Products" from PepsiCo "in interstate commerce," and that "Pepsi RTD soft drinks are sold in interstate commerce." RC ¶¶ 22, 84. He identifies no shipment, seller location, buyer location, or transaction crossing a state line. Courts routinely reject such "boilerplate assertions" of interstate commerce. *Monsieur Touton*, 2006 WL 2192790, at *6 (cleaned up); *see also Wolff*, 1977 WL 1396, at *6 ("Since no specific sales of [defendant's] products or dates are identified, neither the defendants nor the Court can determine … whether the strict interstate commerce requirement is met.").

***No Identified Promotional Program.*** Giannasca also fails to allege that PepsiCo provided any promotional payment or service *at all* under Section 2(d) or 2(e). Giannasca describes grocery retail displays in generic terms and vaguely alleges "promotional payments, allowances, and services," RC ¶¶ 42, 65–69, but omits any particulars—which product(s) were promoted and when, the dollar amount of any payment, the nature of any service provided, or how any payment or service promoted resale. "At this level of generality … the complaint provides no basis for

concluding that any particular vendor agreement relates to 'advertising, promotional, and merchandising services,' a basic condition for liability under §§ 2(d) and (e)." *AutoZone*, 737 F. Supp. 2d at 218. Where, as here, the complaint "does not allege any facts suggesting that [the challenged] economic incentives are promotional or otherwise related to aiding the buyer in reselling the product," it "has not stated a plausible claim to relief under Sections (d) and (e)." *Abbott Lab'ys v. Adelphia Supply USA*, 2018 WL 8967057, at *6 (E.D.N.Y. Aug. 7, 2018).

***No Proportional Inequality.*** Because Giannasca identifies no promotional program, he cannot plausibly allege that the program was not offered "on proportionally equal terms to all other customers competing with" Walmart to resell PepsiCo products. *AutoZone*, 737 F. Supp. 2d at 213. Giannasca's allegations in support of this element are, again, conclusory. *Compare* RC ¶¶ 42, 69; RC p. 58 ¶¶ 30; RC p. 59 ¶ 35, *with D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 797 (E.D.N.Y. 1995) (dismissing Section 2(e) claim where there were "no allegations as to what, if any, services or facilities were furnished the [favored purchasers] upon terms not accorded to all purchasers on proportionally equal terms") (cleaned up).

***Additional RPA Defects As To Walmart.*** Giannasca's RPA claims against Walmart fail for two additional reasons. *First*, Sections 2(d) and 2(e) regulate discriminatory promotional payments or services furnished by a *seller,* not received by a *buyer*—and Walmart is a buyer. 15 U.S.C. § 13(d)-(e). Such claims thus cannot be brought against Walmart. Section 2(d) refers to a seller paying or contracting for the benefit "of a customer of such person" and offering "proportionally equal terms to all other customers," and refers to the "products or commodities manufactured, sold, or offered for sale by such person." Section 2(e) refers to a seller "discriminat[ing] in favor of one purchaser against another purchaser." *Id.* That is, these provisions are "aimed only at sellers" and "make[] no mention of buyers." *Grand Union*, 300 F.2d

at 94. Had Giannasca wished to bring an RPA claim against Walmart, he should have brought it under Section 2(f), *id.* at 94-95, which makes it "unlawful for any person … knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f); *see also Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 76 (1979) ("*A&P*") ("emphasis" of RPA is "price discriminations by sellers"). Giannasca did not bring that claim, much less make any plausible allegations supporting it.

*Second*, liability under Section 2(f) is "limited to situations where the price discrimination is one 'which is prohibited by this section,'" which specifically refers to "subsections (a) and (b)" because they "involve discriminations in price." *A&P*, 440 U.S. at 76. That is, "[u]nder the plain meaning of § 2(f) … a buyer cannot be liable if a prima facie case could not be established against a seller or if the seller has an affirmative defense." *Id.* Because Giannasca does not plausibly allege any violation of the RPA against PepsiCo, *supra* at 29-32, or even bring a claim under Section 2(a) or Section 2(b), Walmart cannot have "derivative" liability under Section 2(f) either, *A&P*, 440 U.S. at 76; *see also Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 215 (2d Cir. 2015) ("A buyer cannot be liable unless the seller of the goods is liable under another section of the Act.").

