**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| IN RE: BRANDED BEVERAGE ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>(1) Indirect Purchasers<br>(2) Direct Consumer Purchasers<br>(3) Direct Reseller Purchasers | Case No. 7:25-CV-6440 (CS)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINTS** |

## TABLE OF CONTENTS

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 4

ARGUMENT ........ 10

I. PLAINTIFFS PLAUSIBLY PLEAD AN UNLAWFUL AGREEMENT ........ 10

A. Plaintiffs Plead Direct and Indirect Evidence of Agreement ........ 11

B. Defendants' Counterarguments Fail ........ 14

II. PLAINTIFFS PLAUSIBLY ALLEGE HARM TO COMPETITION ........ 19

A. Plaintiffs Plead Direct Evidence of Anticompetitive Effects in the Form of Inflated Prices ........ 20

B. Plaintiffs Plead Indirect Evidence of Harm to Competition ........ 24

III. DEFENDANTS NARROWLY CONSTRUE THE ROBINSON-PATMAN ACT INTO NON-EXISTENCE ........ 30

A. Contemporaneous Interstate Sales of Commodities ........ 32

B. Identified Promotional Payment or Service ........ 34

C. Proportional Inequality ........ 34

D. Sections 2(d) and 2(e) ........ 35

IV. PLAINTIFFS' STATE LAW CLAIMS ARE WELL-PLED ........ 36

A. Defendants Concede That Plaintiffs' Consumer Protection Claims Rise or Fall with Their Antitrust Claims ........ 36

B. Plaintiff Giannasca's Massachusetts Consumer Protection Act Claim Should Not Be Dismissed ........ 36

C. The Cartwright Act Claim Survives Under the Rule of Reason, But Only Per Se Is Required ........ 37

D. Indirects Are Not Required to Plead "State Specific Facts" ........ 37

E. Indirects' Consumer Protection Claims Should Be Sustained ........ 38

V. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED .................................................. 39

A. Plaintiffs Have Adequately Alleged Fraudulent Concealment ............................ 40

B. Plaintiffs Allege a Continuing Violation via Defendants' Overt Acts Spanning the Class Period ........................................................................ 45

CONCLUSION ........................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC*,
1 F.4th 102 (2d Cir. 2021) ....24

*ABC Distrib., Inc. v. Living Essentials LLC*,
2016 WL 8114208 (N.D. Cal. Jan. 25, 2016) ....32, 34

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015) ....37

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ....48

*Alan Darush MD APC v. Revision LP*,
2013 WL 12142621 (C.D. Cal. Aug. 28, 2013) ....37

*Alqosh Enters., Inc. v. PepsiCo, Inc.*,2026 WL 478119 (C.D. Cal. Feb. 18, 2026) ....31

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ....15

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. July 31, 2023) ....29

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ....10, 11, 13

*Apprentice Info. Sys. Inc. v. DataScout LLC*,
544 S.W.3d 536 (Ark. 2018) ....39

*In re Auto. Parts Antitrust Litig.*,
2013 WL 2456612 (E.D. Mich. June 6, 2013) ....38

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*,
701 F. Supp. 2d 356 (E.D.N.Y. 2010) ....38

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ....4, 45, 48

*Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*,
712 F. Supp. 3d 499 (D. Vt. 2024) ....37, 38

*Bodine v. First Co.*,
2019 WL 5684399 (S.D. Cal. Nov. 1, 2019) ....37

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................21

*Brown Shoe Co. v. United States*,370 U.S. 294 (1962) ....................25, 26

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
769 F.2d 919 (2d Cir. 1985)....................18

*In re Bystolic Antitrust Litig.*,
583 F. Supp. 3d 455 (S.D.N.Y. 2022)....................36, 39

*Chanel, Inc. v. RealReal, Inc.*,
2026 WL 843256 (S.D.N.Y. Mar. 26, 2026) ....................47

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ....................47

*Coal. for a Level Playing Field, L.L.C. v. AutoZone, Inc.*,
737 F. Supp. 2d 194 (S.D.N.Y. 2010)....................35

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ....................16

*Coniglio v. Highwood Servs., Inc.*,
495 F.2d 1286 (2d Cir. 1974)....................27

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) ....................47

*In re Constr. Equip. Rental Antitrust Litig.*,
2026 WL 2921033 (N.D. Ill. Sept. 28, 2026) ....................26

*Copeland v. Energizer Holdings, Inc.*,
716 F. Supp. 3d 749 (N.D. Cal. 2024) .................... *passim*

*D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*,
873 F. Supp. 786 (E.D.N.Y. 1995) ....................35

*In re Domestic Drywall Antitrust Litig.*,
2016 WL 3769680 (E.D. Pa. July 13, 2016)....................39

*Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*,
104 F. Supp. 2d 184 (W.D.N.Y. 2000)....................29

*Duffy v. Camp*,
882 S.E.2d 675 (N.C. Ct. App. 2022)....................39

*Endure Indus., Inc. v. Vizient Inc.*,
164 F.4th 405 (5th Cir. 2026) ....................26

*In re Eur. Gov't Bonds Antitrust Litig.*,
2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ....................44

*Exquisite Form Brassiere, Inc. v. FTC*,
301 F.2d 499, 500 (D.C. Cir. 1961) ....................35

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ....................38

*FTC v. Fred Meyer, Inc.*,
390 U.S. 341 (1968) ....................35

*FTC v. Tapestry, Inc.*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024) ....................26

*Garg v. Macomb Cnty. Cmty. Mental Health Servs.*,
696 N.W.2d 646 (Mich. 2005) ....................48, 49

*GateGuard, Inc. v. Amazon.com Inc.*,
2023 WL 2051739 (S.D.N.Y. Feb. 16, 2023) ....................27

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019) ....................38

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998) ....................35

*Giordano v. Saks Inc.*,
654 F. Supp. 3d 174 (E.D.N.Y. 2023) ....................45, 46, 47

*Gulf Oil Corp. v. Copp Paving Co.*,
419 U.S. 186 (1974) ....................33

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989) ....................18, 30

*Hack v. President & Fellows of Yale Coll.*,
237 F.3d 81 (2d Cir. 2000) ....................27

*Int'l Tel. & Tel. Corp.*,
104 F.T.C. 280 (1984) ....................33

*Jien v. Perdue Farms, Inc.*,
2020 WL 5544183 (D. Md. Sept. 16, 2020) ....................27

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ....................38

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)....4, 45, 46, 49

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).... *passim*

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)....3, 19, 24, 30

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978)....37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....19, 32

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....11, 12

*Merced Irrigation Dist. v. Barclays Bank PLC*,
165 F. Supp. 3d 122 (S.D.N.Y. 2016)....43

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984).... *passim*

*Monsieur Touton Selection, Ltd. v. Future Brands, LLC*,
2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006)....33, 34

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2015 WL 5767415 (E.D. Pa. July 29, 2015)....27

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
2026 WL 1397077 (2d Cir. May 19, 2026)....24

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014)....39

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021)....38

*In re Nine W. Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000)....43, 45

*Ohio Carpenters' Pension Fund v. Deutsche Bank AG*,
2024 WL 3938456 (S.D.N.Y. Aug. 26, 2024)....44

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....2, 24

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................16, 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024)....................29, 30

*Phhhoto Inc. v. Meta Platforms, Inc.*,
123 F.4th 592 (2d Cir. 2024).................... *passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) (en banc)....................45

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012)....................38

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)....................39

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)....................12, 13, 15

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)....................29

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024)....................25

*Rock v. NCAA*,
928 F. Supp. 2d 1010 (S.D. Ind. 2013)....................27

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014)....................47

*Sensory, Inc. v. Google LLC*,
2026 WL 2017536 (D.D.C. July 13, 2026)....................27

*In re Seroquel XR Antitrust Litig.*,
2022 WL 2438934 (D. Del. July 5, 2022)....................38

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020)....................26

*SL-x IP S.à.r.l. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
2023 WL 2620041 (2d Cir. Mar. 24, 2023)....................46, 47

*SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co., L.P.*,
2026 WL 2137807 (S.D.N.Y. July 24, 2026)....................47

*Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*,
2005 WL 8259828 (C.D. Cal. May 12, 2005) ....................32

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010)....................11

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*,
266 So. 3d 207 (Fla. Dist. Ct. App. 2019) ....................39

*Sunrise Resort Ass'n v. Cheboygan Cnty. Rd. Comm'n*,
511 Mich. 325 (2023) ....................49

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................24, 26

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998)....................20, 29

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021) ....................39

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ....................23

*Twp. of Fraser v. Haney*,
509 Mich. 18 (2022) ....................49

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)....................17, 18

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)....................26

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003)....................28

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)....................25, 46, 47, 48

*Wacker v. JP Morgan Chase & Co.*,
678 F. App'x 27 (2d Cir. 2017) ....................24

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
536 F.3d 663 (7th Cir. 2008) ....................38

*Wolff v. Ford Motor Co.*,
1977 WL 1396 (S.D.N.Y. Apr. 20, 1977)....................31, 32

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971) .....................................................................................................45

**Statutes**

15 U.S.C. § 1 ..............................................................................................................2

15 U.S.C. § 13(d) ........................................................................................................36

15 U.S.C. § 45(a)(1) ....................................................................................................38

Cal. Bus. & Prof. Code §§ 16720 *et seq.* .....................................................................37

Mass. Gen. Laws Ch. 93A §§ 1 *et seq.* ........................................................................37

**Additional Authorities**

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d1 (3d ed. 2007) .......................11

U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.3.D.4 (2023) .......................26

## INTRODUCTION

These consolidated cases challenge Pepsi and Walmart's long-running scheme to inflate the prices retailers and consumers pay for Pepsi's ready-to-drink ("RTD") soft drinks (the "Scheme"). Since 2018, Pepsi and Walmart have used their dominant roles to eliminate retail price competition, increase their collective profits, and split the winnings. IC ¶ 3; CC ¶ 3; RC ¶ 3. As a result of the Scheme, retailers and consumers across the nation have paid—and continue to pay—significantly more for Pepsi soft drinks than they otherwise would have. The three proposed classes—retailers that purchased Pepsi soft drinks directly from Pepsi ("Retailers"), consumers who purchased Pepsi soft drinks directly from Walmart ("Consumers"), and consumers who purchased Pepsi soft drinks indirectly from other retailers ("Indirects")—bring these actions under the federal antitrust laws, the Robinson-Patman Act, and state antitrust and consumer protection laws on behalf of the businesses and individuals the Scheme harmed.[1]

The Scheme has two components. First, Pepsi agreed to police retail prices at Walmart's competitors: retailers that sold Pepsi soft drinks below Walmart's price faced escalating, targeted wholesale price increases until undercutting Walmart became infeasible. IC ¶ 4; CC ¶¶ 4–5; RC ¶¶ 4–5. Second, in exchange, Walmart agreed to accept Pepsi's inflated wholesale prices rather than demand the wholesale price cuts it otherwise would have used to match lower competing retail prices. IC ¶¶ 5–6; CC ¶ 6; RC ¶ 6. The result was a win-win for Defendants: Walmart claimed "price leadership" without having to compete on price, Pepsi preserved its inflated wholesale prices, and other retailers and consumers footed the bill.

[1] Plaintiffs follow the same conventions as Defendants when referring to the three complaints. *See* MTD at 1 n.1.

The Scheme violates the antitrust laws. Section 1 of the Sherman Act prohibits every "contract, combination …, or conspiracy, in restraint of trade." 15 U.S.C. § 1. To state a claim, Plaintiffs must plausibly allege (1) an agreement that (2) unreasonably restrains trade. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018). The Scheme did just that. By eliminating price competition among retailers of Pepsi soft drinks and softening wholesale competition between Pepsi and its rivals, it artificially inflated prices at both the wholesale and retail levels. IC ¶¶ 8–9, 146–148; CC ¶¶ 136–142, 145; RC ¶¶ 149–155, 158. As a result, both retailers and consumers overpaid for Pepsi soft drinks and suffered antitrust injury.

Defendants now move to dismiss Plaintiffs' complaints on several grounds, none of which is persuasive. Defendants' first argument—that Plaintiffs fail to plausibly allege an agreement—ignores Defendants' own words. Pepsi's internal documents memorialize its "foundational commitment" to guarantee Walmart a retail "price gap" over its competitors, RC ¶¶ 46–47; IC ¶ 46; CC ¶ 43, and explain that Pepsi "must commit to raising rate" on a lower-priced rival because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term," IC ¶¶ 55–56; CC ¶ 52; RC ¶ 56. Defendants do not grapple with these admissions. The circumstantial evidence of an agreement is equally compelling. Absent an agreement, Pepsi would want lower retail prices to maximize its sales, and Walmart would use its admitted bargaining leverage to demand lower wholesale prices. Neither did. As the court held in rejecting a motion to dismiss allegations of a nearly identical scheme between Walmart and Energizer, the "plausible inference is that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create." *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024).

