**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: BRANDED BEVERAGE ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>(1) Indirect Purchaser Plaintiffs<br>(2) Consumer Direct Purchasers<br>(3) Direct Retailer Plaintiffs | Case No. 7:25-cv-06440-CS |

**DEFENDANTS PEPSICO, INC., PEPSICO BEVERAGE SALES, LLC, AND WALMART INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINTS**

# TABLE OF CONTENTS

Page

INTRODUCTION ....... 1

ARGUMENT ....... 2

I. PLAINTIFFS' ANTITRUST CLAIMS FAIL ....... 2

A. Plaintiffs Do Not Plausibly Allege An Unlawful Agreement ....... 2

1. Plaintiffs' Theory Makes No Economic Sense ....... 3

2. Plaintiffs Allege No Direct Or Indirect Evidence Of Agreement ....... 4

B. Plaintiffs Do Not Plausibly Allege Substantial Harm To Competition In A Relevant Market ....... 7

1. The Rule Of Reason Requires A Properly Pleaded Relevant Market ....... 7

2. Plaintiffs' Alleged Relevant Product Market Fails As A Matter Of Law ....... 8

3. The Alleged Conduct Did Not Substantially Harm Competition ....... 11

II. PLAINTIFF GIANNASCA'S ROBINSON-PATMAN ACT CLAIMS FAIL ....... 14

III. PLAINTIFFS' OTHER STATE-LAW CLAIMS FAIL TOO ....... 16

A. Plaintiff Giannasca's Massachusetts Chapter 93A Claim Should Be Dismissed ....... 16

B. The Cartwright Act Claim Should Be Dismissed ....... 16

C. Plaintiffs Fail To Allege State-Specific Facts ....... 16

D. Indirects' Consumer-Protection Claims Should Be Dismissed ....... 17

IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED ....... 17

A. Plaintiffs' Opposition Fails To Salvage Fraudulent Concealment ....... 17

B. Plaintiffs Plead No Continuing Violation ....... 20

CONCLUSION........................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ABC Distributing, Inc. v. Living Essentials LLC*,
2016 WL 8114208 (N.D. Cal. Jan. 25, 2016) ....................15

*Alan Darush MD APC v. Revision LP*,
2013 WL 12142621 (C.D. Cal. Aug. 28, 2013) ....................16

*Allen v. Dairy Farmers of Am.*,
748 F. Supp. 2d 323 (D. Vt. 2010) ....................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................2, 6, 7, 16

*Bodine v. First Co.*,
2019 WL 5684399 (S.D. Cal. Nov. 1, 2019) ....................16

*Chanel, Inc. v. RealReal, Inc.*,
2026 WL 843256 (S.D.N.Y. Mar. 26, 2026) ....................20

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ....................8, 9

*Choh v. Brown Univ.*,
2026 WL 1210124 (2d Cir. May 1, 2026) ....................8

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*,
92 F.4th 381 (2d Cir. 2024) ....................2, 4, 5

*Coal. For A Level Playing Field, LLC v. AutoZone, Inc.*,
813 F. Supp. 2d 557 (S.D.N.Y. 2011) ....................14

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) ....................20

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) ....................15

*Copeland v. Energizer Holdings, Inc.*,
716 F. Supp. 3d 749 (N.D. Cal. 2024) ....................5, 8

*Dorrell v. Constellation Energy Corp.*,
2026 WL 2249275 (D. Md. Aug. 5, 2026) ....................18, 21

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006)....................14

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
55 Cal. App. 5th 381 (2020) ....................16

*Grand Union v. FTC*,
300 F.2d 92 (2d Cir. 1962)....................15

*Green Country Food Market, Inc. v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) ....................10, 11

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009)....................19

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015)....................17

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ....................17, 18

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................19

*In re Magnesium Oxide Antitrust Litig.*,
2011 WL 5008090 (D.N.J. Oct. 20, 2011)....................19

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) (en banc) ....................20

*In re Publ'n Paper Antitrust Litig.*,
2005 WL 2175139 (D. Conn. Sept. 7, 2005) ....................17

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021) ....................17

*In re Watson Labs., Inc.*,
101 F.4th 223 (2d Cir. 2024) ....................2, 6

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995)....................12

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)....................20, 21

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)....12

*Litovich v. Bank of Am. Corp.*,
2025 WL 2521039 (S.D.N.Y. Sept. 2, 2025)....18, 19

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
275 F.3d 762 (9th Cir. 2001)....10

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)....7, 13

*Mailand v. Burckle*,
20 Cal. 3d 367 (1978)....16

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)....5, 6

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
2026 WL 1397077 (2d Cir. May 19, 2026)....8

*Ohio Carpenters' Pension Fund v. Deutsche Bank AG*,
2024 WL 3938456 (S.D.N.Y. Aug. 26, 2024)....19

*Phhhoto Inc. v. Meta Platforms, Inc.*,
123 F.4th 592 (2d Cir. 2024)....18, 19

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
828 F.2d 211 (4th Cir. 1987)....18

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014)....10, 11

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024)....9

*Ringgold v. EssilorLuxottica S.A.*,
2026 WL 3269266 (2d Cir. Oct. 30, 2026)....9

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014)....20

*SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co.*,
2026 WL 2137807 (S.D.N.Y. July 24, 2026)....20

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................................................................................9

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)..............................................................................20, 21

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) ..............................................................................19

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*,
536 F.3d 663 (7th Cir. 2008) ................................................................................17

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998)..................................................................................16

**STATUTES**

15 U.S.C.
§ 13(d)...................................................................................................................15
§ 13(f)...................................................................................................................15

Mass. Gen. Laws ch. 93A, § 11 (2026) ...................................................................16

## INTRODUCTION

Plaintiffs' Opposition confirms how their claims fail at every step. *First*, Plaintiffs do not plausibly allege that Walmart agreed to accept higher wholesale prices from PepsiCo, an essential term of the asserted Scheme. Plaintiffs allege only PepsiCo's *internal* descriptions of its *own* goals in managing its largest customer relationship, and nothing from Walmart evincing agreement.