## III. PLAINTIFFS' OTHER STATE-LAW CLAIMS FAIL TOO

Plaintiffs' state-law consumer-protection claims should also be dismissed. These claims are based on the same conduct underlying Plaintiffs' antitrust claims and are deficient for the same reasons. The claims also fail independently: Plaintiff Giannasca cannot sue under Section 9 of Massachusetts Chapter 93A; Consumers plead only a *per se* Cartwright Act theory; and Indirects plead no state-specific facts, and identify no deceptive, unfair, or unconscionable conduct under the consumer-protection statutes they invoke.

**A. Plaintiffs' Consumer-Protection Claims Fail As Derivative Of Their Antitrust Claims**

The Court should dismiss the state consumer-protection claims for the same reasons it should dismiss Plaintiffs' antitrust claims: no plausibly alleged agreement or harm to competition. All three groups of Plaintiffs expressly base their consumer-protection claims on the same alleged conduct as their antitrust claims. *See* CC p. 50 ¶ 13; CC p. 52 ¶ 26 (identical conspiracy allegations); RC p. 61 ¶ 45 ("[b]y engaging in the acts and omissions alleged above and incorporated herein …"); IC ¶ 199 ("The above-alleged conduct … will, if proven, establish a claim under each of the state laws cited below"); IC ¶ 419 ("Defendants' above-described Scheme and conduct" was "in violation of the state consumer protection statutes set forth below"). Because these claims "are based on the same underlying conduct, they all fall together." *In re Watson Labs., Inc.*, 101 F.4th 223, 250 n.17 (2d Cir. 2024) (affirming dismissal in *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 496-98 (S.D.N.Y. 2022) of "101 state-law claims" based on antitrust and consumer-protection laws). This is clear for Indirects' laundry list of state statutes: "plaintiffs cannot simply enumerate a long list of state-law claims … and rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law." *Bystolic*, 583 F. Supp. 3d at 498.

Courts routinely dismiss state consumer-protection claims in these circumstances. *See, e.g.*, *Concrete & Cement*, 2025 WL 1755193, at *24; *La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 WL 1056668, at *33 (S.D.N.Y. Apr. 8, 2025); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *38 (S.D.N.Y. Aug. 29, 2014); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003). And the Second Circuit likewise affirms dismissals where state claims rest on the same deficient conduct. *Watson Labs.*, 101 F.4th at 250 n.17; *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016); *In re*

*Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir. 2006). The same result follows here, and this Court need not address any other reason for dismissing Plaintiffs' consumer-protection claims.

**B. Plaintiff Giannasca Cannot Sue Under Massachusetts Chapter 93A**

Giannasca asserts a claim under Section 9 of Chapter 93A, but Section 9 is available only to consumers acting "for purely personal reasons (such as the purchase of an item for personal use)," and does not apply where "the plaintiff is motivated by business considerations." *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 821 (2004). Giannasca alleges throughout that he purchased PepsiCo products solely for resale at his restaurant and seeks relief only for commercial injury. *E.g.*, RC ¶ 22, p. 53 ¶¶ 4-5, p. 61 ¶ 50. Those allegations foreclose his Section 9 claim as a matter of law. *See, e.g.*, *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016); *In re Loestrin 24 FE Antitrust Litig*., 410 F. Supp. 3d 352, 373 (D.R.I. 2019).

**C. Consumers' Per Se Cartwright Act Claim Fails**

Consumers' claim under the Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq*., pleads only a *per se* theory. But, as discussed in Section I.B.1, the alleged vertical restraint is subject to the rule of reason and not the *per se* rule, as Consumers themselves concede elsewhere in their Complaint. CC ¶ 76 (the alleged Scheme "is subject to a rule of reason analysis"). California generally follows federal law in analyzing vertical restraints under the rule of reason, and California courts look to Sherman Act precedent because both statutes share the same objectives. *See Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*., 55 Cal. App. 5th 381, 406–07 (2020) ("California Courts of Appeal generally analyze vertical restraints under the rule of reason"); *Bert G. Gianelli Distrib. Co. v. Beck & Co*., 172 Cal. App. 3d 1020, 1045 (1985) (declining to apply a *per se* rule to vertical restrictions without preliminary inquiry into their actual competitive impact and redeeming virtues). Because Consumers' Cartwright Act claim is not properly analyzed under the *per se* standard, and because Consumers plead no rule-of-reason

allegations for that claim—no relevant market, market power, or substantial anticompetitive effect, *see* CC p. 52 ¶ 28—the claim should be dismissed.