Defendants' second argument—that vertical price agreements like this one do not harm competition—is contrary to the Supreme Court's opinion in *Leegin Creative Leather Products,*

*Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). *Leegin* warned that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated," *id.* at 894, and that courts must "be diligent in eliminating their anticompetitive uses from the market," *id.* at 897. It singled out the very restraint alleged here: one imposed at the behest of a "dominant retailer" to which "the manufacturer believes it needs access." *Id.* at 893–94; *see id.* at 897–98. As the *Copeland* court observed, an agreement preventing retailers from selling below a set price "harms competition in one of the simplest ways possible." 716 F. Supp. 3d at 768.

Defendants' third argument—that Plaintiffs fail to plead anticompetitive effects—fares no better. Plaintiffs may show anticompetitive effects directly, through evidence of increased prices, or indirectly, through market power in a relevant market. *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016). Plaintiffs do both. Directly, they allege that Pepsi raised prices by double-digit percentages for seven consecutive quarters, far outpacing costs and inflation, CC ¶¶ 55, 57, 145–149; RC ¶¶ 59, 61, 158–162, while real retail soft-drink prices rose more than 70%, IC ¶¶ 70, 72, 84. Indirectly, they allege a relevant market for RTD soft drinks, protected by high barriers to entry, in which Pepsi holds as high as a 40% market share. IC ¶¶ 40–42, 89, 95–96; CC ¶¶ 78–79, 84; RC ¶¶ 88, 90, 95. Defendants' attempts to redraw the market are unpersuasive and turn on fact questions that cannot be resolved on the pleadings.

Defendants' remaining arguments likewise fail. Their challenge to Plaintiff Giannasca's Robinson-Patman Act claim would require a plaintiff, before discovery, to plead transaction-level details available only to Defendants; the statute imposes no such heightened standard, and Giannasca identifies the specific products, months, and promotional programs at issue. RC ¶¶ 61–80. Defendants concede that Indirects' state-law claims rest on "the same alleged conduct" as their antitrust claims, and those claims survive for the same reasons. And Defendants' limitations

arguments are foreclosed by settled precedent: Plaintiffs plead both fraudulent concealment, *see Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 603–05 (2d Cir. 2024), and a continuing violation in which each overcharge restarts the limitations period, *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979). Defendants' motion should be denied in full.

## FACTUAL BACKGROUND

## I. MARKET STRUCTURE

### A. Pepsi and the Ready-to-Drink Soft Drink Market

Pepsi is the second-largest manufacturer in the $150 billion U.S. soft drink industry, after the Coca-Cola Company ("Coca-Cola"). IC ¶ 37; CC ¶¶ 1, 30; RC ¶¶ 1, 34. Pepsi's major brands include Pepsi, Mountain Dew, Starry, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks. IC ¶ 37; CC ¶ 1; RC ¶ 1.

Plaintiffs allege that Defendants' conduct affects the market for RTD soft drinks—the relevant market. Customers do not view other beverages as reasonably interchangeable or close substitutes and will only substitute other products under circumstances that will not allow a substitute to discipline prices. IC ¶ 89; CC ¶ 79; RC ¶ 90.

Pepsi controls more than a third of all RTD soft-drink sales, its only notable competitors are Coca-Cola and Dr Pepper, IC ¶ 39; CC ¶¶ 9, 31; RC ¶¶ 9, 35, and Pepsi bottles many Dr Pepper products, IC ¶¶ 105–108; CC ¶¶ 92, 94–95; RC ¶¶ 103, 105–106. It exercises market power in this market. IC ¶ 97; CC ¶ 86; RC ¶ 97.

### B. Walmart Is the Largest Retailer of Ready-to-Drink Soft Drinks

Walmart dominates retail sales of RTD soft drinks. It is the world's largest company by revenue, with 4,700 stores covering nearly every U.S. Metropolitan Statistical Area. IC ¶¶ 43, 140;

*see also* CC ¶ 22; RC ¶ 27. Ninety percent of Americans, in Walmart's estimation, live within ten miles of a Walmart. IC ¶ 140; CC ¶ 127; RC ¶ 139.

Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it outsized power. This market power is heightened by the many captive customers who use Walmart as their one-stop-shop location for household goods. IC ¶ 44.

Pepsi's most recent Form 10-K identified Walmart as its most important customer: "In 2024, sales to Walmart Inc. (Walmart) and its affiliates, including Sam's Club (Sam's), represented approximately 14% of our consolidated net revenue … the loss of this customer would have a material adverse effect on our [North America] divisions." IC ¶ 44; CC ¶¶ 2, 37; RC ¶¶ 2, 41.

## II. THE SCHEME

### A. Pepsi and Walmart Agree to Create a "Price Gap"

To mitigate the risk of "the loss of this customer," since 2018, Pepsi has agreed to maintain a retail "price gap" or "price hedge" between Walmart and its competitors—in other words, to ensure that Walmart has lower retail prices—by raising competitors' retail prices. IC ¶¶ 3, 45; CC ¶¶ 40, 42–43; RC ¶¶ 44, 46–47.

Pepsi has no unilateral retail price maintenance policy outside the Scheme. Under the Scheme, *Walmart's* preferred retail price, not Pepsi's, sets the floor. IC ¶¶ 53, 86; CC ¶ 38; RC ¶ 42. Pepsi's business documents reflect that "[d]elivering on Walmart hedge commitments is an aligned commercial strategy." As an internal Pepsi email put it, "stay[ing] focused on our price gap … is how we win with Walmart—[w]e stay focused on our deliverables and commitments." IC ¶ 46; CC ¶ 43; RC ¶ 47.

When Pepsi fails to protect Walmart's retail "price leadership," Walmart reacts. For instance, in 2019, Pepsi became aware that a retailer aggressively cut retail prices on 12-pack Pepsi soft drinks. A Pepsi executive wrote: "[The competitor has] now had multiple weeks of very

aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks].” IC ¶ 50; CC ¶ 47; RC ¶ 51. Likewise, in October 2020, Walmart’s senior beverage buyer emailed Pepsi’s Senior Director of Sales to express frustration that Pepsi “continue[d] to undermine [Walmart’s] price leadership with our competition.” The Pepsi Senior Director responded: “[W]e understand the importance of finishing strong and that price leadership is key.” IC ¶ 50. One Pepsi executive noted in an email that if Pepsi’s monthly or quarterly retail price gaps are “out of balance” with Walmart’s expectation, Walmart “will pressure [Pepsi] for actions.” IC ¶ 51.

### B. Pepsi Enforces the Price Gap by *Raising* Competitors’ Prices

In a competitive market, Walmart could only have restored “price leadership” against lower-priced competitors by cutting its own retail prices and sacrificing its profit margins. Instead, Walmart and Pepsi entered into the Scheme: using their combined market power to raise wholesale and retail prices at Walmart’s competitors. Walmart agreed not to cut retail prices (and force Pepsi to cut wholesale prices to compensate) if instead Pepsi targeted competing retailers selling below Walmart’s price and took actions to raise their retail prices above Walmart’s preferred level. IC ¶ 53; CC ¶¶ 41–46; RC ¶¶ 45–50.

Pepsi’s internal communications are explicit that it raised competing retail prices to avoid lowering wholesale and retail prices at Walmart. In 2021, Pepsi’s Pricing Council—an internal, senior Pepsi committee—reviewed a “price gap risk” involving grocery chains “battling” for market share by competing on retail price for Pepsi soft drinks. IC ¶ 54. There was a “decision tree” with two options for addressing the price gap, which Pepsi also called Walmart’s “hedge”: “1. Raise non-[Walmart] customers through Q1 to prevent price risk,” or “2. Manage hedge” by cutting Walmart’s wholesale and retail prices. *Id.*

Where it was “feasible” to do so, Pepsi chose the first option: “moving [the offender’s retail pricing] up to correct hedge.” IC ¶ 55. Food Lion, a regional chain with over 1,000 stores in 10 states, is one example. In 2022, Pepsi became aware that Food Lion had “heavily indexe[d]” its retail prices “against retails at [Walmart] and Kroger” and “set[] retails relative to these competitors.” For this competitive conduct, Pepsi characterized Food Lion as the “worst offender” violating its price leadership commitment by “beating [Walmart] in price.” IC ¶ 55; CC ¶ 51; RC ¶ 55.

Pepsi then designed a multi-year plan to raise Food Lion’s retail prices, emphasizing that Pepsi “must commit to raising rate [on Food Lion] faster than market.” The plan combined targeted wholesale price increases with reduced promotional support until Food Lion had to raise its retail prices to make its Pepsi sales profitable. IC ¶ 55; CC ¶ 52; RC ¶ 56. Pepsi did so pursuant to its Scheme with Walmart. As Pepsi leadership urged its Food Lion sales team: “We absolutely have to demonstrate progress [to Walmart] in the immediate term” to “CLOSE the gap.” IC ¶ 56; CC ¶ 52; RC ¶ 56.

### C. When Pepsi *Failed* to Maintain a Price Gap, Walmart Forced Rollbacks

The Scheme allowed Walmart to maintain inflated retail prices (because it did not need to match lower-priced competitors) and allowed Pepsi to maintain inflated wholesale prices (because it did not need to lower its wholesale prices to subsidize those lower retail prices). If Pepsi failed to uphold its end, Walmart’s enforcement mechanism was to force Pepsi to lower its wholesale prices to Walmart to fund lower retail prices.

Walmart calls its limited-time sales on specific items “Rollbacks,” and they are funded in whole or in part by the manufacturer of that item. When Pepsi failed to raise Walmart’s rivals’ retail prices, Walmart weaponized Rollbacks as punishment: in essence, as a wholesale price cut to subsidize lower retail prices. IC ¶¶ 58–65.

Pepsi executives emphasized that it undertook these price cuts begrudgingly. In 2019, immediately before meeting with Walmart's senior buyer regarding a "very aggressive" sub-Walmart retailer on the Price Gap report, a Pepsi executive lamented: "I see no way that we do not start a planned [Walmart] Rollback ASAP to help with combatting the price gap challenge that this [price report] will most definitely create." IC ¶ 62.

Pepsi agreed to these forced wholesale price cuts only when it could not raise competing retail prices quickly enough to placate Walmart. In December 2021, for example, grocery chains in the Richmond-Raleigh-Charlotte corridor were "battling each other" on retail price, creating a "price gap risk." IC ¶ 63. Only after concluding that "moving Grocery up to correct Hedge is not feasible" did Pepsi agree to a limited, short-term Rollback. *Id.*

As one Pepsi employee wrote after agreeing to a regional Rollback on limited products, Pepsi's hope was that these concessions would "[g]et ahead of price gap challenges by showing [Walmart] we are addressing in key spots and avoid [Walmart] forcing national move." The Scheme was thus enforced by a fear of Walmart unilaterally slashing the national wholesale price it paid for Pepsi. IC ¶ 64.

### D. The Scheme Reflects Walmart's Established Anticompetitive Strategy of Colluding with Suppliers to Inflate Prices

Walmart uses its dominant market position to induce many of its suppliers to enter similar arrangements. For instance, at the same time that Pepsi agreed to ensure Walmart's "price leadership" by raising Food Lion's retail prices, Energizer Holdings, Inc. ("Energizer")—another large supplier in a highly concentrated industry—made a nearly identical commitment at Walmart's behest. IC ¶¶ 11–14, 57; CC ¶¶ 11–12, 39; RC ¶¶ 12–13, 43. In 2021, Energizer imposed a targeted wholesale price increase on one of its direct customers selling below Walmart's

retail price to get the customer to "revise his [retail] pricing and get him off [Walmart's] radar." IC ¶ 57.

## III. THE SCHEME INFLATED PRICES IN THE RELEVANT MARKET

The Scheme inflated wholesale and retail prices for RTD soft drinks. Absent the Scheme, Walmart would have had to match lower retail prices and demand wholesale price concessions from Pepsi across the board—as it did in limited fashion—to remain competitive. IC ¶ 66.

These price cuts would have spread across the market: competing retailers would have matched Walmart and demanded lower wholesale prices, and Coca-Cola would have been forced to follow. IC ¶¶ 4–6, 67; *see also* CC ¶¶ 4–6, 136-142; RC ¶¶ 4–6, 149–155. Instead, by eliminating retail price competition, Defendants maintained their preferred retail and wholesale prices and staved off a price war. IC ¶ 68.