Plaintiffs' Opposition rests on the fallacy that Defendants are asking the Court to choose between two *plausible* explanations on a motion to dismiss. But Plaintiffs' theory is not plausible at all. If Walmart had the leverage Plaintiffs claim, Walmart would have had no reason to agree to higher wholesale prices from PepsiCo. In fact, Plaintiffs' own allegations show the opposite: Walmart continued to negotiate for—and received—lower wholesale prices. Plaintiffs thus allege ordinary buyer-seller negotiations driven by independent business concerns, not conspiracy.

*Second*, Plaintiffs fail to plead a valid relevant market. Plaintiffs' proposed ready-to-drink market definition fails because it is a collection of products Plaintiffs themselves allege have materially different characteristics, prices, and competitive conditions. And Plaintiffs' "Hail Mary" cluster-market theory fails because the alleged cluster is not itself an object of consumer demand.

*Third*, Plaintiffs fail to plausibly allege substantial harm to competition. Plaintiffs ignore even the basic requirements: intrabrand harm alone does not establish substantial harm to competition (because it is not market-wide), and market power is both market-specific and firm-specific (such that Plaintiffs cannot combine PepsiCo's and Walmart's).

*Fourth*, every claim is facially time barred. Plaintiffs cannot invoke fraudulent concealment of conduct they allege was observable, and they identify no new overt act for a continuing violation.

Plaintiffs' other claims fail too. Giannasca's Robinson-Patman claims still identify no contemporaneous interstate sales or specific promotional program (and do not apply to Walmart), and Indirects agree their consumer-protection claims fall with Plaintiffs' antitrust claims. The Complaints should be dismissed with prejudice.

## ARGUMENT

### I. PLAINTIFFS' ANTITRUST CLAIMS FAIL

#### A. Plaintiffs Do Not Plausibly Allege An Unlawful Agreement

The Opposition confirms that Plaintiffs plead no unlawful agreement between PepsiCo and Walmart for two independent reasons: their account of why Walmart would join the alleged Scheme makes no sense, and they lack direct or indirect evidence of an unlawful agreement. Mot. 8-18. In short, Plaintiffs allege efforts by PepsiCo to manage its largest customer, but not what Walmart agreed to do in return.

Plaintiffs' refrain that the Court may not weigh two different *plausible* explanations on a motion to dismiss or apply a summary-judgment "tends to exclude" standard, *see* Opp. 10-11, is a red herring. Defendants do not ask the Court to "choose between plausible inferences"; Plaintiffs' allegations are "not plausible, period." *In re Watson Labs., Inc.*, 101 F.4th 223, 240 n.9 (2d Cir. 2024). When the "complaint itself gives reasons to believe" defendants acted independently, such as when an "obvious alternative explanation" is evident, the complaint does not cross the plausibility line. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007); *see also Watson Labs.*, 101 F.4th at 242 (affirming dismissal of antitrust claim where there were "legitimate commercial interests" and an "'obvious alternative explanation'"); *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 414-15 (2d Cir. 2024) (similar). That's this case.

### 1. Plaintiffs' Theory Makes No Economic Sense

Plaintiffs continue to press the theory that "Pepsi agreed to monitor Walmart's competitors and punish those that attempted to undercut Walmart's retail prices. In exchange, Walmart agreed to accept inflated wholesale prices from Pepsi rather than demand price reductions." Opp. 11. But Plaintiffs still cannot plausibly explain why Walmart would agree to pay higher wholesale prices. *See* Mot. 17-18. And they identify no document, communication, or well-pleaded fact suggesting that Walmart agreed to accept higher prices.

Plaintiffs hypothesize that "absent the agreement, Walmart would have used its leverage to negotiate lower wholesale prices." Opp. 19. Yet their own allegations show that Walmart *did* consistently negotiate for lower prices. For instance, Plaintiffs allege that Walmart "expresse[d] … its dissatisfaction" regarding prices, IC ¶ 50; that Walmart "forced Rollbacks" that "amounted … to a wholesale price cut to subsidize lower retail prices," IC ¶ 61; and that PepsiCo provided a Rollback in a particular region, IC ¶ 63. They allege that Walmart had "extremely advantaged costs" and that PepsiCo imposed a cost increase on other retailers, but not Walmart. CC ¶¶ 50, 54; RC ¶¶ 54, 58; IC ¶ 69. And they allege that Walmart "extracted" lower prices and negotiated for the "lowest wholesale effective cost." RC ¶ 82; RC p. 56 ¶ 22. All of that contradicts Plaintiffs' bare assertion that Walmart agreed to *higher* wholesale prices.

Plaintiffs' allegations also show that PepsiCo did not believe Walmart had agreed to higher wholesale prices, but instead feared Walmart's pressure to lower wholesale prices. Plaintiffs allege PepsiCo had a "decision tree" that included an option to "cut[] Walmart's wholesale and retail prices" through Rollbacks, IC ¶ 54; that PepsiCo agreed to price cuts "begrudgingly," IC ¶ 62; and that PepsiCo "feared" Walmart's reaction to other retailers' lower prices. CC ¶ 47; RC ¶ 51; *see also* Opp. 14 (arguing PepsiCo "expressed ongoing fear").

Plaintiffs' only explanation for why Walmart would forgo lower prices is that doing so let it "sell at inflated prices while preserving its position as the 'lowest-cost retailer.'" Opp. 19. But that just restates the claimed conspiracy and identifies no benefit to Walmart. If Walmart had the leverage that Plaintiffs assert, *see* Mot. 17, it could have negotiated lower wholesale prices from PepsiCo and passed them on to consumers as lower retail prices—keeping the same profit margin and the same lowest-cost status—all without any agreement. Walmart would gain nothing from a conspiracy.