### D. Indirects Plead No State-Specific Facts

Indirects assert state-law claims under statutes that require an intrastate-conduct or substantial-state-effect nexus. *See, e.g.*, Ariz. Rev. Stat. § 44-1412; Cal. Bus. & Prof. Code § 16720; N.C. Gen. Stat. § 75-1.1(b); Mich. Comp. Laws § 445.772. But Indirects fail to allege any state-specific conduct—no agreement, meeting, pricing decision, communication, act of enforcement, or other state-specific acts. Instead, Indirects repeat a formulaic recital that "a substantial part" of Defendants' conduct occurred in each identified State and "substantially affected" that State's trade and commerce. *See, e.g.*, IC ¶¶ 204, 206 (Arizona), ¶¶ 214, 216 (California), ¶¶ 229–230 (Connecticut), ¶¶ 236–237 (Delaware), ¶¶ 350–351 (North Carolina), ¶¶ 499–501 (Massachusetts). These "naked assertion[s]" devoid of "further factual enhancement" do not suffice. *Twombly*, 550 U.S. at 557.

### E. Indirects' Consumer-Protection Claims Fail

Indirects' consumer-protection claims fail to plausibly allege: (1) a prohibited deceptive, unfair, or unconscionable act; and (2) a causal connection between that act and the asserted injury. *See, e.g.*, *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017) ("[I]f failure to disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then any Section 1 antitrust case would automatically become a consumer-protection case. That is not the law."); *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1097–98, 1111–12 (N.D. Cal. 2021) (dismissing claims under numerous state statutes for failure to identify misrepresentations "with any specificity"); *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018) (requiring a deceptive, materially misleading act and resulting injury); *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 210 (Fla.

Dist. Ct. App. 2019) (requiring deception or unfairness, causation, and actual damages); *Duffy v. Camp*, 882 S.E.2d 675, 696 (N.C. Ct. App. 2022) (requiring an unfair or deceptive act that proximately causes injury).

*First*, Indirects' Complaint identifies no deceptive, unfair, or unconscionable act. Each of the 21 counts simply relabels the antitrust allegations as "unfair competition, unconscionable conduct, and deceptive acts and practices." IC ¶ 419; *see also* IC ¶¶ 434–435 (California); *id.* ¶¶ 429 (Arkansas); *id.* ¶ 500 (Massachusetts); *id.* ¶ 549 (New Hampshire). Charging an allegedly supracompetitive price is not deception when the price is disclosed or known by the consumer. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 176–77 (D. Me. 2004). Nor does a conclusory "gross disparity" between price and value identify a misrepresentation or deceptive omission; it alleges only a price difference. *See* IC ¶ 422.

*Second*, Indirects plead no causal connection between any deceptive practice and their losses. Each named Indirect Purchaser Plaintiff alleges only that he or she "paid supracompetitive prices" for Pepsi soft drinks "as a result of the violations alleged in this Complaint." IC ¶¶ 18–29. No named plaintiff is alleged to have seen, heard, or acted on any statement by PepsiCo or Walmart. *See In re Toyota RAV4*, 534 F. Supp. 3d at 1096–97 (dismissing claims where plaintiffs failed to allege that they saw, heard, or acted on the alleged misrepresentations). The pleaded theory centers on an alleged agreement and pass-through, not deception. Indirects cannot supply the missing elements by rebranding state consumer-protection claims as antitrust surrogates. *See Bystolic*, 583 F. Supp. 3d at 498.

## IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED

Even if Plaintiffs had sufficiently alleged the elements of their Sherman Act and various state law claims (they have not), their claims are barred by the statute of limitations.

### A. Plaintiffs' Claims Accrued Before December 2021

***The Applicable Limitations Periods.*** A Sherman Act claim must be "commenced within four years after the cause of action accrued," or it is "forever barred." 15 U.S.C. § 15b; *Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 831 (2d Cir. 1991). Nearly every State whose law Plaintiffs invoke imposes a limitations period of four years or less, and each of those periods expired long before the first complaint was filed.[7] Several are shorter still.[8] And even the longest periods Plaintiffs could invoke do not save their claims, because Plaintiffs plead injury beginning January 1, 2018—more than seven years before the earliest complaint. CC ¶¶ 3, 40, 152; RC ¶¶ 3, 44, 173; IC ¶¶ 16-17, 170.[9] The earliest action, *Giannasca*, was filed on behalf of a putative class on August 5, 2025, but did not include antitrust claims. That did not happen until December 15, 2025, when the *Gelbspan* action was filed on behalf indirect purchasers. The first actions asserting antitrust claims on behalf of direct purchasers from PepsiCo (*Redner's*) and Walmart (*Petretti*)