With their positions secure, Pepsi and Walmart raised wholesale prices for Pepsi soft drinks by double-digit percentages for seven consecutive quarters in 2022 and 2023—increases commentators observed had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on … costs to consumers." IC ¶ 70; CC ¶ 55; RC ¶ 59.

These increased wholesale prices rippled through to higher retail prices, even at Walmart. Moreover, by preventing retail price competition, the Scheme allowed Walmart to directly inflate retail prices even further. IC ¶ 72. Retail prices on soft drinks increased by over 70% between 2019 and 2023, IC ¶ 72, defying the "long-term trend of gradual decline" of soft-drink consumption of over 15% since the early 2000s. IC ¶ 83. *See also* CC ¶ 148; RC ¶ 161.

Nor can Pepsi's wholesale price increases be explained by increased costs or general inflation. IC ¶¶ 84–85; CC ¶¶ 146–147; RC ¶¶ 159–160. Commentators noted that Pepsi had "continually beaten analysts' expectations" by successfully increasing prices by more than costs

during the pandemic. IC ¶ 84. And inflation was only 3.2% in July 2023 and October 2023, but Pepsi increased prices by 15% and 11%, respectively, in each month. IC ¶ 84; CC ¶ 149; RC ¶ 162. A December 2025 industry report using Consumer Price Index data found that from 2020 to 2025, prices for 2-liter soda bottles rose 62% and 12-packs 89%, while overall inflation was 25%. IC ¶ 85.

## IV. THE FTC COMPLAINT IS UNSEALED AND PLAINTIFFS FILE SUIT

The FTC challenged the Scheme under the Robinson-Patman Act in a complaint that was unsealed on December 11, 2025. IC ¶ 157; RC ¶ 172. Retailers, Consumers, and Indirects then filed suit. On September 4, 2026, Defendants moved to dismiss all three complaints, arguing that Plaintiffs (1) fail to plausibly allege an unlawful agreement; (2) fail to plausibly allege substantial harm to competition in a relevant market; (3) fail to state Robinson-Patman Act claims; (4) fail to state their state-law claims; and (5) bring time-barred claims.

## ARGUMENT

## I. PLAINTIFFS PLAUSIBLY PLEAD AN UNLAWFUL AGREEMENT

At the pleading stage, Plaintiffs' allegations must give rise to a plausible inference of an agreement, such as "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Plaintiffs may plausibly plead an agreement through either "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others" had such objective. *Id.* at 764. Plaintiffs "need not show that [their] allegations suggesting an agreement are more likely than not true," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012), and the Court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible," *id.* at 185.

To raise this low pleading bar, Defendants rely on cases elaborating the standard at summary judgment and trial, when an antitrust plaintiff must "present evidence that tends to exclude the possibility of independent action." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). But a "considerably" lesser standard applies at the pleading stage. *See id.* ("The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment." (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d1 (3d ed. 2007))).

### A. Plaintiffs Plead Direct and Indirect Evidence of Agreement

The agreement Plaintiffs allege is simple: Pepsi agreed to monitor Walmart's competitors and punish those that attempted to undercut Walmart's retail prices. In exchange, Walmart agreed to accept inflated wholesale prices from Pepsi rather than demand price reductions. Plaintiffs' detailed allegations of direct and circumstantial evidence satisfy either the pleading standard or the incorrect "tends to exclude" standard Defendants propose. *See Anderson News*, 680 F.3d at 184 ("[P]lausibility is a standard lower than probability").

***Pepsi's "Foundational Commitment"*:** Pepsi's internal documents *explicitly memorialize* Pepsi's "foundational *commitment*" to Walmart to ensure a retail "price gap" between Walmart and its competitors. RC ¶¶ 46–47; IC ¶ 46; CC ¶ 43 (emphasis added). Pepsi's documents, moreover, make clear that this agreement applies to Walmart's *retail*, not wholesale, prices. RC ¶ 48; IC ¶ 47; CC ¶ 44 (defining "price gap" as the "[c]omparison of average price at Walmart" versus competitors). This "commitment"—to guarantee Walmart the lowest retail prices, including by punishing lower-priced competitors—is precisely the agreement Plaintiffs allege, set forth in writing.

Unlike most antitrust conspiracy cases, in which direct evidence of an agreement "can be hard to come by, especially at the pleading stage," *Mayor & City Council of Balt. v. Citigroup,*

*Inc.*, 709 F.3d 129, 136 (2d Cir. 2013), Pepsi's own documents admit the scheme Plaintiffs allege, and even describe their price-inflationary actions as a "commitment"—which certainly provides direct evidence of "a conscious *commitment* to a common scheme," *Monsanto*, 465 U.S. at 768 (emphasis added); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) ("[A]n admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." (quotation omitted)).

***Defendants' Meetings to Implement the Scheme***: Plaintiffs detail Defendants' cooperation to execute their "commitment" and ensure that "Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis." RC ¶ 49; IC ¶ 49; CC ¶ 45. Walmart's buyers received regular "Price Gap" reports detailing the *retail* prices at Walmart's competitors, then met with Pepsi to discuss how Pepsi would address those "gaps," *i.e.*, raise sub-Walmart retail prices. IC ¶¶ 50–51; RC ¶¶ 51–53; CC ¶¶ 47–49.

Defendants' communications show that Pepsi could satisfy its commitment by *raising retail prices* rather than cutting Walmart's wholesale prices. *See, e.g.*, RC ¶¶ 55–56; IC ¶¶ 55–56; CC ¶¶ 51–52. When Pepsi learned that Food Lion was "beating [Walmart] in price," it needed to "begin to CLOSE the gap" because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term." *Id.* Defendants admit that this is a "specific example," MTD at 14, but there are more. *See, e.g.*, IC ¶ 54 (outlining plan to "[r]aise non-[Walmart] customers through Q1 to prevent price risk"); RC ¶ 54; CC ¶ 50 (Pepsi email noting that its strategy "is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs / *retails* ….").

***Walmart's Rollback Threat***: Plaintiffs also detail Walmart's end of the bargain: higher wholesale prices from Pepsi in exchange for its efforts to increase competitors' retail prices. IC ¶¶

53, 65; RC ¶¶ 42, 49–53; CC ¶¶ 38, 45–49. Grocery chains "battling" on retail price in 2021 created a "price gap risk," IC ¶ 54, and Pepsi's Pricing Council created a "decision tree" for satisfying Walmart: either raise the retail prices of Walmart's competitors, or cut Walmart's wholesale price. *Id.* When Pepsi failed to deliver inflated retail prices, Walmart forced Rollback promotions on Pepsi, which amounted "in essence, to a wholesale price cut." *Id.* ¶¶ 59–61. Wherever "feasible," Pepsi chose the first option: "moving [the offender's retail pricing] up." *Id.* ¶¶ 55, 63; RC ¶¶ 53–55, 58; CC ¶¶ 49–51, 54.

***Defendants' Actions Against Unilateral Self-Interest*:** On top of direct, documentary evidence of agreement, Plaintiffs' allegations still tend to exclude the possibility of independent action (which is more than is required). *Anderson News*, 680 F.3d at 184. Each Defendant acted against its economic self-interest absent the agreement—strong circumstantial evidence that the agreement existed. *See Publ'n Paper*, 690 F.3d at 62.

*First*, Pepsi took deliberate, targeted steps to *raise* the retail prices of Walmart's competitors. These steps would make no sense without the agreement. RC ¶ 57; IC ¶ 56; CC ¶ 53. All else equal, it is in a manufacturer's unilateral self-interest to *minimize* its retailers' prices. *See Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024) ("If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to minimize the ultimate retail prices—thereby maximizing sales and ultimately its profits."); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896 (2007) (explaining that the difference between wholesale cost and retail price "represents part of the manufacturer's cost of distribution, which, like any other cost, the manufacturer usually desires to minimize"). Raising retailers' prices drives down sales; a rational manufacturer would do that only for something in return.

*Second*, Pepsi did not unilaterally set resale prices, but allowed *Walmart* to set its competitors' floor. RC ¶¶ 42, 56; IC ¶¶ 53, 55–56, 64, 86; CC ¶¶ 38, 52. This defeats any argument that the Scheme is simply Pepsi implementing a unilateral pricing policy. *See Copeland*, 716 F. Supp. 3d at 764 (distinguishing a "uniform minimum retail price across all retailers," from allowing "*Walmart* to set those minimum prices instead").

*Third*, absent agreement, Pepsi would have no reason to communicate its efforts to inflate retail prices to Walmart. *See, e.g.*, RC ¶ 56; IC ¶ 56; CC ¶ 52 (noting Pepsi's plan to "demonstrate progress [to Walmart]" by sharing its actions against Food Lion). Pepsi's reports to Walmart on its efforts to raise competing retail prices make sense only if Pepsi *agreed* to take those actions.

*Fourth*, Walmart's actions, too, are irrational absent an agreement. Defendants concede Walmart has enormous "bargaining leverage" and every incentive to "negotiate the lowest available wholesale prices." MTD at 17–18. Pepsi expressed ongoing fear of Walmart "*forcing* national [price cuts]" and took actions for the express purpose of "avoid[ing]" those cuts. IC ¶ 64 (emphasis added); *see* RC ¶ 51; CC ¶ 47. But Walmart accepted *higher* wholesale prices than it otherwise could have demanded. This makes sense only as an exchange for Pepsi's agreement to raise rival retail prices.

**B. Defendants' Counterarguments Fail**

In response to these detailed allegations, Defendants raise three primary counterarguments: (1) that Plaintiffs do not plead direct evidence of an agreement; (2) that Plaintiffs' indirect evidence of an agreement "is explained by Defendants' independent business interests"; and (3) that it "makes no economic sense for Walmart to join this alleged conspiracy." MTD at 9–10, 17. Each argument fails.

#### 1. Plaintiffs plead direct evidence of agreement, and indirect evidence suffices regardless

First, Defendants argue that the complaints "lack any direct evidence" and rely on "vague phrases" that "do not identify the object, participants, or terms of any agreement." MTD at 9–10. But Defendants ignore their *own internal communications*, which set forth (a) Pepsi's "foundational commitment" to Walmart's "price gap"; (b) frequent meetings to discuss and enforce that gap; and (c) Pepsi's efforts to inflate retail prices to "demonstrate progress" to Walmart. RC ¶¶ 46–49, 51, 56; IC ¶¶ 46, 49–51, 54–56; CC ¶¶ 42–45, 47, 52. These communications identify the object (Walmart's retail "price gap"), the participants (Pepsi and Walmart), and the terms (Pepsi would inflate competing retail prices; Walmart would forgo wholesale price cuts). That is as direct as "a recorded phone call in which two competitors agreed to fix prices." MTD at 9 (quoting *Citigroup*, 709 F.3d at 136).

In response, Defendants move the goalposts, saying Plaintiffs "identify no written agreement or contractual term requiring PepsiCo to raise rival retailers' prices or Walmart to accept higher wholesale prices." *Id.* at 9. But "[n]o formal agreement is necessary to constitute an unlawful conspiracy," *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946); Plaintiffs need only plead "*a conscious commitment* to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 768 (emphasis added). And regardless, Pepsi did in fact memorialize its "foundational commitment."

In any event, at the pleading stage, nothing turns on whether evidence is characterized as "direct" or "indirect"—a line that is often blurry. *Publ'n Paper*, 690 F.3d at 64 (declining to draw "bright lines" between direct and indirect evidence and evaluating "the totality of the evidence"); *Copeland*, 716 F. Supp. 3d at 762 (similar Walmart scheme plausibly alleged with indirect

evidence). Either way, this Court's inquiry is the same: under the totality of the evidence, do the complaints plausibly allege an agreement? Here, they plainly do.

### 2. Plaintiffs' allegations are not explained by Defendants' independent business interests

Defendants' "independent business interests" argument, MTD at 10, ignores what Plaintiffs actually allege.

***Pepsi's Wholesale Price Increases*:** Defendants mischaracterize the complaints as alleging that Pepsi "increased its wholesale prices to all customers" *pursuant* to the Scheme, MTD at 10, and then argue that "market-wide price increases do not show … an anticompetitive conspiracy," *id.* at 10–11 (quoting *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025)).