A related problem is that Plaintiffs' theory is unfalsifiable; they want to have it both ways. When Walmart obtained lower wholesale prices, that supposedly proves "enforcement" of the conspiracy, Opp. 7; when Walmart did not, that supposedly proves acquiescence to the conspiracy, IC ¶ 65. That heads-I-win, tails-you-lose theory makes every possible outcome evidence of agreement. It therefore identifies no fact from which Walmart's assent can actually be inferred: whatever Defendants do, Plaintiffs cry conspiracy.

At bottom, Plaintiffs' theory requires believing that Walmart took on legal risk and acted contrary to its core business strategy for no reason, publicly promising low prices while secretly conspiring to inflate them. But this Court need not check its common sense at the door. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (noting importance of "judicial experience and common sense"). Because the claimed conspiracy makes no economic sense, and is contradicted by Plaintiffs' own allegations, there is no plausible basis to infer an unlawful agreement here.

### 2. Plaintiffs Allege No Direct Or Indirect Evidence Of Agreement

Plaintiffs misconstrue what counts as direct evidence. Direct evidence requires no inferences. *BNP Paribas*, 92 F.4th at 391. Yet Plaintiffs' case boils down to a host of unwarranted inferences from alleged snippets of PepsiCo documents. Opp. 11-14. Plaintiffs claim that

"nothing turns" on the direct/indirect distinction, *id.* at 15, but that is wrong. Indirect evidence is subject to competing inferences (or obvious alternative explanations) and thus less likely to plausibly allege a conspiracy. *See, e.g.*, *BNP Paribas*, 92 F.4th at 391, 405 (contrasting direct and indirect evidence); *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (similar).

On the substance, Plaintiffs have narrowed their focus. They do not contend that any of (1) the close connections between PepsiCo and Walmart, (2) a since-dismissed FTC investigation, or (3) the percentage of products sold suggest an unlawful agreement. Mot. 15-17. They also concede that PepsiCo's market-wide price increases were not imposed "*pursuant* to the Scheme." Opp. 16 n.2. Nor do they directly argue that disposable-batteries allegations in another case make any conspiracy *here* more plausible—an argument that Second Circuit law forecloses. Mot. 16.

Yet Plaintiffs make the district court's initial decision in that batteries case their chief authority. *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749 (N.D. Cal. 2024). But *Copeland* is unpersuasive. *First*, *Copeland* never confronted why Walmart would agree to pay more—an independent ground to find Plaintiffs' theory implausible. *Supra* 3-4. *Second*, *Copeland* wrongly confined "obvious alternative explanation[s]" to horizontal conspiracies, suggesting it is "easier" to allege a vertical conspiracy. 716 F. Supp. 3d at 763. The opposite is true. Manufacturers and distributors "constantly must coordinate their activities" in a way that horizontal competitors do not; legitimate coordination is the norm in vertical relationships, so alleging an *unlawful* vertical conspiracy should be harder, not easier. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984); *see* Mot. 10-15.[1]

---

[1] In *Copeland*, the defendants "d[id] not take direct issue with plaintiffs' proposed market definition." 716 F. Supp. 3d at 766. Defendants do here. *Infra* 7-11.

Plaintiffs are, therefore, left with fragments of a few PepsiCo documents, lifted entirely from the FTC's complaint against PepsiCo, from which they try to infer a price-fixing agreement. Opp. 11-14; *see* Complaint, *FTC v. PepsiCo, Inc.*, No. 1:25-cv-00664-JMF (S.D.N.Y. Dec. 11, 2025), ECF No. 68. Yet the FTC alleged no conspiracy of any kind, did not sue Walmart, and has since voluntarily dismissed its case. Mot. 15-16. The documents reflect PepsiCo's internal, independent business strategy, not any agreement with Walmart. At most, they are "merely consistent with" agreement, which still falls short. *Twombly*, 550 U.S. at 557. There are also obvious "legitimate commercial interests" that undercut any inference of a price-fixing conspiracy. *Watson Labs.*, 101 F.4th at 242; *see* Mot. 11-15.

Start with PepsiCo's alleged "foundational commitment" to provide Walmart with a "price gap." Opp. 2, 11, 15. Plaintiffs allege that this is "'an aligned commercial strategy' *across Pepsi*," focused on "*our* deliverables," and "how *we* win with Walmart." CC ¶ 43; RC ¶¶ 46-47; IC ¶ 46 (emphases added). These words describe PepsiCo's *own* "commercial strategy," based on its *own* internal assessment, not a "commitment to a *common scheme*." *Monsanto*, 465 U.S. at 768 (emphasis added). Plaintiffs also allege that PepsiCo made "previous commitments on price increase timing" to other retailers, IC ¶ 63, confirming that PepsiCo's "commitments" were ordinary customer-facing business goals—not a euphemism for a secret pact.

PepsiCo's alleged desire to "demonstrate progress" regarding Food Lion fares no better. Opp. 2, 7, 12, 14, 15. Plaintiffs do not allege that Walmart complained about Food Lion's pricing; they allege only that PepsiCo "became aware" of it and then acted. IC ¶ 55; *see* Mot. 14. And PepsiCo's alleged actions (adjusting Food Lion wholesale prices in light of the rest of the market) do not permit an inference of conspiracy—even *terminating* Food Lion in response to a Walmart complaint would not suffice. Mot. 14 (collecting cases).