[7] *See, e.g.*, Ariz. Rev. Stat. § 44-1410 (four years); Cal. Bus. & Prof. Code § 16750.1 (same); Colo. Rev. Stat. § 6-4-119(1) (same); Conn. Gen. Stat. Ann. § 35-40 (same); Del. Code tit. 6, § 2111 (same); D.C. Code § 28-4511(b) (same); Fla. Stat. § 542.26(1) (same); Haw. Rev. Stat. § 480-24 (same); Idaho Code Ann. § 48-115 (same); 740 ILCS 10/7(2), (4) (same); Iowa Code Ann. § 553.16 (same); Md. Code Ann., Com. Law § 11-209 (same); Mass. Gen. Laws ch. 93, § 13; ch. 260, § 5A (same); Mich. Comp. Laws § 445.781 (same); Minn. Stat. Ann. § 325D.64, subd. 1 (same); Mo. Rev. Stat. § 416.131(2) (same); Nev. Rev. Stat. § 598A.220 (same); N.H. Rev. Stat. Ann. § 356:12(II) (same); N.J. Stat. Ann. § 56:9-14 (same); N.M. Stat. Ann. § 57-1-12 (same); N.Y. Gen. Bus. Law § 340(5) (same); N.C. Gen. Stat. § 75-16.2 (same); N.D. Cent. Code § 51-08.1-10 (same); Or. Rev. Stat. § 646.800(2) (same); R.I. Gen. Laws Ann. § 6-36-23 (same); S.D. Codified Laws § 37-1-14.4 (same); Utah Code Ann. § 76-10-3117 (same); Va. Code Ann. § 59.1-9.14(A) (same); Wash. Rev. Code § 19.86.120 (same); W. Va. Code Ann. § 47-18-11 (same); Neb. Rev. Stat. § 59-829 (Junkin Act construed in accordance with federal law, and thus four years, see 15 U.S.C. § 15b).

[8] *See* Kan. Stat. Ann. § 60-512(2) (three years); Miss. Code Ann. § 15-1-49(1) (same); S.C. Code Ann. § 15-3-530(2) (same); Tenn. Code Ann. § 28-3-105 (same); Ind. Code § 34-11-2-4 (two years for statutory penalties); Mont. Code Ann. § 27-2-211 (same); Wis. Stat. Ann. § 133.18(2) (two years for treble damages), *see also Open Pantry Food Marts of Se. Wis., Inc. v. Falcone*, 286 N.W.2d 149, 152 (Wis. Ct. App. 1979).

[9] *See* Ark. Code Ann. § 16-56-115 (five years); Ky. Rev. Stat. § 413.120(2) (same); 42 Pa. Cons. Stat. § 5527 (six years); 12 V.S.A. § 511 (same); Wis. Stat. Ann. § 133.18(2) (six years for recovery of payments).

were filed on December 22, 2025, and December 23, 2025, respectively. This means that any claims that accrued prior to the corresponding dates in December 2021 are untimely as pleaded unless a recognized exception to the statute of limitations applies. *See Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 189 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co. LLC*, 2025 WL 799270 (2d Cir. Mar. 13, 2025). Here, no exception applies.

***The Applicable Accrual Rules.*** A cause of action under Section 1 of the Sherman Act accrues, and the limitations period begins to run, when the plaintiff is first injured by an act of the defendant. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971) ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action."); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-91 (1997) (limitations period starts to run "at the point the act first causes injury"); *see Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. 2008) ("*MSG*") (prospective relief is presumptively barred by laches where the conduct forming the basis for the claims occurred outside the limitations period).

The accrual analysis for Plaintiffs' state-law claims is the same as under federal law. Because the state antitrust statutes Plaintiffs invoke direct courts to construe them in harmony with federal antitrust law, the injury-occurrence rule of *Zenith Radio*, 401 U.S. at 338, governs.[10] The

[10] *See, e.g.*, Ariz. Rev. Stat. § 44-1412; Del. Code tit. 6, § 2113; D.C. Code § 28-4515; Idaho Code § 48-102(3); 740 ILCS 10/11; Iowa Code § 553.2; Mich. Comp. Laws § 600.5827; N.H. Rev. Stat. § 356:14; Neb. Rev. Stat. § 59-829; *Williams v. Citigroup Inc.*, 659 F.3d 208, 213 (2d Cir. 2011) (Donnelly Act construed in accordance with federal antitrust law); *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665 (Wash. 1987) (Washington Consumer Protection Act); *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158 (W.D. Wash. 2021); *Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, 2026 WL 2321409 (10th Cir. Aug. 11, 2026) (Utah); *Connecticut v. Sandoz, Inc.*, 2025 WL 3043397,

handful of States applying a discovery rule fare no better, because Plaintiffs plead that they "notic[ed]" the challenged price increases "[i]n March 2019." CC ¶ 137; RC ¶ 150.[11] Inquiry notice in March 2019 started the clock in every discovery-rule jurisdiction more than four years before suit.