But Plaintiffs do not allege that Pepsi imposed "market-wide price increases" pursuant to the Scheme. Instead, Plaintiffs allege that Pepsi agreed to "police retail prices at Walmart's competitors," and impose on sub-Walmart retailers "a series of escalating, targeted wholesale price increases until undercutting Walmart became infeasible." IC ¶ 4; *see* RC ¶¶ 3–5; CC ¶¶ 3–5. It is these *targeted*, *punitive* wholesale price increases—against retailers whose low pricing Pepsi would otherwise prefer—that make no sense absent the agreement, as they risk losing otherwise profitable sales.[2]

Defendants also argue that their wholesale price increases do not support an inference of agreement because "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." MTD at 10 (quoting *Pac. Bell Tel. Co. v. linkLine*

[2] While Plaintiffs allege that the Scheme enabled Pepsi to implement market-wide price increases, Plaintiffs do not claim that Pepsi imposed market-wide price increases *pursuant* to the Scheme. *See* RC ¶ 59; IC ¶¶ 69–70; CC ¶ 55.

*Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). But as the court recognized in *Copeland*, this argument completely "misses the point":

> The question is not whether [Pepsi]'s actions would be legal if taken independently. The question is whether the actions support an inference that [Pepsi] was acting in accordance with an agreement. If they do, then that suffices to state a claim, because the agreement itself can be illegal even if the actions taken to implement it otherwise would not be.

*Copeland*, 716 F. Supp. 3d at 764. Here, even if Pepsi's targeted price increases would be legal if taken independently, Defendants' *agreement* to impose these price increases at Walmart's behest is unlawful. And even if a "seller's unilateral price increases do not, without more, imply an agreement with a buyer," MTD at 10, Plaintiffs have offered plenty "more" here, including Pepsi's frank admission of a commitment to Walmart's price gap.

***Walmart's "Complaints" and Pepsi's "Responses":*** Defendants separate the agreement into Walmart's "monitoring and complaints" and Pepsi's "monitoring and responses" and argue that neither alone suggests a conspiracy. But a conspiracy must be judged "as a whole," not "by dismembering it and viewing its separate parts." *United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (quotation omitted).

***First,*** Defendants argue that "complaints about price-cutters … do not indicate illegal concerted action," so Pepsi's responses to Walmart's complaints cannot either. MTD at 12, 14–15 (citing *Monsanto*, 465 U.S. at 763).

Defendants are wrong. For one, Walmart did not merely "complain" about lower prices: it "demanded that Pepsi take specific, concrete actions to restore Walmart's price leadership," and—critically—Pepsi made a "commitment" in response to do so. IC ¶¶ 51–56; *see* RC ¶¶ 49–56; CC ¶¶ 45–52. Walmart provided Pepsi consideration, forgoing wholesale price cuts it would have

otherwise pursued. IC ¶¶ 53, 63, 65; *see* RC ¶ 57; CC ¶ 53. Considered "as a whole," *Apple*, 791 F.3d at 319, these allegations describe an agreement, not simply complaining.

In the cases Defendants cite, moreover, manufacturers made *unilateral* distribution or pricing decisions, and the courts held only that a manufacturer's enforcement of *its own* policy, following a dealer's complaint, did not, on its own, "tend[] to exclude" the possibility that the manufacturer was acting independently under the heightened summary judgment standard. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923–24 (2d Cir. 1985); *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1016 (2d Cir. 1989); *cf. Monsanto*, 465 U.S. at 762–64. But here, Pepsi had no preexisting policy—and Defendants do not argue otherwise. The retail price floor originated *with the retailer*: Pepsi policed competitors' prices below *Walmart's* price, in service of *Walmart's* "price leadership." RC ¶¶ 47–51; IC ¶¶ 46–47; CC ¶¶ 43–47. Under these circumstances, Pepsi's actions indicate an agreement. *See Copeland*, 716 F. Supp. 3d at 764 ("[P]reventing intrabrand competition does not explain why Energizer would allow Walmart to set those minimum prices instead of setting them itself.").

***Second***, Defendants' proposed "obvious alternative explanation"—that Walmart's complaints were efforts to "obtain lower wholesale prices" and "fund rollbacks," MTD at 12–13—is the opposite of what Plaintiffs allege. Walmart agreed to *forgo* lower wholesale prices *if Pepsi raised competing retail prices*. RC ¶ 57; IC ¶¶ 53, 65; CC ¶ 53. If Walmart were engaged in "arm's-length negotiation," MTD at 14, it would press for wholesale price cuts regardless of what Pepsi did to its competitors. That it did not is the core of the agreement.

***Third***, Defendants also dismember Pepsi's "responses," theorizing that Pepsi punished competing retailers unilaterally to cater to Walmart's "desire for the lowest price" and maintain a "good relationship with its largest customer." MTD at 10, 14–15. That speculation cannot survive

the detailed allegations of meetings at which Walmart held Pepsi to its "commitment"—an inherently bilateral arrangement. RC ¶ 49; IC ¶¶ 49–51; CC ¶ 45. And even absent those allegations, it is highly *im*plausible that Pepsi would act against its economic self-interest for years simply in *hopes* of pleasing Walmart. *See Copeland*, 716 F. Supp. 3d at 764 ("Even if it is conceivable that [a manufacturer] might accept negative consequences because it expected benefits from a major customer, the more plausible inference is that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create.").

### 3. Walmart's role in the conspiracy makes economic sense

Finally, Defendants contend that it "makes no economic sense" for Walmart to join this conspiracy because its "bargaining leverage" would let it "negotiate the lowest available wholesale prices." MTD at 17–18. That is precisely Plaintiffs' point: absent the agreement, Walmart would have used its leverage to negotiate lower wholesale prices. Instead, it gave up lower prices "in exchange for" Pepsi's commitment to force other retailers' prices upward, RC ¶ 6; CC ¶ 6; *see* IC ¶ 5, allowing it to sell at inflated prices while preserving its position as the "lowest-cost retailer," MTD at 18; *see* RC ¶¶ 4, 8, 42, 64; CC ¶¶ 4, 8, 38, 60; IC ¶¶ 58, 65. That is precisely the "offsetting benefit" that makes "paying more rational," MTD at 17–18, so the agreement makes perfect "economic sense," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. PLAINTIFFS PLAUSIBLY ALLEGE HARM TO COMPETITION

To prove an antitrust violation under the rule of reason, a plaintiff must initially show that the challenged action adversely affected competition in the relevant market. *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016). A plaintiff may satisfy this requirement through (1) "direct evidence of harm to competition [showing] higher prices, reduced output, or lower quality in the market as a whole," or (2) indirect proof "establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other

ground for believing that the challenged behavior' has harmed competition." *Id.* (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)). Plaintiffs do both.

The Supreme Court's analysis in *Leegin* explained when vertical price restraints (agreements between a manufacturer and its resellers restricting resale prices) such as those alleged here can harm competition. While *Leegin* held that vertical price restraints can sometimes be procompetitive when they originate *with a manufacturer*,[3] the Court made clear that the analysis is different where "there is evidence retailers were the impetus" for the restraint. *Leegin*, 551 U.S. at 897–98. In particular, the Court warned of the "anticompetitive consequences of vertical price restraints" where a "dominant retailer" to which "the manufacturer believes it needs access" imposes these restraints to lock in its dominant position against competitors. *Id.* at 893–94. That is precisely what Plaintiffs allege here. *See* RC ¶¶ 51–56; CC ¶¶ 47–52; IC ¶¶ 50–56. Walmart, a dominant retailer, pressured Pepsi to impose minimum resale prices *on rival retailers* so that they could not compete on price with Walmart. *See Leegin*, 551 U.S. at 897–98.

### A. Plaintiffs Plead Direct Evidence of Anticompetitive Effects in the Form of Inflated Prices

Plaintiffs allege that the Scheme impaired both *interbrand* competition (competition between manufacturers selling different brands) at the wholesale level, as well as *intrabrand* competition (competition between retailers selling the same brand) at the retail level. IC ¶¶ 8–9, 146–148. The Scheme thus resulted in inflated prices via two distinct mechanisms: (1) inflated wholesale prices caused by a reduction in *interbrand* competition; and (2) inflated retail prices

[3] In particular, the Court explained that minimum resale prices can prevent discount retailers from free riding on rivals' investments in pre-sale services, such as showrooms and trained staff, for technical or complex products. *Leegin*, 551 U.S. at 890–91. The justification is inapplicable here: carbonated soft drinks sold at Walmart require no such services.

caused by a reduction in *intrabrand* competition *plus* the portion of the inflated wholesale prices that is passed on to consumers. *Id.*

With respect to interbrand competition, vertical price restraints like the Scheme can soften competition among rival manufacturers. *Leegin*, 551 U.S. at 892–93. That risk is greatest in concentrated markets, where each firm's pricing decisions depend on its rivals' expected responses. *See id.* at 892, 897–98. The soft-drink market is such a market: Pepsi, Coca-Cola, and Dr Pepper together sell 93% of carbonated soft drinks in the United States. IC ¶ 7; CC ¶ 31; RC ¶ 35. And the Scheme impaired competition among those three firms through multiple, mutually reinforcing mechanisms. IC ¶¶ 78–80; *see Copeland*, 716 F. Supp. 3d at 766–67 (holding that nearly identical agreement plausibly harmed interbrand competition).

*For one*, the Scheme made it easier for Coca-Cola and Dr Pepper to monitor and follow Pepsi's prices. Firms in a concentrated market often engage in "conscious parallelism," setting supracompetitive prices "by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993); IC ¶ 74. Coca-Cola does just that, describing its strategy as "meet-the-competition pricing" "on par with those of other soda brands." IC ¶ 75; *see* RC ¶ 150; CC ¶ 137 ("It seems that Coke and Pepsi are aligning the 2 liters and 12packs again"). Coca-Cola personnel even contacted Pepsi's customers to confirm Pepsi's price increases. RC ¶ 149; CC ¶ 136. But wholesale prices are often confidential, so price cuts can go undetected, whereas retail prices are public. Resale price maintenance thus helps oligopolists identify "price-cutting manufacturers." *Leegin*, 551 U.S. at 892. By fixing Pepsi's retail prices marketwide at (or above) Walmart's, the Scheme "made it easier for Coca-Cola and Dr Pepper to observe and follow Pepsi's price changes." IC ¶ 146; *see id.* ¶ 78.

*For another*, by placating Walmart, the Scheme "prevented Walmart from instigating a price war." IC ¶ 146. A large buyer like Walmart can force even oligopolistic suppliers to cut wholesale prices, and those forced cuts "have the power to spark a price war by disrupting the pricing equilibrium between oligopolists and spurring competitors to respond in kind." IC ¶ 80. Walmart wielded exactly that power: when Pepsi failed to raise competing retail prices, Walmart forced Pepsi to fund Rollbacks so that Walmart could match lower market prices. IC ¶¶ 59–61. Pepsi's own documents confirm that it raised rivals' retail prices to "avoid [Walmart] forcing [a] national move." IC ¶ 64. Had Walmart forced drastic, nationwide price cuts, Coca-Cola and Dr Pepper—which price in alignment with Pepsi—would have had no choice but to cut their own prices or lose share. *See* IC ¶¶ 75, 80. By enforcing Walmart's preferred retail prices instead, Pepsi averted that price war and allowed Pepsi, Coca-Cola, and Dr Pepper to keep coordinating at inflated wholesale prices. IC ¶¶ 65, 80.

Critically, neither mechanism requires a horizontal agreement among beverage makers. *Contra* MTD at 26. Plaintiffs do not allege that Coca-Cola or Dr Pepper conspired with anyone; they allege that the Scheme between Pepsi and Walmart reduced those rivals' *incentive* to compete on price. IC ¶¶ 78–80, 146. That is a harm the Scheme itself causes, whether or not Pepsi's rivals' parallel pricing would be lawful standing alone. Indeed, *Leegin* warned that vertical price restraints imposed at the behest of a dominant retailer can impair horizontal competition, and that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated." 551 U.S. at 893–94.

The Scheme also impaired *intrabrand* competition, eliminating the price competition between Walmart and its competitors that would otherwise have pushed retail prices down. Pepsi protected Walmart's "price leadership" by preventing rival retailers, such as Food Lion, from

undercutting Walmart. *See, e.g.*, IC ¶¶ 54–56; RC ¶¶ 54–56; CC ¶¶ 50–52. That was the Scheme's intended effect. *See supra* pp. 6–7. And an agreement that prevents retailers from selling below a set price "harms competition in one of the simplest ways possible." *Copeland*, 716 F. Supp. 3d at 768.

Defendants wrongly suggest that antitrust law is indifferent to restraints on intrabrand competition. *See* MTD at 25–26. But *Leegin* held that where, as here, retail price maintenance originates with a retailer like Walmart, the resulting reduction in retail price competition is more likely anticompetitive. *See supra* p. 20.