None of Plaintiffs' other allegations move the needle. Their allegation of "regular meetings … to reinforce and renew their agreement," CC ¶ 45; RC ¶ 49; IC ¶ 49, is a "label[]" and "conclusory allegation" that adds nothing, *Twombly*, 550 U.S. at 555, 557. And before the one specific meeting they alleged—about another retailer's "very aggressive pricing"—a PepsiCo executive "lamented" that a Walmart price cut was unavoidable, IC ¶¶ 50, 62, and PepsiCo weighed its options based on "competitive dynamics" and its "previous commitments," IC ¶¶ 54, 63. Such meetings are therefore "just as much in line with a wide swath of rational and competitive business strategy." *Twombly*, 550 U.S. at 554. Plaintiffs' "decision tree" and "Rollback" allegations, Opp. 6-8, 12-13, likewise contradict the assertion that Walmart agreed to higher prices. *Supra* 3-4. Finally, Plaintiffs' "actions against unilateral self-interest" arguments (at 13-14) are wrong as to PepsiCo and unsupported as to Walmart. PepsiCo's actions are perfectly rational for a supplier facing complaints from its largest customer: it could negotiate higher wholesale prices with smaller retailers, negotiate lower wholesale prices with Walmart, or lose its largest customer. Mot. 14-15. And while accepting higher wholesale prices would indeed be against Walmart's self-interest, no well-pleaded fact suggests that Walmart did so. *Supra* 3-4.

At bottom, PepsiCo's documents reflect ongoing *uncertainty* about how Walmart would react—the *opposite* of an agreement.

### B. Plaintiffs Do Not Plausibly Allege Substantial Harm To Competition In A Relevant Market

#### 1. The Rule Of Reason Requires A Properly Pleaded Relevant Market

All agree that the rule of reason applies here. Mot. 19; Opp. 19. Plaintiffs acknowledge that under the rule of reason, they "must initially show that the challenged action adversely affected competition in the relevant market." Opp. 19. And they recognize that "direct evidence of harm to competition" must be shown "in the market as a whole." *Id.* (quoting *MacDermid Printing Sols.*

*LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016)). Even so, Plaintiffs insist that "[m]arket definition is *only* needed to estimate market shares to infer market power indirectly." Opp. 24 (emphasis added).

That is wrong. A plausible antitrust market is *always* required under the rule of reason. *E.g.*, *Choh v. Brown Univ.*, 2026 WL 1210124, at *2 (2d Cir. May 1, 2026) ("We reject plaintiffs' contention that their allegations of direct anticompetitive harm excuse them from pleading a relevant market."). If Plaintiffs do not plausibly allege a relevant market, that is the end of the inquiry. *See, e.g.*, *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237-39 (2d Cir. 2008) (affirming dismissal on relevant-market grounds without discussing harm to competition); *Choh*, 2026 WL 1210124, at *2-3 (same). Plaintiffs' own authorities say the same. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2026 WL 1397077, at *2 (2d Cir. May 19, 2026) (requiring "direct evidence of actual, sustained anticompetitive effects on competition in the relevant market as a whole"); *Copeland*, 716 F. Supp. 3d at 765 (plaintiffs "must define the relevant market" for "direct or indirect proof").

### 2. Plaintiffs' Alleged Relevant Product Market Fails As A Matter Of Law

Plaintiffs do not plausibly allege a relevant market. Mot. 19-24. Plaintiffs acknowledge that PepsiCo's supply-side relationships are irrelevant to "the definition of the market." Opp. 28; *see* Mot. 23-24. And Plaintiffs themselves invoke interchangeability—whether products are economic substitutes—to exclude bottled water from their proposed market. Opp. 25 ("bottled water is sufficiently differentiated from RTD soft drinks"); *see* Mot. 20. They rest on the conclusory allegation that "there are no reasonable substitutes" for ready-to-drink soft drinks, relying primarily on the "functional and flavor-based attributes" that differentiate soft drinks from bottled water. Opp. 25, 27. But their own allegations undermine that market. Mot. 21-22. If price

and functional differences require excluding bottled water from a market containing both energy drinks and juice, those same differences mean that energy drinks and juice do not belong in the same market either. *Id.* Plaintiffs note the point (at 25), but never answer it. And their own authority confirms that "functional substitutes" do not belong in the same market if they are not "economic substitutes." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340-41 (2d Cir. 2024).

Plaintiffs' market is facially implausible because the products are not interchangeable: Plaintiffs do not argue that a price increase for Diet Pepsi would drive consumers to buy orange juice instead. Mot. 20-21. While Plaintiffs claim that "the Second Circuit has rejected Defendants' argument … that all products in the relevant market must be interchangeable," Opp. 26, Second Circuit law clearly requires reasonable interchangeability. *E.g.*, *Chapman*, 546 F.3d at 237-38. Indeed, the Second Circuit just affirmed dismissal of a complaint whose alleged product market consisted of "prescription lenses, prescription sunglasses, non-prescription sunglasses, and frames" because the market was "overly inclusive" and because those products were not "reasonably interchangeable." *Ringgold v. EssilorLuxottica S.A.*, 2026 WL 3269266, at *2 (2d Cir. Oct. 30, 2026). Plaintiffs' authority, *Todd v. Exxon Corp.*, rested on the fact that the claims concerned "a buyer-side conspiracy," rather than (as here) an alleged seller-side conspiracy. 275 F.3d 191, 201-02 (2d Cir. 2001). That affects how interchangeability works, not its importance: "[t]he proper focus" remains "interchangeability." *Id.* at 202.

Plaintiffs retreat to a "cluster market." Opp. 26-27. Indeed, that is their *only* response to cases rejecting overbroad markets. *Id.* at 27 & n.6; *see* Mot. 22. Plaintiffs present two different theories of clustering. *First*, they note that "products that face 'reasonably similar' competitive conditions and are sold together may be aggregated into a 'cluster market.'" Opp. 26 (citation

omitted). This "similar-conditions" theory reasons that "there is no need to perform separate antitrust analyses for separate product markets when competitive conditions are similar for each." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014). But the products in Plaintiffs' alleged market do not face "reasonably similar" competitive conditions; Plaintiffs allege differences in market concentration, market share, competitors, and commercial relationships. Mot. 23-24; *see also ProMedica*, 749 F.3d at 566 (different market shares and competitors rendered clustering inapplicable). So this theory fails.