***Plaintiffs' Claims Are Facially Time-Barred.*** Here, Plaintiffs allege that the purported Scheme was formed "[a]s early as January 2018," CC ¶ 40; RC ¶¶ 3, 44; IC ¶ 16, and that they were "injured" "[t]hroughout the Class Period" "[f]rom January 1, 2018 to present" by purchasing PepsiCo's products at allegedly inflated prices. CC ¶¶ 152, 154; RC ¶¶ 173, 175; *see* IC ¶¶ 88, 153, 155. Because Plaintiffs allege injuries from January 2018 onward, their claims first accrued outside the limitations period and are untimely. *See, e.g.*, *Kearse v. Kaplan, Inc.*, 692 F. Supp. 2d 398, 400-01 (S.D.N.Y. 2010). None of the Plaintiffs have plausibly alleged that they first suffered injury from the 2018 Scheme during the four years preceding when they filed suit.[12] Thus, their claims must be dismissed unless an exception to the statute of limitations applies—and none does under the facts alleged.

---

at *15-64 (D. Conn. Oct. 31, 2025) (surveying state accrual rules and applying the injury-occurrence rule in States with harmonization provisions).

[11] *See Sandoz*, 2025 WL 3043397 (California, Colorado, Maryland, Massachusetts, Nevada, and New Mexico); *Windesheim v. Larocca*, 116 A.3d 954 (Md. 2015); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir. 1988); Nev. Rev. Stat. § 598A.220(1); N.M. Stat. Ann. § 57-1-12; *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017) (Arkansas).

[12] Retailers allege that one plaintiff (Giannasca) purchased Pepsi-branded products in May 2025, RC ¶ 22, and Consumers allege that one plaintiff (William Davis) made purchases "since at least June 2022," CC ¶ 18, but neither Giannasca nor Davis alleges that these were their first injuries from the alleged Scheme. Instead, they claim injuries "[t]hroughout" the period "[f]rom January 1, 2018 to present." CC ¶¶ 152, 154; RC ¶¶ 173, 175. Plus, an antitrust plaintiff "cannot use an injury that may have accrued to someone else to salvage the plaintiff's own untimely claims." *Dorrell v. Constellation Energy Corp.*, 2026 WL 2249275, at *17 (D. Md. Aug. 5, 2026) (citation omitted). Baldly claiming that "they suffered an injury occurring at some unknown point after … the beginning of the alleged class period" does not suffice. *Id.*

### B. Plaintiffs Do Not Plead A Continuing Violation

"[C]ourts within the Second Circuit 'consistently have looked unfavorably on continuing violation arguments.'" *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003). To invoke the continuing-violation doctrine, a plaintiff must plausibly allege an "overt act" within the limitations period that (1) is "a new and independent act that is not merely a reaffirmation of a previous act," and (2) "inflict[s] new and accumulating injury on the plaintiff." *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)); *SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co., L.P.*, 2026 WL 2137807, at *9 (S.D.N.Y. July 24, 2026).

"Not every act qualifies as an 'overt act.'" *MSG*, 2008 WL 4547518, at *10. An asserted act does not restart the limitations period when it is merely a "manifestation" or "reaffirmation" of time-barred conduct. *Sabre*, 938 F.3d at 68. The performance of an allegedly anticompetitive contract is a "manifestation" of the decision to enter the contract, not an independent overt act. *Id.*; *Ciprofloxacin*, 261 F. Supp. 2d at 229. Thus "[i]f the conduct merely carries out a preexisting contractual agreement, the Second Circuit treats this conduct as the continuing effects or 'reaffirmation' of the original violation rather than an overt act." *SS&C*, 2026 WL 2137807, at *9. In *Sabre*, that meant that *defendants* did not commit a new "overt act" each time the *plaintiff* paid an allegedly supracompetitive price. 938 F.3d at 68-69; *see Giordano*, 654 F. Supp. 3d at 192–93 & n.11 (rejecting effort to apply to a vertical conspiracy a rule that each sale to a plaintiff under the asserted scheme constitutes an overt act). Likewise, *Chanel, Inc. v. RealReal, Inc.* dismissed antitrust claims as time-barred, holding that later acts taken pursuant to an earlier manufacturer-retailer agreement did not revive claims based on that agreement because "[a]n ongoing agreement in the absence of any overt acts cannot trigger a new beginning of the statute of limitations period." 2026 WL 843256, at *5 (S.D.N.Y. Mar. 26, 2026); *see also, e.g.*, *SL-x IP.*