Defendants also speculate that the agreement could "enhance interbrand competition by inducing PepsiCo's rivals to compete on price." MTD at 25. That did not happen; real prices of all soft drinks rose dramatically. And such enhanced competition occurs only when minimum retail prices prevent "free riding" on retailers' pre-sale services or brand promotion. *Leegin*, 551 U.S. at 890–91. Defendants do not explain what services Walmart—the paradigmatic discount retailer—offers to educate consumers about Pepsi soft drinks, let alone how the restraints prevent free riding on them. *See id.* at 882 (manufacturer wanted consumers "to get a different experience than they get in Sam's Club or in Wal–Mart").[4]

The complaints' pricing allegations confirm the direct effects of harm to competition at both levels of distribution. Between 2018 and 2025, Pepsi increased the wholesale price of a 12-pack by 64% and a two-liter bottle by 104%. RC ¶ 61; CC ¶ 57. Walmart customers also paid

---

[4] Although Walmart sometimes features Pepsi RTD soft drinks in its stores with flashy displays and advertisements, *see* RC ¶¶ 66–67, Fig. 1, Defendants offer no reason to believe that other retailers could "free ride" on these services. Indeed, such an argument would be implausible, given that discount retailers such as Walmart are usually the types of retailers who are accused of free riding on such services, not providing them. *See, e.g.*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937–38 (7th Cir. 2000).

more. CC ¶ 60 (alleging increases in prices of Pepsi six-packs and Mountain Dew 12-packs at Walmart stores); *see also* RC ¶ 64; IC ¶ 72. Retail prices on all soft drinks increased by over 70% during the Class Period, IC ¶ 72 & Fig. 1, ¶ 81; *see also* CC ¶¶ 136–141; RC ¶¶ 149–154 (describing Pepsi's and Coca-Cola's parallel price increases), and these increases cannot be explained by increases in Pepsi's costs, *see* CC ¶¶ 146–149; RC ¶¶ 159–162; IC ¶¶ 84–85. Pepsi's own executives said as much: its Chief Executive Officer told investors that "we've been able to raise prices and consumers stay within our brand," and its Chief Financial Officer said the company was "capable of taking whatever pricing [increases] we need." RC ¶ 60; IC ¶ 71; CC ¶ 56.

### B. Plaintiffs Plead Indirect Evidence of Harm to Competition

Anticompetitive effects can also be shown indirectly by showing sufficient "market power" to cause an adverse effect, "plus some other ground for believing that the challenged behavior" has harmed competition. *MacDermid*, 833 F.3d at 182.

#### 1. Plaintiffs adequately plead a relevant market

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001); *see also Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d Cir. 2017) (same).

Market definition is only needed to estimate market shares to infer market power indirectly. For this reason, "direct evidence of anticompetitive effects may in some circumstances reduce the need for precise market definition." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2026 WL 1397077, at *2 (2d Cir. May 19, 2026) (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 & n.7 (2018); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 & n.11 (2d Cir. 2021)). Nevertheless, Plaintiffs have more than adequately alleged a relevant antitrust market.

Plaintiffs plausibly plead that RTD soft drinks in the United States are a relevant product and geographic market: there are no reasonable substitutes, and a hypothetical monopolist could profitably raise prices above competitive levels without losing enough customers to defeat the increase. IC ¶¶ 89–94; CC ¶¶ 79–83; RC ¶¶ 90–94. That is sufficient to allege a relevant antitrust market. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024).

Plaintiffs also plead the "practical indicia" of market boundaries. *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). These include "functional and flavor-based attributes"—carbonation, sweeteners, flavors, rehydration, and stimulants—that distinguish RTD soft drinks from bottled water, IC ¶ 136, and industry data that track water separately from RTD soft drinks, IC ¶ 139; *see Regeneron*, 96 F.4th at 339 ("peculiar characteristics" and "industry or public recognition").

Defendants do not dispute Plaintiffs' allegations that bottled water is sufficiently differentiated from RTD soft drinks such that it does not defeat the hypothetical monopolist test. *See* MTD at 21–22 (arguing instead that Plaintiffs' differentiation of bottled water from RTD soft drinks supports further market segmentation). Nor do they contest that the United States is a relevant geographic market or even suggest that another substitute for RTD soft drinks could defeat the hypothetical monopolist test. On this record, Plaintiffs have sufficiently alleged a relevant antitrust market to pass the plausibility threshold.

Instead, Defendants argue that Plaintiffs' market is too *broad*, suggesting that carbonated soft drinks, sports drinks, ready-to-drink coffee, ready-to-drink tea, energy drinks, and juice are too differentiated to share a product market. MTD at 20–21. But a relevant market need not be the *smallest* possible one. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) (within a broader relevant market, "well-defined submarkets may exist which, in themselves,

constitute product markets for antitrust purposes" (quoting *Brown Shoe*, 370 U.S. at 325)). And the Second Circuit has rejected Defendants' argument, *see* MTD at 20–21, that all products in the relevant market must be interchangeable such that "if the price of Diet Pepsi were slightly increased, consumers would switch to Gatorade, a Starbucks Frappuccino, or orange juice," *see Todd*, 275 F.3d at 199–200 (rejecting "over-inclusive" challenge to market including non-interchangeable accountants and engineers).

On the contrary, products that face "reasonably similar" competitive conditions and are sold together may be aggregated into a "cluster market" for analytic convenience "even though not all products in the cluster are substitutes for each other." U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.3.D.4 (2023); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."). Relevant markets thus regularly include non-substitutes that are marketed and sold together, such as left shoes and right shoes.[5]

A "cluster of products can comprise a relevant product market 'if the cluster is itself an object of consumer demand.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (citation omitted). Here, the complaints plausibly allege an RTD soft-drink "cluster" market even if not all products in it are substitutes. *See* RC ¶¶ 128, 143; CC ¶¶ 116, 131;

[5] *See, e.g., Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 413–14 (5th Cir. 2026) (holding product market may comprise "a 'cluster of services' insulated from competition as a result of their distinctiveness, cost advantages, and settled consumer preference" (quotation omitted)), *cert. denied*, 2026 WL 2976620 (U.S. Oct. 5, 2026)*; FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 440 (S.D.N.Y. 2024) (accepting "crossbody bags, satchels, shoulder bags, and totes as a 'cluster' market")*; see also In re Constr. Equip. Rental Antitrust Litig.*, 2026 WL 2921033, at *13 (N.D. Ill. Sept. 28, 2026) (recognizing a cluster market in heavy equipment such as dozers and excavators).

IC ¶ 131. Retailers typically must stock all or almost all RTD soft-drink subcategories, RC ¶¶ 128, 143; CC ¶¶ 116, 131; IC ¶ 131; consumers expect to buy them in one place, and retailers do not view carrying only a subset as competitively feasible, RC ¶¶ 128, 143; CC ¶¶ 116, 131; IC ¶ 131. Pepsi reinforces this by conditioning reimbursements and discounts on retailers devoting set percentages of shelf space to Pepsi products. IC ¶ 132; RC ¶¶ 130, 143; CC ¶¶ 118, 131. Defendants ignore these allegations, and the cases they cite did not involve cluster markets at all.[6] Regardless, even if an alleged market is too broad, that understates Defendants' market share and thus provides no basis for dismissal. *See, e.g.*, *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *10 (D. Md. Sept. 16, 2020)*; In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015).

Next, Defendants argue that Plaintiffs "define the market by the identity of the seller, PepsiCo." MTD at 21. Not so. Plaintiffs define the market by *product* and include *all* RTD soft-drink sellers. RC ¶¶ 88–89; CC ¶¶ 78–79; IC ¶¶ 89–91. *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85–86 (2d Cir. 2000), which involved a single-brand market for a "Yale education," is inapposite.

Finally, Defendants contend that Plaintiffs "ignore consumer substitution." MTD at 23–24. They do not. The complaints expressly allege that there are "no reasonable substitutes" for RTD soft drinks; that demand is therefore "relatively inelastic"; that a hypothetical monopolist could profitably impose a small but significant price increase; and that Defendants in fact did so without

[6] *See Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974) (rejecting alleged entertainment market including movies, plays, and sports as "so broadly defined as to render that concept all but meaningless"); *GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739, at *18 (S.D.N.Y. Feb. 16, 2023) (delivery, retail, and security services too disparate); *Sensory, Inc. v. Google LLC*, 2026 WL 2017536, at *8 (D.D.C. July 13, 2026) (voice assistant and internet search platforms too disparate); *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1021–22 (S.D. Ind. 2013) (sports undifferentiated by game or gender).

losing enough sales to make the increase unprofitable. RC ¶¶ 90–94; IC ¶¶ 89–93; CC ¶¶ 79–83. They explain why bottled water falls outside the market. RC ¶ 144; IC ¶¶ 135–138; CC ¶ 132. And they allege, in the alternative, that RTD soft drinks form a cluster market because retailers must stock all or nearly all subcategories and consumers expect to buy them in the same place. RC ¶¶ 128, 143; CC ¶¶ 116, 131; IC ¶ 131.

Defendants instead point to allegations concerning which manufacturers sell a particular RTD soft drink, and those concerning Pepsi's bottling, licensing, and ownership interests in brands such as Dr Pepper, and argue that these do not show "whether consumers view particular products as reasonable substitutes." MTD at 24. But Plaintiffs do not offer them for that purpose. Those allegations go to Pepsi's share *within* the relevant market, not to the definition of the market itself. RC ¶¶ 97–127; CC ¶¶ 86–115; IC ¶¶ 97–130. Indeed, as Defendants themselves acknowledge, whether a given manufacturer makes, bottles, or licenses a product has nothing to do with whether consumers regard that product as a substitute for another. *See* MTD at 24 (such arrangements "say[] nothing about whether consumers view particular products as reasonable substitutes"). Defendants' real objection, then, is a *sub silentio* attack on Plaintiffs' market-share allegations: they dispute whether the sales of licensed and jointly owned products "may properly be attributed to PepsiCo." MTD at 24. As Defendants themselves recognize, however, such "supply-side relationships" do not determine the relevant market, *id.*; market definition and market power are distinct inquiries, *compare id.* at 19–20, *with id.* at 28. At most, Defendants' objection goes to the size of Pepsi's share within that market—a factual issue that Defendants do not raise, and which provides no basis for dismissal.

**2. Plaintiffs adequately plead that Defendants have market power**

Market power can be proven either directly or indirectly. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). Plaintiffs here allege both. First, Plaintiffs sufficiently

allege direct evidence of market power. As discussed above, *see supra* Section II.A, the Scheme enabled Defendants to reduce competition and repeatedly raise prices above competitive levels without losing sales to rivals, RC ¶¶ 96, 142; IC ¶¶ 71, 98, 145; CC ¶¶ 85, 130. That is sufficient direct evidence of market power to defeat Defendants' motion. *See Tops Mkts.*, 142 F.3d at 98 (market power may be proven "directly by evidence of the control of prices or the exclusion of competition").

Second, Plaintiffs allege indirect evidence of market power, which may be "inferred" from a sufficient "percentage share of the relevant market." *Tops Mkts.*, 142 F.3d at 98; *see Copeland*, 716 F. Supp. 3d at 767. Pepsi's share of the RTD soft-drink market is as high as 40%, CC ¶ 78; RC ¶ 88; *see also* IC ¶ 95 (34%), and it is dominant in several subcategories, *see generally* CC ¶¶ 86–116; RC ¶¶ 97–128; IC ¶¶ 97–131. To the extent those subcategories are relevant submarkets, Pepsi has 40% of carbonated soft drinks, RC ¶ 98, 40% of non-carbonated soft drinks, *id.* ¶ 108, 61.6% of sports drinks, *id.* ¶ 109, and 45–60% of RTD coffee, *id.* ¶ 113. That is sufficient. *See Visa*, 344 F.3d at 239–40 (holding that MasterCard had market power with about 26% of a highly concentrated market); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 527 (M.D. Tenn. 2023) (holding shares of 25% to 53% sufficient).[7] Pepsi's market power is reinforced by high barriers to entry, IC ¶¶ 40–42, 96; CC ¶ 84; RC ¶ 95, which Defendants do not challenge, *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F.

---

[7] Defendants assert in a footnote that "[e]ven a 30% share is insufficient as a matter of law," MTD at 29 n.5, but neither case they cite so holds, *see Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*, 104 F. Supp. 2d 184, 189-90 (W.D.N.Y. 2000) (declining to dismiss with a 37% market share); *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 n.22 (S.D.N.Y. July 31, 2023) (allegations of 30 to 35% market share "raised for the first time at oral argument" and "not address[ed] fully").

Supp. 3d 65, 98–99 (E.D.N.Y. 2024) (25% share "in a market defined by high barriers to entry" sufficient).