*Second*, Plaintiffs contend that a "cluster of products can comprise a relevant product market 'if the cluster is itself an object of consumer demand.'" Opp. 26 (citation omitted). For this "package-deal" theory, *ProMedica*, 749 F.3d at 567, the "product package" must be "'significantly different from, and appeal[] to buyers on a different basis from, the individual products considered separately.'" *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) (citation omitted). Not so here. The Tenth Circuit rejected an almost identical package-deal theory, where plaintiffs claimed that "a full line of beverage products," including "Pepsi branded products," "Dr. Pepper branded products," and other "juices, teas, sport drinks, and water products," constituted a cluster market. *Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284-85 (10th Cir. 2004).

Plaintiffs also allege that "[c]onsumers expect and value the convenience of accessing and purchasing all categories of RTD soft drinks in the same retail stores." CC ¶¶ 116, 131; RC ¶¶ 128, 143; IC ¶ 131. But one-stop shopping does not explain how consumers respond to changes in price (the relevant question). That is not enough; a cluster requires that customers "enter the store with the intent to purchase both Pepsi and Dr. Pepper together," such that "the absence of one of those products would cause the customer to go to another store." *Green Country*, 371 F.3d at

1284. Plaintiffs' allegation that consumers value having these categories in one place does not make the cluster "itself an object of consumer demand." *Id.* And the theory has no stopping point: Plaintiffs themselves describe Walmart as a "one-stop-shop location *for household goods*," Opp. 5 (emphasis added), but even they do not claim that "household goods" is a cluster market.

Next, Plaintiffs allege that "[r]etailers typically need to stock all or almost all of the various subcategories of RTD soft drinks" because of consumer demand. CC ¶¶ 116, 131; RC ¶¶ 128, 143; IC ¶ 131. But that does not mean retailers need to buy the package together, which is the relevant question. *See Green Country*, 371 F.3d at 1284; *ProMedica*, 749 F.3d at 567-68. Grocery stores must also stock eggs, potato chips, and apples, but those products are not in the same relevant market; no one would substitute eggs for potato chips if the price of potato chips went up. That retailers compete on their overall assortment does not place every product they carry in the same relevant market. *See id.*

Plaintiffs finally allege that PepsiCo offers discounts based on shelf-space allocations. CC ¶¶ 118, 131; RC ¶¶ 130, 143; IC ¶ 132. Yet their own "screenshot" shows that PepsiCo offers *different* reimbursements for *different* percentages of *different* products—reinforcing that these products do not belong in the same cluster market. CC ¶ 133; RC ¶ 145. The screenshot also undermines Plaintiffs' market boundaries, since it includes "mixers," "Propel," and "protein" drinks—products that Plaintiffs do not include in their alleged market. *Id.*

### 3. The Alleged Conduct Did Not Substantially Harm Competition

***No Direct Evidence.*** Plaintiffs claim the restraint "impaired" "*intrabrand* competition … at the retail level" and "*interbrand* competition … at the wholesale level." Opp. 20. The former is irrelevant; the latter is speculative (not direct) and contradicted by their own allegations.

On intrabrand harm, Plaintiffs admit they must allege harm "in the market as a whole," Opp. 19, which includes "*all* RTD soft-drink sellers" (not just PepsiCo), *id.* at 27. PepsiCo price increases alone cannot show harm in the whole market. Mot. 25-26. Plaintiffs also ignore the rule that "a plaintiff must also show more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *see* Mot. 26. Instead, they cite (at 20, 23) *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), for the idea that a "dominant retailer" can use resale price maintenance to harm competition. Yet *Leegin* was concerned about *interbrand* harm, because "vertical price restraints … reduce intrabrand competition" by their very nature. *Id.* at 903-04. And *Leegin* recognized that interbrand harm requires market power, because "[i]f a retailer lacks market power, manufacturers likely can sell their goods through rival retailers." *Id.* at 898. Walmart's alleged 14% of PepsiCo's revenue does not show market power in the relevant market. It says nothing about Walmart's sales of other manufacturers' soft drinks; it includes products outside the alleged market, like snacks; and it is too low to demonstrate market power regardless. Mot. 28-29 & nn.4-5.

On interbrand harm, Plaintiffs do not allege a conspiracy with Coca-Cola or Dr Pepper, instead focusing on these companies' "*incentive* to compete on price." Opp. 22. But Plaintiffs cite no case holding that reduced incentives count as direct evidence. Nor do Plaintiffs dispute the thinness of their allegations concerning Coca-Cola and Dr Pepper price increases. *See* Mot. 26-27.

Neither of Plaintiffs' two interbrand "mechanisms" suffices. Opp. 21-22. *First*, Plaintiffs claim the alleged Scheme "made it easier for Coca-Cola and Dr Pepper to monitor and follow Pepsi's prices." *Id.* at 21. But they also note that "retail prices are public" and that, even during

the alleged Scheme, Coca-Cola did not know about PepsiCo's wholesale pricing. *Id.*; *see* Mot. 26. Plaintiffs fail to allege *how* the alleged Scheme made monitoring "easier." *Second*, Plaintiffs claim the alleged Scheme "'prevented Walmart from instigating a price war.'" Opp. 22 (citation omitted). This is not "direct": it rests on a counterfactual chain of inferences in which Walmart forces nationwide price cuts on PepsiCo products and Coca-Cola and Dr Pepper have "no choice" but to follow. *Id.* It is also contradicted by Plaintiffs' allegations that "short-term" Rollbacks focused on a particular "region." IC ¶ 63. The Second Circuit rejected a less attenuated argument—that a nonparty "would have decreased its prices but for the conspiracy"—as "little more than speculation." *MacDermid*, 833 F.3d at 184.