*S.à.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2620041, at *2-3 (2d Cir. Mar. 24, 2023) (finding no new overt act in sale of intellectual property that was "merely a 'manifestation' of Defendants' alleged prior agreement to freeze SL-x out of the market"). Nor can Plaintiffs invoke the continuing-violation doctrine under state law. The state-law doctrines track their federal analogue, and Plaintiffs plead no new and independent overt act.[13]

Here, all of Plaintiffs' claims center on the same alleged January 2018 Scheme, and none of the later conduct pleaded qualifies as a new and independent overt act. Plaintiffs point to: (i) continued "performance" of the alleged agreement through wholesale price increases (CC ¶¶ 54–57; RC ¶¶ 58–61; IC ¶¶ 149, 155); (ii) continued "policing" of competing retailers' prices (CC ¶¶ 46–52; RC ¶¶ 49–55; IC ¶ 155); and (iii) "adjust[ments]" to the alleged scheme "to match new Walmart prices" (CC ¶ 153; RC ¶ 174; IC ¶ 154). Each of these is, by Plaintiffs' own description, a mere implementation or reaffirmation of the alleged January 2018 Scheme—not a new agreement, a new term, or an independent restraint. *RealReal*, 2026 WL 843256, at *4–5; *Sabre*, 938 F.3d at 68; *see, e.g.*, CC ¶ 57; RC ¶ 61; IC ¶ 70. Plaintiffs themselves characterize the asserted price increases as flowing from a single "foundational commitment" implemented over the ensuing years. *See* CC ¶¶ 3, 40, 43, 52; RC ¶¶ 3, 44, 47, 56; IC ¶¶ 46, 87.

Even if Plaintiffs had alleged a qualifying overt act, it would support only claims for injuries caused by acts within the limitations period; it would not resurrect the earlier claims. "[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189; *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 572 (S.D.N.Y. 2016)

[13] *See, e.g.,* Iowa Code § 553.16; Idaho Code § 48-115(3); Mich. Comp. Laws § 600.5855. Indeed, Michigan has abolished the continuing-violation doctrine outright. *Garg v. Macomb Cnty. Cmty. Mental Health Servs*., 696 N.W.2d 646, 650 (Mich. 2005).

(limiting recovery to injury "caused by overt acts committed inside the limitations period"). Plaintiffs "cannot use an independent, new act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190. *RealReal* rejected that maneuver, holding that allegations of recent conduct could not revive claims based on an earlier manufacturer-retailer agreement. 2026 WL 843256, at *5. Thus, even under Plaintiffs' theory, any viable claim would be limited to injury caused by a properly pleaded act within the statutory period—not the alleged January 2018 Scheme.

### C. Plaintiffs Do Not Plead Fraudulent Concealment

Fraudulent concealment cannot rescue these time-barred claims. It is an equitable tolling doctrine reserved only for "rare and exceptional circumstances." *Chalmers v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 3628416, at *5 (2d Cir. Dec. 15, 2025); *Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *17 (S.D.N.Y. 2025) (same); *see also Watson v. United States*, 865 F.3d 123, 133 (2d Cir. 2017) ("'Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs.'"). To invoke fraudulent concealment, Plaintiffs must plead *with Rule 9(b) particularity*: (1) that Defendants concealed from Plaintiffs the existence of their cause of action; (2) that Plaintiffs remained unaware of the cause of action until a date within four years of commencing suit; and (3) that Plaintiffs exercised reasonable diligence in trying to discover the concealed cause of action. *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012); *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703 (S.D.N.Y. 2019). Plaintiffs must allege both "that they diligently pursued their rights" and that it would "have been impossible for a reasonably prudent person to learn" of the claim. *Chalmers*,

2025 WL 3628416, at *5. The same holds for Plaintiffs' state-law claims.[14] The Complaints plead none of these requirements.