Although not necessary, Plaintiffs also allege that Walmart has market power, both in many retail markets (IC ¶¶ 140–141; RC ¶ 157; CC ¶ 144) and, more importantly, as a buyer negotiating with vendors such as Pepsi. IC ¶ 142; RC ¶¶ 41–42; CC ¶¶ 37–38. Walmart's captive customers let it effectively determine brand choice for a significant share of Pepsi's customers, so Pepsi identifies the loss of Walmart as a material risk factor. IC ¶ 142.[8] That is the market power that matters here. *See Copeland*, 716 F. Supp. 3d at 768 ("Energizer … effectively *delegated* [its] market power to Walmart and gave Walmart the ability to set retail prices and increase wholesale prices for Energizer products.").[9] Finally, Defendants take issue with Plaintiffs' allegation that Walmart has market power because Pepsi "effectively delegates its market power to Walmart," arguing that the market power of two firms cannot be combined. MTD at 28–29. But as the *Copeland* court held in rejecting this argument, "the 'relevant entity' here is not solely Walmart, but rather the combination of Energizer and Walmart." *Copeland*, 716 F. Supp. 3d at 768.

## III. DEFENDANTS NARROWLY CONSTRUE THE ROBINSON-PATMAN ACT INTO NON-EXISTENCE

Defendants misread the Robinson-Patman Act ("RPA") to require a pleading standard where plaintiffs would be forced—***pre-discovery***—to plead with minute detail many thousands of

---

[8] Defendants' argument that Pepsi is also sold in "convenience stores, pharmacies, coffee shops, and vending machines" is therefore irrelevant (and outside the pleadings): Walmart's power arises because its shoppers would not turn to those outlets if Walmart stopped carrying Pepsi products.

[9] Neither *Hayden*, 879 F.2d at 1014-16, which affirmed summary judgment on a record lacking evidence of concerted action, nor *MacDermid*, 833 F.3d at 182–84, which reversed a jury verdict because the plaintiff failed to prove harm to competition, helps Defendants. Here, Pepsi and Walmart allegedly conspired to raise RTD soft-drink prices—and succeeded. *See, e*.g., RC ¶¶ 43–82; IC ¶¶ 174–177.

individual transactions. For a statute intended to protect smaller, less-resourced retailers, that is backwards and unworkable: no plaintiff could plead such minutiae without the records discovery would provide.

Most importantly, Defendants cite no case that holds the RPA to the Rule 9(b) heightened pleading standard; all that is required of Plaintiff Giannasca[10] at this point are the "minimal" standards of Rule 8(a). *See Wolff v. Ford Motor Co.*, 1977 WL 1396, at *2 (S.D.N.Y. Apr. 20, 1977). And the only case cited by Defendants for the proposition that the RPA "requires transaction-specific pleading," MTD at 29, is *Alqosh Enterprises, Inc. v. PepsiCo, Inc.*, 2026 WL 478119, at *5 (C.D. Cal. Feb. 18, 2026), which involved a motion to strike class allegations, ***not*** a motion to dismiss—and, in fact, where the motion to dismiss had been previously denied.

The facts of *Alqosh* highlight why the class allegations were stricken based on the commonality requirement of Rule 23(a)(2) (not on Rule 12(b)(6)). *Id.* at *3. While Plaintiff Giannasca asserts that all similarly situated retailers were disadvantaged ***in comparison to Walmart***, the *Alqosh* putative class representative alleged that each class member had been disadvantaged as compared to ***various*** larger chain grocery stores. As the *Alqosh* court put it, "whether Frito-Lay charged Sunset Market a price 84% higher than the price it charged Albertson for the same bag of Doritos will have no bearing on whether Frito-Lay charged Whiskey Well a price 60% higher than the price it charged a Vons outlet for the same product." *Id.* at *5. Here, each class member has a common denominator: Walmart. Pepsi and Walmart conspired to give ***only Walmart*** favoritism over smaller retailers. But more importantly for purposes of this motion, *Alqosh* states a class certification requirement, not a pleading requirement.

[10] While Defendants are correct that at this point Giannasca is the only named Plaintiff asserting a Robinson-Patman claim, class counsel has been retained by a new Plaintiff that has standing to assert a Robinson-Patman claim.

### A. Contemporaneous Interstate Sales of Commodities

In *Wolff*, cited by Defendants, the court held that "the plaintiff still must do more than cite section numbers and plead some of the statutory language." *Wolff*, 1977 WL 1396, at *3. Plaintiff has done far more. *See* RC ¶¶ 65–80; *see also ABC Distrib., Inc. v. Living Essentials LLC,* 2016 WL 8114208, at *4 (N.D. Cal. Jan. 25, 2016) (denying motion to dismiss as it was sufficiently specific for plaintiffs to allege that "Costco in California received a 'business scan promotion' from defendants in 2011 and 2012 and that no similar rebate was made available to plaintiffs"); *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 2005 WL 8259828, at *5 (C.D. Cal. May 12, 2005) (denying motion to dismiss RPA claim because although "the complaint does not name specific prices and clients, the allegations are sufficient to state a claim and put Defendants on notice of the violations and competitive harm alleged by Plaintiffs").

Defendants fault Plaintiff for comparing Walmart's retail price of a two-liter Pepsi soda with his own wholesale price. This is a smokescreen. The retailer complaint uses retail prices to make nearly inescapable inferences: that if the retail price Walmart charges is at or near the wholesale price Plaintiff pays for the same product, it necessarily follows that Walmart is paying a lower wholesale price. MTD at 30; RC ¶ 80. Walmart's retail pricing indicates only two possibilities: that it gets a wholesale cost advantage not offered to Giannasca, or that it is operating at a loss. The latter possibility strains plausibility. *See generally Matsushita*, 475 U.S. at 588–90 (explaining the implausibility of predatory pricing in most circumstances). The Court should accept the obvious inference that Walmart has a substantial wholesale price advantage. RC ¶¶ 79–80.

This is more than enough to satisfy the contemporaneous sales requirement. That Plaintiff does not list the dates of each and every transaction between Walmart and Pepsi of two-liter Pepsi sodas is inconsequential at this stage of litigation; there has been no discovery.

Crucially, in order to state a Robinson-Patman claim, "at least one of the sales that create the alleged price discrimination at issue must be 'in interstate commerce,' *although it does not matter whether the sale at the higher price or the sale at the lower price moves across a state line.*" *Int'l Tel. & Tel. Corp.*, 104 F.T.C. 280, 380 (1984) (emphasis added); *see also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) ("With almost perfect consistency, the Courts of Appeals have read the language requiring that 'either or any of the purchases involved in such discrimination (be) in commerce' to mean that § 2(a) applies *only where 'at least one of the two transactions* which, when compared, generate a discrimination … cross(es) a state line.'" (emphasis added) (citation omitted)).

Plaintiff alleges that multiple transactions crossed a state line, and these allegations are not "boilerplate assertions," MTD at 31, of a single transaction. *See* RC ¶¶ 19, 21–22, 84. Plaintiff avers that he purchased the soft drinks in question in interstate commerce. RC ¶ 22. Further, the products subject to the discrimination necessarily crossed state lines. Walmart is the largest company in the world and stocks the named products throughout its stores. RC ¶¶ 27, 41. The class consists of retailers nationwide. They, too, are in all 50 states. Pepsi does not have bottling plants in every state. It follows, inescapably, that Pepsi sold (as just one example) 12-packs of 12-ounce cans of Diet Pepsi to both Walmart locations, and to smaller retailers such as Giannasca or even Redner's Market in states where it does not have a bottler, and therefore across state lines.

Under this authority, it does not matter whether Giannasca and the retailer class members, or Walmart, stocked the bottles that crossed state lines. Because both Pepsi-Walmart and Pepsi-class member transactions crossed state lines during the Class Period, this is a non-issue.

Finally, Plaintiff alleges *specific products* (*e.g.*, Mountain Dew 12-pack 12-ounce; Pepsi 6-pack 16.9-ounce) as well as *specific months* in which they were sold. RC ¶¶ 61–64; *cf. Monsieur*

*Touton Selection, Ltd. v. Future Brands, LLC*, 2006 WL 2192790, at *5 (S.D.N.Y. Aug. 1, 2006) (dismissing complaint without prejudice where plaintiff failed to identify "any allegedly favored competitor except in the most conclusory terms" and the complaint made "no allegation relevant to the requirement that there be a discriminatory transaction involving goods of like grade or quality").

## B. Identified Promotional Payment or Service

The promotions given to Walmart and not its smaller competitors are described at length in the complaint:

> eye-catching advertising displays, multimedia advertising, and advantaged in-store placement relative to other brands and items in the store [including] ***dump bins*** (freestanding containers where customers can easily grab loose items), ***inline displays*** (displays integrated directly onto the regular store shelves, highlighting specific products within the aisle), ***endcap displays*** (located at the end of aisles, these are highly visible and often used for showcasing new products or special promotions), ***gondola displays*** (shelving units that allow for displaying a variety of products across multiple levels), ***point-of-purchase displays*** (positioned to capture the attention of customers near a point of purchase), ***casestacker displays*** (designed to stack multiple cases of a product on top of each other, ideal for bulk items), ***shelf talkers*** (small signage attached to shelves to highlight promotions or product details), ***floor displays*** (free-standing displays that sit directly on the floor), and ***pallet displays*** (a large platform built on a pallet, used to showcase large quantities of a single product).

RC ¶ 67 (emphasis added). Plaintiff even includes a photograph of one of these specific promotional displays. It would be unrealistic to expect Plaintiff to allege specific names given to these promotions that could be learned only from Pepsi-Walmart communications. *See ABC Distrib.*, 2016 WL 8114208, at *4 (denying motion to dismiss where plaintiff alleged a "business scan promotion").

## C. Proportional Inequality

Defendants claim that Plaintiff fails to identify any promotional program, and thus "cannot plausibly allege that the program was not offered 'on proportionally equal terms to all other

customers competing with' Walmart to resell PepsiCo products." MTD at 32 (quoting *Coal. for a Level Playing Field, L.L.C. v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 213 (S.D.N.Y. 2010)). But this is false. Plaintiff explicitly cites the facts of Pepsi's multitudinous promotional programs that were supplied to Walmart and not smaller retailers like Giannasca's. RC ¶¶ 61–67. Defendants' case citation here, *D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 797 (E.D.N.Y. 1995), again is inapposite to Plaintiff's complaint; the complaint in that case contained "no allegations as to what, if any, 'services or facilities' were furnished the 'competitor resellers' 'upon terms not accorded to all purchasers on proportionally equal terms,'" *id.* (citations omitted). Here, alongside the allegation that the promotional pricing was not offered proportionally to Giannasca, Plaintiff lists at length the promotions that Walmart received that others did not, with illustration. *See* RC ¶ 67.

**D. Sections 2(d) and 2(e)**

Sections 2(d) and 2(e) "were **designed to prohibit indirect price discrimination in the form of advertising and other promotional allowances** made available to purchasers on disproportionate terms." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 144 (2d Cir. 1998) (emphasis added) (citing *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 350–51 (1968)). "Section 2(d) and Section 2(e) differ in that in the former, the purchaser supplies the services or facilities and the supplier repays the purchaser; in the latter, the seller supplies the services and facilities for use of the customer in facilitating resales." *Id.* (citing *Exquisite Form Brassiere, Inc. v. FTC*, 301 F.2d 499, 500 (D.C. Cir. 1961)).

The disproportion in discounts supplied by Pepsi to Walmart as against retailers that might challenge Walmart's pricing, as alleged in the complaint, RC ¶¶ 65–74, 78, 80–81, 87, 158, 178, 182, constitutes the exact kinds of "indirect price discrimination" that these provisions are designed to protect against. But Defendants misunderstand Plaintiff's allegations of violations of

Sections 2(d) and 2(e). Walmart is not merely a passive purchaser; it used its market power to cajole Pepsi into actively denying to other retailer customers the promotions and terms it gives Walmart. The text of Section 2(d), for example, reads that

> It shall ***be unlawful for any person engaged in commerce to pay or contract for*** the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d) (emphasis added). Effectively bribing Pepsi to exclude other, smaller retailers from promotional programs violates this Section. Section 2(f), which Defendants suggest is the more appropriate provision, concerns those who "knowingly" receive such promotions or discounts; Walmart did more—it actively conspired to exclude others from them.

## IV. PLAINTIFFS' STATE LAW CLAIMS ARE WELL-PLED

### A. Defendants Concede That Plaintiffs' Consumer Protection Claims Rise or Fall with Their Antitrust Claims

Defendants argue that because Plaintiffs' consumer protection claims are based "on the same alleged conduct as their antitrust claims … they all fall together." MTD at 34 (citing *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 498 (S.D.N.Y. 2022), *aff'd sub nom. In re Watson Lab'ys, Inc.*, 101 F.4th 223 (2d Cir. 2024)). The corollary is also true.[11] Because Plaintiffs have adequately pleaded both an anticompetitive agreement and resulting harm to competition, the consumer protection claims survive as well.