***No Indirect Evidence.*** Plaintiffs cannot avoid the fundamental problem with their indirect evidence: it conflates the market power of PepsiCo and Walmart in two distinct markets. Mot. 27-29. Whatever their procedural posture, *see* Opp. 30 n.9, the cited cases hold that market power is "'the ability of a *single* seller to raise prices'" and that the market shares of two defendants (even in the same market) "'could not be aggregated.'" Mot. 28 (citations omitted). Those holdings foreclose Plaintiffs' theory of indirect harm. Instead of confronting binding law, Plaintiffs again invoke the out-of-circuit *Copeland* order, Opp. 30, which ignores the market-specific and firm-specific nature of market power. Mot. 27-29. And while Plaintiffs assert (at 30) that Walmart's market power is "not necessary," that is wrong too. As their repeated appeals (at 20, 22, 23) to *Leegin* show, they need Walmart to be a "dominant retailer" driving the claimed Scheme. Otherwise, there can be no interbrand harm at all. Because Walmart does not have market power in Plaintiffs' market, Mot. 28-29 & nn.4-5, Plaintiffs cannot plead indirect evidence of harm to competition in that market.

## II. PLAINTIFF GIANNASCA'S ROBINSON-PATMAN ACT CLAIMS FAIL

Giannasca's RPA claims fail several times over. Mot. 29-33. In opposition, Giannasca attacks a straw man. Defendants do not ask him "to plead with minute detail many thousands of individual transactions," Opp. 30-31, only details of *some* paired transactions, as the law requires, Mot. 29-31. Giannasca's argument that "no plaintiff could plead such minutiae without the records discovery would provide," Opp. 31, is a "plea for discovery [that] runs contrary to the pleading requirements of *Iqbal* and *Twombly*," which require the dismissal of implausible claims "'even when the information needed to establish a claim of discriminatory pricing is solely within the purview of the defendant.'" *Coal. For A Level Playing Field, LLC v. AutoZone, Inc.*, 813 F. Supp. 2d 557, 568-69 (S.D.N.Y. 2011) (citation omitted).

***No Contemporaneous Pair Of Sales.*** Giannasca identifies no PepsiCo sale to the Lynn, Massachusetts Walmart contemporaneous with his purchases. Mot. 30-31. He claims his retail-to-wholesale price comparison shows Walmart's "substantial wholesale price advantage." Opp. 32. But the contemporaneous-sales requirement concerns timing, not price, and Giannasca brings no Section 2(a) price-discrimination claim.[2] Walmart shelf prices say nothing about when PepsiCo sold to Walmart. RC ¶¶ 71-79. And his out-of-circuit cases (at 32-34) do not address the contemporaneous-sales requirement.

***No Sale In Interstate Commerce.*** Giannasca pleads no challenged sale that crossed state lines. Mot. 31. He infers interstate purchases by putative class members because "Pepsi does not have bottling plants in every state," Opp. 33, but that premise is absent from the Complaint.

---

[2] Allegations of "discounted and/or favorable price structuring levels implicate[] only Section 2(a)," not Sections 2(d) and 2(e). *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 33 (2d Cir. 2006) (cleaned up).

Regardless, allegations about other class members do not work. *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 376 n.5 (S.D.N.Y. 2024).

***No Identified Promotional Program Or Proportional Inequality.*** Giannasca identifies no promotional payment or service PepsiCo provided to Walmart, let alone one denied him on proportionally equal terms. Mot. 31-32. RC ¶ 67 lists generic promotion types and includes a photo of a Walmart display; it does not say which promotions PepsiCo paid for or furnished to Walmart—or when, where, for which products, or on what terms. By contrast, *ABC Distributing, Inc. v. Living Essentials LLC* involved allegations of the specific promotion, its timing, and its denial to plaintiff. 2016 WL 8114208, at *4 (N.D. Cal. Jan. 25, 2016).

***Additional RPA Defects As To Walmart.*** Sections 2(d) and 2(e) do not apply to Walmart as a buyer. Mot. 32-33 (quoting *Grand Union v. FTC*, 300 F.2d 92, 94 (2d Cir. 1962)). Giannasca does not address that case law—or cite any contrary case. Instead, Giannasca makes up a theory: that "[e]ffectively bribing Pepsi to exclude other, smaller retailers" violates Section 2(d). Opp. 36. That theory does not track Section 2(d)'s language. It makes no sense to say that it is "unlawful for [Walmart] to pay or contract for the payment of anything of value to or for the benefit of a customer of [Walmart]," 15 U.S.C. § 13(d), when Giannasca's theory depends on *PepsiCo's* other customers and allegedly does not benefit Walmart customers. And Giannasca's "effectively bribing" formulation sounds a lot like Section 2(f)'s "knowingly to induce," *id.* § 13(f), but Giannasca did not bring a Section 2(f) claim. And even if he had, 2(f) applies only to 2(a) violations, not 2(d) and 2(e). Mot. 33.

## III. PLAINTIFFS' OTHER STATE-LAW CLAIMS FAIL TOO

### A. Plaintiff Giannasca's Massachusetts Chapter 93A Claim Should Be Dismissed

The Opposition does not dispute that Giannasca, who bought solely for resale, cannot sue under Section 9. Mot. 35. Instead, Giannasca invokes Section 11, Opp. 37, which his Complaint never mentions, *see* RC pp. 59-62, ¶¶ 38-56. A caption citing "Ch. 93A *et seq.*," *id.* p. 59, gives no fair notice of a Section 11 claim, *see Twombly*, 550 U.S. at 555. Regardless, Section 11 requires conduct "*primarily and substantially* within the commonwealth," Mass. Gen. Laws ch. 93A, § 11 (emphasis added), which Plaintiffs' own allegations of a nationwide Scheme rule out. RC ¶¶ 24, 26-27, 156-157; p. 53 ¶¶ 3-4.