***No Affirmative Acts Of Concealment.*** Plaintiffs do not identify any affirmative act of concealment that prevented them from discovering their claims. To plead fraudulent concealment, a plaintiff must allege "active concealment." *Pearl v. Cty. of Long Beach*, 296 F.3d 76, 88 (2d Cir. 2002). Active concealment requires more than claiming that the conduct in question was secret or non-public. *Litovich*, 2025 WL 2521039, at *17 ("[a]lleging that Defendants had non-public communications that were not disclosed is not sufficient"); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59 (S.D.N.Y. 2012) (rejecting fraudulent concealment despite allegations about "confidential nature" of challenged conduct). Instead, active concealment requires a "trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood v. Carpenter*, 101 U.S. 135, 143 (1879); *see also, e.g.*, *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988); *Garippo v. Skokie Valley Air Control Inc.*, 2026 WL 296391, at *2 (N.D. Ill. Feb. 4, 2026).

Plaintiffs do not plead anything resembling active concealment. The "affirmative acts" Consumers and Retailers identify are (i) generic price-increase notices describing a "broad consideration set" underlying price adjustments (CC ¶ 157; RC ¶ 178), (ii) public denials of wrongdoing in press statements and letters to Congress (CC ¶¶ 158–164; RC ¶¶ 179–184), and (iii) public codes of conduct (CC ¶¶ 168-173; RC ¶¶ 188-193; *see* IC ¶¶ 162-166). Indirects identify public statements by Walmart's CEO in May 2022 and 2023 that Walmart wanted "lower

---

[14] *See*, *e.g.*, *In re Packaged Seafood*, 242 F. Supp. 3d at 1110-16 (fraudulent concealment requires affirmative concealment and due diligence across the several States); *Sandoz*, 2025 WL 3043397, at *30 (Delaware requires "actual artifice" and "[m]ere silence is insufficient").

prices on food" and that "[o]ver time, the market works," together with PepsiCo's cost-based explanations for its price increases. IC ¶¶ 158–159. None is an affirmative act of concealment.

Generic commercial explanations for price increases and public commentary about competitive forces do not plead a "trick or contrivance" designed to divert suspicion from a conspiracy; they describe routine business communications. *See Dorrell*, 2026 WL 2249275, at *20 (rejecting fraudulent concealment because allegations of concealment in the complaint, "stripped of the conclusory labels of secrecy or deceptive intent, primarily allege[d] normal business activities"). And public denials of liability are the ordinary response to an accusation, not evidence of a scheme to prevent discovery. *Litovich*, 2025 WL 2521039, at *17 ("'communications to the community at large will not generally support a finding of fraudulent concealment'"); *Pocahontas Supreme Coal Co., v. Bethlehem Steel Corp*., 828 F.2d 211, 218-19 (4th Cir. 1987) ("To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct … would effectively nullify the statute of limitations."); *cf. Phhhoto Inc. v. Meta Platforms, Inc*., 123 F.4th 592, 606 (2d Cir. 2024) ("specific[]" statements "about the criteria on which [an] algorithmic feed operated" went beyond "signaling the company's compliance with general legal obligations").

Even if one of these statements could qualify as an affirmative act of concealment, Plaintiffs nowhere allege they even *saw* these allegedly concealing statements from Defendants. *See Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 509 n.9 (E.D. Mich. 2025) (rejecting fraudulent concealment where plaintiff did not allege he saw any of the defendant's allegedly concealing statements); *Premier Concrete LLC v. Argos N. Am. Corp*., 2021 WL 1209354, at *8 (N.D. Ga. Mar. 31, 2021) (similar); *cf. Phhhoto*, 123 F.4th at 606 (plaintiff "rel[ied] on" defendant's statement "to allay [any] concern" about defendant's conduct). A statement cannot

have delayed discovery for a plaintiff who never encountered it, and Plaintiffs do not allege any changed course or delay in bringing suit because of the alleged statements. In short, Plaintiffs identify no extraordinary act by Defendants that prevented earlier discovery.