### B. Plaintiff Giannasca's Massachusetts Consumer Protection Act Claim Should Not Be Dismissed

[11] Indeed, the decision in *Bystolic* turned on the plaintiffs' failure to plead viable antitrust claims, unlike plaintiffs here. The other cases Defendants cite, MTD at 34, fail on similar grounds.

Defendants offer no valid basis for dismissing Plaintiff Giannasca's Massachusetts Consumer Protection Act ("MCPA") claim. Their argument is limited to the assertion that Giannasca cannot proceed under Chapter 93A, § 9 because he purchased Pepsi products for resale and thus acted as a business rather than a consumer. Giannasca's allegations support a valid claim under Section 11, which governs claims by persons engaged in commerce. The complaint's claim is not pleaded solely under § 9. Rather, it is captioned "Violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws ch. 93A *et seq.*" RC p. 59 ¶ 38.

### C. The Cartwright Act Claim Survives Under the Rule of Reason, But Only Per Se Is Required

First, as shown above, *supra* Section II, Plaintiffs have adequately alleged harm to competition that satisfies their burden under the rule of reason. Thus, the motion to dismiss the Cartwright Act claim should be denied. In addition, California law recognizes that vertical price-fixing agreements may constitute per se violations of the Cartwright Act, notwithstanding federal Sherman Act precedent.

"[U]nder the California Supreme Court decision, *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978), vertical price fixing schemes are per se illegal." *Alan Darush MD APC v. Revision LP*, 2013 WL 12142621, at *1 (C.D. Cal. Aug. 28, 2013); *see also Bodine v. First Co.*, 2019 WL 5684399, at *3 (S.D. Cal. Nov. 1, 2019).

### D. Indirects Are Not Required to Plead "State Specific Facts"

Defendants cite no authority requiring "state-specific facts." MTD at 36. Courts in this Circuit hold that any intrastate-effect requirement is satisfied by allegations that a nationwide conspiracy inflated prices in each relevant state. *See, e.g., In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253 (D. Conn. 2015) (holding that no cited statute "contains so categorical a limitation by its plain text"); *Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*, 712 F.

Supp. 3d 499, 548 (D. Vt. 2024) (holding intrastate activity sufficiently pled where "antitrust impact … was felt within each state" (quotation omitted)). Plaintiffs so allege. *See, e.g.*, IC ¶ 169.

**E. Indirects' Consumer Protection Claims Should Be Sustained**

Defendants contend that Plaintiffs fail to plausibly allege a deceptive, unfair, or unconscionable act, or a causal connection between that act and Plaintiffs' injury. MTD at 37. Defendants are wrong.

State consumer protection statutes reach anticompetitive conduct. The FTC Act prohibits "unfair methods of competition," 15 U.S.C. § 45(a)(1); Sherman Act violations satisfy its unfairness standard, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986); and state statutes are modeled on it, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008). Thus, "proof of anticompetitive conduct [will] establish[ ] a violation of each state's laws." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 575 (S.D.N.Y. 2021) (quotation omitted). These statutes are also liberally construed and typically authorize antitrust claims. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *23 (E.D. Mich. June 6, 2013); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 894 (E.D. Pa. 2012).

Defendants admit that "[a]ll three groups of Plaintiffs expressly base their consumer-protection claims on the same alleged conduct as their antitrust claims." MTD at 34. Where that is so, courts routinely hold that the antitrust allegations support the consumer protection claims. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 267–68 (S.D.N.Y. 2019); *In re Seroquel XR Antitrust Litig.*, 2022 WL 2438934, at *21 (D. Del. July 5, 2022); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 378–79 (E.D.N.Y. 2010); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d

814, 840 (E.D. Pa. 2019); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 3769680, at *11 (E.D. Pa. July 13, 2016).

Defendants' cases are not to the contrary. *Propranolol* addressed only the "deception" prong, not whether a Sherman Act violation is an "unfair method of competition." *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017). *Toyota RAV4* and *Stewart Agency* were not antitrust cases. *See In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1097–98, 1111–12 (N.D. Cal. 2021); *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 210 (Fla. Dist. Ct. App. 2019). *Apprentice* held only that a competitor was not a "consumer." *Apprentice Info. Sys. Inc. v. DataScout LLC*, 544 S.W.3d 536, 539 (Ark. 2018). *Duffy* confirms that North Carolina's statute prohibits "unfair" practices. *Duffy v. Camp*, 882 S.E.2d 675, 696 (N.C. Ct. App. 2022). And *Bystolic* held only that consumer protection claims rise or fall with antitrust claims. 583 F. Supp. 3d at 498.

Furthermore, to the extent that any of Plaintiffs' consumer protection claims require alleging a "deceptive" act in addition to the act being anticompetitive (Defendants point to none), Plaintiffs do so here. *See* IC ¶¶ 156–167 (alleging fraudulent concealment of the Scheme).

Finally, Indirects plead not only a "pass-through" theory of causation, MTD at 37, but also that the conduct directly targeted consumers by inflating retail prices directly. IC ¶ 8. That suffices to plead causation.

## V. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

"Because a statute of limitations is an affirmative defense, [a defendant] bears the burden of proof to show … the claims [are barred]." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 230 (2d Cir. 2014) (citations omitted). Plaintiffs' claims are timely under two doctrines: fraudulent concealment and continuing violation.

### A. Plaintiffs Have Adequately Alleged Fraudulent Concealment

To invoke fraudulent concealment, Plaintiffs must plead: (1) that Defendants concealed from Plaintiffs the existence of their cause of action; (2) that Plaintiffs remained unaware of the cause of action until a date within four years of commencing suit; and (3) that Plaintiffs exercised reasonable diligence in trying to discover the concealed cause of action. *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 603–05 (2d Cir. 2024). Plaintiffs have pled each element with particularity. Indeed, the concealment here is more brazen than the concealment the Second Circuit held sufficient in *Phhhoto*, and the remaining elements present, at most, fact-intensive questions that cannot be resolved on a motion to dismiss.

#### 1. Defendants concealed the existence of Plaintiffs' cause of action

To plead concealment, "the plaintiff can either: (1) identify 'affirmative steps' taken by the defendant to conceal the plaintiff's claim; or (2) show that the defendant's misconduct was inherently 'self-concealing.'" *Phhhoto*, 123 F.4th at 604–05. Plaintiffs here do both.

Plaintiffs plead with particularity the concrete, affirmative steps Defendants took to conceal the Scheme. The complaints identify numerous public statements from both Defendants that directly disavowed the existence of any scheme to monitor and increase competitors' prices. *See Phhhoto*, 123 F.4th at 606. Walmart's code of conduct proclaims that "success comes from offering quality products and services at low prices" through "[e]ffective competition" rather than "anticompetitive practices," and it commits Walmart to "not sharing competitively sensitive information—such as pricing, costs, bid submissions, or strategic plans—with competitors, either directly or through a third party, such as a supplier." RC ¶ 190; IC ¶ 164; CC ¶ 170. Likewise, Walmart's supplier guidelines expressly "prohibit[]" every supplier from "[p]roviding or offering to share with Walmart another third party's non-public, commercially sensitive or proprietary information," including "a competitor's future pricing or product strategies," and from

"[d]iscussing with Walmart your sales plans or strategies that you have with your other customers." RC ¶ 189; IC ¶ 163; CC ¶ 169. Pepsi likewise maintains a public-facing code of conduct pledging to earn customer business "on the basis of our superior products, customer service and competitive prices." RC ¶ 193; IC ¶ 166; CC ¶ 173.

Building on these policies, Defendants—Walmart in particular—cultivated a brand identity around holding prices down. Walmart's CEO publicly vowed that Walmart would "do all we can to try and keep prices from going up," RC ¶ 186; CC ¶ 166; IC ¶ 160, and that Walmart was "proud to try and hold prices down[.]" RC ¶ 187; CC ¶ 167; IC ¶ 161. Walmart boasted that it was "committed to negotiating on behalf of its customers so it can deliver value and everyday low prices." RC ¶ 185; CC ¶ 165. Pepsi, for its part, assured the public and Congress that it "remains committed to providing all customers with fair, competitive, and non-discriminatory pricing," RC ¶ 184; CC ¶ 164, and represented that "PepsiCo does not control retail pricing." RC ¶ 180; CC ¶ 160.

Meanwhile, Defendants secretly did the opposite: while pledging not to discuss "sales plans or strategies," they met regularly to set the prices Pepsi would charge Walmart's competitors, and while Walmart assured customers it was "negotiating on [their] behalf … [to] deliver value and everyday low prices," Defendants were collaborating to raise prices at Walmart's competitors. RC ¶¶ 176–178, 185; CC ¶¶ 157, 165, 169; IC ¶¶ 154, 158, 163.

These misstatements are more brazen than those held sufficient in *Phhhoto*, where Meta's press release listed only neutral criteria for Instagram's feed and thereby "implied that other factors … were not in play." 123 F.4th at 605–06. Here, Defendants affirmatively assured the public that they were not engaging in the very conduct Plaintiffs allege. Indeed, Defendants repeatedly concede that the complaints allege a "secret" conspiracy. MTD at 1, 9.

Defendants dismiss their statements as "[g]eneric commercial explanations" that do not "divert suspicion from a conspiracy." MTD at 45. But Plaintiffs rely on specific, factual representations about how Defendants compete and what information they share—not "puffery." A "factual representation about the criteria on which" a defendant operates is one a plaintiff may reasonably "rely on … to allay [any] concern." *Phhhoto*, 123 F.4th at 606. Defendants' code-of-conduct commitments and pricing assurances are exactly that.

Defendants' own motion proves the point. Defendants invoke the very statements Plaintiffs allege were concealing—Walmart's commitment to "negotiating on behalf of its customers," its pledge to "hold prices down," and its request that suppliers "help us roll back prices"—as showing "hard bargaining over input costs, not an agreement for Walmart to pay more." MTD at 12–13. They add that, "[u]nder Walmart's alleged policies, it cannot and does not know the 'future pricing or product strategies' of its competitors." MTD at 13. But Plaintiffs do not allege these policies *were followed*; they allege Defendants used them to conceal the Scheme. By arguing that these public statements are irreconcilable with the alleged conspiracy, Defendants concede that the statements in fact concealed it.

Finally, Defendants argue that no Plaintiff alleges seeing a particular concealing statement. MTD at 45. But the inquiry-notice standard is "objective," asking whether "a person of ordinary intelligence [would] consider it 'probable'" that wrongdoing occurred, not whether a given plaintiff read a given press release. *Phhhoto*, 123 F.4th at 607. *Phhhoto* itself credited fraudulent concealment allegations based on statements made "to the community at large." *Id.* Defendants' out-of-circuit consumer-fraud decisions cannot displace that standard.

### 2. Plaintiffs remained ignorant of their cause of action until within four years of filing suit

Plaintiffs pinpoint the date of discovery: the December 11, 2025 unsealing of the FTC's complaint. IC ¶ 157; RC p. 52 ¶ 2; CC p. 47 ¶ 2. Plaintiffs' complaints followed within days.[12] That is sufficient. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) (pinpointing the precise date of public notice satisfies the second prong on a motion to dismiss); *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (holding that plaintiffs who filed within days of the first media reports satisfied the doctrine).

No "storm warnings" placed Plaintiffs on inquiry notice before December 2025. "[K]nowledge of an injury … is distinct from knowledge that the injury was part of an anticompetitive or otherwise illegal scheme." *Phhhoto*, 123 F.4th at 608. Consumers had no basis to attribute higher soft-drink prices to an illegal scheme, least of all while Defendants blamed inflation, commodity costs, and market forces. RC ¶¶ 178, 186; CC ¶¶ 157, 166; IC ¶ 165. That Plaintiffs "notic[ed]" price increases in March 2019, MTD at 46 (citing CC ¶ 137; RC ¶ 150), is thus beside the point. *See Phhhoto*, 123 F.4th at 611.

Pepsi's own filings in the FTC action confirm that the facts needed to uncover the Scheme were non-public. Pepsi moved to seal "confidential negotiations between Pepsi and its retail customers," "confidential, customer-specific business strategies and forward-looking plans," and "confidential pricing and go-to-market plans." IC ¶ 167. Those admissions show the facts were unavailable to Plaintiffs. *Cf. Merced*, 165 F. Supp. 3d at 135–36 ("[T]he nature, existence and

---

[12] The *Giannasca* complaint was filed several months earlier, on August 5, 2025, but did not allege a secret agreement between Pepsi and Walmart because Giannasca had no notice of that agreement or ability to discover it until the FTC complaint was unsealed.

extent of unlawful activity could only be discerned and uncovered by access to [the defendant's] emails….").