### B. The Cartwright Act Claim Should Be Dismissed

Consumers pleaded their Cartwright Act count as a *per se* violation, while conceding the rule of reason applies; they cannot amend through their Opposition. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Courts applying California law generally analyze vertical restraints under the rule of reason, *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 406-07 (2020), which Consumers ignore. Their cases are either unpublished stay and remand orders that predate *Flagship*, *Alan Darush MD APC v. Revision LP*, 2013 WL 12142621, at *1-3 (C.D. Cal. Aug. 28, 2013); *Bodine v. First Co.*, 2019 WL 5684399, at *3 (S.D. Cal. Nov. 1, 2019), or involve express franchise terms setting prices, *Mailand v. Burckle*, 20 Cal. 3d 367, 373-74, 377-80 (1978). Consumers' Cartwright Act claim should be dismissed.

### C. Plaintiffs Fail To Allege State-Specific Facts

Indirects do not dispute that their statutes require in-state conduct or effects; they argue only that no authority requires "state-specific facts." Opp. 37. *Twombly* does: a "formulaic

recitation" of in-state effects is a "naked assertion." 550 U.S. at 555, 557. Each count repeats one sentence with the State's name changed, *e.g.,* IC ¶¶ 230, 237, 351; and for 24 of 31 jurisdictions, no named plaintiff alleges a purchase, IC ¶¶ 18-29. That is not enough. Plaintiffs' own authority, *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255-56 (D. Conn. 2015), rejected similar "copy-and-paste" pleading.

### D. Indirects' Consumer-Protection Claims Should Be Dismissed

Plaintiffs assume that pleading any Sherman Act violation pleads a claim under 21 consumer-protection statutes, relying (at 38) on *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663 (7th Cir. 2008). But *Windy City* applied Illinois-specific factors to an Illinois statute, confirming that each state defines prohibited conduct, causation, and injury for itself. *See In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1097-98, 1104-13 (N.D. Cal. 2021). Indirects' lone causation allegation, IC ¶ 8, attempts to describe antitrust harm, not a causal link between any deceptive or unfair act and any named plaintiff's loss.

## IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs do not dispute that they allege their claims first accrued in January 2018, Opp. 39; *see* Mot. 37-40. Their claims are thus time barred unless an exception applies, and neither exception is plausibly alleged.

### A. Plaintiffs' Opposition Fails To Salvage Fraudulent Concealment

***No Concealment.*** "Self-concealment" applies only when an agreement depends on secrecy to function. *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224 (E.D.N.Y. 2003). "[M]erely alleging a price-fixing conspiracy, and nothing more," does not suffice. *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005). Here, the alleged Scheme operated through conduct visible to the very Retailers who sue: wholesale price increases and promotional cuts announced in notices they received in real time,

CC ¶¶ 48-52; RC ¶¶ 52-56, 178. The asserted "price gap" compared public shelf prices. CC ¶ 44; RC ¶ 48; IC ¶ 47. And Plaintiffs' theory of harm depends on transparency: "retail prices are public," making PepsiCo's pricing "easier" for rivals "to observe and follow." Opp. 21. A scheme that worked because rivals could observe it does not "'defy detection.'" *Ciprofloxacin*, 261 F. Supp. 2d at 224 (citation omitted).

Plaintiffs also identify no "trick or contrivance intended to exclude suspicion and prevent inquiry." Mot. 44-46; *see* Opp. 40-42. *First*, "'communications to the community at large'" like codes of conduct do not support fraudulent concealment. *Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *17 (S.D.N.Y. Sept. 2, 2025). Plaintiffs call them "specific, factual representations," Opp. 42, but generic compliance pledges are what *Phhhoto Inc. v. Meta Platforms, Inc.* itself distinguished. 123 F.4th 592, 606 (2d Cir. 2024). *Second*, statements that Walmart is "proud to try and hold prices down," RC ¶¶ 185-187, say nothing about PepsiCo's dealings with other retailers. They are "normal business activities," *Dorrell v. Constellation Energy Corp.*, 2026 WL 2249275, at *20 (D. Md. Aug. 5, 2026), consistent with Walmart pressing PepsiCo to fund Rollbacks, IC ¶¶ 59-65. *Third*, PepsiCo's notices about "a broad consideration set" and "[n]o single factor determin[ing] pricing actions," CC ¶ 157; RC ¶ 178, disclaim an exhaustive list. *Cf. Phhhoto*, 123 F.4th at 606. And failing to disclose a metric tracked for negotiations is not concealment. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987). PepsiCo's 2025 press statements and congressional letter, CC ¶¶ 158-164; RC ¶¶ 179-184, are ordinary public denials of liability. Mot. 45.

*Phhhoto* is distinguishable. There, Meta described the specific criteria governing its feed, and the plaintiff relied on that "to allay" the concerns it was investigating. 123 F.4th at 606. Plaintiffs identify no comparable statement, and no named plaintiff alleges having seen or relied

on any statement. Mot. 45-46. That inquiry notice is "objective," Opp. 42, is beside the point: a statement the plaintiff never encountered concealed nothing. *See In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *23 (D.N.J. Oct. 20, 2011) (requiring plaintiff's reliance on concealing act).