***No Timely Discovery.*** Neither Consumers nor Retailers allege that they discovered the purported Scheme within the four years preceding their lawsuits. Instead, they plead that "[f]rom 2018 to 2025, Pepsi increased its prices dramatically for every retail customer except Walmart," that those price increases "cannot be explained based on competitive forces or unilateral self-interest," and that they "notic[ed]" the price increases "[i]n March 2019." CC ¶ 130, 137, 172; RC ¶¶ 142, 150, 158. "[A]ccepting class plaintiffs' premise that only a plot can explain the [price increases], class plaintiffs had every basis, in real time," to assert the claims they now allege. *In re Interest Rate Swaps Antitrust Litig*., 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017). Indirects fix discovery at the December 11, 2025 unsealing of the FTC's complaint, IC ¶ 157, which brought Robinson-Patman Act claims. But the date on which one complaint was unsealed does not establish that earlier discovery was impossible. Indirects plead no facts explaining what specifically the unsealed complaint revealed, why the alleged Scheme could not have been investigated earlier, or how the mere allegations in a dismissed FTC Robinson-Patman Act complaint could supply the factual basis for Indirects' claims under different statutes. The failure to plead when Plaintiffs discovered the purported Scheme independently defeats fraudulent concealment. *See Hinds Cnty. Miss. v. Wachovia Bank N.A*., 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) (rejecting fraudulent concealment where plaintiffs "d[id] not state 'with particularity'" when "Named Plaintiffs or Class members became aware of the antitrust violations"); *Fire & Police Pension*, 368 F. Supp. 3d at 703 (similar).

***No Reasonable Diligence.*** Plaintiffs also plead no facts showing reasonable diligence in investigating their claims. Diligence requires plausible allegations as to the plaintiff's specific inquiries—when they were made, to whom, about what, and with what response. *Id.* at 704; *Litovich*, 2025 WL 2521039, at *17 ("[a]lleging that Defendants had non-public communications that were not disclosed is not sufficient"). Plaintiffs allege none of these particulars. They instead assert that they "could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy." CC ¶ 156; RC ¶ 177; IC ¶ 157. That conclusory assertion does not satisfy Rule 9(b) particularity, or even Rule 8's plausibility standard. *See Iqbal*, 556 U.S. at 678; *Litovich*, 2025 WL 2521039, at *18 ("[g]eneral assertions of due diligence" do not suffice for fraudulent concealment). Courts reject tolling theories built on this same formulation. *See, e.g.*, *Fire & Police Pension*, 368 F. Supp. 3d at 703–04 (rejecting a tolling claim based on assertion that the plaintiff "had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by exercise of due diligence"); *Hinds Cnty.*, 620 F. Supp. 2d at 521–22 (similar); *Lewis v. Danos*, 83 F.4th 948, 956 (5th Cir. 2023) (similar). Plaintiffs fall far short of showing "'that it would have been *impossible* for a reasonably prudent person to learn'" about their cause of action. *Pearl*, 296 F.3d at 85.

## V. DISMISSAL SHOULD BE WITH PREJUDICE

Plaintiffs filed initial complaints, filed consolidated complaints, and then amended with the benefit of Defendants' pre-motion letters. At this point, further amendments would be futile because the defects are legal, not factual: Plaintiffs' conspiracy theory is implausible, their proposed market is unworkable, Giannasca's Robinson-Patman Act and Indirects' state law claims are defective, and the claims are untimely on the face of the pleadings. No further amendment will cure Plaintiffs' theory. Plaintiffs' claims therefore should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion and dismiss Plaintiffs' Complaints with prejudice.

Dated: September 4, 2026

Respectfully submitted,

*/s/ Jay P. Srinivasan*
Jay P. Srinivasan (*pro hac vice*)
GIBSON DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7296
Email: JSrinivasan@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Steve Pet (*pro hac vice*)
GIBSON DUNN & CRUTCHER
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8678
Email: sweissman@gibsondunn.com
Email: spet@gibsondunn.com

Laura K. O'Boyle
GIBSON DUNN & CRUTCHER
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2304
Email: LOBoyle@gibsondunn.com

Henry Cornillie (*pro hac vice* forthcoming)
GIBSON DUNN & CRUTCHER
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone: 415.393.8200
Email: hcornillie@gibsondunn.com

*Attorneys for Defendants PepsiCo, Inc. and PepsiCo Beverage Sales, LLC*

*/s/ David Marriott*
David Marriott
Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Email: david.marriott@lw.com
Email: lawrence.buterman@lw.com

Belinda S Lee (*pro hac vice*)
Ashley M. Bauer (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415.391.0600
Email: belinda.lee@lw.com
Email: ashley.bauer@lw.com

*Attorneys for Defendant Walmart Inc.*

**WORD COUNT CERTIFICATION**

In accordance with Local Civil Rule 7.1(c), I certify that the foregoing Memorandum of Law is 15,706 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Date: September 4, 2026

*/s/ Jay P. Srinivasan*
Jay P. Srinivasan