**3. Plaintiffs' continued ignorance was not the result of a lack of diligence**

A plaintiff acts with reasonable diligence when it reasonably relies on a defendant's neutral public explanations for the challenged conduct. For example, in *Phhhoto*, the plaintiff's reliance on Meta's public, neutral description of its algorithm was reasonable and thus satisfied diligence. 123 F.4th at 611–12. The same logic controls here. Plaintiffs reasonably relied on Defendants' public representations attributing price increases to commodity costs and inflation, and on Defendants' codes of conduct disavowing the sharing of competitively sensitive information, rather than immediately suspecting an antitrust conspiracy. Courts in this District have repeatedly held that where a plaintiff "relies on misrepresentations of above-board behavior" in a defendant's codes of conduct, "allegations about their reliance on those false reassurances can prove sufficient due diligence to withstand a motion to dismiss." *Ohio Carpenters' Pension Fund v. Deutsche Bank AG*, 2024 WL 3938456, at *7 (S.D.N.Y. Aug. 26, 2024) (citations omitted).

Defendants' demand that Plaintiffs detail specific investigative steps, MTD at 47, is inappropriate at the pleading stage of a consumer class action. No Plaintiff could investigate Pepsi's internal pricing strategy, its confidential negotiations with Walmart, or its wholesale pricing. The diligence question in these circumstances is "too fact-intensive to support dismissal." *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *14 (S.D.N.Y. Mar. 14, 2022); *see also Ohio Carpenters'*, 2024 WL 3938456, at *8 (reliance-based diligence allegations, though "not extensive," were "adequate at the pleading stage").

Pepsi's own sealing efforts independently support diligence. Pepsi fought to keep the FTC complaint and its evidence under seal as "particularly sensitive" and "confidential." IC ¶ 167; RC p. 52 ¶ 2. Plaintiffs cannot be faulted for failing to discover what Defendants worked to suppress.

### B. Plaintiffs Allege a Continuing Violation via Defendants' Overt Acts Spanning the Class Period

Independently, Plaintiffs' claims are timely as to every inflated-price purchase within the limitations period because Plaintiffs plausibly allege a continuing violation.

"In the context of a continuing antitrust conspiracy … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Nine W. Shoes*, 80 F. Supp. 2d at 192 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). The Supreme Court has explained that "[a]ntitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., *each sale* to the plaintiff, 'starts the statutory period running again[.]'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (emphasis added) (citation omitted). As the Eighth Circuit observed, "[e]very other circuit to consider this issue applies *Klehr*, holding that each sale in a price-fixing conspiracy is an overt act that restarts the statute of limitations." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065 (8th Cir. 2017) (en banc).

Defendants argue that Plaintiffs' claims are time-barred because the conspiracy began in 2018. MTD at 37–47. But Plaintiffs allege an ongoing conspiracy that caused overcharges on each new purchase. IC ¶¶ 153–155; RC ¶¶ 174–175. Each such purchase is a *new and independent* injury that restarts the limitations period as to its damages. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 193 (E.D.N.Y. 2023) ("[A] price fixing consumer plaintiff may raise a claim within four years of the date she

made a purchase at an inflated price….”), *aff'd sub nom. Giordano v. Saks & Co. LLC*, 2025 WL 799270 (2d Cir. Mar. 13, 2025).[13]

Defendants do not acknowledge, let alone attempt to distinguish, these decades of binding law. Instead, they rely on an irrelevant holding in *US Airways*: that where a plaintiff claims antitrust harm based on a contract *it signed* with a defendant, the mere execution of contractual terms does not constitute an "overt act" but is rather "merely a 'manifestation' or 'reaffirmation'" of a contract that was entered into before the limitations period. MTD at 41 (quoting *US Airways*, 938 F.3d at 68).

But Defendants' yearslong, evolving scheme is not the execution of a contract, and *US Airways* applies only to a plaintiff's own preexisting contract with the defendant—"agreements binding the parties." 938 F.3d at 68. Indeed, the *US Airways* panel recognized a continuing price-fixing conspiracy as the paradigmatic continuing violation. *Id.* at 67 (quoting *Klehr*, 521 U.S. at 189).

Holding otherwise would be absurd. Purchasers would have to sue before buying anything, contrary to the rule that damages not be "speculative" or "unprovable," *Zenith*, 401 U.S. at 339, and conspirators who survived four years without being sued could then continue to conspire with impunity indefinitely, *see id.* at 340.

Even if charging supracompetitive prices alone were not overt acts, "the clock can restart … if the conspiracy continues through additional overt acts" such as those alleged here. *SL-x IP S.à.r.l. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2023 WL 2620041, at *2 (2d Cir. Mar. 24,

[13] Defendants argue that *Giordano* rejected this rule, but *Giordano* involved "no-hire agreements," not price-fixing agreements such as that alleged here. *Giordano*, 654 F. Supp. 3d at 189–90. Indeed, the *Giordano* court expressly declined to extend its reasoning to price-fixing cases, which it called "fundamentally conceptually different." *Id.* at 193.

2023) (summary order). Plaintiffs allege that during the limitations period Defendants met frequently "to discuss and renew the scheme" and "adjust[] it to match new Walmart prices," organized "new wholesale price increases," and "repeatedly enforced their agreement against retailers who attempted to undercut Walmart." IC ¶¶ 153–155; RC ¶ 174. Each is "a new and independent act" that "inflict[s] new and accumulating injury on the plaintiff." *US Airways*, 938 F.3d at 68 (quotation omitted). Indeed, "the typical antitrust continuing violation occurs … when conspirators continue to meet to fine-tune their cartel agreement." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014) (quotation omitted).

Defendants call these acts "a mere implementation or reaffirmation of the alleged January 2018 Scheme." MTD at 42. But actively maintaining a price-fixing conspiracy is a series of new overt acts, not continued performance of a contract. *See Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *9 (D. Conn. Oct. 31, 2025) (distinguishing "an alleged price-fixing conspiracy between competitors stretching over several years" from "prices stemming from an illegal clause in a single contract with a single customer"); *Samsung*, 747 F.3d at 1204.

Defendants' cases are not to the contrary. *See* MTD at 41–43 (citing *SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co., L.P.*, 2026 WL 2137807 (S.D.N.Y. July 24, 2026); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003); *SL-x*, 2023 WL 2620041; *Chanel, Inc. v. RealReal, Inc.*, 2026 WL 843256 (S.D.N.Y. Mar. 26, 2026); *Giordano*, 654 F. Supp. 3d 174). None involved an ongoing price-fixing conspiracy. In each, the plaintiff's injury was fixed by the original agreement, either because the plaintiff was a party to it (*US Airways*, *SS&C*) or because it was not a purchaser paying overcharges (*Giordano*, *RealReal*,

*SL-x*).[14] *See Berkey*, 603 F.2d at 295 ("[A] purchaser … is not harmed until the monopolist actually exercises its illicit power to extract an excessive price.").

Unlike in *US Airways*, the conspiracy Plaintiffs allege was not a contract that specified the prices that would be paid by Plaintiffs in the future. Pepsi and Walmart did not fix a price in January 2018 and walk away. They agreed on an outcome—Walmart would hold retail price leadership without sacrificing margin—and a means: when a rival undercut Walmart, Pepsi would raise that rival's costs. RC ¶¶ 6, 55–58, 64, 178; CC ¶¶ 6, 51–54, 60, 157; IC ¶¶ 5, 53, 55–56, 69. Each time a retailer like Food Lion threatened Walmart's price, RC ¶¶ 55–57; CC ¶¶ 51–53; IC ¶¶ 55–56, Defendants had to identify the threat, decide how to respond, and impose new wholesale terms. Each response "fine-tune[d]" the conspiracy; none was the inertial consequence of a 2018 contract.

Finally, Defendants argue that any claim "would be limited to injury caused by a properly pleaded act within the statutory period." MTD at 42–43. But the Second Circuit has held that a purchaser suing for overcharges paid within four years "may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Berkey*, 603 F.2d at 296; *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *15 (E.D.N.Y. Sept. 22, 2010) ("There is no requirement that the plaintiffs identify specific conduct on the part of the defendants during the limitations period.").[15]

---

[14] Furthermore, *RealReal* held that "[a]n ongoing agreement *in the absence of any overt acts* cannot trigger a new beginning of the statute of limitations period." *RealReal*, 2026 WL 843256, at *5 (emphasis added). That holding, by its own terms, does not reach a continuing price-fixing conspiracy.

[15] Because Plaintiffs have plausibly alleged a continuing violation under federal law, and Defendants concede that "the state law doctrines track their federal analogue," MTD at 42, Plaintiffs have adequately pled a continuing violation under state law as well. Defendants claim that Michigan has "abolished" the continuing-violation doctrine, but *Garg v. Macomb County Community Mental Health Services*, 696 N.W.2d 646, 650 (Mich. 2005), was an employment

## CONCLUSION

Defendants' motion to dismiss should be denied.[16]

discrimination case, and does not apply to Michigan's antitrust law. And *Garg* simply held, consistently with *Klehr,* that a plaintiff's damages were limited to claims that accrued during the limitations period, and could not reach back further. *Twp. of Fraser v. Haney*, 509 Mich. 18, 29 (2022) (noting *Garg* "allowed the claim that accrued within the limitations period to go forward"); *Sunrise Resort Ass'n v. Cheboygan Cnty. Rd. Comm'n*, 511 Mich. 325, 339 (2023) (similar).

[16] Should the Court grant any part of Defendants' motion, dismissal should be without prejudice so that Plaintiffs may correct or supplement any factual deficiencies.

Dated: October 19, 2026

*/s/ Daniel H. Silverman*
Daniel H. Silverman
**COHEN MILSTEIN SELLERS & TOLL LLP**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Daniel Gifford
Emily Marcus
**COHEN MILSTEIN SELLERS & TOLL LLP**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
dgifford@cohenmilstein.com
emarcus@cohenmilstein.com

*Interim Lead Class Counsel for Proposed Indirect Purchaser Class*

Blake Hunter Yagman
**YAGMAN PLLC**
The Chrysler Building
405 Lexington Avenue, Floor 26
New York, NY 10174
Tel: (929) 709-1493
blake.yagman@yagmanpllc.com

Alexander W. Cogbill
**ZELLE LLP**
45 Broadway, Suite 920
New York, NY 10006
Tel: (646) 876-4420
acogbill@zellelaw.com

Christopher T. Micheletti (*pro hac vice*)
Qianwei Fu (*pro hac vice*)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

Respectfully submitted,

*/s/ Thomas H. Burt*
Thomas H. Burt
Lillian R. Grinnell
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue New York, NY 10016
Tel: (212) 545-4600
burt@whafh.com
grinnell@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
malmstrom@whafh.com

*/s/ Matthew S. Weiler*
David D. Burnett
**SCHNEIDER WALLACE COTTRELL KIM LLP**
1050 30th Street NW
Washington, D.C. 20007
Tel: (415) 421-7100
dburnett@schneiderwallace.com

Todd M. Schneider
Matthew S. Weiler
Erica Fruiterman
Braden R. Leach
**SCHNEIDER WALLACE COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com
efruiterman@schneiderwallace.com
bleach@schneiderwallace.com

*Interim Co-Lead Class Counsel for Proposed Direct Purchaser and Consumer Classes*

Daryl Andrews
Glen DeValerio
**ANDREWS DEVALERIO LLP**
P.O. Box 67101
Chestnut Hill, MA 02467
Tel: (617) 999-6473
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

Robert J. Gralewski, Jr. (*pro hac vice*)
**KIRBY MCINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Tel: (858) 834-2044
Fax: (858) 255-7772
bgralewski@kmllp.com

James Isacks
**KIRBY MCINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel: (212) 371-6600
Fax: (212) 371-6600
jisacks@kmllp.com

*Counsel for Indirect Purchaser Plaintiffs and the Proposed Class*

*/s/ Julian C. Diamond*
Joseph I. Marchese
Julian C. Diamond
Spencer N. Migotsky
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
jmarchese@bursor.com
jdiamond@bursor.com
smigotsky@bursor.com

*Liaison Counsel for Direct Purchaser and Consumer Plaintiffs and the Proposed Classes*

**WORD COUNT CERTIFICATION**

In accordance with Local Civil Rule 7.1(c), I certify that the foregoing Memorandum of Law is 15,750 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: October 19, 2026

*/s/ Daniel H. Silverman*
Daniel H. Silverman