***No Timely Discovery.*** The Complaints' central inference—that PepsiCo's price increases "cannot be explained" by costs, demand, or inflation—rests entirely on public data. CC ¶¶ 130, 146-149; RC ¶¶ 59, 158-162; IC ¶¶ 70, 82-85. If "only a plot can explain" that pricing, Plaintiffs "had every basis, in real time," to investigate. *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017). Retailers allegedly knew more than just injury: one remarked in March 2019 that Coca-Cola and PepsiCo were "aligning" prices "again," RC ¶ 150, and in July 2021, Coca-Cola asked it to confirm PepsiCo's increases, RC ¶ 149.

Defendants' explanations, which Plaintiffs say public data refuted in real time, CC ¶¶ 146-149; RC ¶¶ 159-162; IC ¶ 84, could not have deterred inquiry. Plaintiffs do not identify with Rule 9 particularity any fact first revealed on December 11, 2025. *See Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520-21 (S.D.N.Y. 2009). And PepsiCo's 2025 sealing motion, IC ¶ 167, is a routine litigation step, not fraudulent concealment. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987).

***No Reasonable Diligence.*** Plaintiffs identify no act of diligence by any named plaintiff, instead invoking "reasonabl[e] reli[ance]" and calling investigation "inappropriate at the pleading stage." Opp. 44. But diligence must be pleaded with particularity, *e.g.*, *Litovich*, 2025 WL 2521039, at *18, and no reliance is pleaded, *cf. Phhhoto*, 123 F.4th at 606, 611-12; *Ohio Carpenters' Pension Fund v. Deutsche Bank AG*, 2024 WL 3938456, at *7 (S.D.N.Y. Aug. 26,

2024) (same). The conclusory assertion that Plaintiffs "could not have discovered" the conspiracy, RC ¶ 177, is precisely what courts reject. *Hinds Cnty.*, 620 F. Supp. 2d at 521-22.

### B. Plaintiffs Plead No Continuing Violation

***Sales Are Not "Overt Acts."*** *Klehr v. A.O. Smith Corp.*'s dictum about price-fixing conspiracies producing "a series of unlawfully high priced sales" describes a horizontal cartel, 521 U.S. 179, 189 (1997), as do Plaintiffs' principal cases. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065-67 (8th Cir. 2017) (en banc); *Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *9 (D. Conn. Oct. 31, 2025); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014). By contrast, Plaintiffs plead vertical resale price maintenance. RC ¶ 86. For vertical supplier-distributor arrangements, later supracompetitive payments are merely a "manifestation" or "reaffirmation" of the original agreement, not new overt acts. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019); *see Propane*, 860 F.3d at 1067 (applying each-new-sale doctrine to horizontal cartel while distinguishing vertical restraints); *Allen v. Dairy Farmers of Am.*, 748 F. Supp. 2d 323, 349 (D. Vt. 2010) ("every-purchase-equals-a-new-violation-theory" inapplicable to vertical restraints). Courts apply that rule to manufacturer–retailer arrangements to which plaintiffs were strangers. *E.g.*, *Chanel, Inc. v. RealReal, Inc.*, 2026 WL 843256, at *4-5 (S.D.N.Y. Mar. 26, 2026); *cf.* Opp. 46. Here, Plaintiffs claim that Defendants "agreed on *an outcome* … *and a means*" at the outset, Opp. 48 (emphases added), in a January 2018 "foundational commitment," RC ¶¶ 44, 47. Later conduct merely carried out that "means." *SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co.*, 2026 WL 2137807, at *9-11 (S.D.N.Y. July 24, 2026).

***No Other Overt Acts.*** The allegation that Defendants "met frequently to discuss and renew the Scheme," IC ¶ 154, identifies no post-December 2021 meeting, participant, or new term. *Chanel*, 2026 WL 843256, at *5. Nor do the 2022 Food Lion allegations, Opp. 48, supply an overt

act: they describe progress under the existing "commitment," RC ¶ 47, and involve a retailer from which no named plaintiff alleges buying, RC ¶¶ 19-25; IC ¶¶ 18-29. An overt act must injure the plaintiff, *US Airways*, 938 F.3d at 68, not "someone else," *Dorrell*, 2026 WL 2249275, at *17. Regardless, a new overt act would not revive claims for earlier injuries. *Klehr*, 521 U.S. at 189-90.

## CONCLUSION

For these reasons, this Court should dismiss Plaintiffs' Complaints with prejudice.[3]

[3] As this Court previously indicated, dismissal should be with prejudice. Feb. 26, 2026 Tr. at 15:19-21, 17:2-5.

Dated: November 18, 2026

Respectfully submitted,

*/s/ Jay P. Srinivasan*
Jay P. Srinivasan (*pro hac vice*)
GIBSON DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7296
Email: JSrinivasan@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Steve Pet (*pro hac vice*)
GIBSON DUNN & CRUTCHER
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8678
Email: sweissman@gibsondunn.com
Email: spet@gibsondunn.com

Laura K. O'Boyle
GIBSON DUNN & CRUTCHER
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2304
Email: LOBoyle@gibsondunn.com

Henry Cornillie (*pro hac vice*)
GIBSON DUNN & CRUTCHER
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone: 415.393.8200
Email: hcornillie@gibsondunn.com

*Attorneys for Defendants PepsiCo, Inc. and PepsiCo Beverage Sales, LLC*

*/s/ David Marriott*
David Marriott
Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Email: david.marriott@lw.com
Email: lawrence.buterman@lw.com

Belinda S Lee (*pro hac vice*)
Ashley M. Bauer (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415.391.0600
Email: belinda.lee@lw.com
Email: ashley.bauer@lw.com

*Attorneys for Defendant Walmart Inc.*

**WORD COUNT CERTIFICATION**

In accordance with Local Civil Rule 7.1(c), I certify that the foregoing Memorandum of Law is 6,223 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Date: November 18, 2026

*<u>/s/ Jay P. Srinivasan</u>*
Jay P. Srinivasan